## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SLSJ, LLC,

               Plaintiff,

v.

ALBERT KLEBAN and THE LE RIVAGE
LIMITED PARTNERSHIP,

               Defendants.

Civil Action No.
No. 3:14-cv-390 (CSH)

**APRIL 30,  2015**

### RULING ON DEFENDANTS' MOTION TO DISMISS [DOC. 17] AND DEFENDANTS' MOTION TO COMPEL ARBITRATION [DOC. 19]

**HAIGHT, Senior District Judge:**

### I.  INTRODUCTION

Plaintiff SLSJ, LLC ("Plaintiff" or "SLSJ") brings this action against Albert Kleban ("Kleban") and  Le Rivage Limited Partnership ("Le Rivage") (herein collectively "Defendants"), Plaintiffs' former partners in Sun Realty Associates ("Sun Realty"), a family-owned Connecticut limited liability company with the sole business purpose of owning ,operating, managing and leasing the Black Rock Shopping Center ("Black Rock"), a commercial property in Fairfield, Connecticut. Specifically,  Plaintiff seeks money damages relating to a Membership Interest Purchase Agreement ("Purchase Agreement") it executed on June 27, 2013, in which Plaintiff agreed to sell its 33.3333 percent membership interest in Sun Realty and outstanding promissory notes to Kleban  for the sum of $2,020,540.41.[1]  SLSJ also seeks to recover with respect to an "Assignment of Membership

---

[1]   As Plaintiff alleges,"Defendant Le Rivage is Kleban's limited partnership and assignee of Kleban's rights under the Purchase Agreement."  Doc. 29, at 6.

1

Interest," dated July 29, 2013, which SLSJ executed to assign all of its right, title and interest in its Sun Realty membership interest and preferred return capital contributions (promissory notes ) to defendant Le Rivage, Kleban's successor in interest under the Purchase Agreement. Kleban, on behalf of Sun Realty and Sun Realty-SMP, Inc. (hereinafter "SMP"), Sun Realty's manager, authorized that transfer.

Plaintiff alleges that in selling its interest in the membership agreement, it relied upon Kleban's fraudulent statements and misrepresentations regarding the value of Black Rock.[2] Within six months of that sale, in December 2013, Defendants, through Kleban Properties, sold an 80% interest in a portfolio of three properties, including the Black Rock Shopping Center, for a purchase price of $150 million.[3]

In its Complaint, SLSJ asserts five claims: breach of fiduciary duty, violation of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), and fraud against Kleban; and aiding and abetting breach of fiduciary duty and "imposition of constructive trust" against Le Rivage, Doc. 1 ("Complaint," filed 3/26/2014). As relief, Plaintiff prays for "[a]n award of damages" or the "[i]mposition of a constructive trust over the proceeds of any sale of Black Rock Shopping Center or an interest therein attributable to the 33.3333 percent membership interest in Sun Realty assigned by SLSJ to defendants," minus an "appropriate offset for the amounts SLSJ received under the

---

[2] In the words of Defendants' counsel, Plaintiff "claims that it was essentially tricked by Mr. Kleban, through misleading statements and omissions, into selling its membership interest" in Sun Realty. Doc. 20, at 1.

[3] The Court takes judicial notice that Kleban Properties, LLC, is a Connecticut limited liability company, with its business address located at 1189 Post Road 3B, Fairfield, Connecticut. *See* http://wwww.concord-sots.ct.gov. Albert Kleban is designated as the "Founder and Principal" of Kleban Properties. *See* http://www.klebanproperties.com/about.htm.

Purchase Agreement." *Id.*, at 19-20 (¶¶ A-B). In addition, Plaintiff seeks "[a]n award of pre-judgement and post-judgment interest, attorneys' fees and costs." *Id.*, at 20 (¶ C).

Pending before the Court are two potentially dispositive motions by Defendants: a motion to dismiss the action for lack of personal jurisdiction over Defendants pursuant to Federal Rule 12(b)(2) of Civil Procedure [Doc. 17] and a motion to compel arbitration [Doc. 19] pursuant to Sun Realty's Operating Agreement. The Court herein resolves both motions.

## II.  FACTUAL BACKGROUND

The following facts have been gathered from the case record – *i.e.*, pleadings, affidavits, and exhibits. Plaintiff's case centers on Sun Realty Associates, LLC, a Connecticut limited liability company with the "sole business purpose" of ownership, operation, management, and leasing of commercial real estate in Fairfield, Connecticut, known as the Black Rock Shopping Center.[4] Doc. 1, ¶ 13. Sun Realty originated as a family business owned by three brothers, Leon, Harry and Irving Kleban, each of whom is now deceased. *Id.*, ¶¶ 4-5. The Kleban brothers passed their membership interests in Sun Realty to their children, grandchildren, and/or affiliated business entities or trusts. *Id.* Defendant Albert J. Kleban is the son of Irving Kleban and is the general partner of Defendant Le Rivage, which is a member of Sun Realty. *Id.*, ¶¶ 14, 17. Lois Jeruss, who is Defendant Kleban's cousin, is the daughter of Leon Kleban, and the managing member of Plaintiff SLSJ. *Id.*, ¶ 14. Jeruss currently owns 70% of Plaintiff, and the remainder is owned by her two daughters. *Id.*, ¶ 18. As discussed *supra*, Plaintiff previously owned a 33.3333% membership interest in Sun Realty. *Id.*, ¶ 13.

---

[4]Throughout this opinion, the Court's reference to a Connecticut limited liability company indicates that the company has been created under the laws of Connecticut.

Pursuant to Sun Realty's "Operating Agreement," SMP was appointed as manager of Sun Realty. *Id.*, ¶¶ 15, 20. Defendant Kleban was at all relevant times the President of SMP. *Id.*, ¶ 15. Plaintiff asserts that, pursuant to the Operating Agreement, SMP, as manager, held "full, exclusive and complete discretion, power and authority [subject to limitations not relevant here] to manage, control, administer and operate the business and affairs of the Company [and] to make all decisions affecting such business and affairs . . ." *Id.,* ¶ 20. Plaintiff alleges that SMP "owed an express, contractual duty under the operating agreement to 'render, to the extent circumstances render it just and reasonable, true and full information of all things affecting the Members to any Member.'" *Id.*, ¶ 21.

Defendant Kleban, through SMP, arranged for Turnpike Properties, LLC (hereinafter "Turnpike") to manage the Black Rock Shopping Center. *Id.*, ¶ 16. Defendant Kleban is the managing member of Turnpike and his son, Kenneth M. Kleban, is the co-manager.[5] *Id.* Plaintiff argues that "Defendant Kleban, as president of [SMP], as managing member of [Turnpike], and as the individual with principal responsibility to manage Sun Realty[,] owed fiduciary duties to members of Sun Realty, including [Plaintiff]." *Id.*, ¶ 22.

SLSJ asserts that it "entrusted Kleban to put other members' interests above his own, to refrain from self-dealing and to provide material information concerning SLSJ's investment." *Id.*, ¶ 26. In addition, Plaintiff claims that "Le Rivage, as a member of Sun Realty also owed duties of

---

[5]    Although  not named in the pleadings, this Court takes judicial notice that Kenneth M. Kleban is the "son of Albert Kleban." *See* www.klebanproperties.com/principals.htm ("In 2004, Mr. Kleban joined the family real estate business with his father Albert . . . "). The Court also takes judicial notice that Turnpike Properties, LLC is a Connecticut limited liability company with offices located at 2181 Black Rock Turnpike, Fairfield, Connecticut 06825 and four principals. *See* http://www.concord-sots.ct.gov/CONCORD.  Two of Turnpike's principals include Kenneth M. Kleban, "Co-Manager," and Defendant Albert Kleban, "Managing Member." *Id.*

good faith and fair dealing to SLSJ and other members under governing Connecticut law." *Id.*, ¶ 27.

On April 6, 2013, Defendant Kleban sent an e-mail to the members of Sun Realty, detailing a number of problems with tenants at the Black Rock Shopping Center and also outlining the current financial status of Sun Realty. *Id.*, ¶ 29. The e-mail included a request for capital contributions from Sun Realty members, including a proposed capital contribution of $99,999.90 from Plaintiff. *Id.*, ¶ 31; *see also* Doc. 1-1 (Ex. A), at 4.[6]

---

[6]  In the April 6, 2013 email, Albert Kleban painted a "somewhat bleak" picture of the "economic situation" for tenants at Black Rock, and concluded as follows:

> We are all unhappy that we have to start amortizing our existing mortgage, which was part of the mortgage agreement negotiated in 2006. This amortization forecloses the possibility of any repayment of the outstanding loans until we sell or refinance the property. I know that it is the desire of most of us to refinance rather than sell, if at all possible, but each of us must recognize the reality of the situation.

> We should contribute our pro rata share for these extraordinary expenses, rather than take it out of reserves which we should be building up for the possible refinancing. I suggest something in the neighborhood of $300,000 [divided ] on a pro rata basis . . . .

Doc. 1-1, at 4-5 (¶ 10).

Furthermore, in that email Kleban addressed requests by Sun Realty members for an appraisal of Black Rock, as follows:

> Several owners have indicated their interest in knowing what the properties are worth for their estate planning tax purposes or possible sale and for what the future may portend. Some may consider the possibility of a sale of their interests or might urge us to sell the property. In the opinion of those who have substantial interest in the properties, it was a wise decision to make. You have now seen those appraisals. This property has no cash flow expected for a very substantial period of time. As long as each of us understands what the situation really is they [sic] can make a decision of whether to sell or buy or whatever. I am personally wrestling with the possibility of selling my interest depending on tax consequences of a sale by me, but I am definitely not interested in buying any interests.

*Id.*, at 5.

On April 19, 2013, Kleban's son, acting as co-manager of Turnpike, sent an e-mail to Sun Realty members regarding issues with tenants and potential capital calls. Doc. 1, ¶ 35. *See also* Doc. 1-2 (Ex. B), at 3 (email in which "Ken Kleban" advised SLSJ and other Sun Realty members: Sun Realty faces "a challenging scenario" and "we are seeing tremendous pressure on our many smaller tenants").[7] That email indicated that "'there would indeed be a capital call of significance – on top of [a] debt to equity conversion – in 2016 or before'" and "attached an analysis stating that the value of Black Rock Shopping Center was approximately $20.6 million, and the value of Sun Realty was less than $5 million." Doc. 29, at 11; *see also* Doc. 1, ¶ 35, Doc. 1-2, at 3.

Thereafter, on April 30, 2013, Plaintiff received a similar valuation of Sun Realty from another member of that entity, also allegedly prepared by Defendant Kleban. Doc. 1, ¶ 37; Doc. 1-3. In that email, captioned "Subject: Sun Realty," Allan Kleban wrote, "Here is the one page valuation that I have discussed with Ken and Albert" and "[t]hey are agreeable to buying your interest and mine at this valuation." Doc. 1-3, at 2.

On May 3, 2013, Defendant Kleban forwarded a letter of intent to Plaintiff, "offering to pay $2,020,540.41 to SLSJ to purchase its membership interest and its $914,308 in principal amount promissory notes from Sun Realty." Doc. 1, ¶ 39. Defendant Kleban forwarded a second letter of intent to Plaintiff on May 22, 2013, once again offering to purchase SLSJ's membership interest and notes for $2,020,540.41; and "SLSJ accepted Kleban's offer days thereafter." *Id.*, ¶ 40.

On June 27, 2013, SLSJ executed a written Membership Purchase Agreement ("Purchase Agreement") with Defendant Kleban, dated June 1, 2013, wherein SLSJ agreed to sell its 33.3333%

---

[7]   In the text of the email, Kenneth Kleban stated that he was providing "a brief analysis showing the shortfall [Sun Realty] would have if [it ] were to be able to refinance [Black Rock] today." Doc. 1-2 (Ex. B).

membership interest and outstanding promissory notes to Kleban, in exchange for $2,020,540.41, with one half payable in the form of a promissory note. *Id.*, ¶ 41.

On July 29, 2013, Plaintiff executed an "Assignment of Membership Interest" (the "Assignment"), assigning its membership interest in Sun Realty to Le Rivage, as Kleban's successor-in-interest under the Purchase Agreement. *Id.*, ¶ 42. Kleban then authorized the transfer on behalf of Sun Realty and its manager, SMP. *Id.* According to Plaintiff, the e-mails and valuations prior to the Assignment were misleading in that, unbeknownst to Plaintiff, during 2013, Kleban was attempting to identify a third-party investor to purchase the Black Rock Shopping Center. *Id.*, ¶ 43.

In December of 2013, Kleban Properties sold an 80% interest in a portfolio of three properties, including the Black Rock Shopping Center, to Regency Centers Corporation ("Regency").[8] *Id.*, ¶ 44. Plaintiff alleges that "SLSJ had no knowledge or information [prior to December 2013] concerning Kleban's efforts to obtain investors in Sun Realty or Black Rock Shopping Center." *Id.*, ¶ 45. Under publicly announced terms, Regency paid the sum of $150 million for an 80% majority stake in the three shopping centers, all located in Fairfield, Connecticut. *Id.*, ¶ 46.

In particular, Plaintiff claims that it had no knowledge of the following facts at the time it agreed to sell its membership interest to Kleban: (1) in early 2013, Kleban was approached by one or more third parties, inquiring about potential acquisition of properties including the Black Rock Shopping Center; (2) in early 2013, Kleban commenced discussions with HFF, Inc. ("HFF"), a national investment real estate brokerage firm, regarding "a possible engagement to solicit potential

---

[8] *See* n.3 *supra*, regarding identity of Kleban Properties, LLC.

purchasers or investors in Sun Realty or Black Rock Shopping Center;" and (3) HFF "believed that Black Rock Shopping Center was among 'the best located and most highly sought after [properties] in the suburban New York market.'" *Id.*, ¶ 47. Plaintiff concedes that no brokerage firm was actually engaged by Kleban until after Plaintiff sold its membership interest in Sun Realty, *id.*, ¶ 48; but Plaintiff alleges that had it been aware of the three aforementioned facts, it would not have sold its membership interest in Sun Realty, *id.*, ¶ 49.

As set forth *supra*, Plaintiff's Complaint asserts three "claims for relief" against Kleban individually: Breach of Fiduciary Duty (First Claim), Violation of the Securities Exchange Act of 1934 (Third Claim),[9] and Fraud (Fourth Claim). All three claims are based on the same factual

---

[9]   Under the third claim, Plaintiff alleges that Kleban acted in violation of Section 10 of the Exchange Act, which states in pertinent part:

> It shall be unlawful for any person, directly or indirectly , by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange–
>
>> (b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Moreover, Plaintiff claims that Kleban violated federal regulations regarding securities by "employ[ing] any device, scheme, or artifice to defraud;" "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," or "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5 (b)(a)-(c).

allegations: Kleban's alleged misrepresentations about the financial condition of Sun Realty and failure to inform Plaintiff of efforts to sell the Black Rock Shopping Center in early 2013.[10]  As to Le Rivage, Plaintiff asserts two claims:  Aiding and Abetting Breach of Fiduciary Duty (Second Claim) and "Constructive Trust" (Fifth Claim), both relating to Le Rivage's role as assignee of Kleban's interest in the Purchase Agreement.

---

[10]   The viability of Plaintiff's Third Claim, alleging a breach of the 1934 Securities Exchange Act, depends upon whether Plaintiff is correct when it alleges in the complaint at ¶ 70: "Membership interests in Sun Realty are 'securities' under the Exchange Act." Sun Realty, the complaint also alleges, at ¶ 1, is an "LLC," or "limited liability company." The question of whether an interest in an LLC should be regarded as a "security" under the Securities Exchange Act of 1934 has generated a considerable amount of litigation.  In *United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008), the Second Circuit described an LLC as "a relatively new, hybrid vehicle that combines elements of the traditional corporation with elements of the general partnership while retaining flexibility for federal tax purposes." 529 F.3d at 89.  Judge Katzmann's opinion notes that the only category of a "security" in the 1934 Act's statutory scheme potentially applicable to an LLC is "investment contract," *id*. at 87, but adds that "because of the sheer diversity of LLCs, membership interests therein resist categorical classification.  Thus, an interest in an LLC is the sort of instrument that requires case-by-case analysis into the economic realities of the underlying transaction."  *Id*. at 89.  In *Leonard,* the Second Circuit reasoned that the determinative factor is whether an investor in an LLC plays a wholly passive role in the operation of the company.  If that be the fact, the LLC is regarded for securities laws purposes as an "investment contract," and membership interests are "securities."  *Leonard* affirmed a conviction for securities fraud in connection with the sale of interests in LLCs created to make films.  The Second Circuit concluded that the jury could have determined that "the defendants sought and expected passive investors for Little Giant and Heritage [the LLCs], and therefore the interests that they marketed constituted securities."  *Id.* at 91.

In the case at bar, the Defendants do not challenge the applicability of the 1934 Securities Exchange Act to the underlying transaction, but that is of no moment: the question goes to this Court's subject matter jurisdiction, and the Court has an independent duty to inquire into its existence.  The complaint at bar sufficiently alleges that the Plaintiff, SLSJ LLC, played a passive role in the operation of Sun Realty, which on Plaintiff's theory of the case Kleban controlled.  The complaint also sufficiently alleges a complete diversity of citizenship between the parties, an additional source of this Court's subject matter jurisdiction.

### III.   MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION [Doc. 17]

#### A.   Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(2)

When challenged with  a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir.1999). *See also Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006); *Chirag v. MT MARIDA MARGUERITE SCHIFFARHRTS*, 933 F.Supp.2d 349, 351 (D.Conn. 2013). "Plaintiff's burden is apportioned based on how far the case has progressed." *Corning Inc. v. Shin Etsu Quartz Products Co., Ltd.*, 242 F.3d 364, 2000 WL 1811067 (Table), at *2 (2d Cir. 2000) (citing *Ball v. Metallurgie Hoboken-Overpelt*, 902 F.2d 194, 197 (2d Cir. 1990)).

In a posture such as the case at bar, where there has been no evidentiary hearing or jurisdictional discovery, that burden is light. *See Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).  Under such circumstances, a plaintiff facing a 12(b)(2) motion may "carry this burden by pleading in good faith . . . legally sufficient allegations of jurisdiction, *i.e.*, by making a prima facie showing of jurisdiction." *Whitake*r, 261 F.3d at 208 (citation and internal quotation marks omitted).  *See also DiStefano v. Carozzi North Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) ("Where, as here, a court relies on pleadings and affidavits, rather than conducting a full-blown evidentiary hearing, the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant") (citation and internal quotation marks omitted); *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir.1994) ("Where . . . the district court relies solely on the pleadings and supporting affidavits, the plaintiff need only make a prima facie showing of jurisdiction."); *Ball*, 902 F.2d at 197 (holding that plaintiff may defeat a 12(b)(2) motion by

pleading, in good faith, legally sufficient allegations of jurisdiction).

The district court is afforded "considerable procedural leeway" in deciding a 12(b)(2) motion, and may, if it elects to do so,  accept affidavits regarding jurisdiction.  *Corning, Inc.*, 242 F.3d 364, 2000 WL 1811067, at *2 (citing *Marine Midland Bank v. Miller*, 664 F.2d 899, 904 (2d Cir.1981)).  In resolving the personal jurisdiction issue, "all allegations [in plaintiff's affidavits] are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir.1993).  *See also CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986) ("until an evidentiary hearing is held, [plaintiff] need make only a prima facie showing by its pleadings and affidavits that jurisdiction exists;" and "[t]hose documents are construed in the light most favorable to plaintiff and all doubts are resolved in its favor.") (citations and internal quotation marks omitted).  Moreover, "[i]t is well established that jurisdiction is to be determined by examining the conduct of the defendants as of the time of service of the complaint." *Greene v. Sha–Na–Na*, 637 F.Supp. 591, 595 (D.Conn.1986).

In general, in determining whether personal jurisdiction exists, the Court makes a threshold finding as to whether the applicable state's long-arm statute authorizes the assertion of jurisdiction over the non-resident defendants.[11] *Whitaker,* 261 F.3d at 208.  *See also, e.g.,, Nedgam Prods., LLC v. Bizparentz Found.*, No. 3:09–CV–500 (CFD), 2010 WL 3257909, at *3 (D.Conn. April 29, 2010).

---

[11]   For example, pursuant to Connecticut's "long-arm statute," Conn. Gen. Stat. § 52-59b, "a court may exercise personal jurisdiction over any nonresident individual [or] foreign partnership . . . who in person or through an agent":  1) transacts any business within the state, 2) commits a tortious act other than defamation within the state, 3) commits a tortious act other than defamation outside the state that causes injury within the state, 4) owns, uses, or possesses real property in the state, or 5) uses a computer or computer network located in the state.

Then, if the requirements of the state long-arm statute are met, the Court must determine whether the exercise of jurisdiction over the Defendants would violate the constitutional principles of due process, U.S. Const. amend. XIV. Specifically, the Court must decide whether the nonresident defendants have "minimum contacts" with the forum state. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980); *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945). In order to possess "minimum contacts," the defendant must purposely avail himself of the privileges and benefits of the forum state, *Hanson v. Denckla*, 357 U.S. 235, 253, (1958), such that his "conduct and connection with the forum [s]tate" should make him " reasonably anticipate being haled into court there." *World-Wide Volkswagen*, 444 U.S. at 297.

However, where jurisdiction is predicated on a federal statute which confers nationwide service of process, the Court's analysis for determining personal jurisdiction does not include an examination of the state's long-arm statute. In particular, in a case such as that at bar, which includes a claim under the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, *et. seq.*, the Second Circuit has "held that Section 27 [of that statute] confers personal jurisdiction over a defendant who is served anywhere within the United States." *S.E.C. v. Montle*, 65 F.App'x 749, 751 (2d Cir. 2003) (citing *Kidder, Peabody & Co., Inc. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir.1991)). In other words, "[t]he jurisdiction of the Act extends to foreign non-residents to the extent permitted by the Fifth Amendment due process clause of the United States Constitution." *IM Partners v. Debit Direct Ltd.*, 394 F.Supp. 2d 503, 512 (D.Conn. 2005) (citing *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1340 (2d Cir. 1972)).

To satisfy the due process requirements of jurisdiction under Section 27, the plaintiff need only show that the defendants have "minimum contacts" with the United States, and that the

assertion of jurisdiction is "reasonable"– that is, "the assertion of jurisdiction over the defendant[s] comports with traditional notions of fair play and justice under the circumstances of the case." *Montle*, 65 F. App'x at 752 (citing *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567–68 (2d Cir.1996)).   Because "Congressional power to authorize nationwide service of process in cases involving the enforcement of federal law is beyond question," *Mariash v. Morrill,* 496 F.2d 1138, 1143 n. 6 (2d Cir.1974), "with respect to U.S. residents, constitutional due process in a federal question case requires only that the nationwide service authorized by statute is 'reasonably calculated to inform the defendant of the pendency of the proceedings in order that he may take advantage of the opportunity to be heard in his defense,'" *In re Michaelesco*, 288 B.R. 646, 652 (D. Conn. 2003) (quoting *Mariash*, 496 F.2d at 1143).   Thus, "[a] minimum contacts analysis with the forum state in which the district court sits is unnecessary because the sovereign exercising jurisdiction is the United States, not a particular state."  *Michaelesco*, 288 B.R. at 652.

In accordance with Second Circuit authority, Judge Hall of this District noted in *RMS Titanic, Inc. v. Geller,* No. 3:99CV2401(JCH), 2000 WL 306997 (D. Conn. Jan. 10, 2000), "[t]his provision [15 U.S.C. § 78aa] has been widely read as conferring personal jurisdiction over a defendant who is served anywhere in the United States."  2000 WL 306997, at *1 (citing *Kidder, Peabody & Co.*, 925 F.2d 556).   In such circumstances, "[d]ue process requires only that the service of process 'must be reasonably calculated to inform the defendant of the pendency of the proceedings in order that he may take advantage of the opportunity to be heard in his defense.'" 2000 WL 306997, at *1  (quoting *Mariash*, 496 F.2d at 1143).  "Importantly, the *Mariash* court expressly rejected any requirement that a defendant have minimum contacts with the state (or district) seeking to exercise jurisdiction over him or her," or it.  *Id.*   Put simply, the only "minimum contacts" required to assert personal

jurisdiction are "contacts with the United States, the sovereign seeking to exercise jurisdiction." *Id.* *See also Sawant v. Ramsey*, 570 F. Supp. 2d 336, 346 (D. Conn. 2008) (Connecticut district court possessed personal jurisdiction over defendant, despite his lack of contacts with Connecticut, because that "lack of contacts with Connecticut [was held to be] irrelevant" because "a claim under [Section 27] of the [Securities] Exchange Act [was] involved." ) (quoting *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767(LBS), 2004 WL 2754653 at *3 (S.D.N.Y. Dec. 2, 2004)); *United States v. Sutton*, No. 3:04-CV-00596 (EBB), 2005 WL 281162, at *1 (D. Conn. Jan. 10, 2005) ("Because the relevant 'minimum contacts' under the Fifth Amendment are contacts with the United States, . . . the 'minimum contacts' analysis is essentially unnecessary with respect to [non-resident] defendants" who are  "citizen[s] of the United States. . . .") (citations omitted).

**B.**     **Defendants' Arguments**

First, in support of their motion for lack of personal jurisdiction, Defendants assert that Kleban is "a resident of the State of Florida;" and Le Rivage is "a Delaware limited partnership" comprised of partners who are each "resident[s] of the State of  Florida."  Doc. 17, p. 1; *see also* Doc. 1, ¶¶ 4-5.  Defendants Kleban and Le Rivage are thus a nonresident individual and a foreign partnership, respectively. With respect to personal jurisdiction, Defendants argue that Connecticut's long-arm statute, Conn. Gen. Stat. § 52-59b, is the applicable law; and  Plaintiff has made no allegations to specifically address which, if any, category under Conn. Gen. Stat. § 52-59b applies. Doc. 18, at 7.  Specifically, Plaintiff does not allege that either Defendant 1) transacted any business within the state, 2) committed a tortious act other than defamation within the state, 3) committed a tortious act other than defamation outside the state that causes injury within the state, 4) owned,

used, or possessed real property in the state, or 5) used a computer or computer network located in the state. *Id.*

Rather, Defendants contend, "Plaintiff apparently bases its entire case for jurisdiction over Defendants upon a written contract whereby Defendants allegedly submitted to the jurisdiction of this Court 'to adjudicate the disputes asserted herein.'"   Doc. 18, at 8 (quoting Complaint [Doc. 1], ¶ 11).  Defendants deduce that the contract containing the jurisdictional provision is the June 27, 2013 Purchase Agreement that Plaintiff entered with Kleban.  Doc. 18, at 8. Defendants argue  that "[t]here is no allegation that the Purchase Agreement was breached and Plaintiff has not asserted a cause of action for breach of contract." *Id.*   Defendants state that the causes of action in this case do not arise out of or relate to the terms of the Purchase Agreement,  but rather exist independently of it.  *Id.*  Therefore, Defendants maintain that "none of Plaintiff's causes of action relies on, or will require, construction of the Purchase Agreement."  *Id.*

In particular, Defendants assert that all of Plaintiff's allegations relate to activity which occurred *prior to* the execution of the Purchase Agreement, such as Kleban's alleged misrepresentations and omissions before the Purchase Agreement was executed. *Id.*, at 9.  In addition, Plaintiff's allegations regarding breach of fiduciary duty relate to the Sun Realty Operating Agreement, which is a separate agreement. *Id.*  Defendants also argue that Plaintiff's claims for violation of the Securities Exchange Act and fraud do not relate to or arise from the Purchase Agreement. *Id.*  Similarly, the two claims against Le Rivage, abetting a breach of fiduciary duty and "constructive trust," are neither  based upon nor relate to the Purchase Agreement.  *Id.*

Defendants conclude that because none of Plaintiff's causes of action arise from or relate to the Purchase Agreement, Plaintiff has failed to meet the burden of proving personal jurisdiction over

the Defendants.  They state that they only consented to personal jurisdiction with respect to legal controversies arising from the Purchase Agreement.  Absent Defendants' consent, Plaintiff must prove that there is personal jurisdiction over the Defendants based on Conn. Gen. Stat. § 52-59b, and Plaintiff "simply has not done so."  Doc. 18, at 2.   Defendants represent that "[t]he Complaint merely sets forth misrepresentations and omissions allegedly made by a Florida individual [Kleban] to individuals in Illinois or Massachusetts."  *Id.*, at 9.

In sum, Defendants argue that Plaintiff has failed to meet its burden to withstand a Rule 12(b)(2) challenge, obviating a need for  the Court to address whether jurisdiction would comport with due process.  Accordingly, Defendants argue that there is no proven personal jurisdiction over Defendants and the Complaint should be dismissed.

## C.    **Plaintiff's Support for Personal Jurisdiction**

Plaintiff SLSJ contends that personal jurisdiction over Defendants is proper based on three grounds: the "forum selection" clause in the Purchase Agreement, the nationwide service provision contained in Section 27 of the Securities Exchange Act, and Connecticut's long arm statute, Conn. Gen. Stat. § 52-59b(a).

### 1.    **Forum Selection Clause**

First, Plaintiff argues that Defendants have consented to personal jurisdiction under the express terms of the Purchase Agreement, which provides for "exclusive jurisdiction" of the state and federal courts in Fairfield County in any action which arises out of or relates to the agreement.[12]

---

[12]  Captioned "Governing Law;  Consent  to  Jurisdiction,"  paragraph 7.7 of the Purchase Agreement states, in relevant part:

16

Doc. 29, at 6; *see also* Doc. 29-1 (Ex. A) (Purchase Agreement), ¶ 7.7. Plaintiff asserts that "under settled law" the "[p]arties can consent to personal jurisdiction through forum-selection clauses in contractual agreements," Doc. 29, at 6 (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006)); and "strong federal public policy support[s] the enforcement of forum selection clauses," *id.* (quoting *Martinez v. Bloomberg LP*, 740 F.3d 211, 218-19 (2d Cir. 2014)).

Plaintiff argues that "[c]ourts consistently construe similar forum-selection clauses broadly," such as in *BioCapital, LLC v. BioSystem Solutions, Inc.*, No. FSTCV085009331S, 2009 WL 1815056 (Conn. Super. Ct. June 1, 2009). Doc. 29, at 15-16. Plaintiff points out that in *BioCapital*, the Connecticut Superior Court observed: "When 'arising out of,' 'relating to,' or similar words appear in a forum selection clause, such language is regularly construed to encompass . . . tort claims associated with the underlying contract." *Id.*, at 16 (quoting 2009 WL 1815056, at * 6). Accordingly, Plaintiff concludes, the forum selection clause in the Purchase Agreement is applicable to all of SLSJ's claims, including the tort claims.

### 2.    Nationwide Service under Securities and Exchange Act of 1934

Second, Plaintiff asserts that Defendants' Rule 12(b)(2) arguments completely ignore the fact that the Complaint includes a claim pursuant to Section 27 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78aa. Doc. 29, at 21. That statute "provides for nationwide jurisdiction for

---

Each of the parties submits to the exclusive jurisdiction of any state or federal court sitting in Fairfield County, Connecticut in any action or proceeding arising out of or relating to this Agreement.

Doc. 29-1, at 7, ¶ 7.7.

violations of its securities fraud provisions." *Id.*, at 22 (quoting *IM Partners v. Debit Direct, Ltd.*, 394 F. Supp. 2d 503, 512 (D.Conn. 2005)).  Specifically, Section 27 states, in pertinent part:

> The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. . . . Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

15 U.S.C. § 78aa.

Plaintiff asserts that, as this District has previously held, a lack of Connecticut contacts is "irrelevant" to personal jurisdiction when "a claim under the Exchange Act is involved" because "Section 27 . . . confers personal jurisdiction over a defendant who is served anywhere within the United States." *Id.* (citing*, inter alia, Sawant v. Ramsey*, 570 F.Supp. 2d 336, 346 (D.Conn. 2008)).

With respect to minimum contacts, Plaintiff cites this Court's holding in *Greene v. Emersons Ltd.*, 86 F.R.D. 47, 64-65 (S.D.N.Y. 1980), to conclude that a plaintiff prosecuting a civil action under the Exchange Act may proceed against a defendant "in any district wherein any act or transaction constituting the violation occurred" or "in a district where the defendant is 'found or is an inhabitant or transacts business.'"  Doc. 29, at 22-23.  Therefore, in support of jurisdiction over Kleban and Le Rivage, Plaintiff states the following:

> Kleban made his misleading statements alleged in the complaint from his Connecticut limited liability company, Turnpike Properties, located in this district, and to a Connecticut limited liability company, plaintiff SLSJ. (*See* Statement of Facts, section 3.a., [Doc. 29] (summarizing Compl. ¶¶ 28-33, & 35 and Exs. A & B thereto); Exhibit C [to Doc. 29], Apr. 6, 2013 email string; Exhibit L [to Doc. 29],

18

at Conn. Sec'y of State search results for Turnpike Properties, LLC.) . . . [M]oreover, Kleban, regularly transacts business in this district.

Doc. 29, at 23.  In sum, Plaintiff argues that "this Court's exercise of jurisdiction . . . comports with due process requirements under the United States Constitution in light of Kleban's continuous and systematic activities in Connecticut and his activities purposefully directed at SLSJ, a Connecticut company, giving rise to the injuries it alleges." *Id.*

### 3.    Connecticut's Long Arm Statute

Finally, and as an additional basis for jurisdiction over the Defendants, Plaintiff asserts that "SLSJ's pleadings, affidavit and written materials amply make the required prima facie showing that the exercise of personal jurisdiction over defendants is proper under Connecticut's long-arm statute and comports with constitutional due process." Doc. 29, at 23.  In particular, Connecticut's long arm statute states, in relevant part,  that "a court may exercise personal jurisdiction over any nonresident individual . . . who in person or through an agent . . . [t]ransacts any business within the state, where the cause of action arose from the transaction of business." *Id.* at 24, quoting *MacDermid, Inc. v. Canciani*, 525 F. App'x, 8, 10 (2d Cir. 2013) (quoting Conn. Gen. Stat. § 52-59b(a)) (internal quotation marks omitted).  Even a "single purposeful business transaction" may suffice to give rise to jurisdiction.  Doc. 29, at 24 (citing *MacDermid*, 525 F. App'x at 10).  In other words, Defendants engaged in "some form of affirmative conduct allowing or promoting the transaction of business within the forum state." Doc. 29, at 24 (quoting *Nusbaum & Parrino, P.C. v. Collazo de Colon*, 618 F. Supp. 2d 156, 161-62 (D.Conn. 2009)).

Plaintiffs contend that "Defendants engaged in a single purposeful transaction of business in Connecticut" when they "jointly engaged a Connecticut agent (an attorney licensed in Connecticut

and located in Weston), to prepare purchase offers (letters of intent dated May 3 and 22, 2013) from Kleban to a Connecticut limited liability company (plaintiff SLSJ)."[13] Doc. 29, at 24; Doc. 1, ¶¶ 39, 40. Moreover, Plaintiffs assert that "Kleban's offers proposed to acquire SLSJ's interests in another Connecticut limited liability company (Sun Realty) which was located in Connecticut and had as its sole business owning and operating Connecticut real estate (Black Rock Shopping Center)." Doc. 29, at 24-25. Also, Kleban was "authorized and empowered to act for and represent" Sun Realty as its "Tax Matters Manager" under Sun Realty's Operating Agreement. *Id.*, at 25 (quoting "Operating Agreement," Doc. 20, at 34 (¶ 7.4)). Furthermore, Sun Realty and its Connecticut real estate, Black Rock, were each "managed by a separate Connecticut company itself owned and controlled by Kleban, (Sun Realty-SMP, Inc. and Turnpike Properties, respectively)." Doc. 29, at 25..

Then, both Defendants "formed their contractual relationship with Connecticut company SLSJ under the Purchase Agreement and Assignment of Membership Interest," both of which were drafted and negotiated by Defendants' Connecticut agent and counsel. *Id.* Defendants expressly included in the Purchase Agreement language that "the internal laws of the State of Connecticut" would govern and the state or federal courts "sitting in Fairfield County, Connecticut" would exercise "exclusive jurisdiction" for any action relating to the agreement.[14] *Id.*

In sum, Plaintiff argues that Defendants "transacted business" in Connecticut by engaging in "an on-going contractual relationship with a Connecticut corporation;" negotiating and/or

---

[13] The case record reflects that the attorney engaged by Defendants was Stephan B. Grozinger, Esq., 249 Lyons Plain Road, Weston, CT 06883. Doc. 29-1, at 17, 22.

[14] Defendants' Connecticut legal counsel drafted the Purchase Agreement, forwarding an initial draft to SLSJ by email on June 3, 2013, and included in paragraph 7.7 the forum-selection clause in the same form in which it appeared in the final, executed contract. Doc. 29, at 14; Doc. 29-1 (Ex. B).

executing a contract in Connecticut; inserting a "choice-of-law" clause, selecting the "internal laws of the State of Connecticut to govern;" and "appointing the state or federal courts 'sitting in Fairfield, Connecticut' as the 'exclusive jurisdiction'" for any action relating to the agreement.  *Id.* (citing *Vertrue Inc. v. Meshkin*, 429 F. Supp. 2d 479, 490 (D.Conn. 2006)).  Also, "[i]n the weeks preceding Kleban's purchase offer to SLSJ," he allegedly "made misleading statements to SLSJ concerning the business and financial condition of Sun Realty through his Connecticut property management company, Turnpike."  Doc. 29, at 26.

　　　　Plaintiffs thus conclude:

> Under all of these circumstances, defendants have in person and through their agent and counsel affirmatively engaged in conduct promoting the transaction of business in Connecticut and have committed tortious acts in Connecticut in connection with the Purchase Agreement and acquisition that gives rise to SLSJ's complaint. This Court has ample bas[e]s to exercise jurisdiction under Connecticut's long-arm statute.

*Id.*

　　　　With respect to due process, Plaintiff argues that Defendants "have engaged in continuous and systematic activities in the forum" or "have purposefully directed their activities at residents in the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Id.* (quoting *IM Partners v. Debit Direct*, 304 F. Supp. 2d 503, 512 (D.Conn. 2005)).  Specifically, Plaintiff asserts that Kleban has engaged in continuous, systematic activities in Connecticut "for more than sixty years" and invoked the benefits and protection of that state's laws.  Doc. 29, at 26. For example, Kleban acted as "president and shareholder of Sun Realty-SMP, Inc., a corporation organized under Connecticut law and  located in Connecticut" and manager of Sun Realty, which in turn, owned and operated the Black Rock Shopping Center in Fairfield. *Id.*, at 26-27.  Kleban was also the "managing member of Turnpike," a real estate management company which was organized

under Connecticut law, located in Connecticut, "managed Black Rock Shopping Center," and "currently manages 14 Connecticut shopping centers and commercial properties." *Id.,* at 27 (citing Ex. L, documents from Conn. Sec'y of State re: Turnpike Properties, LLC, and Ex. M, "Turnpike Properties Our Centers," www.turnpikepropertiesct.com/TP2.html).[15]

Furthermore, Defendant Le Rivage, as a member of Connecticut limited liability company Sun Realty, "was also engaged in continuous and systematic activities in Connecticut before the subject acquisition transaction." *Id.*

**D.   Analysis**

At the outset, the Court notes that the case at bar is currently in the discovery stage. Moreover, there have been no hearings so that the only factual information presented to the Court appears in the Complaint and the parties' papers filed in support and opposition to the present motion.[16] Under such circumstances, at the *prima facie* stage, the Plaintiff need only assert facts constituting jurisdiction and these facts must be judged in the light most favorable to the plaintiff.

---

[15]   Plaintiff points out that on Turnpike's company website, Kleban and his co-owners are described as "successful developers for over 40 years" who "have built and currently manage over 1 million square feet of regional and neighborhood strip shopping centers throughout Connecticut." Doc. 29, at 27 (citing www.turnpikepropertiesct.com/TP4.html).  In addition, the Kleban Properties website states that "Albert J. Kleban, Esq. is a graduate of the University of Connecticut and holds a degree from its law school," "is most recognized in Fairfield County for his keen business acumen, real estate expertise and significant real estate portfolio;" "owns and/or controls approximately 1,000,000 square feet of retail and office space in Connecticut and Florida (the majority is held in Connecticut);" and "is respected by many and considered to be one of the premier real estate developers in Fairfield County."  Doc. 29, at 28 (quoting Ex. N, "Biography of Principals," www.klebanproperties.com/principals.htm).

[16]   The Court also takes judicial notice of public facts "generally known within the territorial jurisdiction of the trial court" and/or are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

*See, e.g., Ball,* 902 F.2d at 197*; CutCo,* 806 F.2d at 365; *Amerbelle Corp. v. Hommell*, 272 F.Supp.2d 189, 192 (D.Conn.2003).

1.   <u>Nationwide Service under Securities Exchange Act of 1934, 15 U.S.C. § 78aa</u>

Upon careful review of the parties' briefs, including the authorities cited and other relevant precedent, the Court finds that Plaintiff is correct in asserting that personal jurisdiction may be asserted over Defendants pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.   Specifically, the Second Circuit has "held that Section 27 confers personal jurisdiction over a defendant who is served anywhere within the United States."   *S.E.C. v. Montle*, 65 F.App'x 749, 751 (2d Cir. 2003) (citation omitted).   *See also Kidder, Peabody & Co., Inc. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d. Cir.1991)("Jurisdiction is predicated on section 27 of the 1934 Act, which provides for nationwide service of process.").   *See also  IM Partners v. Debit Direct Ltd.,*  394 F.Supp.2d 503, 512 (D.Conn. 2005) ("Section 27 of the 1934 Exchange Act provides for nationwide jurisdiction for violations of its securities fraud provisions. 15 U.S.C. § 78aa").   Because personal jurisdiction is proper under this statute in any place in the United States, the Court need not apply the state long-arm statute as part of its analysis.

The Court must, however, assess whether personal jurisdiction over these Defendants comports with due process. *Montle*, 65 F. App'x at 752.   "To satisfy the due process requirements of jurisdiction under this statute," the Plaintiff "need only show that the relief defendants have 'minimum contacts' with the United States, and that the assertion of jurisdiction is 'reasonable'– that is, whether the assertion of jurisdiction over the defendant comports with traditional notions of fair play and justice under the circumstances of the case."   *Id.* (quoting  *Metro. Life Ins. Co. v.*

*Robertson–Ceco Corp.*, 84 F.3d 560, 567–68 (2d Cir.1996)).  *See also IM Partners*, 394 F.Supp. 2d at 512 ("The jurisdiction of the Act extends to foreign non-residents to the extent permitted by the Fifth Amendment due process clause of the United States Constitution.") (citation omitted).

The Second Circuit has articulated that a plaintiff prosecuting a civil action under the Exchange Act may proceed against a defendant with nationwide service, "subject to the constraints of the Due Process clause of the Fifth Amendment." *Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974).  "[W]ith respect to U.S. residents, constitutional due process in a federal question case requires only that the nationwide service authorized by statute is 'reasonably calculated to inform the defendant of the pendency of the proceedings in order that he may take advantage of the opportunity to be heard in his defense.'"  *In re Michaelesco*, 288 B.R. 646, 652 (D. Conn. 2003) (quoting *Mariash*, 496 F.2d at 1143).  Thus, "[a] minimum contacts analysis with the forum state in which the district court sits is unnecessary because the sovereign exercising jurisdiction is the United States, not a particular state." *Michaelesco*, 288 B.R. at 652.  Under such circumstances, the "exercise of jurisdiction is justified if the defendant resides within the territorial boundaries of the United States and has been properly served." *Id.* (citing *Mariash*, 496 F.2d at 1143).

As the Second Circuit explained, it is not the state [of Connecticut] "but the United States 'which would exercise its jurisdiction over them (the defendants)' [a]nd plainly, where, as here, the defendants reside within the territorial boundaries of the United States, the 'minimal contacts,' required to justify the federal government's exercise of power over them, are present." *Mariash*, 496 F.2d at 1143.  "Indeed, the 'minimal contacts" principle does not . . .  seem particularly relevant in evaluating the constitutionality of in personam jurisdiction based on nationwide, but not extraterritorial, service of process." *Id.*   "It is only the latter, quite simply, which even raises a

question of the forum's power to assert control over the defendant." *Id.*

In the case at bar, both Defendants concede that they are present within the United States, citizens thereof and doing business therein. The complaint alleges that Kleban is a citizen of Florida, and that Le Rivage is a Delaware limited partnership with all partners residing in Florida. *See* Doc. 18 (Defendants' Memorandum), at 1. However, it is also clear that both Kleban and Le Rivage, as members of Sun Realty, took actions within the state of Connecticut, including, *inter alia*, hiring Connecticut counsel to negotiate and complete the Purchase Agreement with SLSJ, and transacting business with respect to Connecticut commercial property, including Black Rock Shopping Center.[17] Under these circumstances nationwide service is appropriate and comports with the notice requirement of the Fifth Amendment.

### 2. Choice of Forum Clause in Purchase Agreement

Even if Plaintiff's Complaint did not include a viable claim under the Securities Exchange Act of 1934, so that there existed no statutory nationwide service, this Court would still posses personal jurisdiction over Defendants pursuant to the forum selection clause in the Purchase Agreement. Paragraph 7.7 of that agreement, captioned "Governing Law; Consent to Jurisdiction," states, in pertinent part:

> Each of the parties submits to the exclusive jurisdiction of any state or federal court sitting in Fairfield County, Connecticut in any action or proceeding arising out of or relating to this Agreement.

Doc. 29-1, at 7, ¶ 7.7.

---

[17] "By the well settled law of partnership each member of the firm is both a principal and an agent." *Latta v. Kilbourn*, 150 U.S. 524 (1893); *accord CutCo Industries, Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986). Kleban was a general partner in Le Rivage; and both Kleban and Le Rivage were members of Sun Realty.

The Second Circuit has held that "[p]arties can consent to personal jurisdiction through forum-selection clauses in contractual agreements." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) (citing *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315–16 (1964) ("it is settled ... that parties to a contract may agree in advance to submit to the jurisdiction of a given court"))*. See also Martinez v. Bloomberg LP*, 740 F.3d 211, 218-19 (2d Cir. 2014)(recognizing the "strong federal public policy supporting the enforcement of forum selection clauses").

Therefore, where a forum selection clause is valid and enforceable, it amounts to consent to personal jurisdiction. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 n. 14 (1985). *See also Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315–16 (1964) ("And it is settled . . . that parties to a contract may agree in advance to submit to the jurisdiction of a given court . . . ."); *Dorchester Fin. Securities, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (if the trier of fact credited defendant's consent to submit to personal jurisdiction of the forum in a letter agreement, "such consent . . . would plainly suffice to establish personal jurisdiction over BRJ [defendant]"); *Farrell Lines, Inc. v. Columbus Cello-ploy Corp.*, 32 F.Supp.2d 118, 127 (S.D.N.Y. 1997) (holding bill of lading's forum selection clause binding over defendant insurers so that it "amount[ed] to consent to personal jurisdiction."); *PowerDsine, Inc. v. Broadcom Corp.*, No. 07–CV–2490 (SJF)(WDW), 2008 WL 268808, at *3 (E.D.N.Y. Jan. 29, 2008) ("When such a clause is part of the contract that forms the basis of the action, it "will be enforced, obviating the need for a separate analysis of the propriety of exercising personal jurisdiction.") (citation omitted).

The Second Circuit applies a four-part test to determine whether to enforce a forum selection clause, making the following inquiries : (1) was the clause reasonably communicated to the party resisting enforcement; (2) was the clause mandatory or merely permissive; (3) are the claims and

26

parties involved in the suit subject to the forum selection clause; and (4) has the resisting party rebutted the presumption of enforceability by making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid as obtained through "fraud or overreaching." *Phillips v. Audio Active Ltd.,* 494 F.3d 378, 383-84 (2d Cir. 2007). *See also D.H. Blair*, 462 F.3d at 103.

In the present action, the Defendants do not contest the validity of the forum selection clause. They do not challenge that the forum clause was communicated to them and had mandatory force.[18] Rather, Defendants refute only the third factor – the applicability of the forum selection clause to the claims at bar, arguing that Plaintiff's claims do not arise out of or relate to the Purchase Agreement. Defendants argue that "[t]his case . . . simply does not arise out of that agreement" in that "[t]here is no allegation that the Purchase Agreement was breached" and "Plaintiff has not asserted a cause of action for breach of contract." Doc. 18, at 8-9.  Moreover, Defendants assert that the Court has no need to construe the terms of the Purchase Agreement in that Plaintiff's claims "exist independently of the Purchase Agreement" and are based exclusively on "activity occurring prior to the execution of the Purchase Agreement."  *Id.*

The Court finds that Defendant's interpretation of the forum selection language, and thus the applicability, of the Purchase Agreement is too restrictive.  As the Second Circuit stated in *Martinez*, 740 F.3d at 223-24, "questions of enforceability [of a forum selection clause] are resolved under

---

[18]     As Plaintiff pointed out, it was Defendant Kleban who hired counsel to draft the Purchase Agreement so that he was responsible for the insertion of the forum selection clause in the agreement.  Doc. 29, at 14; Doc. 29-1, at 17 (Ex. B,  6/3/2013 email chain forwarding draft agreement from Stephan B. Grozinger, Esq. to Ken Kleban, who in turn forwarded it to counsel for Lois Jeruss).  The draft agreement contained the forum selection clause, ¶ 7.7 ("Governing Law; Consent to Jurisdiction"), in the same form in which it ultimately appeared in the Purchase Agreement.

federal law, while interpretive questions – questions about the meaning and scope of a forum selection clause – are resolved under the substantive law designated in an otherwise valid contractual choice-of-law clause").

Applying the parties' selected governing law, "Connecticut law," the Court finds that Connecticut courts construe forum selection clauses broadly.  For example, in *BioCapital, LLC v. BioSystem Solutions, Inc.*, No.  FSTCV085009331S, 2009 WL 1815056 (Conn. Super. Ct. June 1, 2009), the Court construed a forum-selection clause with language very similar to that contained in the present ¶ 7.7:

> Each of the parties hereto hereby consents to the exclusive jurisdiction of all state and federal courts location in Delaware, . . . for the purpose of any suit, action or other proceeding *arising out of, or in connection with*, this agreement or any of the transactions contemplated hereby.

2009 WL 1815056, at *4.  The plaintiff in that case argued for a narrow interpretation of the clause, asserting that "because six of the nine counts in the complaint allege a breach of fiduciary duties against the defendants, they are independent of the agreement." *Id.*  The court concluded that "[t]he question therefore becomes whether a claim of breach of fiduciary duty is outside the terms of an agreement such that it is not subject to a forum selection clause." *Id.*  In holding that the forum selection clause applied to both contract and tort-based claims, the court stated that "[f]orum selection clauses . . . are "equally applicable to contractual and tort causes of action." *Id.* (quoting *Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 514 (9th Cir.1988)). [19]

---

[19]   *See also Nat'l Cabinet & Millwork Installation, LLC v. Zepsa Industries, Inc.*, No. CV146048332S, 2014 WL 7739249, at *3 (Conn. Super.  Ct. Dec. 31, 2014) ("courts construe language in a forum selection clause such as 'arising out of' or 'relating to' to encompass tort claims associated with the underlying contract," and "the presence of a [state statutory]  claim does not provide a basis for disregarding the parties' contractual choice of forum").

The *BioCapital* court further noted that "[t]he resolution of whether a forum selection clause applies to a particular tort claim depends upon the intention of the parties reflected in the wording of the clause and the facts of each individual case."  2009 WL 1815056, at *4 (citing *Manetti-Farrow*, 858 F.2d at 514 *and  Terra Int'l, Inc. v. Mississippi Chem.Corp.*, 119 F.3d 688, 693 (8th Cir.1997), *cert. denied*, 522 U.S. 1029 (1997)).  As in the case at bar, the language in the *BioCapital* contract made "no distinction . . . as to the types of actions to which the forum selection clause applie[d]." 2009 WL 1815056 at *5.  The parties could therefore not avoid application of the clause by claiming that breach of fiduciary duty fell outside the terms of the agreement.  *Id.* (collecting cases).

The Connecticut court in *BioCapital* also adopted the analyses of several federal courts, holding that "a forum selection clause does not simply apply to claims for the contract itself but rather to all disputes that arise out of or concern the contract." 2009 WL 1815056, at *6 (citing, *e.g.*, *Abbott Labs. v. Takeda Pharm. Co.*, 476 F.3d 421, 424-25 (7th Cir. 2007)).   In particular, the *BioCapital* court cited the Second Circuit's holding  in *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir.1993), *cert. denied*, 510 U.S.945 (1993), "rejecting the contention that only allegations of contractual violations fall within the scope of forum selection clauses."[20] 2009 WL 1815056, at

---

[20]  In *Roby v. Corp. of Lloyd's*, the Second Circuit noted the "strong public policy in favor of forum selection" and held that federal securities claims were also covered by the forum selection clause in agreements between investors in insurance syndicates.  Chief Judge Meskill, as he then was, explained the court's holding as follows:

There is ample precedent that the scope of clauses similar to those at issue here is not restricted to pure breaches of the contracts containing the clauses. . . . In *Bense v. Interstate Battery System of America,* 683 F.2d 718, 720 (2d Cir.1982), we held that a forum selection clause that applied to "causes of action arising directly or indirectly from [the agreement]" covered federal antitrust actions. Similarly, the Supreme Court in *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, *reh'g denied*, 419 U.S. 885 (1974),

*6.

Here, paragraph 7.7 of the Purchase Agreement does not address, list, or distinguish between the kinds of claims covered by the forum selection clause. It merely states that each party "submits to the exclusive jurisdiction of any state or federal court sitting in Fairfield County, Connecticut *in any action or proceeding arising out of or relating to* this Agreement;" and "[e]ach of the parties waives any defense of inconvenient forum to the maintenance of any action." Doc. 29-1 (Ex. A),at 7 (¶ 7.7) (emphasis added).[21]

Plaintiff's claims revolve around alleged fraudulent representations with the purpose of inducing Plaintiff to enter the Purchase Agreement with Kleban, and then to execute the Assignment to Le Rivage. Said claims do "arise out of" the Purchase Agreement in that they ultimately depend upon or relate to its existence, and to the manner in which the Agreement came into existence. *See, e.g., Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*, 475 F.Supp. 2d 450, 454 (S.D.N.Y. 2007).

---

held that controversies and claims "arising out of" a contract for the sale of a business covered securities violations related to that sale. *Id.* 417 U.S. at 519–20. We find no substantive difference in the present context between the phrases "relating to," "in connection with" or "arising from." We therefore reject the [plaintiffs'] contention that only allegations of contractual violations fall within the scope of the clauses.

996 F.2d at 1361 (lateral citations omitted).

[21]   As stated *supra,* in the Purchase Agreement, Defendants vested the state and federal courts of Fairfield County, Connecticut, with "exclusive jurisdiction" over matters arising under or relating to the agreement. Doc. 29-1, at 7 (¶ 7.7). This District resolves federal claims for the entire state of Connecticut. It is composed of 3 seats of court (Hartford, New Haven, and Bridgeport); and cases filed at the 3 locations are assigned randomly to Judges sitting at any one of the 3 seats. Thus, although this Court sits in New Haven, it is a federal court of "Fairfield County, Connecticut" under the Purchase Agreement.

According to Plaintiff, the contract's very formation was the product of the alleged torts, fraud and breach of fiduciary duty. Specifically, SLSJ entered the Purchase Agreement "in reliance on statements from Kleban concerning material facts relating to Sun Realty and Black Rock Shopping Center." Doc. 1, ¶ 28. Moreover, "Le Rivage knowingly and substantially assisted Kleban's breach of fiduciary duty by succeeding to Kleban's interest under the Purchase Agreement and acquiring SLSJ's membership interest and notes with knowledge of the misleading statements and incomplete information provided." *Id.*, ¶ 66. Under such circumstances, the alleged torts of fraud, breach of fiduciary duty and aiding and abetting said breach, may be subsumed under the agreement's forum selection clause in that all claims either arose out of or for were related to the agreement.

Furthermore, Plaintiff's claim for "constructive trust" relates to the Purchase Agreement because through that claim Plaintiff essentially seeks to revoke or alter the Purchase Agreement. In that claim, Plaintiff requests the Court to force Le Rivage to convey the subject membership interest, and/or subsequent associated proceeds from the Regency transaction, to SLSJ. Doc. 1, ¶ 91.

Lastly, even were this Court to apply an extremely narrow reading of the forum selection clause in the Purchase Agreement, holding, for example, that the clause fails to apply because Kleban also has fiduciary duties which "arise from" the Operating Agreement, this Court would still possess personal jurisdiction over Defendants. Pursuant to the Securities Exchange Act of 1934, as described *supra*, and alternatively Connecticut's long-arm statute, described below, Plaintiff has demonstrated that this Court has personal jurisdiction over Kleban and Le Rivage.

31

### 3. **Connecticut's Long-Arm Statute**

Finally, even had Plaintiff not included a claim under the Securities Exchange Act of 1934 and/or Defendants had not consented to jurisdiction through a forum selection clause in the Purchase Agreement, the District of Connecticut would still have personal jurisdiction over Defendants under Connecticut's long arm statute.  Defendants transacted business within Connecticut and  the Court's exercise of jurisdiction over them comports with the requirements of due process.  *See, e.g., Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996).

To resolve issues of personal jurisdiction under Federal Rule 12(b)(2) of Civil Procedure, a district court must engage in a two-step inquiry.  *Licci ex rel. Licci v. Lebanese Canadian Bank*, *SAL*, 732 F.3d 161, 168 (2d Cir.2013).  This is true whether the federal court is  presented with a challenge to personal jurisdiction in a diversity case, *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 231 (2d Cir.1963), or in a federal-question case, *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014).

In either circumstance, first, the court determines whether the defendant is subject to jurisdiction under the law of the forum state.  *Licci*, 732 F.3d at 168; *Sonera Holding*, 750 F.3d at 225.  Second, the court considers "whether the exercise of personal jurisdiction over the defendant comports with the Due Process Clause of the United States Constitution." *Sonera Holding*, 750 F.3d at 225 (citing *Licci*, 732 F.3d at 168).[22]

---

[22]  As the Second Circuit explained  in *Sonera Holding*, 750 F.3d at 225:

In the area of personal jurisdiction, "[t]he canonical opinion . . . remains *International Shoe*, in which [the Supreme Court] held that a State may authorize its courts to exercise personal jurisdiction over an out-of-state defendant if the defendant has 'certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Goodyear*

Under Connecticut's long-arm statute, "a court may exercise personal jurisdiction over any nonresident individual [or] foreign partnership . . . who in person or through an agent: (1) [t]ransacts any business within the state; (2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; (3) commits a tortious act outside the state causing injury to person or property within the state . . . ; (4) owns, uses or possesses any real property situated within the state; or (5) uses a computer . . . ." Conn. Gen. Stat. § 52-59b(a).  *See, also, e.g.*, *Nedgam Productions, LLC*, 2010 WL 3257909, at *3.

In *MacDermid, Inc. v. Canciani*, 525 F.App'x 8, (2d Cir. 2013), the Second Circuit noted:

> "In determining whether the plaintiffs' cause of action arose from the defendants' transaction of business within [Connecticut]," Connecticut courts "do not resort to a rigid formula," but rather . . . "balance considerations of public policy, common sense, and the chronology and geography of the relevant factors." *Zartolas v. Nisenfeld*, 184 Conn. 471, 440 A.2d 179, 181, 182 (1981). No particular factor is dispositive, and a "single purposeful business transaction" may give rise to jurisdiction. *Id.* at 181; *see Nusbaum & Parrino, P.C. v. Collazo de Colon*, 618 F.Supp.2d 156, 161-62 (D.Conn. 2009) ("A purposeful business transaction is one in which the defendant has engaged in some form of affirmative conduct allowing or promoting the transaction of business within the forum state." (internal quotation marks omitted)).

525 F.App'x at 10.

In the case at bar, Defendants have each, either "in person or through an agent," "transacted business" within the state of Connecticut within the meaning of Connecticut's long-arm statute, Conn. Gen. Stat. § 52-59b(a).[23]  Specifically, both Kleban and Le Rivage engaged in purposeful

_____

*Dunlop Tires Operations, S.A. v. Brown*, __ U.S. __, 131 S.Ct. 2846, 2853, 180 L.Ed.2d 796 (2011) (second alteration in original) (internal quotation marks omitted) (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

[23]  The Court notes that, although not argued by SLSJ, it also appears that Defendants may have "commit[ted] a tortious act outside the state causing injury to person or property within

33

business transactions in Connecticut.  They owned and managed commercial properties within the

state of Connecticut during the alleged tortious conduct leading up to the execution of the Purchase

Agreement.  Through appointed counsel, they made proposals to acquire SLSJ's interest in Sun

Realty,  a Connecticut limited liability company.

Kleban was specifically "empowered to act for and represent" Sun Realty as its "Tax Matters

Manager" under Sun Realty's Operating Agreement.  Doc. 20, at 34 (¶ 7.4).  Plaintiff asserts that

"[i]n the weeks preceding Kleban's purchase offer to SLSJ [of Plaintiff's membership interest in

Black Rock], Kleban [allegedly] made misleading statements to SLSJ concerning the business and

financial condition of Sun Realty through his Connecticut property management company, Turnpike

Properties."  Doc. 29, at 26 & Doc. 29-1 (Ex. C).

As to Le Rivage, that partnership is the successor in interest to Albert Kleban, who is and was

Le Rivage's Secretary and General Partner. *Id.*, at 17 ("Kleban Affidavit"), ¶ 6. Le Rivage engaged

in business activities as a member of Connecticut limited liability company Sun Realty, which

owned, operated, and managed Black Rock Shopping Center.  *Id.* ("Pursuant to the Operating

Agreement, The Le Rivage Limited Partnership . . . is a member of Sun Realty Associates, LLC").

Kleban and Le Rivage jointly engaged Connecticut counsel, Attorney Grozinger, to draft, negotiate,

and assist in the completion of the Purchase Agreement with Plaintiff.  *See* Doc. 29, at 24

("Defendants jointly engaged a Connecticut agent (an attorney licensed in Connecticut and located

in Weston), to prepare purchase offers (letters of intent dated May 3 and 22, 2013) from Kleban to

a Connecticut limited liability company (plaintiff SLSJ)") (citing Doc. 29-1 (Exs. D - G, & K; Ex.

---

the state" and /or "own[ed], use[d] or possesse[d] . . . real  property situated within the state."
Conn Gen. Stat. § 52-59b(a) (3)-(4).

L, Conn. Sec'y of State search results for Sun Realty Associates, LLC).  In addition, Kleban's offers to SLSJ were aimed at acquiring SLSJ's interests in Sun Realty, a Connecticut limited liability company located in Connecticut, with its sole stated business purpose of owning and operating Connecticut real estate, the Black Rock Shopping Center.  *See* Doc. 29-1, at 36-43 (Exs. D & E); Doc. 20, at 25 (¶ 2.1).[24]

As to the second inquiry regarding "minimum contacts," Defendants' business activities within Connecticut are evidence of sufficient "minimum contacts" with the forum state for due process purposes.  To comport with due process, a non-resident defendant must have "minimum contacts" with the forum jurisdiction "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945). "Due process requires that the foreign defendants either have engaged in continuous and systematic activities in the forum or that they have purposefully directed their activities at residents in the forum and the litigation results from alleged injuries that arise out of or relate to

---

[24]  In its Operating Agreement, Sun Realty states:

The Name of the Company is SUN REALTY ASSOCIATES, LLC.  The Members have formed the Company as a Connecticut limited liability company by converting an existing Connecticut general partnership known as "Sun Realty Associates" ( a Connecticut general partnership formed pursuant to a Partnership Agreement dated June 18, 1975 . . .) into the Company and by having the Organizer file the Articles with the Connecticut Secretary of the State.  The purpose of the Company shall consist solely of the ownership, operation, management and leasing of certain real estate comprised of a shopping center project known as The Black Rock Shopping Center, located at 2189-2215 and 2271 Black Rock Turnpike, Fairfield, Connecticut (the "Property").

Doc. 20, at 25 (¶ 2.1).

Moreover, the "Office of the Company" was listed as "located at c/o Turnpike Properties, LLC, 1877 Black Rock Turnpike Fairfield, Connecticut 06430 . . . ." *Id.* (¶ 2.3).

those activities." *IM Partners*, 394 F. Supp. 2d at 512 (quoting *FDIC v. Milken*, 781 F.Supp. 226,

229 (S.D.N.Y.1991)).  *See also  Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

      In the case at bar, as described above,  Defendants purposefully directed their activities at a

Connecticut limited liability company, Plaintiff SLSJ, in offering to acquire its interests in another

Connecticut limited liability company, Sun Realty.  These activities allegedly led to Plaintiff's injury,

the sale of its 33.3333 percent membership interest based on fraudulent representations.

      Furthermore, in addition to the transaction at issue, Albert Kleban has engaged in continuous

and systematic business activities in Connecticut.  As one of Kleban's business websites attest, he

has been, and continues to be, a well-known actor in commercial real estate in Connecticut:

> [H]e is most recognized in Fairfield County for his keen business acumen, real estate
> expertise and significant real estate portfolio. Presently Mr. Kleban owns and/or
> controls approximately 1,000,000 square feet of  retail and office space in
> Connecticut and Florida (the majority is held in Connecticut). His properties all
> generate positive cash flow, are well located, have strong historical occupancy and
> are meticulously maintained. Mr. Kleban prides himself as having an excellent
> rapport with his tenants, on both the local and national level. Mr. Kleban has been
> quite successful in taking profitable, "neighborhood type" retail centers and attracting
> larger national tenants to create destination sites, plus maximize cash flow. He is
> consistently supported by the Towns in which he owns properties and as such,
> proposed developments are rarely met with any municipal obstacles. Mr. Kleban is
> respected by many and considered to be *one of the premier commercial real estate
> developers in Fairfield County.*

*See* http://www.klebanproperties.com/principals.htm (under caption, "Albert J. Kleban") (last visited

4/22/2015) (emphasis added).[25]  *See also* Doc. 29-1, at 85-92, Ex. O  (January/February 2014

"Fairfield Living" magazine cover article, entitled "The Kleban Machine: Building a Future for

---

[25]  Kleban is founder and principal of Kleban  Properties, LLC, another Connecticut
limited liability company located in Connecticut.  Kleban Properties describes itself on its website
as a "real estate developer operating from offices throughout Fairfield County, Connecticut."
http://www.klebanproperties.com/about.htm.  Under the description are photos of seven individuals,
including "Al Kleban, Founder & Principal." *Id.*

Fairfield") (describing Kleban's extensive real estate projects in Fairfield County, Connecticut, as having "shaped the way Fairfielders shop, eat, travel, play and even live in their hometown").

Pertinent to the case at bar, since at least January 1, 2013, Albert Kleban is and has been the President of Sun-Realty-SMP, which was appointed as manager of Sun Realty. Doc. 20, at 17 (Kleban Affidavit), ¶¶ 3-4. SMP managed the Black Rock Shopping Center and continues to manage approximately 14 Connecticut shopping centers and commercial properties. Doc. 29-1 (Ex. L). Furthermore, Kleban is the "Managing Member" of Turnpike Properties, LLC, another Connecticut limited liability company, located in Connecticut. As set forth, *supra*, Turnpike was hired by SMP to manage the Black Rock Shopping Center. *See* Doc. 20, at 25; Doc. 29-1 (Ex. C); http://www.turnpikepropertiesct.com/TP2.html (last visited 4/22/2015); and http://www.concord-sots.ct.gov/CONCORD (listing Albert Kleban as 4th principal and "Managing Member" of Turnpike Properties) (last visited 4/22/2015).

With respect to Defendant Le Rivage, that limited partnership has also engaged in continuous systematic activities in Connecticut. Le Rivage, as a member of Sun Realty, owned, operated, and managed the Black Rock Shopping Center. As described *supra*, Le Rivage and Kleban jointly hired an attorney in Connecticut to prepare and complete the Purchase Agreement with Plaintiff, a Connecticut limited liability company. Le Rivage was also the successor in interest to Albert Kleban, its Secretary and "General Partner," when the Purchase Agreement was created. *Id.*, at 17 ("Kleban Affidavit"), ¶ 6.

In sum, both Kleban and Le Rivage "transacted business" in and possessed "minimum contacts" with Connecticut, such that the maintenance of this suit in Connecticut does not offend traditional notions of fair play and substantial justice. This Court possesses personal jurisdiction

over the Defendants under Connecticut's long-arm statute, Conn. Gen. Stat. § 52-59b(a).

For the foregoing reasons, Defendants' motion to dismiss [Doc. 17] for lack of personal jurisdiction over the Defendants will be denied.

## IV.   MOTION TO COMPEL ARBITRATION [Doc. 19]

### A.   Parties' Arguments

In addition to their motion to dismiss, Defendants bring a motion to compel arbitration pursuant to the terms of the Operating Agreement of Sun Realty Associates, LLC.  Section 12.7 of that agreement states, in relevant part:

> Any dispute between the parties hereto arising out of or relating to this Agreement shall be settled by arbitration conducted in Fairfield, Connecticut in accordance with the Commercial Arbitration Rules, as applicable, of the American Arbitration Association and judgment upon the award, which shall be binding and conclusive upon the parties hereto, may be entered in any court having jurisdiction thereof.

Doc. 20, at 17 (Kleban Affidavit), ¶ 8.

Defendants argue that the Sun Realty Operating Agreement should apply to the present action because Plaintiff, Le Rivage, and SMP are all parties to that Agreement.  Doc. 20, at 8 (citing Kleban Affidavit, ¶¶ 6-7).   In particular, "Sun Realty was operated and managed pursuant to the terms of its Operating Agreement" and "[t]he relationship between its members is further governed by that agreement."  Doc. 20, at 2.  "[T]he claims brought against Mr. Kleban are brought by virtue of his position with SMP, and SMP's purported [fiduciary] obligations to Sun Realty members, as set forth in the Operating Agreement."[26]  *Id.*, at 8.   Furthermore, the claims against Le Rivage, as a member

---

[26]  In the Operating Agreement, SMP, as manager of Sun Realty,  held "full, exclusive and complete discretion, power and authority" to "manage, control, administer and operate the business and affairs of the Company [and] to make all decisions affection such business and affairs" of Sun Realty.  Doc. 20, at 31 (¶ 6.1).

of Sun Realty, allege that Le Rivage breached the duty of good faith and fair dealing with respect to other members of Sun Realty." *Id.* (citing Doc. 1 ("Complaint"), ¶ 27).

Defendants further assert that "[t]he alleged conduct which forms the basis of the Plaintiff's causes of action all occurred *prior to* the execution of the Purchase Agreement." *Id.* (emphasis in original). Therefore, the terms of the Operating Agreement, and not the Purchase Agreement, should apply.

Defendants point out that the "Operating Agreement explicitly requires that all disputes between members which arise out of, or are related to, the Operating Agreement be arbitrated pursuant to the American Arbitration Association's Commercial Arbitration Rules." *Id.* According to Defendants, "Plaintiff failed to follow this contractual provision, and instead filed suit in this Court." *Id.* Therefore, "in accordance with established state and federal policy," the "Court should grant this Motion and compel the arbitration of this dispute." *Id.*

Plaintiff objects to the motion to compel arbitration, arguing that the Defendant's asserted entitlement to arbitration is "contrary to fact and law." Doc. 29, at 17. Plaintiff states that this action arises out of or relates to the Purchase Agreement regarding Black Rock, not Sun Realty's Operating Agreement. Doc. 29, at 13. Under the Purchase Agreement, "each party expressly consented to the 'exclusive jurisdiction' of the state and federal courts in Fairfield County" in any action arising out of or relating to that agreement. *Id.* (citing Ex. A, Purchase Agreement at ¶ 7.7. It thus follows that Defendants submitted to the jurisdiction of this Court.

In its brief in opposition to the motion to compel, Plaintiff asserts that "Defendants are incorrect when they argue that SLSJ's allegations 'revolve exclusively around activity occurring prior to the execution of the Purchase Agreement.'" Doc. 29, at 17 n .6. In support, Plaintiff points to the

Assignment on July 29, 2013, which Plaintiff executed more than a month after execution of the Purchase Agreement. *Id.* (citing Doc. 1, ¶¶ 47, 49). In particular, Plaintiff alleges that had it known of "discussions that were underway with a broker and potential investors [which occurred before and continued after execution of the Purchase Agreement], SLSJ would have rejected Kleban's purchase offer in May 2013, would have declined to enter the Purchase Agreement, *and* would have refused to assign its membership interest and promissory notes to Le Rivage." Doc. 1, ¶ 49 (emphasis added). In addition, Plaintiff notes that "nothing in the phrase arising out of or relating to restricts the scope of paragraph 7.7 to claims based on events *after* the execution of the Purchase Agreement." Doc. 29, at 17 n .6 (emphasis added).

With respect to the arbitration clause in the Operating Agreement, Plaintiff argues that Kleban is not officially a party to that agreement. *Id.*, at 18-19. Moreover, to the extent that the Operating Agreement arbitration clause is implicated by SLSJ's claims, "that provision has been superseded by the Purchase Agreement forum-selection clause." *Id.*, at 19-21.

**B.**   **Analysis**

**1.**   **Kleban**

With respect to Defendant Kleban, the Court notes, and Defendants concede, that Kleban was not, in his individual capacity, a signatory to the Operating Agreement.[27]   Although he signed the contract in his various official capacities (General Partner of Le Rivage and President of SMP), he did not sign it in his individual capacity. Moreover, the parties to the Operating Agreement, as listed on the signature pages of the agreement, were "The Le Rivage Limited Partnership," "Sun

---

[27]   Defendants state in their reply brief on this motion that "[b]oth Plaintiff and SMP are parties to the Operating Agreement. Mr. Kleban, in his individual capacity, is not." Doc. 32, at 8.

Realty-SMP, Inc.," "Harry Kleban Share A Trust U/W Article Sixth," "The Allan J. Kleban Family Trust," "The Roberta A. Howard Family Trust," "The Natalie R. Blank Family Trust," and "SLSJ, LLC." Doc. 20, at 48-50.  From such facts, Plaintiff asserts that Kleban is not a "party" in his individual capacity.

"It is black letter law that an obligation to arbitrate can be based only on consent." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, (2d Cir. 2008) (citing *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989).  The Second Circuit has explicitly held that "'while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, (2d Cir. 2011).  Put simply,  "[a] party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit."' *Id.*  (quoting *Vera v. Saks & Co.*, 335 F.3d 109, 116 (2d Cir.2003)).

"Nevertheless,  a 'nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.'" *Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 133 (2d Cir. 1997) (quoting *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir.1995)).  *See also Interbras Cayman Co. v. Orient Victory Shipping Co.*, 663 F.2d 4, 7 (2d Cir.1981) (*per curiam*) (granting trial on whether alleged principal-agent relationship bound nonsignatory party to arbitration agreement).  For example, "under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of 'the relationship among the parties, the contracts  they signed . . . , and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *Sokol*

*Holdings*, 542 F.3d  at 358 (quoting *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004)).

In this action, it is likely that Kleban, by virtue of his central role and authority over Le Rivage and SMP (as General Partner and President, respectively), may be a non-signatory who may compel arbitration of disputes arising out of or relating to that particular agreement.  *See, e.g., Sokol Holdings*, 542 F.3d at 358. Furthermore, the Agreement itself defines "Members" to include "those members set forth in Exhibit 'A' and any additional or substitute Member duly accepted by the other Members pursuant to the terms of this Agreement . . . ."  Doc. 20, at 23.  Therefore, the agreement, "by and among those Members set forth on Exhibit 'A'," even contemplates that the list of members "may be amended from time to time pursuant to the terms of th[e] Agreement." *Id.*, at 20.  It may be that Kleban, by virtue of his position as "principal-agent" of one or more Members, or perhaps even later-added Members, is entitled to assert the arbitration clause.  However, the Court need not reach the issue of his possible entitlement because regardless of how that issue might be resolved, the arbitration clause in that agreement was superseded by the forum selection clause of the Purchase Agreement with respect to the claims at bar.

In the Second Circuit, "an agreement to arbitrate is superseded by a later-executed agreement containing a forum selection clause if the clause 'specifically precludes' arbitration, *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 284 (2d Cir.2005) (quoting *Pers. Sec. & Safety Sys. v. Motorola*, 297 F.3d 388, 396 n. 11 (5th Cir.2002)), but there is no requirement that the forum selection clause mention arbitration, *see Applied Energetics*, 645 F.3d at 525." *Goldman, Sachs & Co. v. Golden Empire Schools Fin. Auth.,* 764 F.3d 210, 215 (2d Cir. 2014).

In particular, the Second Circuit has "held that an arbitration agreement was superseded by

an agreement stating that '[a]ny dispute arising out of this Agreement shall be adjudicated in' [the designated state's] courts, and that the agreement and related documents (not including the earlier arbitration agreement) 'constitute the entire understanding and agreement' of the parties with respect to the [subject matter] at issue." *Goldman, Sachs*, 764 F.3d at 215 (citing *Applied Energetics*, 645 F.3d at 523-24). Under these circumstances, "the subsequent agreement specifically preclude[d] arbitration, even though it did not mention arbitration, because the forum-selection clause was all-inclusive and mandatory.'" *Goldman, Sachs*, 764 F.3d at 215-16 (citing *Applied Energetics*, 645 F.3d at 525) (internal quotation marks omitted).

In the case at bar, the subsequent Purchase Agreement was entered into between "Albert J. Kleban" and "SLSJ, LLC" in June of 2013 and states, in pertinent part:

> This Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Connecticut, without regard to principles of conflicts of law. Each of the parties submits to the *exclusive jurisdiction* of any state or federal court sitting in Fairfield County, Connecticut *in any action or proceeding arising out of or relating to this Agreement*. Each of the parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any party with respect thereto.

Doc. 29-1 (Ex. A), at 21-22 (emphasis added).[28]   As in *Applied Energetics*, it is clear from the

---

[28]   The Court notes that in their Reply Brief in support of their motion to compel arbitration, Defendants argue that SMP, as a party to the Operating Agreement, but not to the Purchase Agreement, "alone can revoke or supersede its right to arbitration pursuant to the Operating Agreement." Doc. 32, at 8.   In other words, Defendants assert that Kleban, who entered the Purchase Agreement with SLSJ, cannot agree to terms superseding the arbitration clause in the Operating Agreement, essentially because he is an individual without power to do so.   The Court finds that this argument conflicts with, and thus undercuts, Defendants' prior contention that Kleban, as General Partner of Le Rivage and President of SMP, has the power, as an agent of these parties, to enforce the arbitration clause even though he is a non-signatory to the Operating Agreement. Doc. 32, at 2-3.   Defendants apparently recognize Kleban as empowered," by virtue of his "principal-agent" relationship to the signatories of the Operating Agreement, to enforce the arbitration clause but not to revoke it.   The Court finds such a contradictory argument unpersuasive. If Kleban is, as

language of this forum selection provision that the clause is mandatory – stating that each of the parties submits to the "exclusive jurisdiction" of any "state or federal court" in Fairfield County – and all inclusive – pertaining to "any action or proceeding arising out of or relating to this Agreement."  The explicit reference to "court" makes clear that the parties intended a judicial, as opposed to arbitration, forum and the "exclusive jurisdiction" with respect to "any action or proceeding" precludes resolution by any other means.[29]

Furthermore, as in *Applied Energetics*, the Purchase Agreement at issue makes clear that it displaced the arbitration clause in the Operating Agreement by including a "merger clause" in the following language:

> This Agreement sets forth the entire understanding of the parties with respect to the transactions contemplated hereby. It shall not be amended or modified except by written instrument duly executed by each of the parties hereto. *Any and all previous agreements and understanding between or among the parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.*

---

Defendants assert, in a position to enforce the arbitration clause, he necessarily had the power to revoke it, a power of revocation Kleban in fact exercised by means of the Purchase Agreement's forum selection provision.

[29]  As to the issue of whether Plaintiff's claims arise out of or relate to the Purchase Agreement, as discussed *supra* in Part III.D.2., I find that the claims do pertain to that agreement. Plaintiff's counsel correctly states in opposition to Defendants' motion to compel:

> [T]his action unquestionably arises out of and relates to the Purchase Agreement. Each of SLSJ's claims centers on the allegation that defendant Kleban made misleading statements and omitted material facts to induce SLSJ to enter into the Purchase Agreement and thereafter to transfer its interests to Le Rivage as required under the agreement. Had SLSJ not disposed of its interest under the Purchase Agreement, it would have no claims.

Doc. 29, at 17 (citation omitted).

Doc. 29-1, at 22 (¶ 7.3, captioned "Contents of Agreement; Parties in Interest, etc.") (emphasis added).

Just as the Second Circuit found the merger clause conclusive in *Applied Energetics*, the parties' present merger clause, displacing "all previous agreements and understandings," confirms that even if Defendants would otherwise have rights to arbitrate disputes with Plaintiff relating to matters under the Operating Agreement, those rights were superseded with respect to claims relating to the Purchase Agreement. *See also Goldman, Sachs & Co. v. Golden Empire Schs. Fin.*, 922 F. Supp.2d 435, 440-41 (S.D.N.Y. 2013) ("as the Second Circuit made clear in *Applied Energetics*, a forum selection clause need not explicitly contradict an arbitration agreement to trump it; instead, it may simply substantively exclude it"), *aff'd*, 764 F.3d 210 (2d Cir. 2014); *Biremis, Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. CV-11-4934 (LDW), 2012 WL 760564, at *5 (E.D.N.Y. Mar. 8, 2012) (by granting "exclusive jurisdiction" to federal and state courts of "all disputes" in "more recent forum selection clause," parties waived earlier agreement to arbitrate).

The Operating Agreement was executed in 2006, seven years prior to the parties' entry into the Purchase Agreement. Doc. 20, at 51. When the Purchase Agreement was executed in June 2013, it superseded and thus vitiated any earlier agreement to arbitrate with respect to claims *regarding the subject matter of the Purchase Agreement* – namely, claims relating to Kleban's purchase of SLSJ's membership interest in Sun Realty).

Possibly, as Defendants assert, certain provisions in the Operating Agreement may be relevant with respect to Plaintiff's various claims (including breach of fiduciary duty and violation of the Securities Exchange Act of 1934, 15 U.S.C. § 78c). Nonetheless, the crux of Plaintiff's present action is the Purchase Agreement, and subsequent Assignment thereof – that is, whether

Kleban fraudulently induced SLSJ to enter the contract and whether Le Rivage knowingly accepted assignment of that contract after the alleged fraud. The Court thus concludes that Plaintiff's claims likely "arise from" and most definitely "relate to" the Purchase Agreement, such that its forum selection clause should be applied.

If as Defendants assert, "at best, the Court is presented with two coexistent dispute resolution clauses," Doc. 20, at 13, the Court finds the latter clause to be the operative agreement with respect to claims relating to the Purchase Agreement. Granted, the right for parties to arbitrate under Sun Realty's Operating Agreement continues to exist in other contexts – *e.g.*, with respect to claims arising out of or relating solely to the Sun Realty Operating Agreement. However, in the specific context of cases relating to the Purchase Agreement, that agreement's forum selection clause prevails.

### 2.    <u>Le Rivage</u>

As to Defendant Le Rivage, Plaintiff has clarified that "Le Rivage is defendant here only by virtue of becoming Kleban's assignee as Purchaser under the Purchase Agreement." Doc. 29, at 18; *see also* Doc. 1 ("Complaint"), ¶¶ 28, 30, 42, 47- 49, 52, 66, 90. Thus, Plaintiff argues, "Kleban and Le Rivage cannot engraft arbitration rights into the Purchase Agreement simply by assigning the contract rights to a party with a preexisting arbitration agreement with SLSJ." *Id.*

Under the Purchase Agreement, "All of the terms and provisions of this Agreement shall be binding upon . . . the successors and assigns of Seller and Purchaser." Doc. 29-1 (Ex. A), ¶ 7.4. Le Rivage, as assignee, thus has no greater or different rights than its assignor, Kleban, who agreed to adjudicate "any action or proceeding arising out of or relating to" the Purchase Agreement in a "state

or federal court sitting in Fairfield County." *See, e.g., Shoreline Commc'ns, Inc. v. Norwich Taxi, LLC*, 70 Conn. App. 60, 72 (2002) ("It is hornbook law . . . that an assignee stands in the shoes of the assignor" so that "[a]n assignee has no greater rights or immunities than the assignor would have had if there had been no assignment" and has "no authority to rewrite the contract for which it has assumed full responsibility.") (citations and internal quotation marks omitted); *Export Dev. Canada v. T. Keefe & Son, LLC*, No. CV095032894S. 2011 WL 2536398, at *3 (Conn. Super. June 2, 2011)("[A]n assignee has no greater rights or immunities than the assignor would have had if there had been no assignment.")(citations and internal quotation marks omitted); *Caires v. JP Morgan Chase Bank*, 745 F.Supp.2d 40, 47 (D.Conn. 2010) ("It is well established, in Connecticut, that an assignee stands in the shoes of the assignor.") (citation omitted); *Flagstar Bank, FSB v. Ticor Title Ins. Co.*, 660 F.Supp. 2d 346, 350 (D.Conn. 2009) ("An assignee stands in the shoes of the assignor," and . . . ha[s] no greater rights or immunities than [the assignor] would have had if there had been no assignment.") (quoting *Shoreline Commc'ns, Inc.,* 70 Conn. App. at 72).

In sum, even assuming *arguendo* that Kleban possessed the authority to compel arbitration under the Operating Agreement, his entry into the Purchase Agreement revoked that right with respect to actions "arising out of or relating to" the later agreement. Furthermore, Le Rivage, as assignee, obtained the same rights and obligations as Kleban under the Purchase Agreement. Le Rivage is thus bound by the Purchase Agreement's stipulation that state or federal courts in Fairfield County, Connecticut have "exclusive jurisdiction" over actions arising out of or relating to the agreement. Doc. 29-1, at 21-22.

In sum, neither Defendant may compel arbitration of SLSJ's present claims under the Operating Agreement. Accordingly, Defendants' motion to compel arbitration will be denied.

## V.   CONCLUSION

For the aforementioned reasons, the Court makes the following Rulings:

1.   Defendants' Motion to Dismiss the complaint [Doc. 17] for lack of personal jurisdiction over them is DENIED.

2.   Defendants' Motion to Compel Arbitration pursuant to the Operating Agreement  [Doc. 19] is DENIED.

3.   The stay of discovery, entered by this Court in its prior Order [Doc. 37] on Defendants' Motion for a Protective Order [Doc. 36], is VACATED.  All discovery may resume and the parties may, if necessary,  reschedule depositions and/or move for revised case deadlines, seeking additional time for discovery, upon a demonstration of "good cause."

4.   In light of the Court's Rulings contained herein, Plaintiff's Emergency Motion for Reconsideration [Doc. 39] is DENIED as moot.

The foregoing is So Ordered.

Dated: New Haven, Connecticut
      April 30, 2015

           _/s/Charles S. Haight, Jr._____
           CHARLES S. HAIGHT, JR.
           Senior United States District Judge