# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SLSJ, LLC,

               Plaintiff,

v.

ALBERT KLEBAN and THE LE RIVAGE
LIMITED PARTNERSHIP,

               Defendants.

Civil Action No.
No. 3:14-cv-390 (CSH)

**SEPTEMBER 29, 2017**

## RULING ON DEFENDANTS' MOTION IN LIMINE
## TO PRECLUDE EXPERT TESTIMONY [DOC. 65]

**HAIGHT, Senior District Judge:**

This case arose from a dispute relating to a family-owned limited liability company, Sun Realty Associates ("Sun Realty"). The Defendants move *in limine* to preclude the proposed testimony of Professor Jonathan R. Macey, the liability expert of Plaintiff SLSJ, LLC ("SLSJ"). In connection with the motion, Defendants submit Macey's expert report, which was disclosed to them in accordance with Federal Rule of Civil Procedure 26(a)(2) and (b)(4). This Ruling resolves the motion.

## I. BACKGROUND

Plaintiff SLSJ brings this action against an individual, Albert Kleban, and against Le Rivage Limited Partnership ("Le Rivage") (collectively "Defendants"), Plaintiffs' former partners in Sun Realty, alleging, *inter alia*, breach of fiduciary duty and fraud regarding the sale of Plaintiff's one-third interest in Sun Realty, including its sole asset, the Black Rock Shopping Center ("Black

1

Rock"), a commercial property in Fairfield, Connecticut.[1]  Plaintiff executed a "Membership Interest Purchase Agreement" ("Purchase Agreement") on June 27, 2013, agreeing to sell its 33.3333 percent membership interest in Sun Realty and outstanding promissory notes to Kleban and his successor-in-interest, Le Rivage, for the sum of $2,020,540.41.[2]  Plaintiff thereafter executed an "Assignment" of its interest in Sun Realty to Le Rivage on July 29, 2013.  Doc. 1, ¶ 47.

In selling and assigning its interest in Sun Realty, Plaintiff allegedly relied upon Kleban's fraudulent statements and misrepresentations regarding the value of Black Rock.[3]  In December 2013, within six months after that sale and assignment, Kleban Properties and Regency Centers Corporation ("Regency Centers") – "a real estate investment trust owning more than 300 retail properties [in] the United States with a total capitalization of $6.7 billion" – "publicly announced that they were entering into an agreement under which Regency Centers would acquire an 80% interest in a portfolio of three properties controlled by Kleban Properties, including Black Rock Shopping Center." *Id.*, ¶ 44.  On or about March 12, 2014, Kleban Properties and Regency Centers closed that transaction for a purchase price of $150 million.[4]  *Id.*, ¶ 56.

_____

[1] Lois Jeruss is Defendant Kleban's cousin, the daughter of Leon Kleban, and the managing member of Plaintiff SLSJ.  Doc. 1, ¶ 14.  She currently owns 70% of Plaintiff, and the remainder is owned by her two daughters.  *Id.*, ¶ 18.  Prior to the sale at the center of this action, Plaintiff owned a 33.3333% membership interest in Sun Realty.  *Id.*, ¶ 13.

[2] Plaintiff represents that "Defendant Le Rivage is Kleban's limited partnership and assignee of Kleban's rights under the Purchase Agreement."  Doc. 29, at 6.

[3] In the words of Defendants' counsel, Plaintiff "claims that it was essentially tricked by Mr. Kleban, through misleading statements and omissions, into selling its membership interest" in Sun Realty.  Doc. 20, at 1.

[4] According to Defendants, "the Regency Centers transaction involved a portfolio of eleven separate entities, one of which was Sun Realty Associates, which formed a joint venture with Regency Centers.  Regency Centers owns 80% of the joint venture and the Portfolio owns 20%."

## II.  PENDING MOTION

Pending before the Court is Defendants' motion *in limine* for an Order excluding the proposed testimony of Plaintiff's expert, Professor Jonathan R. Macey, "for failure to satisfy the requirements of Fed. R. Evid. 702."  Doc. 65, at 1.  Plaintiff disclosed Macey's expert report to Defendants in compliance with Federal Rules 26(a)(2) and 26(b)(4) of Civil Procedure.  Doc. 66, Ex. A.  Defendants assert that in that report, Macey concludes and will testify at trial that "Defendants have breached certain legal duties owed to SLSJ."  Doc. 65, at 1.  Macey will also allegedly "endeavor[ ] to instruct the trier of fact on the 'legal rules' governing limited liability companies and privately held businesses." *Id.*  Defendants argue that according to three decades of Second Circuit precedent, "*each and every* facet of this proffered testimony is inadmissible under the Federal Rules of Evidence." *Id.* (emphasis in original).

Plaintiff objects to Defendants' motion, asserting, *inter alia*, that courts "generally permit expert corporate governance testimony" and "[t]his case presents no reason for the exception."  Doc. 75, at 6 (citation and internal quotation marks omitted).  Moreover,  Macey's "proposed testimony seeks to explain [corporate governance] concepts in the context of the privately-held company at issue here." *Id.*

## III.  DISCUSSION

### A.  Legal Standard - Motion *In Limine*

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Highland Capital Mgmt., L.P. v. Schneider,* 551 F. Supp. 2d 173, 176

---

Doc. 63, at 4.  *See also* Doc. 1, ¶ 44.

(S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)).[5]  "The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial."  *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (internal quotation marks omitted).  In particular, a motion *in limine* "may be directed toward limiting the subjects about which  testimony may be offered, or about which  particular witnesses may testify," including "expert witnesses."  3 Moore's Federal Practice, § 16.77[4][d][iii] (Matthew Bender 3d ed. 2009).

In the case at bar, a preliminary ruling on the proffered expert testimony of Professor Macey is in the interests of justice.  In particular, Defendants assert that if Macey's testimony is precluded *in limine*, Defendants may avoid "the substantial expense  associated with deposing Professor Macey, who charges  $875.00 per hour," a fee Defendants would have to bear, as well as the expense of retaining a rebuttal witness regarding his testimony.  Doc. 66, at 6 n.1.  If, however, Macey's testimony is allowed, in whole or part, Defendants will have the opportunity to take discovery to prepare to rebut that testimony.

**B.   Expert Testimony**

"The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995).  *See also SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d

---

[5]  As the United States Supreme Court noted in *Luce v. United States*,"[*i*]*n limine* has been defined as "[o]n or at the threshold; at the very beginning; preliminarily."  469 U.S. at 40 n.2. (quoting Black's Law Dictionary 708 (5th ed. 1976)).  The term is used in the "broad sense to refer to  any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered."  469 U.S. at 40 n.2.

107, 119 (2d Cir. 2006) (with respect to a district court's admission of expert testimony, the Second Circuit "review[s] a district court's evidentiary rulings under a deferential abuse of discretion standard, and will not disturb such rulings unless they are 'manifestly erroneous.'") (internal citations omitted); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) ("A decision to admit or exclude expert scientific testimony is not an abuse of discretion unless it is 'manifestly erroneous.'") (quoting *McCullock*, 61 F.3d at 1042); *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("It is well-established that 'the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous.'") (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962)).

"Significantly, the abuse of discretion standard 'applies as much to the trial court's decisions about *how to determine reliability* as to its ultimate conclusion.'" *Amorgianos*, 303 F.3d at 265 (emphasis in original) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). Consequently, when a district court analyzes the admissibility of expert evidence, it exercises broad discretion in determining the appropriate method for evaluating reliability under the circumstances of each case. *Id.*

Furthermore, "[d]oubts about the usefulness of an expert's testimony, should be resolved in favor of admissibility." *Canino v. HRP, Inc.*, 105 F. Supp. 2d 21, 28 (N.D.N.Y. 2000) (quoting *Marmol v. Biro Mfg. Co.*, No. 93-CV-2659(SJ), 1997 WL 88854, at *4 (E.D.N.Y. Feb. 24, 1997)). *See also E.E.O.C. v. Beauty Enterprises, Inc.*, 361 F. Supp. 2d 11, 20 (D. Conn. 2005) (citing *Canino*, 105 F. Supp. 2d at 28, for "reasoning that doubts about the usefulness of an expert's testimony should be resolved in favor of admissibility"); *Larabee v. M M & L Int'l Corp.*, 896 F.2d 1112, 1116 n. 6 (8th Cir.1990) ("[We] note that 'doubts about whether an expert's testimony will be

useful should generally be resolved in favor of admissibility.'") (quoting J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 702[02] at 702-30 (1988)).

## C. <u>Permissible Scope of Expert Testimony</u>

The proper scope of an expert's testimony is delineated by Federal Rule of Evidence 702. That rule provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier
>
> of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case."

Fed. R. Evid. 702.

Addressing scientific expert testimony – concerning the admissibility of data derived from scientific techniques or expert opinions – the United States Supreme Court held in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), that the Federal Rules of Evidence have superseded the common law regarding the "proper standard for admission of expert testimony."[6] 509 U.S. at 585, 589-90. Courts thus apply Federal Rule of Evidence 702, "which clearly contemplates

---

[6] The Second Circuit noted in *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005), that "[t]he shift under the Federal Rules to a more permissive approach to expert testimony . . . did not represent an abdication of the screening function traditionally played by trial judges." Rather, as the Supreme Court explained in *Daubert*, "Rule 702 governs the district court's responsibility to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Id.* (quoting *Daubert*, 509 U.S. at 589).

some degree of regulation of the subjects and theories about which an expert may testify." *Id.* at 589.

"Per *Daubert* and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015). *See also United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)).

Finally, expert testimony, although probative, may be excluded by Federal Rule of Evidence 403. Under Rule 403, the court may "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. For example, federal courts have held that "Rule 403 bars expert testimony purporting to interpret the governing law, because such testimony will necessarily confuse the jury by providing competing interpretations of the law." *CDX Liquidating Tr. ex rel. CDX Liquidating Trustee v. Venrock Assocs.*, 411 B.R. 571, 587 (N.D. Ill. 2009) (citation omitted). "Expert testimony about the governing law is barred under Rule 403 because 'it would be a waste of time if witnesses or counsel should duplicate the judge's statement of the law, and it would intolerably confound the jury to have it stated differently.'" *Id.* (quoting *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir.1988) (holding, *en banc*, that trial court erred in admitting expert testimony on the legality of warrantless searches, whether defendants had conducted a "search" and had received valid "consent"). *See also United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir.1999) ("[T]he Court must determine whether the [expert] testimony usurps . . . the role of the trial judge in instructing the jury as to the applicable law . . . .") (citation and internal quotation marks and punctuation

omitted).

### D.    <u>Qualifications of Expert</u>

As to qualification of an expert, the trial judge has broad discretion to resolve that issue. *See, e.g., United States v. Brown,* 776 F.2d 397, 400 (2d Cir. 1985) ("[T]he trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous.") (citation omitted), *cert. denied,* 475 U.S. 1141 (1986)*; McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1138, n. 7 (2d Cir.1979) ("The broad discretion of the trial court to determine the qualifications of witnesses will not be disturbed unless its ruling was manifestly erroneous.") (citation and internal quotation marks omitted).

Within the Second Circuit, courts have liberally construed expert qualification requirements. "Liberality and flexibility in evaluating qualifications should be the rule [and] the expert should not be required to satisfy an overly narrow test of his own qualifications." *Lappe v. American Honda Motor Co.*, 857 F. Supp. 222, 226 (N.D.N.Y.1994), *aff'd*, 101 F.3d 682 (2d Cir.1996). *See also Brown*, 776 F.2d at 400 (noting that qualification requirements under Rule 702 "must be read in the light of the liberalizing purpose of the rule").  In general, "[t]o determine whether a witness qualifies as an expert, "courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Tin Yat Chin*, 371 F.3d at 40 (citing *United States v. Diallo*, 40 F.3d 32, 34 (2d Cir.1994)).

When considering an expert's "practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth."  *Valentin v. New York City*, No. 94-CV-3911 (CLP), 1997 WL 33323099, at *14 (E.D.N.Y.

Sept. 9, 1997) (citing *United States v. Barker*, 553 F.2d 1013, 1024 (6th Cir.1977) (noting that expert need not have certificates of training nor memberships in professional organizations, nor be an outstanding practitioner in the field in which he professes expertise) and *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 850 (8th Cir. 1981) ("[T]he expert need not have complete knowledge about the field in question, and need not be certain. He need only be able to aid the jury in resolving a relevant issue.")).

One may become qualified as an expert based on practical experience, so that professional education is not a prerequisite. *United States v. Angelilli*, 660 F.2d 23, 39-40 (2d Cir.1981) (holding that experienced auctioneers, buyers, and former marshals properly testified as experts on custom and practice at auctions of property), *cert. denied*, 455 U.S. 945 (1982). Alternatively, "formal education may also suffice to qualify a witness as an expert in a particular field, and the lack of extensive practical experience directly on point does not necessarily preclude the expert from testifying." *Valentin*, 1997 WL 33323099, at *15.

E.  **Reliability of Evidence**

The United States Supreme Court has held that pursuant to the trial judge's "gatekeeping responsibility," the Court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Expert testimony "must be supported by appropriate validation – *i.e.*, good grounds, based on what is known." 509 U.S. at 590 (internal quotation marks omitted). In addition, "whether basing [his or her] testimony upon professional studies or personal experience, [an expert must] employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 430 (S.D.N.Y. 2016)

(quoting *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).

As to the "bases" of an expert's opinion, Federal Rule of Evidence 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

"[E]xpert testimony may be based on 'experience alone – or experience in conjunction with other knowledge, skill, training or education." *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d at 413 (quoting Fed. R. Evid. 702 advisory committee's note). In certain fields of expertise, "experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *Id.* As with an expert's qualifications, the "test of reliability is flexible" so that "a district court has 'the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999)).

Regarding an expert's bases for testimony, the Second Circuit has clarified that "[a]lthough expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citations and internal quotation marks omitted). Generally, "[a] district court has discretion under Federal Rule of Evidence 703 'to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony.'" *Id.* (quoting *Shatkin v.*

*McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir.1984)).

## F.  Relevance – Opinions of Expert on Ultimate Issues

After finding that an expert is qualified to testify and his or her testimony will be reliable, the district court must decide whether the expert's testimony will be relevant to the issues in the case. Specifically, with respect to relevance, Rule 702, Fed. R. Evid., requires the district court to decide whether the expert's testimony will "help the trier of fact." *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d at 413.

Expert testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it," *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.1991),[7] does not aid the jury in making a decision, *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d at 413. Rather, such testimony "undertakes to tell the jury what result to reach," and thereby "attempts to substitute the expert's judgment for the jury's," *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir.1994) (emphasis omitted).

Courts have often barred expert witnesses from expressing opinions upon ultimate issues. *See, e.g., United States v. Scop*, 846 F.2d 135, 139-40 (2d Cir.1988) (holding that the expert's "repeated statements embodying legal conclusions exceeded the permissible scope of opinion testimony under the Federal Rules of Evidence"), *on reh'g*, 856 F.2d 5 (2d Cir. 1988). In other words, although an expert was allowed to "opine on an issue of fact within the jury's province," he was barred from "giv[ing] testimony stating ultimate legal conclusions based on those facts." *Scop*, 846 F.2d at 139-40.

Under the current Federal Rule of Evidence 704, however, an expert "opinion is not

---

[7]  *Cert. denied,* 502 U.S. 813 (1991).

objectionable just because it embraces an ultimate issue." Nonetheless, as the Notes of the Advisory Committee recognize, the abolition of the "ultimate issue" rule does not render all legal opinions admissible. The Notes thus state:

> The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact. In order to render this approach fully effective and to allay any doubt on the subject, the so-called "ultimate issue" rule is specifically abolished by the instant rule.
>
> The older cases often contained strictures against allowing witnesses to express opinions upon ultimate issues, as a particular aspect of the rule against opinions. The rule was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information. 7 Wigmore §§ 1920, 1921; McCormick § 12. The basis usually assigned for the rule, to prevent the witness from "usurping the province of the jury," is aptly characterized as "empty rhetoric." 7 Wigmore, § 1920, p. 17. Efforts to meet the felt needs of particular situations led to odd verbal circumlocutions which were said not to violate the rule. . . .
>
> . . .
>
> [Nonetheless,] [t]he abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances *against the admission of opinions which would merely tell the jury what result to reach*, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria.

Fed. R. Evid. 704. advisory committee notes (emphasis added).

The Second Circuit has stated that "[t]his circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion." *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (gathering cases). "While Rule 704 has abolished the common law 'ultimate issue' rule, however, it has not 'lower[ed] the bars so as to admit all opinions.'" *Id.* (quoting Fed.R.Evid.

704 advisory committee's note).[8]

## G.  Corporate Governance Testimony

As to the substance of expert testimony proffered, within the Second Circuit, "[c]ourts generally permit expert corporate governance testimony," but "experts are restricted to explaining general corporate governance concepts, such as setting forth the respective roles of a corporation's directors and officers, the nature of an officer's fiduciary duties to the corporation, or the concept of parent-subsidiary corporate separateness."  *United States v. Brooks*, No. 06-CR-550 (S1) (JS), 2010 WL 291769, at *3-4 (E.D.N.Y. Jan. 11, 2010).  *See also  Pereira v. Cogan*, 281 B.R. 194, 200 (S.D.N.Y. 2002) (permitting corporate governance expert to testify to "customary practices in a profession or industry," even though the customs and practices are "based in good part on what others believe the law to require.").

"As a general rule an expert's testimony on issues of law is inadmissable."  *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)(citing, generally, Note, "Expert Legal Testimony," 97 Harv. L. Rev. 797 (1984)).  *See also  Brooks*, 2010 WL 291769, at *4 ( "[O]verwhelmingly, courts specifically preclude the expert from offering either legal conclusions or opinions that apply corporate governance concepts to the case's specific facts.").[9] As one court summarized in the

---

[8]  With respect to factual evidence, although Federal Rule of Evidence abolished the rule against expert testimony on ultimate issues of fact, Rule 704 was not intended to allow expert opinions "which would merely tell the jury what result to reach."  *See* Fed. R. Evid. 704 advisory committee notes.

[9]  *See also Pereira v. Cogan*, 281 B.R. 194, 198 (S.D.N.Y. 2002) (allowing expert testimony regarding general principles of corporate governance (*e.g.,* duties owed by officers and directors to the corporation) but striking "ultimate legal conclusions" to be decided by the jury (*e.g.,* board of directors' failure to discharge its "fundamental oversight responsibilities and duty of care in managing the corporation's business and affairs").

context of securities litigation, "[w]hile the expert can make factual conclusions that embrace an ultimate issue to be decided by the fact-finder [under Fed. R. Evid. 704(a)], the expert cannot give testimony stating *ultimate legal conclusions* based upon those facts, nor can that testimony track the language of the statute or the law that the defendants are accused of violating." *S.E.C. v. U.S. Envtl., Inc.,* No. 94-cv-6608(PKL)(AJP), 2002 WL 31323832, at *4 (S.D.N.Y. Oct. 16, 2002) (emphasis added).

Within the Second Circuit, numerous courts have followed this distinction, allowing corporate governance expert testimony on factual conclusions that may embrace an ultimate issue but disallowing such testimony on ultimate legal conclusions. *See, e.g.*, *Scop*, 846 F.2d at 139-40 (holding expert's repeated statements that defendants' conduct established a manipulative and fraudulent scheme within the meaning of the securities laws exceeded the permissible scope of opinion testimony); *Marx & Co. v. Diners' Club*, Inc., 550 F.2d 505, 509-10 (2d Cir. 1977) (Where the expert's testimony "did not concern practices in the securities business, on which [he] was qualified as an expert, but were rather legal opinions as to the meaning of the contract terms at issue," his testimony fell outside his area of expertise and was an invasion of the court's authority to instruct the jury on the applicable law.), *cert. denied*, 434 U.S. 861 (1977); *S.E.C. v. U.S. Envtl., Inc.*, No. 94-cv-6608 (PKL)(AJP), 2002 WL 31323832, at *4 (S.D.N.Y. Oct. 16, 2002) (noting that "[t]he *Marx* and *Scop* cases distinguish between factual conclusions embracing an ultimate issue to be decided by the trier of fact, which may be included in an expert's testimony, and opinions which embody legal conclusions that "encroach upon the court's duty to instruct on the law") (citing *United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir. 1991)). *See also Red Rock Commodities, Ltd. v. Standard Chartered Bank*, 140 F.3d 420, 424 (2d Cir. 1998) (holding expert testimony to determine

whether a contract was ambiguous was inadmissible as "unnecessary and superfluous because of the special legal knowledge of the judge;" "[t]he district court did not need the experts' advice as to how the case should be decided.") (citing *Marx*, 550 F.2d at 510).

As District Judge Seybert noted in *Brooks*, "overwhelmingly, courts specifically preclude the expert from offering either legal conclusions or opinions that apply corporate governance concepts to the case's specific facts." 2010 WL 291769, at *4. Therefore, "although a corporate governance expert can explain what a CEO does, and what a fiduciary duty is, the expert cannot opine as to whether a specific CEO's acts breached any fiduciary duty." *Id. See also, e.g., CDX Liquidating Trust.*, 411 B.R. at 587 (holding corporate governance expert "cannot judge what Defendants did or did not do; nor whether they violated the law in that if he were to opine that (and to explain how) their conduct constituted a breach of fiduciary duty, he would necessarily be deeming Plaintiff's version of the facts to be the credible account, which is prohibited"); *Floyd v. Hefner*, 556 F. Supp. 2d 617, 640 (S.D. Tex. 2008) (Plaintiff's corporate governance expert, an attorney with over 20 years of experience in corporate and securities matters, was allowed to "testify as to the standards of conduct applicable to directors in general," but he was not permitted to "testify as to whether the Defendants' conduct comported with the actions of reasonably prudent individuals in the same or similar circumstances" because the latter was a conclusion that "must be determined by the trier of fact.").[10]

---

[10] In general, under Connecticut law, "[t]he determination of whether a duty exists between individuals is a question of law" so that "[o]nly if a duty is found to exist does the trier of fact go on to determine whether the defendant has violated that duty." *Biller Assocs. v. Peterken*, 269 Conn. 716, 721-22 (2004) (citation and internal quotation marks omitted). *See also, e.g., Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) ("[T]he viability of plaintiffs' complaint hinges on a question of law, specifically, [defendant's] purported status as a fiduciary based on its alleged agency relationship with its customers."); *Bass ex rel. Bass v. Miss Porter's Sch.*, 738 F. Supp. 2d

For example, in a complex action regarding corporate or securities law, "expert testimony may help a jury understand unfamiliar terms and concepts;" but "[i]ts use must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Bilzerian*, 926 F.2d at 1294. In discussing case precedent on expert testimony, the Second Circuit clarified that such cases "distinguish between factual conclusions that may be included in an expert's testimony – though they embrace an ultimate issue to be decided by the jury – and opinions embodying legal conclusions that encroach upon the court's duty to instruct on the law." *Id.* (citing *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988),[11] and *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 512 (2d Cir. 1977)[12]).[13]

---

307, 330 (D. Conn. 2010) ("The fact that the existence of a fiduciary duty exists turns on the facts of the case does not render the question one of fact rather than law."); *Trafalgar Power, Inc. v. U.S. Bank Nat. Ass'n*, No. 5:05-CV-1533, 2012 WL 555044, at *5 (N.D.N.Y. Feb. 21, 2012) ("The determination of whether a duty exists between individuals is a question of law.") (quoting *Biller*, 269 Conn. at 721), *aff'd sub nom. Christine Falls Corp. v. U.S. Bank Nat. Ass'n*, 546 F. App'x 13 (2d Cir. 2013).

In the context of corporate law, Connecticut has legislation which describes the fiduciary duties of loyalty and care between members in a limited liability company. *See, e.g.*, Conn. Gen. Stat. § 34-255h ("Standards of conduct for members and managers" set forth in "The Connecticut Uniform Limited Liability Act").

[11]  *Modified*, 856 F.2d 5 (2d Cir.1988).

[12]  *Cert. denied*, 434 U.S. 861 (1977).

[13]  As Circuit Judge Cardamone noted in *Bilzerian*:

In *Marx*, it was held that an expert's legal opinion on the meaning of certain contract terms was outside the witness'[s] area of expertise and was also an invasion of the court's authority to instruct the jury on the applicable law. 550 F.2d at 509-510. In *Scop*, an expert's repeated statements that defendants' conduct established a manipulative and fraudulent scheme within the meaning of the securities laws exceeded the permissible scope of opinion testimony. 846 F.2d at 139. These cases

**H.  Proposed Expert Testimony of Professor Macey**

In the case at bar, Plaintiff has alleged that "through a series of misleading statements and omissions of material fact," SLSJ was "induced" by Kleban to sell its interest in Sun Realty at an "unfair price."  Doc. 1, ¶ 2.  In its Complaint, Plaintiff asserts five causes of action: three claims against Kleban –  breach of fiduciary duty, violations of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), and fraud; and two actions against Le Rivage – "aiding and abetting breach of fiduciary duty" and "imposition of constructive trust."  In order to assist in proving the elements of these claims, Plaintiff has hired Professor Macey, the Sam Harris Professor of Corporate Law, Corporate Finance and Securities Law at the Yale Law School and Professor at the Yale School of Management.  Doc. 66 (Ex. A), ¶ 7.

According to Macey, he is "an expert in corporate governance and in the relationship between LLCs and their members."  *Id.*, ¶ 8.  His "expertise includes knowledge of the ordinary and customary business practices between and among LLCs and other forms of business organization and their investors."  *Id.*  Macey explains that he has been hired to "analyze, and to provide testimony about, the nature of the business relationship between SLSJ and Kleban as well as the economic and public policy implications of certain communications [that were] made and not made to SLSJ by Kleban."  *Id.*, ¶ 4.  He has also been asked to "give testimony that will help the trier of fact to understand the organization and structure of a limited liability company or other privately held

---

establish that although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts.

926 F.2d at 1294.

business firm in which there are active and passive investors, the ordinary and customary expectations, understandings, behavior, norms and arrangements among owners of privately-held firms (including with specific reference to the operating agreement at issue in this case), the relative roles and responsibilities of managers, active investors and passive investors in the management of the business and dissemination and acquisition of information concerning the business, as well as the underlying economic bases for such ordinary and custom organization, structure, expectations, understandings, behavior, norms and arrangements, and the resulting legal rules, including the duty of good faith and fair dealing members owe to each other and the fiduciary duties owed by a manager to members, including the duty to subordinate self-interest to the interest of the firm and its members, the duty to provide material information, and the particular manifestation of these duties that arise when a manager engages in a transaction with a member to whom the manager owes fiduciary duties." *Id.*

With the aim of presenting all of the law, facts, and public policy regarding the case at hand, Macey has explicitly stated in his report that he has formulated three "principal opinions" regarding the merits of Plaintiff's claims based on a summary of facts provided by Plaintiff's counsel.[14] The opinions, as summarized by Professor Macey, are as follows:

> **Opinion 1**: It is ordinary and customary behavior in a private enterprise in which there are both active investors and passive investors for the active investors to act in good faith and to subordinate their own private interests to the general goal of maximizing the returns of all investors, including the passive investors, and to disclose to passive investors information concerning the business that is material to their decisions concerning their investments. When engaging in self-dealing

---

[14] According to Defendants, each of Macey's opinions consists of the "customary norms in private enterprise and common pitfalls of passive investors engaged with closely held businesses, coupled with conclusory and repeated assertions that Defendants breached duties of care owed to Plaintiff." Doc. 66, at 3.

transactions with minority investors, and/or when specifically asked for such information, the expectation that the controlling majority will act fairly and in good faith is extremely acute. The investment relationship between SLSJ and Sun Realty was a typical arrangement in which a passive investor (SLSJ) reposed trust and confidence in an active investor (Kleban) to act as a faithful steward of its investment.

**Opinion 2:** Among the more flagrant ways that a controlling investor can breach its fiduciary duties to non-controlling investors such as Plaintiff is by freezing out and/or squeezing of their minority interests. Because controlling investors have a monopoly on information, they can skew the delivery of information to minority investors to make it appear that the condition of the business is worse than it really is. In addition, they can demand that minority investors lend or contribute additional capital to a firm, which forces such minority investors to choose between "throwing good money after bad" by continuing to invest and selling out their investment at bargain basement prices to the controlling investor, who can then often enjoy a greater degree of control and sell its new, larger interest at a premium or profit. In addition, even to the extent that capital calls are voluntary rather than mandatory, they can have a coercive effect on investors, and they can motivate investors to agree to the sale of their interests at "fire sale" prices. It is my opinion that Kleban's conduct in this matter constituted such a breach of the duties owed to the Plaintiff.

**Opinion 3:** The interest of Kleban were [sic] not aligned with the interests of the Plaintiff. Kleban's interests lay in buying SLSJ's interest for himself at the lowest possible price, particularly when he knew that there were other interested buyers of Black Rock Shopping Center at potentially higher prices. Plaintiff's interest was in receiving the highest return on its investment in Sun Realty Associates and, in the event of a sale, the highest price available anywhere in the market for SLSJ's interest. This was a clear conflict. It is ordinary and customary business behavior for investors such as Kleban to disclose and to manage such conflicts. Based on the facts provided to me, Kleban's failure to disclose and to manage his obvious conflicts of interest constituted breaches of fiduciary duty.

Doc. 66 (Exhibit A, "Expert Report of Jonathan R. Macey"), ¶¶ 10-12.

In addition to his three opinions, Macey states that he will "tailor [his] testimony" and "provide context" designed to advance Plaintiff's theory of liability and emphasize Defendant's alleged wrong-doing. *Id.*, ¶¶ 14-16. As to "context," Macey plans to testify to the jury that a duty of care was created by Kleban's "expertise in real estate management and finance" and "repeated

assurances to Plaintiff that he was keeping Plaintiff fully informed and was managing Sun Realty for the benefit of all investors." *Id.*, ¶¶ 15, 28. He also proposes to "tailor [his] testimony to explain why SLSJ's employment of legal counsel does not alter the fiduciary duties owed to SLSJ." *Id.*, ¶ 15 . As further "context," he proposes to explain to the jury ways in which Defendants breached legal duties of care through "squeeze-outs, freeze-outs," the disclosure of "asymmetric information," and Kleban's "undisclosed" "dealings with third-parties" in an "effort to sell interests in Black Rock Shopping Center," as well as "efforts to amend [the] Sun Realty Operating Agreement" to obtain a majority interest in Sun Realty Associates. *Id.,* ¶ 16.

Furthermore, Macey intends to testify to the jury with respect to the law regarding limited liability companies and privately held businesses by, for example, providing the "legal rules" which govern them. He thus states that he will advise the triers of fact on:

> the duty of good faith and fair dealing members owe to each other and the fiduciary duties owed by a manager to members, including the duty to subordinate self-interest to the interest of the firm and its members, the duty to provide material information, and the particular manifestations of these duties that arise when a manager engages in a transaction with a member to whom the manager owes fiduciary duties.

*Id.* (Ex. A), at 24 (¶ 4).

According to Defendants, Macey also intends to "present testimony that impermissibly promotes Plaintiffs theory of the case," discussing "matters concerning which he has no personal knowledge." Doc. 66, at 5. For example, Macey intends to testify about: (i) communications between Lois Jeruss and her personal counsel, Carleen Shreder, and Defendants, Doc. 66, at 5 (citing Ex. A, ¶ 30); (ii) information conveyed to Sun Realty members at a "family meeting" on April 29, 2013, *id.* (citing Ex. A, ¶¶ 31-32); (iii) information conveyed at that meeting but allegedly withheld

from Plaintiff; *id.* (citing Ex. A, ¶ 33); (iv) communications between Defendants and prospective buyers of Black Rock Shopping Center, and Plaintiff's position that prospective purchasers should be disclosed to Plaintiff, *id.* (citing Ex. A. ¶¶ 34-35); (v) written communications between Kleban and Plaintiff regarding the "bleak economic situation" of Black Rock Shopping Center, challenges facing "smaller tenants," and the need for " additional capital contributions," *id.* (citing Ex. A, ¶¶37-38); (vi) terms of certain loans or capital contributions, *id.* (citing Ex. A, ¶¶ 43-45); and (vii) the respective "interests" of Kleban and Plaintiff, *id.* (citing Ex. A, ¶¶ 46-47), purporting that they "were not aligned."

Lastly, Macey intends to testify about certain facts which Defendants characterize as "lay matters within the jury's ken." Doc. 66, at 5. In particular, he "proposes to educate the jury on*, inter alia*, 'the organization and structure of a limited liability company' and 'the relative roles and responsibilities' of members of those companies." *Id.* (quoting Macey Report, Ex. A., at ¶ 4).

Summarizing Defendants' argument to preclude Macey's testimony, Defendants claim that he intends to: "(i) opine that Defendants breached legal duties owed to Plaintiff, (ii) instruct the jury on the applicable law, (iii) present a one-sided narrative of facts about which he has no personal knowledge, and (iv) address non-scientific matters that do not require expert testimony." Doc. 66, at 5-6. Defendants seek to have this expert testimony completely precluded because "[t]he Second Circuit has made it abundantly clear that each and every facet of this proffered testimony is inadmissible under [the] Federal Rules of Evidence." *Id.*, at 6.

## I. <u>Analysis</u>

### 1. <u>Expert's Qualifications</u>

With respect to Professor Macey's proffered expert testimony in this case, the Court is

satisfied that he meets the first requirement under Federal Rule of Evidence 702. He is an expert in the area in which he intends to testify. *See* Fed. R. Evid. 104(a), 702. Macey has established that he is well qualified to assist the jury as an expert in the field of corporate governance. As stated in his Report, he is the "Sam Harris Professor of Corporate Law, Corporate Finance and Securities Law at the Yale Law School and Professor in the Yale School of Management." Doc. 66 (Ex. A), ¶ 7. He is also a member of the Board of Directors of the Yale Law School Center for the Study of Corporate Governance and a member of the Faculty Advisory Group of Yale's Millstein Center for Corporate Governance and Performance. *Id.* Because he is "an expert in corporate governance and in the relationship between LLC's and their members," he may assist the jury in understanding the basic principles of corporate governance. Pursuant to Rule 702, Macey is "[a] witness who is qualified as an expert by [his] skill, experience, training, or education." His specialized knowledge will assist the trier of fact "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).[15]

### 2. Reliability and Relevance

Having determined that Macey is a qualified expert, the Court next examines his proffered opinions for their reliability and relevance. First, as to reliability, the current version of Rule 702 "incorporates the standards established in the seminal Supreme Court cases *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)." *Hersko v. United States*, No. 13-CV-3255 (JLC), 2016 WL 6126461, at *2-3 (S.D.N.Y. Oct. 20, 2016) (citing *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, 593 F. Supp.

---

[15] The Court also notes that Defendants neither challenge Macey's qualifications nor his assertions that he is an expert in the field of corporate governance. *See* Doc. 75, at 8.

2d 549, 555-56 (S.D.N.Y. 2008)).  "In *Daubert*, the Supreme Court required trial courts to serve as gatekeepers of expert testimony to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable,  509 U.S. at 589;" and "[i]n *Kumho Tire*, the Supreme Court held that *Daubert's* gatekeeping obligation applies to non-scientific experts as well, 526 U.S. at 141." *Hersko*, 2016 WL 6126461, at *3.

In particular, in determining whether an expert's proffered testimony is reliable, the court must ascertain whether the expert, "basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual vigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.  Under *Daubert*, in assessing an expert 's reasoning and/or methodology, the district court examines four non-exclusive criteria: (1) whether the expert's concept is capable of being, and has been tested; (2) whether it has been subjected to peer review; (3) what the known rate of error is; and (4) whether the technique and theory is generally accepted by the scientific community in which it belongs.  *Daubert*, 509 U.S. at 593-94.[16]

With respect to nonscientific evidence, "[c]onsistent with *Kumho Tire*, the Rule [702] as amended provides that all types of expert testimony present questions of admissibility for the trial

_____

[16]  *See also Rieger v. Orlor, Inc.*, 427 F. Supp. 2d 99 (D. Conn. 2006), in which Judge Arterton of this District enumerates the *Daubert*  reliability factors as follows:

> (1) whether the theory or technique on which the expert relies has been or could be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique has been generally accepted in the scientific community.

427 F. Supp. 2d at 102 (citing *Daubert*, 509 U.S. at 593-94).

court in deciding whether the evidence is reliable and helpful." Fed. R. Evid. 702 advisory committee note. *See also In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 593 F. Supp. 2d 549, 556 (S.D.N.Y. 2008) (discussing 2000 Amendments to Rule 702). The district court must thus act as a "gatekeeper," following general standards "in deciding whether the evidence is reliable and helpful . . . ." Fed. R. Evid. 702 advisory committee note. "Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others." *Id.* Moreover, "some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise." *Id.*

The United States Supreme Court has articulated that the test of reliability is "flexible," depending upon the "nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co.*, 526 U.S. at 150. No single factor is determinative for purposes of reliability. *Id.. See also Rieger v. Orlor, Inc.*, 427 F. Supp. 2d 99, 102 (D. Conn. 2006)

Once it finds the basis of the testimony to be reliable pursuant to Rule 702, the district court must make the determination regarding the expert testimony's relevance – *i.e.,* whether it will "assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (citing Fed. R. Evid. 702). In general, it is "well-established" in the Second Circuit that "experts are not permitted to present testimony in the form of legal conclusions." *United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined No. of Cans of Rainbow Foam Paint*, 34 F.3d 91, 96 (2d Cir. 1994). *See also Cameron v. City of N.Y.*, 598 F.3d 50, 62 (2d Cir. 2010) ("[W]itnesses may not "present testimony in the form of legal conclusions . . . [because] [s]uch testimony undertakes to tell the jury what result to reach, and thus attempts to substitute the witness's judgment for the jury's.")

(citation, internal quotation marks, and brackets omitted); *Rieger.*, 427 F. Supp. 2d at 104 ("[Because Kleiner's opinion does not proffer any specialized knowledge, and invokes legal standards (*i.e.*, that defendants could have accommodated plaintiff's disability without significant impact, and that defendants retaliated against plaintiff), his opinion would not aid the jury in making a decision, but rather attempts to substitute [his] judgment for the jury's.") (citation and internal quotation marks omitted); *Mason Capital, Ltd. v. Kaman Corp.*, No. 3:05CV1470 (MRK), 2005 WL 2850083, at *6 (D. Conn. Oct. 31, 2005) (citing *Articles of Banned Hazardous Substances*, 34 F.3d at 96, to hold expert's "construction of federal statutes is a judicial task and not a proper subject of expert testimony"). In sum, an expert's testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it," by definition does not "aid the jury in making a decision." *Bilzerian*, 926 F.2d at 1294.

*Bilzerian* is an instructive Second Circuit opinion on the permissible boundaries of an expert witness's testimony at a jury trial. In this criminal case, the defendant, charged with misrepresenting the source of funds used to purchase stock, was required to disclose the purchase on a form filed with the SEC known as a Schedule 13D. Defendant stated in that form that the stock in question was purchased with "personal funds," and did not disclose that those funds were raised from other investors with whom he had a profit-sharing and guarantee-against-loss agreement. The government charged that failure to disclose was fraudulent, and in aid of that charge called Professor John C. Coffee as a government expert witness "to testify regarding the requirements of Schedule 13D concerning disclosure of the source of funds and arrangements and understandings with others." 926 F.2d at 1294. On appeal from his conviction, defendant contended that Professor Coffee's testimony "constituted an impermissible legal instruction" and should not have been allowed by the trial judge.

*Id*.

The Second Circuit rejected that appeal. Judge Cardamone's opinion said:

> As a general rule an expert's testimony on issues of law is inadmissible. The *Marx* and *Scop* cases distinguish between factual conclusions that may be included in an expert's testimony – though they may embrace an ultimate issue to be decided by the jury – and opinions embodying legal conclusions that encroach upon the court's duty to instruct on the law. . . . These cases establish that although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating legal conclusions based on those facts.
>
> Unlike *Scop* and *Marx*, the government's expert in the present case did not give his opinion as to whether Bilzerian's actions violated the securities laws. As the government's first witness, much of Professor Coffee's testimony was general background on federal securities regulation and the filing requirements of Schedule 13D, which he presented by referring to a blank form. Although Professor Coffee did answer a few questions based on hypothetical facts, the use of hypotheticals was first introduced by the defense on cross-examination. The mere use of hypotheticals does not usurp the jury's function of applying the law to the facts of the case.

926 F.2d at 1294 (citations omitted). In affirming the defendant's conviction, the Second Circuit quoted with approval this limiting charge given to the jury by Judge Ward, the trial judge:

> Professor Coffee is here to furnish you with background concerning the meaning of terms, the procedures which are followed and his opinion as to the reasons for these procedures. He is not here to give his opinion as to what the law requires. That is a matter which must be presented to you by the court.

*Id*. at 1295.

Put simply, "[b]y definition, expert testimony that 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it,' *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.1991), does not 'aid the jury in making a decision'; rather, it 'undertakes to tell the jury what result to reach,' and thus 'attempts to

substitute the expert's judgment for the jury's,' *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir.1994) (emphasis omitted)." *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 413 (S.D.N.Y. 2016).

In evaluating the admissibility of the opinions Professor Macey proposes to state in the case at bar, it is useful to contrast the Second Circuit's reasoning in *Bilzerian* in allowing Professor Coffee's expert opinion testimony for the government, which the court of appeals allowed, with the proposed expert opinion testimony of Lee Spencer, a former SEC director, who the defendant wished to call "to elicit that the phrase 'personal funds,' as generally understood in the securities industry, includes funds derived from loans of the type received by defendant. 926 F.2d at 1295. The trial judge excluded that testimony "because it related directly to the issue of whether Bilzerian's actual 13D disclosures complied with the legal requirements;" and "[t]hus, the expert testimony would have constituted an impermissible instruction on governing law." *Id.* The Second Circuit, rejecting defendant's appeal on the point, held that the trial judge's exclusion of this particular proposed opinion testimony was correct . Judge Cardamone's opinion reasoned:

> Although testimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice, testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice. Several hypothetical questions posed to Mr. Spencer included the particular facts alleged in the indictment, blurring the line between testimony regarding industry practice and an opinion on the legality of defendant's conduct. It does not appear that the trial court's ruling was clearly wrong or that the limits placed on Spencer's earlier testimony prejudiced the defense.

*Id*. (citation omitted).[17]

In *United States v. Russo*, 74 F.3d 1383, 1395 (2d Cir. 1996), another prosecution for stock manipulation, the Second Circuit cited *Bilzerian* and affirmed the trial court's admission of a government expert's testimony because "it focused solely on factual considerations and did not involve any legal characterizations. [The expert] gave no opinion as to whether the appellants had violated the securities laws and did not make any statements about their intent; he simply described certain stock transactions and his opinion of their effect upon the market."

In *Kidder, Peabody & Co. v. IAG International Acceptance Group N.V.,* 14 F. Supp.2d 391 (S.D.N.Y. 1998), I had occasion to evaluate the proposed expert opinion testimony of yet another formidable academic: Arthur R. Miller, then the Bromley Professor of Law at Harvard Law School and noted authority on Federal civil practice. The defendant (IAG) had succeeded in obtaining a summary judgment dismissing the claim of plaintiff (Kidder, Peabody) for breach of contract, and then counterclaimed for damages caused by Kidder's initiation of the failed action and attachments of IAG's property at that time. Kidder defended against that counterclaim by contending that "it acted in good faith and upon the advice of counsel in suing IGA and obtaining and serving an order of attachment," 14 F. Supp. 2d at 393, and proposed to elicit from Professor Miller expert opinion testimony in support of that defense.

---

[17] One may note in passing that Judge Winter dissented in part in *Bilzerian*. In Judge Winter's view, "Although he is an estimable scholar, I believe that much of Professor Coffee's testimony was inadmissible. These portions consisted largely of legal opinions that should have been explored solely in the court's instructions to the jury," particularly when Spencer, defendant's expert, "was prevented by the court from answering questions that were in principle indistinguishable from those answered by Professor Coffee." 926 F.2d at 1304. Judge Winter regarded this perceived error as harmless for appeal purposes. In my evaluation of Professor Macey's proposed testimony, I am guided by Judge Cardamone's opinion for the majority in *Bilzerian*.

Specifically, Professor Miller gleaned facts from discovery (documents and depositions), described them in considerable detail, and then stated in a written report these principal opinions: "(I). Kidder sought and received advice from its outside counsel, Miller & Wrubel, relating to the dispute between Kidder and IAG, and used that advice consistent with the way in which a typical business client relies on its outside counsel"; and "(II). Kidder and Miller & Wrubel both reasonably believed that Kidder had a prima facie case of breach of contract against IAG, had proper grounds for seeking an order of attachment, and properly did not move to confirm the attachment." 14 F. Supp.2d at 394.

Professor Miller's opinions, thus expressed, posed a question under Rules of Evidence 702-704 that the opinion posed in this manner:

> The main thrust of Professor Miller's opinion is that Kidder reasonably relied upon M & W's advice in suing IAG and obtaining an order of attachment, both Kidder and M & W having formed the reasonable belief that sufficient legal grounds existed to pursue that course. While Professor Miller's report is cast in terms of the reasonableness of Kidder's and M & W's conduct, it is the functional equivalent of an opinion that Kidder did not act with malice, since one who in good faith relies upon the advice of counsel has probable cause to initiate civil proceedings, and so does not act maliciously.

> Accordingly Professor Miller's opinions "embrace[] an ultimate issue to be decided by the trier of fact," a function sanctioned by Rule 704(a), so long as those opinions do not "merely tell the jury what result to reach," an effect explicitly condemned by the Advisory Committee Notes. Nor may Professor Miller's opinions usurp the trial judge's function of instructing the jury on the law. I now consider whether Professor Miller's proffered opinions cross the line into these forbidden territories.

14 F. Supp. 2d at 398. After reviewing Second Circuit cases on the point, 14 F. Supp. 2d at 399-404, I concluded that "Second Circuit authority requires me to preclude Professor Miller's opinion

testimony, as set forth in his written report." *Id.* at 404. The reasons for that conclusion are stated in the *Kidder* opinion at 404:

    \* "To the extent that Professor Miller would seek to opine before the jury that Kidder had probable cause to believe IAG breached its contract with Kidder, he would inevitably have to discuss his construction of the contract and the parties' obligations thereunder—as he does at length in the sub-paragraphs to his written report. But that testimony would usurp the role of the jury, and is precluded by the *Marx* and *Krear* decisions."

    \* "To the extent that Professor Miller would seek to opine before the jury "about the elements of New York contract and attachment law  – as he does at length in . . . his written report – his testimony would usurp the role of the trial judge in instructing the jury on the law."

    \* "To the extent that Professor Miller would seek to opine before the jury that Kidder acted reasonably and in good faith  – as he argues at length in his written report  – the overwhelming weight of Second Circuit authority precludes expert testimony about these issues."

On that aspect of the case, I wrote in explanation:

> Whether a party acted with objective reasonableness is a quintessential common law jury question. By the same token, juries traditionally decide whether an individual acted knowingly, or willfully, or maliciously, or with specific intent, or with any other relevant state of mind. Thus, this case will present to the jury no new or more demanding task than what juries have always done.

14 F. Supp. 2d at 404. Because the questions Professor Miller undertook to answer in his expert opinion were the same as common law juries traditionally answer in their verdicts, it could not be said that Professor  Miller's opinions qualified for admission under Rule 702(a), which requires the trial judge to be satisfied that "the expert's scientific, technical, or other specialized knowledge will

help the trier of fact to understand the evidence or to determine a fact in issue."

Presumably, counsel for Kidder felt aggrieved by the refusal of the trial judge to allow them to present as commanding a figure as Professor Arthur Miller to the jury and elicit from him supportive opinions. In an effort, probably unsuccessful, to assuage counsel, I concluded the opinion in *Kidder* with these reflections, equally applicable to the case at bar:

> Notwithstanding Kidder's protests, this result works no unfairness upon it. The Kidder and M & W witnesses will testify fully concerning the relevant facts, as indeed they should. The Court will instruct the jury on the laws of contract, attachment, and malicious prosecution, as indeed it should. The jurors will then apply that law to the facts as they find them, as indeed they should, in fulfillment of the Nation's legal traditions.

14 F. Supp. 2d at 405.

Furthermore, regardless of the subject area of the expert testimony, testimony on "lay matters," which are not beyond the jury's ken is not admissible. *Andrews v. Metro-North Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989). In other words, " [a] district court should not admit testimony that is directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." *Sharkey v. J.P. Morgan Chase & Co.*, 978 F. Supp. 2d 250, 252 (S.D.N.Y. 2013) (citing and quoting *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir.2001)) (internal quotation marks omitted).

Finally, with respect to relevance, an expert's testimony may be excluded under Federal Rule of Evidence 403 "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Testimony which is prejudicial and/or wastes time by reciting and analyzing numerous alleged facts (not in evidence) to reach legal conclusions based

upon them, may be kept out of evidence under Rule 403.

### a. Bases for Macey's Opinions - Reliability

In the case at bar, rather than relying on statistical or scientific data, Macey's reasoning and methodology as a expert in general corporate governance principles are based upon his "knowledge and expertise in corporate governance and organization, particularly in the context of privately-held firms." Doc. 66, ¶ 6. As discussed above, Macey holds positions reflecting his extensive background in this field, including "Sam Harris Professor of Corporate Law, Corporate Finance and Securities Law at the Yale Law School and Professor in the Yale School of Management."[18]  *Id.*, ¶ 7. In fact, as Plaintiff notes in its responsive memorandum, the parties "do not dispute Professor Macey's ample qualifications to testify as an expert concerning the disclosed subjects of his anticipated testimony." Doc. 75, at 8.

Examining the factual basis for particular opinions, Macey states that he has formulated his proffered opinions by analyzing "facts alleged and a review of a fact summary provided by plaintiff's counsel."[19] *Id.*, ¶ 6. To provide a comprehensive list of the factual bases for his opinions, Macey appends a document entitled "Summary of Complaint and Facts that May be Assumed." Because he asserts that Plaintiff's counsel has provided him with a "fact summary," one may infer that Plaintiff has indicated that these are the facts and such facts "may be assumed" for purposes of

---

[18] Macey has provided his comprehensive curriculum vitae ("CV") with his report. That CV includes, *inter alia*, his educational degrees (A.B. in economics from Harvard College, 1977; and J.D. from Yale Law School, 1982), as well as the titles of multiple publications he authored.

[19] Macey has appended a "Summary of Complaint and Facts that May be Assumed" as Exhibit 1 to his report. That Summary includes columns of alleged "communications" between the parties and alleged "undisclosed facts." Defendants have not endorsed this summary as an accurate depiction of the facts in this case.

preparing his testimony.   In order to determine whether the fact finder will be assisted by Macey's opinions, it is essential to clarify whether he is asserting that these are factual allegations by Plaintiff, hypothetical facts, or undisputed facts (agreed upon by the parties).

A corporate governance expert may not simply recite a factual narrative from one party's perspective, granting it credibility, when he has no personal knowledge of the facts addressed. Rather, the reliability or status of the evidence upon which he bases his opinion must be clear. Under Federal Rule of Evidence 703, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Moreover, if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703.  "But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *Id.*

In the case at bar, it is unclear whether Macey believes that he is offering an expert opinion based on admissible, alleged, or hypothetical facts.   He must state with complete clarity the status of the "facts" in his appended summary or these facts will confuse, rather than assist, a jury.

In its responsive memorandum, Plaintiff states that "Professor Macey's expected testimony includes certain opinions concerning *facts in this case he was asked to assume*, as well as testimony on several generic concepts and principles not tied to specific facts in this case and in 'addition to' his opinions." Doc. 75, at 14 (citing Macey's Report, Doc. 66, ¶ 13) (emphasis added). *See also id.*, at 16 ("Mr. Macey is also prepared to testify to certain opinions based on his specialized knowledge and facts he was asked to assume.").  Plaintiff plainly asserts that "Professor Macey will assume

facts, not testify to them." *Id.,* at 19.  According to Plaintiff, "Macey is explicit that his analysis rests entirely on facts he was asked to assume" so that he "takes no position of the accuracy or completeness of the facts he assumed, nor on the credibility of any witness testimony or other evidence." *Id.*

The Court, however, finds a lack of clarity on this point in Macey's Report.  Granted, Macey states generally that he is relying on a factual summary provided to him by Plaintiff.  He does not, however, state that each of his opinions is based solely on facts that are *alleged*, and not yet proven to be true. Nor does he clarify that his opinions will only be of assistance if the assumed facts are proven to be true, which at this time they are not.  Essentially, unless and/or until these facts are proven, they may be viewed simply as hypothetical facts.  Otherwise, as Defendants assert, Macey appears to give credence to Plaintiff's version of the facts, constituting a narrative that supports Plaintiff's theory of the case.

Granted, as Plaintiff suggests, there may eventually be "ample proof in the contemporaneous documentary record and the testimony of witnesses with first-hand knowledge" to prove Plaintiff's allegations which form the basis for Macey's opinions.  Doc. 75, at 20.  At this time, however, it would be pure speculation to decide which allegations may eventually become facts in the record. The parties will be left to their proof at trial.  Needless to say, Macey will not be able to testify definitively as to "facts" not currently in the record.

For example, as to the extensive list of "communications" Macey  presents in his factual "Summary," those communications are not all in the record.  Doc. 66 (Exhibit 1), at 50-81. If the jury becomes confused, believing that these communications are facts, Macey's testimony may be unduly prejudicial.   Furthermore,  if  Plaintiff  fails  to  present  an  evidentiary  basis  to  admit  these

communications, Plaintiff may only be allowed to "disclose them to the jury . . . if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect," Fed. R. Civ. P. 703. [20] For example, if the communications simply contain "hearsay" – out of court statements offered for their truth – and there are no applicable exceptions to allow their admission, these communications may not be deemed factual evidence supporting an expert opinion. As Macey himself aptly notes, decisions, like opinions, based on untrue facts are useless – "Garbage in; garbage out."[21]

In addition, at this time there is no apparent reason that "specialized knowledge" will be helpful to the jury in assessing straightforward communications and information disseminated among the parties in this case. With an understanding of the general principles regarding the roles of members in a limited liability company, as provided by Macey, a lay person should have the ability to understand and even interpret the events that transpired.[22]

---

[20] Regarding the content of a large number of these communications, Macey provides the heading, "Undisclosed facts." Doc. 66 (Ex. 1), at 59-76. The heading suggests that these are "facts" before the Court (*i.e.*, evidence) and/or have been "undisclosed" to Plaintiff until some point in time. This heading may thus be doubly prejudicial or misleading to the trier of fact.

[21] As Macey states in footnote 10 of his Report:

The phrase garbage in – garbage out, or GIGO, is the postulate that no matter how sophisticated and capable an information processor is, the quality of that information it generates cannot be superior to the quality of the information it received. In other words, *an expert working on inaccurate data will only yield misleading results*.

Doc. 66, at 11 (emphasis added).

[22] There are limited circumstances in which an expert can comment on documents which, unlike in this case, have been admitted into evidence and require expert knowledge to interpret them. *See, e.g., Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016) ("An expert also may offer commentary on documents in evidence if the expert's testimony relates to the 'context in which [documents] were created, defining any complex or specialized terminology, or drawing

The Court clarifies that Macey may, as an expert, testify to hypothetical facts, provided that he properly designates them as hypothetical and experts in his particular field "would reasonably rely on those kinds of facts." Fed. R. Evid. 703. *See also Bilzerian*, 926 F.2d at 1294 (An expert's "mere use of hypotheticals [in his testimony] does not usurp the jury's function of applying the law to the facts of the case."); *Kidder, Peabody & Co.*, 14 F. Supp. 2d at 398 ("Under the usual format, . . . [the plaintiff's] fact witnesses would testify first." The expert "would then be asked to respond to hypothetical questions based upon the prior testimony," which would "allow[ ] the factual underpinnings of the expert's opinions to be tested by cross-examination."). Transparency regarding the unproven nature of "facts" discussed by the expert will be key.

### b. Content of Opinions Offered - Relevance

With respect to relevance, the Court turns to the content of the particular opinions Macey has proffered. As stated *supra*, Macey may testify as to the general business principles that apply to limited liability companies. *See, e.g., Scott*, 315 F.R.D. at 46 ("Experts may . . . offer testimony discussing 'ordinary practices and usages' in a particular industry.") (quoting *Highland Capital Mgmt., L.P.* v. Schneider, 379 F.Supp.2d 461, 471 (S.D.N.Y. 2005) (describing cases in which courts permitted testimony from expert witnesses regarding customs and practices in the securities industry based upon the expert's knowledge of standard trading practices).[23]

---

inferences that would not be apparent without the benefit of experience or specialized knowledge.'") (quoting *In re Fosamax Products Liab. Litig.*, 645 F. Supp. 2d 164, 192 (2009)).

[23] *See also, e.g., Shaw Group, Inc. v. Marcum*, 516 F.3d 1061 (8th Cir.2008) (affirming admission of expert testimony regarding "ordinary business practices"); *Royal Marco Point 1 Condo. Ass'n v. QBE Ins. Corp.,* No. 2:07-cv-16-FTM-99SPC, 2011 WL 470561, *4 (M.D.Fla. Feb.2, 2011) (allowing expert to compare party's conduct to what he "has seen in his experience to be standard and typical in the industry" so long as he did not testify as to ultimate legal conclusion that the matter was handled in "good or bath faith"); *CDX Liquidating Trust,* 411 B.R. at 589 (holding expert could

In so testifying, Macey must remain mindful that when corporate governance testimony relates to a limited liability company, it must be tailored to address that particular form of business entity – *i.e.*, not a publicly traded corporation *See, e.g.*, *Tindall v. H & S Homes, LLC*, No. 5:10-CV-044 CAR, 2012 WL 3241885, at *10, 12 (M.D. Ga. Aug. 7, 2012) (excluding portions of expert's corporate governance testimony on limited liability company because he did "not appear to rely upon any materials or publications related to private, closely-held companies like those involved in this case" but nonetheless allowing expert's "opinions . . . based upon [his] decades of practical experience in the areas of corporate finance and management").

Defendants, in reply to Plaintiff's response to their motion, request that the Court ban all expert testimony relating to "corporate governance" in the case of a limited liability company because they believe that there is nothing about a closely held family business that is beyond the ken of the average juror. Doc. 75, at 4-7. This blanket approach to exclusion conflicts with a district court's necessarily flexible gatekeeping analysis of expert testimony. Provided that the testimony is properly tailored to the case and based on the specialized knowledge and experience of an expert, it may be permitted. A general ban on testimony regarding principles related to small limited liability companies will not be imposed. "Limited liability companies are a relatively new business structure allowed by state statute, having some features of corporations and some features of partnerships."[24] *McNamee v. Dep't of the Treasury*, 488 F.3d 100, 107 (2d Cir. 2007) (citation and internal quotation marks omitted). Like corporations, limited liability companies and their members

properly "testify about [d]efendants' conduct in light of industry . . . standards").

[24] *See, e.g.*, Conn. Gen. Stat. §§ 34-243, *et seq.* ("The Connecticut Uniform Limited Liability Act"); § 34-255h ("Standards of conduct for members and managers"); and § 34-255i ("Rights of member, manager and person disassociated as member to information").

have rights, duties, and liabilities. Moreover, their formation involves organizing documents and operating agreements.

In the case at bar, Plaintiff has brought claims against Defendants regarding breach of fiduciary duties, aiding and abetting said breaches, and fraud in violation of the common law and Securities and Exchange Act. The parties to the case were members of Sun Realty, a limited liability company. An understanding of the general concepts regarding a limited liability company may assist the jury in determining whether Defendants have breached, or abetted in breaching, fiduciary duties to the Plaintiff. Under these circumstances, Macey will be permitted to testify as to the general principles regarding these business entities.

### 1.    __Opinion 1__

Regarding Opinion 1, in general, its contents will assist the jury if, as Macey suggests, he provides testimony regarding the "ordinary and customary behavior in a private enterprise in which there are both active investors and passive investors."[25] He may also assist in explaining the general duties and/or obligations of both types of investors in such circumstances. However, Macey may not state the conclusion that "[t]he investment relationship between SLSJ and Sun Realty was a typical arrangement in which a passive investory (SLSJ) reposed trust and confidence in an active investor ( Kleban) to act as a faithful steward of its investments." Doc. 66, at 26. That statement

---

[25]    Defendants make much of the distinction in complexity between a publicly held corporation and a small, family-held limited liability company, arguing that no expert testimony is required or permitted to explain "generic concepts and principles" pertaining to the latter. Doc. 81, at 7-8. The Court finds this sweeping assertion unpersuasive. A limited liability company is a legal entity with certain principles and terms about which an expert may testify. Granted, the extent of detail regarding this smaller and less complex business entity may not be as extensive. However, such testimony may prove helpful to jurors with little or no business experience or knowledge, and in that regard, will be permitted within the parameters described in this Ruling.

contains factual issues to be decided by the jury, facts which he has "assumed," giving rise to "the danger of unfair prejudice, confusion of the issues, or misleading the jury," Fed. R. Evid. 403.

The jury must decide whether SLSJ reasonably reposed its trust in Kleban to act as steward of its investments; and if so, whether that trust was violated. As this Court previously stated in *Kidder, Peabody & Co.*, 14 F. Supp. 2d at 404, under Second Circuit precedent, expert testimony is precluded regarding "quintessential common law jury question[s]." As the Second Circuit has directed, expert testimony's "use must be carefully circumscribed to assure that the expert does not usurp. . . the role of the jury in applying that law to the facts before it." *Bilzerian*, 926 F.2d at 1294.

In Plaintiff's Memorandum in response to Defendants' motion, Plaintiff's counsel readily acknowledges that courts "will preclude the expert 'from offering either legal conclusions or opinions that apply corporate governance concepts to the case's specific facts." Doc. 75, at 6 (citing *United States v. Brooks*, No. 06-CR-550 (S1) (JS), 2010 WL 291769, at *4 (E.D.N.Y. Jan. 11, 2010)). Through counsel, Plaintiff concedes that "Professor Macey's report includes a handful of such statements and opinions explicating fiduciary duties and concluding that defendant Kleban breached." *Id.* As a solution to this problem, Plaintiff suggests that such statements "are readily isolated, and plaintiff will stipulate to exclude them so long as there is a jury trial to determine plaintiff's claims for breach of fiduciary duty or aiding and abetting such a breach."[26] *Id.* At this

---

[26] Plaintiff explains that it "seeks to inquire into and elicit those opinions [regarding breaches of fiduciary duties] only if there is a trial limited to plaintiff's fraud claims under the Securities Exchange Act and common law, where a jury will not be asked to decide whether Mr. Kleban breached his fiduciary duties, and the opinions therefore will not embrace 'ultimate legal conclusions.'" Doc. 75, at 6. Such a distinction, however, fails to address the lack of relevance of fiduciary duties should all claims involving them be dismissed. An expert's opinion must be relevant to be admissible. Fed. R. Evid. 702. The Court need not, however, reach an issue which is not before it.

time, the Court concludes that these statements should be excluded and makes no further decision on whether any future use will be permitted.

### 2. Opinion 2

As to Opinion 2, Macey may explain the terms "freeze out" or "squeeze out" as they relate to the legal principles of a limited liability entity. For example, he may explain that a controlling investor has a monopoly on information regarding the private enterprise. To a limited extent, Macey may also provide hypothetical ways in which a controlling investor may interact with a passive investor regarding the condition of the business and/or the need for investors to contribute additional capital. However, Macey may not testify at length regarding possible "misleading" actions. A jury has the ability to determine whether the actions of an investor are "misleading" and to understand, without assistance, the kinds of facts upon which investors may be misled. Moreover, it is the Plaintiff – as opposed to Macey – who must present the facts upon which SLSJ claims it was misled.

Furthermore, Professor Macey may *not* testify: "It is my opinion that Kleban's conduct in this matter constituted such a breach of the duties owed to the Plaintiff." Doc. 66, at 26.[27] Determining whether there was a fiduciary duty under the circumstances of this particular case and whether any such duty was breached by Defendants will be issues to be decided by the jury. It is the role of the jury to apply the law to the facts before it and reach an ultimate legal conclusion.[28]

_____

[27] In citing Macey's report (Exhibit A to Doc. 66), the Court refers to the page numbers appearing at the top of the document (*i.e.*, as they appear in Doc. 66 on the case docket), as opposed to that report's internal pagination by Macey.

[28] In its responsive memorandum, Plaintiff itself states that it "will stipulate that in a jury trial encompassing its fiduciary duty claims it will not offer Mr. Macey's opinion concerning what conduct, generically or in the facts of this this [sic] case, constitutes a breach of fiduciary duty." Doc. 75, at 17. In so stating, Plaintiff reveals an understanding that such an opinion would be improper and thus barred.

3.      **Opinion 3**

Regarding Opinion 3, Macey may describe how the interests of an active and a passive investor may diverge and even conflict.   Doc. 66, at 26.   He may not, however, testify regarding the circumstance where the active investor wishes to buy the passive one's interest "at the lowest possible price," and the passive investor seeks to "receiv[e] the highest return on its investment" by selling at "the highest price available anywhere in the market."  *Id.*   The concepts of self interest and an investor's desire to obtain the best return on its investment are within a layperson's grasp without expert assistance.

In addition, as an expert, and not a factual witness, Macey may not  assert that "Kleban's interests lay in buying SLSJ's interest for himself at the lowest possible price, particularly when he knew that there were other interested buyers of Black Rock Shopping Center at potentially higher prices."  *Id.*   Kleban's motives and what he knew about other interested buyers of Black Rock Shopping Center must be established in evidence by the parties.   They are factual issues to be decided by the jury.   "[E]xperts may not offer opinions regarding the intent or motive of parties as part of their analysis."  *Scott*, 315 F.R.D. at 45.   "As a general rule, '[i]nferences about the intent or motive of parties or others lie outside of the bounds of expert testimony.'" *Id.* (quoting *In re Rezulin Prods*. Liab. Litig., 309 F.Supp.2d 531, 547 (S.D.N.Y. 2004))

In contrast, and as Plaintiff notes in its memorandum, Macey may testify as to the "ordinary and customary business behavior for [active] investors . . . to disclose and manage . . . conflicts" that may arise with passive investors.  *Id.*   He may not, however, state that "Kleban's failure to disclose and to manage his obvious conflicts of interest constituted breaches of fiduciary duty."  *Id.*   Whether Kleban failed to disclose and/or manage conflicts of interest regarding Black Rock Shopping Center

are questions for the jury. Furthermore, whether Kleban's behavior, as determined by the jury, constituted "breaches of fiduciary duty" is an ultimate legal conclusion in the case. Once again, Macey may not encroach upon the jury's role to apply the law to the facts in the case.[29]

Next, after reviewing Macey's three principal opinions, the Court examines Macey's proffered "additional testimony." To the extent that this testimony explains general corporate concepts, such as the respective roles of members of a limited liability company, it will be allowed. The Court will thus permit all of the testimony which goes to the "the corporate form of business organization, including the organization and structure of a limited liability company (LLC), the difference between active (managing) investors/members and passive (non-managing) investors/members in LLCs, and the roles and responsibilities of such active investors vis-à-vis the passive investors." *Id.*, at 27 (¶ 13). In general, Macey may also "provide testimony on the use of Operating Agreements in LLCs" and the "ordinary and customary behavior of LLCs and . . . the economic nature and function of the fiduciary duties owed by managing members of LLCs to non-

---

[29] With respect to Opinion 3, Plaintiff agrees that Macey may only properly present general corporate governance principles relating to conflicts of interest. Plaintiff thus states:

> If trial in this matter encompasses plaintiff's fiduciary duty claims, plaintiff seeks to present only that portion of Mr. Macey's "Opinion 3" that concerns the standard of "ordinary and customary business behavior" in the context of a conflict of interest, and will inquire into only that portion of Mr. Macey's Opinion 3 that concerns the process by which "such conflicts are managed in ethical and well-managed businesses," the common understanding that controlling investors who face such conflicts "must manage them appropriately," and the two principal ways such "[c]onflicts are managed," *i.e.*, disclosure and process, so that "[i]nvestors whose interests are affected by a manager's conflict of interest should be informed and consulted about what a manager or controlling investor is planning to do that will affect the value of their investments."

Doc. 75, at 18 (citing Macey's Report, Doc. 66 (Ex. A), ¶¶ 47, 49-50).

managing members, and . . . the customary expectations and understandings that passive investors have when they are members of LLCs." *Id.* (¶ 15). In describing the relationship among the members of a limited liability company, he may note that the employment of legal counsel by one member does not alter the relationship between the members.[30] *Id.* He may further explain how expertise in real estate management and finance of an active member of an LLC may customarily affect the duties of that member to passive members. *Id.*

Macey may not, however, instruct the jury about what happened in this case between Kleban and SLSJ (*e.g.*, whether Kleban made "repeated assurances to Plaintiff that he was keeping Plaintiff fully informed and was managing Sun Realty for the benefit of all investors"). *Id.* Factual evidence of what happened between the parties will be presented by counsel at trial; and the jurors, as finders of fact, will draw their own conclusions.

In addition, as set forth *supra*, if they are general business terms, Macey may explain the concepts of "squeeze-outs," "freeze-outs," and "asymmetric information in closely-held business organizations, particularly LLCs." *Id.*, at 27-28 (¶ 16). He may not, however, testify regarding "Kleban's dealings with third-parties from January 2013 in an undisclosed effort to sell interests in Black Rock Shopping Center, as well as Kleban's efforts to amend Sun Realty Operating Agreement to reduce to 50% the minimum votes necessary to make key decisions such as selling the company or property." *Id.* These alleged facts are outside of his personal knowledge, and the jury must find the relevant facts in this case.[31]

---

[30] As Plaintiff states, Macey may testify "as a generic matter based on business principles and norms, when a passive investor retains a lawyer." Doc. 75, at 25.

[31] Macey may use hypothetical fact patterns to illustrate customary dealings and fiduciary duties that may arise with respect to an LLC. He may not testify to the veracity of facts of which he

### 4. Macey's Proffered Support for Opinions

#### a. Support for Opinion 1

Finally, the Court will examine the portion of Macey's report called "Support for Opinions" to determine whether such support may be presented in this case. As to "Support for Opinion 1," the Court finds that it is proper for Macey to base his opinion on the "ordinary and customary behavior in a private enterprise in which there are both active investors and passive investors," including the customary good faith of active investors in disclosing information to passive investors which is "material to their decisions concerning their investments." Doc. 66 (Ex. A), ¶ 17. In providing support for his opinions, however, Macey may not characterize the investment relationship between SLSJ and Sun Realty as "a typical arrangement in which a passive investor (SLSJ) reposed trust and confidence in an active investor (Kleban) to act as a faithful steward of its investments." At this time, such an opinion is based on a one-sided factual narrative presented by Plaintiff's counsel. Moreover, it usurps the jury's role in interpreting the evidence to make its own determination.

Next, Macey may testify about the "norms in the world of business," and the nature and "purpose of fiduciary duties" among investors in business relationships (*e.g.,* protection of minority investors so that "an investment that result[s] in less than a controlling stake" may not be deemed "imprudent" and or stifle economic growth). *Id.*, ¶¶ 18-19. Macey may further explain the general fiduciary duties of managers of LLCs and directors and officers of corporations. *Id.*, ¶ 20. He may

---

has no personal knowledge, are not in evidence, and would be prejudicial were the jury to confuse them with established facts. Macey may not, therefore, testify to alleged facts to suggest the nature of the relationship between the parties or the "surrounding circumstances . . . [to show] whether Kleban dealt fairly with SLSJ." Doc. 75, at 23.

elaborate on the "fiduciary obligation in circumstances that present . . . a *principal-agent* or *agency problem*." *Id.*, ¶¶ 21, 22-26 (emphasis in original). Macey may not, however, discuss the application of this principle to alleged facts in the case. He may pose hypotheticals for illustrative purposes. However, the jury must find the facts and apply the law to them to reach its own conclusions.

By way of background, in discussing the fundamentals of the principal- agent relationship, Macey may explain the general importance of such a relationship to society. *Id.*, at 8 (¶ 23). In so doing, he may define such terms as "agency costs" and explain their impact upon investors and the economy in general. *Id.,* at 8-9 (¶¶ 23-24). He may describe an agent's fiduciary duty of loyalty toward the prinicipals/investors in a business relationship, discussing such concepts as self-dealing and full and fair disclosure. *Id.,* at 9 (¶ 25). He may also provide the "economic rationale for imposing fiduciary duties – to encourage investments." *Id.*

On the other hand, Macey may not opine about facts regarding the relationship between SLSJ and Sun Realty or Kleban. Specifically, he may not reach legal conclusions about the facts in the case – *i.e.,* may not decide any ultimate issues of law based on yet unproven sets of facts. For example, he may not argue or conclude that "Albert Kleban was, and held himself out as, an experienced sophisticated real estate developer who was both respected and a person worthy of trust." *Id.*, ¶ 27. It is up to Plaintiff's counsel to present evidence regarding how Kleban presented himself to Plaintiff; and it is within the jury's province to decide whether any such depiction is accurate. *Id.* Similarly, Plaintiff must place into evidence whatever assurances Kleban "repeatedly" made to SLSJ and other members of Sun Realty that "he was managing the business for their interests and keeping them apprised of material information concerning the business." *Id.*, ¶ 28.

Macey may not testify regarding the truth of alleged facts which are outside his knowledge. He may also not refer to documents not in evidence whose contents may be viewed as unduly prejudicial and/or capable of interpretation by a layperson. *See id.*, at 31 (n. 9 (quoting an April 6, 2013 email from Kleban to "Partners" regarding a summary of the "present situation")).[32]

In addition, Macey may not label Kleban as the "controlling investor" or Plaintiff as the "passive investor." *Id.*, at 11 (¶ 29). Rather, he may define those terms and allow the jury to decide if these labels should apply to the parties once the facts are fully presented. Macey is also precluded from basing opinions regarding the relationship between Kleban and Plaintiff on vague "portions of the record in this case supplied to [him] by Plaintiff's counsel." *Id.* Macey may not testify to the veracity of facts not in evidence and/or merely accept facts as true based on Plaintiff's representations.

Macey may not testify regarding what Plaintiff's manager Lois Jeruss asked her personal counsel. *Id.,* ¶ 30. He has no personal knowledge of these alleged statements, which also may constitute inadmissible hearsay and/or be privileged. Macey may, however, describe the effect, if any, on the relationship between an active investor and a passive investor if the passive investor hires an attorney. *Id.* As described *supra,* he may also discuss the general concept of "asymmetry of information," and its ramifications for passive investors. *Id.*

---

[32] Even were counsel to present such documents for admission into evidence, absent a proffer by counsel of a relevant applicable exception, such statements in a document may be hearsay if offered for the truth of the matters asserted. Fed. R. Evid. 801(a).

Moreover, although facts need not be admissible for an expert opinion relying on them to be admitted, the proponent of the opinion may only disclose inadmissible facts if an expert in that field would "reasonably rely on those kinds of facts" and "if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 793. The Court cannot make such a determination on the documents referenced at this time.

Finally, with respect to an alleged "family meeting" which took place on April 29, 2014, Macey may not testify substantively regarding the events at a meeting at which he was not present. In other words, he cannot testify to knowledge of who attended the meeting, what was said, the "agenda" for the meeting, any "disclosures" made at the meeting, and/or any fiduciary duties owed or breached at any such meeting. *Id.*, ¶¶ 31-35. Macey lacks a proper factual basis to present the facts of this meeting to the jury.

### b.      Support for Opinion 2

As support for his second principal opinion, Macey seeks to discuss breaches of fiduciary duties by a controlling investor to a non-controlling investor through such actions as "freezing out" and "squeezing out" minority interests. *Id.*, at 35 (¶ 36). He may testify in general about these concepts as they relate to LLCs. *Id. See, e.g., CDX Liquidating Trustee*, 411 B.R. at 588 (corporate governance expert permitted to "explain the general background" against which the conduct of corporate officers or directors operate). However, Macey may not conclude that "[i]t is [his] opinion that Kleban's conduct in this matter constituted such a breach of the duties owed to the Plaintiff." Doc. 66, at 14 (¶ 36). As described *supra*, under the weight of Second Circuit law, this is an ultimate conclusion which he is precluded from making. *See, e.g., Brooks*, 2010 WL 291769, at *4 ("[A]lthough a corporate governance expert can explain what a CEO does, and what a fiduciary duty is, the expert cannot opine as to whether a specific CEO's acts breached any fiduciary duty.").

Regarding an April 6, 2013, communication between Kleban and Plaintiff, unless it may be interpreted as a party admission, the contents of that communication may be hearsay if offered for

the truth.[33]  Doc. 66 (Ex. A), ¶ 37.  Moreover, unless deemed a hypothetical event, such a communication must either  be  admitted into evidence with a proper basis or assessed for its "prejudicial effect" before becoming the factual basis for an expert opinion.  Fed. R. Evid. 703. The same preclusion applies to the contents of an April 19, 2013, communication from Kleban's son, Ken, to Plaintiff and other Sun Realty members, as well as Macey's characterization of that communication as "pessimistic."  *Id.*, ¶ 38.  Macey may not testify regarding "a substantial number of other pessimistic communications" made to Plaintiff, nor as to Kleban's alleged actions in "actively . . . identifying purchasers for Black Rock Shopping Center."  *Id.*, at 38 (¶ 39 and n.22). The facts regarding these alleged activities have not yet been established and/or placed into evidence before the jury.

Furthermore, whether a communication is "pessimistic" and whether a party is  "actively" identifying potential buyers" are determinations which a lay person may make without the assistance of an expert.  *See, e.g,  United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008) ("Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own.").[34]

---

[33]  *See* Fed. R. Evid. 801(d)(3) (describing elements required to find "an opposing party's statement" does not constitute hearsay).

[34] *See also United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir.1994) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."); *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993) ("In determining whether such evidence will assist the jury, the district court must make a common sense inquiry  into  whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.") (citing Fed. R. Evid. 702, advisory committee note) (internal quotation marks omitted).

Macey may not testify to statements allegedly made by Defendants to Plaintiff "on a regular basis" that the "company needs capital calls." *Id.*, at 37 (¶ 40 & nn. 22-24). Such statements have not been factually established so that Macey may not discuss them as having actually been made, much less interpret their contents and significance to the parties. He may, however, discuss hypothetical requests by LLC members for "capital calls" to provide the jury with illustrative examples of LLC behavior.

Regarding Macey's legal discussion of the "Sun Realty LLC Operating Agreement," contract interpretation is a matter of law for the Court. *See, e.g.*, *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) ("Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court.") (citations and internal quotation marks omitted); *Care Travel Co. v. Pan Am. World Airways, Inc.*, 944 F.2d 983, 988 (2d Cir. 1991) ("The determination as to whether the contract language is readily susceptible to one or more interpretations is made by the court with reference to the contract alone."). Only after the Court finds that ambiguity exists is "extrinsic evidence of the parties' intent . . . [to] be looked at as an aid to construing the contractual language." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993). In particular, in the context of business law, an expert may not testify on legal standards he or she derives from the contract. *See, e.g.*, *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 508 (2d Cir. 1977) ("We hold that the District Court erred in permitting Friedman, an expert witness [in securities regulation and a lawyer] called by plaintiffs, to give his opinion as to the legal obligations of the parties under the contract."). Once again, the Court emphasizes that it is improper for Macey to give instructions on the applicable law. Due to his qualification as an expert in corporate governance, he

may simply testify as to the ordinary practices of members or investors in LLCs.

In particular, Macey may not testify that he "read the SunRealty LLC Operating Agreement" and is "aware that Plaintiff was not contractually obliged to make capital contributions." *Id.*, ¶ 41. He may, however, define a "capital call" in corporate governance and explain the impact of such a call on the party issuing it. He may give information about the possible reasons such a call may be issued, without defining the reason such a call may have been made in this case. *Id.,* ¶¶ 41-42.

In that same vein, Macey may testify as to the coercive nature of various capital calls without characterizing any such call in this action. *Id.*, ¶ 43. For example, he may state that sometimes capital calls "can have a coercive effect on investors, and they can motivate investors to agree to the sale of their interests at 'fire sale' prices." *Id*., ¶ 42. He may not, however, testify that the capital calls in this action, if any, were "particularly coercive." *Id.* With respect to capital calls, Macey may not characterize the contents of communications between the parties regarding capital contributions. He was not privy to such communications, and a jury can decide what events may be characterized as "coercive." *Id.* , ¶ 43 n. 35. Macey is also precluded from testifying regarding SLSJ opting out of any capital calls or Kleban making loans to Sun Realty. *Id.*, ¶¶ 44-45 & n. 25-28. He lacks personal knowledge of those facts, which must be introduced into evidence by Plaintiff if they are admissible before being recounted as facts..

### c.     Support for Opinion 3

Macey may not testify regarding the alignment of the interests of the particular parties in this action and/or whether those interests actually conflicted. *Id.*, ¶ 46. His sole basis for such testimony is the factual narrative prepared by Plaintiff's counsel, containing facts not yet in evidence. Macey may, in any event, discuss generally how the interests of active investors and passive investors in an

LLC generally align. He may testify regarding the "ordinary and customary business behavior for [such] investors . . . to disclose or to manage such conflicts." *Id.* In particular, he may discuss the "[c]onflicts in business" that arise with controlling investors and passive investors in the real estate industry," *id.*, ¶ 49, and how such conflicts are handled ("disclosure and process"), *id.*, ¶ 50. Once again, Macey may not reach the legal conclusion that "[b]ased on [his] review of the record provided to [him] Kleban did not act consistently with [the requisite] fiduciary duties."[35] *Id.*

### 5. **Macey's Conclusions**

It is readily apparent that prominent portions of Professor Macey's proffered expert opinion testimony fall well outside the boundaries of what is permissible at a jury trial. Those boundaries are established by Federal Rules of Evidence 702 to 704 and the great weight of Second Circuit authority, including the cases cited *supra*.

Thus, one finds, in the "Conclusions" section of Macey's report, declarations that "the Defendant committed a flagrant breach of the fiduciary duties to Plaintiff by freezing out and/or squeezing out its minority interests" (¶ 54), and "Kleban's failure to disclose or to manage his obvious conflicts of interest constituted breaches of fiduciary duty" (¶ 57). These are textbook examples of the sort of judgmental verdict-by-expert's opinion that cases like *Bilzerian* and *Kidder, Peabody* expressly forbid. An expert witness is not permitted, by his or her testimony, to tell a lay jury what verdict that jury should reach; and the more eminent, presentable and articulate the expert, the greater the risk this might occur.

Equally problematic is Macey's conclusion in ¶ 53 that "[t]he investment relationship

---

[35] Macey's statement, "based upon [his] review of the record," also suggests that his interpretation of the facts has been established as evidence. Doc. 66, ¶ 50. Such a statement is particularly prejudicial and/or potentially misleading in light of Macey's expert status.

between SLSJ and Sun Realty was a typical arrangement in which a passive investor (SLSJ) reposed trust and confidence in an active investor (Kleban) to act as a faithful steward of its investments." Macey's opinion on this point, which undertakes to describe with particularity the intentions and mental processes of the individual parties to the litigation, commits the impermissible sin of "blurring the line between testimony regarding industry practice and an opinion on the legality of defendant's conduct." *Bilzerian*, 926 F.2d at 1295. The individual members of plaintiff SLSJ can testify and describe the nature of whatever trust and confidence they reposed in Kleban, be it healthy skepticism; blind, trusting and unthinking acceptance; or something in between. The jury will make what it will of that testimony, and consider its effect in the light of the trial judge's instructions on the applicable law. But this is not an acceptable subject for an expert witness's opinion.

## IV.   CONCLUSION

As one commentator, noted, "[t]he guiding principle of the body of rules governing the admissibility of expert testimony is helpfulness: to be admissible, expert testimony must be helpful." "Expert Legal Testimony," 97 Harv. L. Rev. 797 (1984). Federal Rule of Evidence 702 permits a qualified expert to testify about his or her knowledge of a field if the testimony will assist the trier of fact to "understand the evidence or to determine a fact in issue." With this principle in mind, as the discussion in this Ruling demonstrates, there  are some portions of Professor Macey's lengthy "Expert Report" which would be permissible in the form of trial testimony to a jury. However, the report is so infused with what is impermissible for that purpose that the proper course for the Court to take at this time is to grant the Defendants' motion to preclude Macey's report in its present form, together with its proposed accompanying testimony, *without prejudice* to Plaintiff's counsel obtaining from Professor Macey a revised report and proposed testimony, whose contents comply

with the strictures and limitations expressed in this Ruling.

Counsel for Defendants may then depose Professor Macey on the contents of his revised report, or make further or renewed objections to its contents, or take both of these steps. Eventually what will emerge is expert opinion testimony on behalf of Plaintiff whose substance may be placed before a jury, as to which Defendants have had the discovery contemplated by the Rules.

In formulating his new opinion, Macey is reminded that "although an expert may give his opinion on an issue of fact that the jury will eventually decide, he may not give testimony stating ultimate legal conclusions based on those facts." *AUSA Life Ins. Co. v. Dwyer*, 899 F. Supp. 1200, 1202 (S.D.N.Y. 1995) (citing *Bilzerian*, 926 F.2d at 1294). Ultimate legal conclusions by an expert, particularly those in which an expert tracks the language of a legal standard or statute, are barred. *See, e.g.*, *Scop*, 846 F.2d at 140 (reversing defendant's conviction on criminal securities counts where expert witness's opinion "drew directly upon the language of the statute and accompanying regulations concerning 'manipulation' and 'fraud'"). Moreover, a corporate governance expert may not simply recite a factual narrative from one party's perspective, granting it credibility, when he has no personal knowledge of the facts addressed.

For the foregoing reasons, Defendants' motion [Doc. 65] to preclude the expert opinion testimony of Professor Macey in its present form is GRANTED, *without prejudice* to Plaintiff's right to submit a revised opinion and testimony by Macey, consistent with this Ruling.

It is SO ORDERED.

Signed: New Haven, Connecticut
          September 29, 2017

                                        /s/Charles S. Haight, Jr.
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge