# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SLSJ, LLC, | : | Case No. 3:14-CV-00390 (CSH) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ALBERT KLEBAN and THE LE RIVAGE, | : | April 5, 2018 |
| LIMITED PARTNERSHIP, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT[1]

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Albert Kleban and The Le Rivage Limited Partnership ("Le Rivage") (herein collectively "Defendants") respectfully move that summary judgment enter against Plaintiff SLSJ, LLC's Complaint.

---

[1] Defendants' Motion for Summary Judgment is filed in accordance with the Scheduling Order, which directed dispositive motions to be filed "within thirty (30) days following the close of discovery." Doc. 84. As discussed herein, completion of discovery has been delayed because the revised report of Plaintiff's expert, Professor Jonathan R. Macey, has not to date been disclosed.

The Court's September 29, 2017 ruling on Defendants' Motion to Prelude Expert Testimony (the "Ruling") provided, in pertinent part, that Professor Macey's "report is so infused with what is impermissible … that the proper course for the Court to take at this time is to grant the Defendants' motion to preclude Macey's report in its present form, together with its proposed accompanying testimony, *without prejudice* to Plaintiff's counsel obtaining from Professor Macey a revised report and proposed testimony, whose contents comply with the strictures and limitations expressed in this Ruling." Doc. 85 at 52.

On October 4, 2017, counsel conferred in regard to the Ruling and the scheduling of Defendants' disclosure of experts pending the submission of a revised expert report from Professor Macey. Plaintiff's counsel stated that Professor Macey would need additional time to review the Court's ruling and to provide a revised report. Defendants' counsel agreed to the request for additional time and stated he would disclose Defendants' expert reports, if any, following submission of Professor Macey's revised report.

On April 2, 2018, counsel again conferred, following receipt of the Court's order of March 29, 2018, directing filing of the Joint Trial Memorandum. Doc. 86. Plaintiff's counsel at that time informed Defendant's counsel that he does not yet have a revised report from Professor Macey. Defendants' counsel accordingly informed Plaintiff's counsel that Defendants will be filing this motion for summary judgment.

Distilled to its essence, Plaintiff alleges that it was cheated in connection with the sale of its interest in a certain limited liability company to Albert Kleban, and charges Albert Kleban with breach of fiduciary duty and fraud in violation of the common law and the Securities Act of 1934 ("Securities Act"). The case must be dismissed because Plaintiff's theories of liability are legally defective and not supported by the facts. As matters of law, Plaintiff was neither owed a fiduciary duty nor possessed a "security" interest as defined in the Securities Act.  Moreover, the record demonstrates that Plaintiff's allegations against Defendants are false, and that Albert Kleban at all times relevant dealt with Plaintiff in a fair and transparent manner.

## I.        STATEMENT OF UNDISPUTED FACTS

### A.        Sun Realty Associates, LLC

This case has its origins in the sale, purchase and assignment of Plaintiff's ownership interest in Sun Realty Associates, LLC ("Sun Realty"), a family-owned limited liability company, which owned a portion of Black Rock Shopping Center, located at 2187-2285 Black Rock Turnpike in Fairfield, Connecticut ("Black Shopping Center"). Among other tenants, Black Rock Shopping Center is presently leased to clothing retailers, The Gap and Old Navy, food vendors, Einstein Bros. Bagels and Moe's Southwest Grill, and an aquatics centers called Wings of Water School of Swimming ("Wings Over Water").[2]

Sun Realty was owned at its inception by three brothers, Leon, Harry and Irving Kleban. Doc 1. at ¶ 14. The brothers each owned a one-third membership interest in Sun Realty, which, upon their deaths, passed to their children, grandchildren, or affiliated business entities or trusts. Id. at ¶ 17. Some of those children and affiliated business entities are parties to this lawsuit. Defendant Albert Kleban is the son of Irving Kleban, and the general partner of Defendant Le

---

[2]        See Kleban Properties, http://www.klebanproperties.com/connecticut/fairfield/blackrockshoppingcenter_floorplan.pdf (last visited Apr. 2, 2018).

Rivage Limited Partnership ("Le Rivage"). Lois Jeruss is the daughter of Leon Kleban and first cousin to Albert Kleban. She is the managing member of Plaintiff SLSJ, LLC ("Plaintiff" or "SLSJ"). Id. Jeruss owns 70% percent of Plaintiff and the remainder is owned by her two daughters. Id. at ¶ 18; **Exhibit A**, **SLSJ, LLC Deposition Transcript ("SLSJ Dep.") 16:24 — 17:5.**

Sun Realty is organized pursuant to a certain Amended and Restated Operating Agreement, executed by Sun Realty members on May 26, 1999, and amended February 20, 2002 ("Sun Realty Operating Agreement"). The members of Sun Realty and their percentage ownership interests, as stated in the Operating Agreement, at the relevant times, were as follows: The Roberta Howard Family Trust (8.333%), The Natalie A. Blank Family Trust (8.333%); The Allan J. Kleban Family Trust (8.333%); SLSJ (33.333%); Harry Kleban Share A Trust U/W Article Sixth (8.333%); LeRivage (11.105%); Eleanor I. Levin (11.105%); Ruth I Berger (11.110%); and the Sun Realty-SMP, Inc. ("SMP") (.01%). **Exhibit B, Sun Realty Operating Agreement, Exhibit A.**

Article VI of the Operating Agreement designated SMP as the corporate manager of Sun Realty. **Id. at § 6.2**. SMP was owned by Albert Kleban and his wife Alida Kleban, and was comprised of five directors: Albert and Alida Kleban, their son, Ken Kleban, Stephan B. Grozinger, Esq., and Lucy G. Fabrizi. **Exhibit C, Unanimous Consent of the Shareholders of Sun Realty-SMP, Inc. and Related Documents ("SMP Consent Agreement"); Exhibit D, Albert Kleban Deposition Transcript ("Albert Kleban Dep.") 31:19-22.**

The Operating Agreement invested SMP with the authority "to manage, control, administer and operate the business and affairs of [Sun Realty] and to make all decisions affecting such business and affairs." **Exhibit B, Operating Agreement, § 6.2.** SMP's

management authority included the power to, *inter alia*: acquire property, enter into lease agreements and other contracts, purchase liability and other insurance, make expenditures necessary for the management of the affairs of the company, and expend funds on capital improvement projects up to a specified amount. **Id. at § 6.2(a)-(h).**

The management authority of SMP was, however, limited in numerous and important ways. SMP, for example, had no authority to negotiate the sale or secure refinancing of Black Rocking Shopping Center without agreement from 51% of the Sun Realty membership interest. **Id. at § 6(h)**. It also could not compel any member of Sun Realty to make capital contributions to Sun Realty. Capital contributions to Sun Realty were strictly voluntary. **Id. at § 3.2(b); Exhibit E, Allan Kleban Deposition Transcript ("Allan Kleban Dep.") 84:1-2, 94:19-22; Exhibit F, Memorandum from Albert Kleban to Sun Realty Members, dated 1/9/12** (stating "there is no provision in the operating agreement for a required capital call"). In keeping therewith, there were also limits on the amount of money SMP was authorized to spend on capital improvement projects. **Id. at § 6.2(g)**. SMP also could not unilaterally alter the terms of the Operating Agreement. Amendments to the Operating Agreement required the unanimous consent of all members of Sun Realty. **Id. at § 12.1**.

In addition to the management authority invested in SMP under the Operating Agreement, the day-to-day management, operation and maintenance of Black Rock Shopping Center was assigned to Turnpike Properties, LLC ("Turnpike") pursuant to a certain Property Management Contract entered into between Sun Realty and Turnpike on January 1, 2001 ("Turnpike Property Management Contract"). **Exhibit G, Turnpike Property Management Contract**. Turnpike was owned, in part by Albert and Ken Kleban, and employed Jackie Campell (nee Morris), as its property manager. **Id.; Exhibit D, Albert Kleban Dep. 48:12-18**.

Pursuant to the Property Management Contract, Turnpike was required to, *inter alia*, collect rents; purchase supplies, equipment and trade services; order and supervise repairs and alterations; pay invoices; maintain and repair fixtures, equipment and other machinery; take legal action on behalf of Sun Realty; review plans and specifications related documents for tenant construction work; and ensure compliance with laws and ordinances relative to the property's leasing, use, operation and maintenance. **Exhibit G at § 2.1.**

As discussed in greater detail below, much of SMP's and Turnpike's time and energy was spent keeping the properties at Black Rock Shopping Center fully leased. Efforts in this regard included, *inter alia*, marketing the property, negotiating lease agreements with tenants and real estate brokers, directing "fit-ups" or redesign of the property to accommodate new tenants, submitting zoning board applications, and working out forbearance agreements when a tenant fell into arrears. The time and energy spent on such tasks increased significantly as tenants squeezed by the 2008/2009 recession folded and vacated Black Shopping Center.

B.     **Sun Realty Members Are Kept Abreast of Developments At Black Rock**

SMP, as manager to Sun Realty, and Turnpike, as the property manager of Black Rock Shopping Center, kept the members of Sun Realty informed about Sun Realty's financial affairs and developments at Black Rocking Shopping involving tenants. Sun Realty members were kept apprised in this regard by Albert Kleban, Ken Kleban and/or Jackie Campbell, on behalf of SMP and Turnpike. Information for Sun Realty members was conveyed through written correspondences sent by e-mail, fax and mail, as well as a website that was developed in more recent years. **Exhibit E, Allan Kleban Dep. at 21:14 - 24:22.** Some of the information that SMP and Turnpike conveyed was financial in nature. For example, on a yearly basis, SMP and Turnpike distributed a projected cash flow and a projected roll to Sun Realty members. On a

monthly basis, SMP and Turnpike distributed to members a cash flow and expense report. **Id. at 153:13 - 154:22.** Financial information, including profit and loss information, cash flows and rent rolls, were also accessible to Sun Realty members through an online website. **Id. at 23:1 - 24:22.**

Information conveyed to Sun Realty members by SMP and Turnpike also related to financial difficulties of tenants, tenant turnover, replacement of tenants, and SMP's and Turnpike's creative efforts to keep Black Rock Shopping Center fully leased and profitable. By way of example, in 2008 and 2009, SMP advised Sun Realty members regarding, *inter alia*: replacement of Marty's Shoes by Nine West; replacement of Rye Ridge Deli with Moe's Southwest Grill; replacement of Olympia Sports with Aspen Dental; a lease signed with Fundamental Plus to assume space occupied by The Gap; efforts to redemise Old Navy to accommodate Fresh Market; lease negotiations with Gap; an arrearage owing from Madison Jewelers; and a rent concession from Hallmark Cards. **Exhibit H, Memorandum from Albert Kleban to Sun Realty Members, dated 1/18/08; Exhibit I, Memorandum from Albert Kleban to Sun Realty Members, dated 10/22/09; Exhibit PPP, Memorandum from Albert Kleban to Sun Realty Members, dated 11/6/09.**

In 2010, SMP and Turnpike advised Sun Realty regarding, inter alia, recapture of the lower level of Ritz Camera and plans to construct a swimming pool at the shopping center as part of lease negotiations with Wings Over Water School of Swimming ("Wings Over Water"). **Exhibit J, Memorandum from Albert Kleban to Sun Realty Members, dated 8/3/10; Exhibit K, Memorandum from Albert Kleban to Sun Realty Members, dated 9/29/10; Exhibit L, Memorandum from Albert Kleban to Sun Realty Members, dated 12/7/10.**

In 2011 and 2012, SMP and Turnpike advised Sun Realty members regarding, *inter alia*: replacement of Nine West with Carter's Jewelers; termination of lease agreement by Madison Jewelers; an arrearage owing from Hallmark Cards; a new lease agreement signed with Hallmark Cards; a property façade renovation; and construction at the Rehabilitation Associates and Verizon spaces. **Exhibit M, E-mail from J. Campbell to Sun Realty Members, dated 2/15/12 Exhibit N, Memorandum from Albert Kleban to Sun Realty Members, dated 10/13/11; Exhibit O, Memorandum from Albert Kleban to Sun Realty Members, dated 10/18/11.**

Given the information that SMP and Turnpike regularly disseminated regarding Sun Realty's financial affairs and the status of tenants at Black Rock Shopping Center, there was a general consensus among Sun Realty members that SMP and Turnpike were doing a good job of keeping all members sufficiently informed. **Exhibit A, SLSJ Dep. at 69:5-11; Exhibit E, Allan Kleban Dep. at 36:10-20.** Plaintiff, through counsel, regularly asked SMP and Turnpike questions, and received answers regarding Sun Realty's affairs, including questions regarding, amortization schedules, capital calls, cash reserves, cash distributions, cash flows from tenants properties, construction projections, debt servicing, project financing, repayment schedules for loans made to Sun Realty by members, and tax considerations. **Exhibit M; Exhibit P, E-mail from J. Campbell to C. Schreder, dated 11/22/08; Exhibit Q, E-mail from C. Schreder to J. Campbell, dated 8/11/10; Exhibit R, E-mail from J. Campbell to C. Schreder, dated 8/17/11; Exhibit S, E-Mail from C. Schreder to J. Campbell, dated 10/20/11; Exhibit T, E-mail from J. Campbell to C. Schreder, dated 10/25/11; Exhibit U, E-mail from C. Schreder to J. Campbell, dated 10/28/11; Exhibit V, E-mail from C. Schreder to J. Campbell, dated 11/2/11.** On several occasions, to help answers its questions regarding Sun Realty, SMP and Turnpike, through Albert Kleban, invited Lois Jeruss and her attorney to visit the premises in

November 2011.  **Exhibit W**, **Note from Albert Kleban, dated 11/3/11**.  However, Lois Jeruss declined the invitation.  **Exhibit D at 141:11 – 142:7**.

### C.      Early Capital Calls

As was the case for many commercial property owners at the time, the economic recession presented Sun Realty with particular challenges, including greater than average tenant turnover.  Although SMP and Turnpike, were, in most instances, able to negotiate lease agreements with new tenants, replacement of old tenants generally meant brokerage fees in connection with lease agreements and "fit-up" costs required to redesign spaces in order to accommodate new tenants.  Though not required under the terms of the Operating Agreement, SMP on several occasions asked Sun Realty members to make certain pro rata contributions to pay for costs associated with tenant turnover.  For example, new lease agreements planned at the end of 2009 with Moe's Southwest Grill, Gap, Old Navy, Aspen Dental, and Fundamentals Plus, required a capital infusion of $1.5 million.  **Exhibit I; Exhibit X, Memorandum from Albert Kleban to Sun Realty Members, dated 11/6/09**.  In 2010, a $600,000 capital call was required to recapture the first floor of Ritz Camera and for construction of a swimming pool for Wings Over Water.  **Exhibits J and L**.  Again, in 2011, $200,000 in capital was required for fit-up costs to lease space to Carter's Jewelers.  **Exhibits N and O**.  The voluntary nature of the capital calls meant that, as a practical matter, a capital improvement project could not proceed unless there was agreement among a substantial interest of members.  **Exhibit N**.  In this regard, each member of Sun Realty was an active participant in its direction and management.

### D.      SLSJ Is An Active Participant In Sun Realty

As 33.3333% stakeholder in Sun Realty, Plaintiff's interest in Sun Realty was roughly three times greater than Sun Realty's next largest member.  In theory, Plaintiff had as much say in

Sun Realty's direction and management as any other members — perhaps more so given the size of its membership interest. In practice, Plaintiff was an active participant in Sun Realty's affairs, expressing its opinion on Sun Realty's management and direction to SMP and Turnpike, generally through its attorney Carleen Schreder. At the time relevant to this lawsuit, Ms. Schreder was an estate tax and income tax planning attorney, who had experience representing family owned businesses and, in the real estate area, advising clients on loans, transfers, sales and exchanges. **Exhibit Z, Carleen L. Schreder, Attorney Biography.** Plaintiff's interests in Sun Realty were also represented by attorney Richard Hoffman. **Exhibit A, SLSJ Dep. at 135:8-14.** Mr. Hoffman was very familiar with the Connecticut real estate market. **Id.**

One of Plaintiff's most significant, early involvements in the direction and management of Sun Realty occurred in the early 2000s when Albert Kleban, on behalf of SMP, was presented with the opportunity to purchase a gas station adjacent to Black Rock Shopping Center. Purchase of the gas station would have permitted the expansion of Black Rock Shopping, and every member of Sun Realty, including Plaintiff, agreed that the purchase would generate a substantial increase in gross income for Sun Realty. Ultimately, however, Plaintiff refused to consent to the purchase of the gas station, thereby preventing Sun Realty from purchasing it. Instead, numerous other Kleban family members with ownership interests in Sun Realty created another limited liability company, Fairfield Break and Wheel, LLC ("FBW"), which purchased the gas station property. FBW then ground leased the gas station property to Sun Realty, so that that Sun Realty could expand Black Rock Shopping Center onto that property. **Exhibit AA, Letter from J. Campbell to C. Schreder, dated 8/5/05**. Despite its decision not to consent to the purchase of the gas station, Plaintiff, as a member of Sun Realty, would later benefit from the increase in

gross sales owing to Sun Realty's ground lease of the gas station property from FBW. **Id.; Exhibit BB, Letter from C. Schreder to J. Campbell, dated 8/5/05.**[3]

Plaintiff was also an early advocate of Sun Realty selling out to a third party, and in that regard, was instrumental in setting Sun Realty on a course that culminated in the sale of the Sun Realty and certain other entities affiliated with the Kleban family in the fourth quarter of 2013. In November 2011, for example, Plaintiff advised SMP that given the stress on owners created by reoccurring capital calls, it would be in Sun Realty's best interest to sell Black Rock Shopping Center. **Exhibit CC, E-mail from C. Schreder to J. Campbell, dated 11/8/11.** In response to this suggestion, SMP commissioned an appraisal of the property. **Exhibit DD, Memorandum from Albert Kleban to Sun Realty Members, dated 1/9/12; Exhibit EE, Wellspeak Appraisal, 12/23/11; Exhibit FF, E-mail from J. Campbell to C. Schreder, dated 2/1/12.** Again, in January and March of 2012, Plaintiff urged SMP to sell Sun Realty's interest in Black Rock Shopping Center. **Exhibit GG, E-mail from C. Schreder to J. Campbell, dated 1/20/12; Exhibit HH, Memorandum from C. Schreder to Albert Kleban, dated 3/12/12.** As discussed below, SMP thereafter engaged in efforts to market and sell Black Rock Shopping Center.

Apart from steering Sun Realty toward the decision to sell Black Rock Shopping, and steering it away from purchasing the gas station property and The Children's Place property, Plaintiff participated in the affairs of Sun Realty in other ways. Plaintiff, for example, repeatedly advised Sun Realty to adopt an overall plan for dealing with tenant turnover and to abandon its piecemeal approach to addressing tenant vacancies. **Exhibits S and V**. In particular, Plaintiff expressed its position that cash flow should be diverted to capital improvements to obviate the

---

[3] Sun Realty later had an opportunity to purchase another piece of property contiguous with Black Rock Shopping Center, which was home to The Children's Place.  Plaintiff, however, refused to go along with the purchase of that property, requiring Sun Realty members to from an entity called Kleban Development Corporation, LLC ("KBC") in order to purchase that property.  **Exhibit E** at 147: 9-19.

necessity of making loans to Sun Realty to fund the costs associated with tenant defaults.
**Exhibit T.** On one occasion, Plaintiff advised SMP to direct cash flow from a recently acquired lease with Nine West to Sun Realty's cash reserves in order to reduce the need for capital calls.
**Exhibit P.** On another occasion relevant to Sun Realty's cash flow, Plaintiff advised Albert Kleban to arrange for a bank loan to FBW so that FBW could make payments on a loan Sun Realty had made to FBW. **Exhibit II, Letter from C. Schreder to Albert Kleban, dated 8/3/05**.

Plaintiff also played a significant role in decisions SMP made on behalf of Sun Realty regarding Sun Realty's potential tax obligations. In November 2011, for example, Plaintiff advised SMP that a sale of Black Rock Shopping Center should occur before the end of 2012 to avoid expected increases in tax rates, including capital gains taxes. **Exhibit CC.** Later, in August 2010, in connection with the construction of a swimming pool for Wings Over Water, Plaintiff advised Sun Realty regarding the tax implications of a $170,000 loan from Sun Realty to Wings Over Water, explaining to SMP that to avoid a tax event, SMP should not accept rent payments from Wings Over Water as its repayment of the loan. **Exhibit M.** Again, in January 2012, Plaintiff identified an error in the way Sun Realty was allocating interest on its 2011 tax return.
**Exhibit JJ, Memorandum from C. Schreder to Albert Kleban, dated 6/29/12; see also Exhibit HHH, E-mail from Albert Kleban to Sun Realty Members, dated 7/14/12; Exhibit III, E-mail from C. Schreder to J. Campbell, dated 9/11/12; Exhibit KK, E-mail from J. Campbell to C. Schreder, dated 9/25/12.** As a result of Plaintiff's input, SMP caused Sun Realty to correct the error and calculate the interest in the manner Plaintiff had suggested.
**Id.**

E.     **Sun Realty Needs To Refinance Black Rock's Mortgage**

SMP's regular updates to Sun Realty members about developments at Black Rock Shopping Center and the financial affairs of Sun Realty, included an early appraisal of Sun Realty's obligation to refinance its mortgage in 2015. **Exhibit DD**. In January 2012, SMP Turnpike advised Sun Realty that the expected mortgage refinance would likely require amortization and higher interest rate, which would reduce cash flow, as well as personal guarantees from Sun Realty members. **Id.** In light of considerations presented by the obligation to refinance the mortgage, as well as a desire expressed by some members of Sun Realty to sell Black Rock Shopping Center, SMP asked each member of Sun Realty to indicate whether they would be interested in selling their shares of Sun Realty to other members or would agree to Sun Realty selling Black Rock Shopping to a third party. **Id.** SMP at this time provided Sun Realty members with the appraisal it commissioned for the property in response to Plaintiffs earlier urging that that the property be sold. **Id.; see Exhibit EE.** Plaintiff advised SMP that it would be in favor of Sun Realty selling Black Rock Shopping Center in its entirety, as well as an option that involved Plaintiff selling its interest in Sun Realty to other members of Sun Realty before the mortgage had to be refinanced. **Exhibit HH.** Plaintiff also advised SMP that Lois Jeruss would not be willing to personally guarantee any loans in connection with mortgage refinance. **Id.**

In addition to considerations regarding the impending mortgage refinance, high tenant turnover and uncertainty about whether other tenants would be renewing their lease agreements, factored into Sun Realty's members' deliberations about whether or not a sale of their individual interests in Black Shopping Center, or a sale of their property in its entirety, was advisable. In June and July of 2012, SMP reported to Sun Realty members that Madison Jewelers was going out of business and was behind on rent, that Hallmark was struggling to make rent payments and

would be filing for bankruptcy, that Ritz Camera was $12,000 behind on rent and would also be filing for bankruptcy, and that Audio Design had vacated Turnpike Shopping Center[4] without giving notice. **Exhibit LL, Memorandum from Albert Kleban to Sun Realty Members, dated 6/27/12; Exhibit MM, Memorandum from Albert Kleban to Sun Realty Members, dated 7/10/12; Exhibit HHH.** SMP described the problems with tenants as "serious"; **Exhibit HHH**; and characterized the real estate market as "exceptionally difficult"; **Exhibit LL**. In December 2012, SMP, through Albert Kleban, reported that the retail stores at Black Rock Shopping Center were having a "less than stellar performance" as a result of a variety of factors, including a decline in consumer spending, competition from big chain stores, and internet sales, and that in addition to Madison Jewelers, The Clubhouse was also behind on rent. **Exhibit NN, Memorandum from Albert Kleban to Sun Realty Members, dated 12/12/12.** Nevertheless, Albert Kleban was cautiously optimistic about Sun Realty's position in the short term. Id.; see also id. at Ex. 14, ¶ 8.

The obligation to refinance the mortgage and problems with tenants were areas of concern the following spring. With respect to problems with tenants, SMP advised Sun Realty members in April 2013 that Madison Jewelers was $86,000 behind on rent, that the lease agreement with Total Look was expiring, that Koko Fit Club was terminating its lease, and that lease of the Madison Jewelers space to Meat House would require fit-up costs and brokerage fees. **Exhibit OO, Memorandum from Albert Kleban to Sun Realty Members, dated 4/6/13**. Sun Realty members were also aware at this time that Sun Realty's biggest tenants, The Gap and Old Navy, might not renew their leases. **Exhibit E, Allan Kleban Dep. 187:3-18**. SMP also

---

[4] Turnpike Shopping Center was not part of Sun Realty's portfolio, but was owned by other entities affiliated with the Kleban family. As it was located near Black Rock Shopping Center, the unexpected vacancy of Audio Design was indicative of the general real estate environment at Black Rock Turnpike. See Transcript of Allan Kleban Deposition ("Allan Kleban Dep.") at 35-36.

reiterated at this time that Sun Realty was required to start amortizing the mortgage for Black Rock Shopping Center pursuant to the original mortgage agreement for Black Rock Shopping Center negotiated in 2006. **Exhibit OO.** To fund the amortization and expenses relating to tenant turnover, SMP suggested that Sun Realty members pay their pro rata share of a $300,000 capital call, which, in Plaintiff's case would have been $99,999.00.  **Id.** In addition to the expected $300,000 capital call, Ken Kleban provided Sun Realty members with an analysis that projected that the expected mortgage refinance would need to be funded by additional significant capital contributions as well as a conversion of loans made by Sun Realty members to Sun Realty to equity. **Exhibit PP, E-mail from J. Campbell to Sun Realty Members, dated 4/19/13.**

   F.   **Family Meeting**

To address the future of Black Rock Shopping Center, SMP, through Albert Kleban, invited Sun Realty members to a family meeting to be held at the Turnpike office on April 29, 2013 at 9:00 am (the "Family Meeting"). Albert Kleban expressed his view that the meeting would facilitate "a friendly and open exchange of ideas, complete transparency of . . . family business operations, and solidarity as a family moving forward."  **Exhibit QQ, E-mail from Albert Kleban to Sun Realty Members, dated 4/6/13.** The Family Meeting was by all accounts well-attended, but Lois Jeruss refused to attend, having determined ahead of time that nothing new would come of the meeting and that it would not be worth her while to attend.  **Exhibit E, Allan Kleban Dep. at 79:1-17; Exhibit A, SLSJ Dep. at 124:13 — 129:17.** The Family Meeting provided clarity on the direction of Sun Realty.

The prospect of selling Sun Realty to a third party was also discussed at the Family Meeting.  **Exhibit E, Allan Kleban Dep. at 91:22 — 92:22.** Albert and Ken Kleban explained that they had exploratory conversations with certain real estate investment trusts ("REITs"),

including Kimco Realty ("Kimco") about selling interests in Sun Realty or other properties owned by the Kleban family.  **Id.** at 92:18-94-2; **Exhibit RR, Ken Kleban Deposition Transcript ("K. Kleban Dep.") at 56:12-24; Exhibit D, Albert Kleban Deposition Transcript ("Albert Kleban Dep.") at 89:13 - 90:11; 121:3-16.**  Albert and Ken also explained that they had preliminary conversations with HFF, a commercial real estate broker, about marketing Black Rock Shopping Center and other Kleban family properties as properties for sale. **Exhibit RR, K. Kleban Dep. at 54:9 — 56:24**. Albert Kleban expressed his opinion, however, that Kimco was the only REIT that presented a remotely promising option for Sun Realty. **Exhibit D, Albert Kleban. Dep. at 121:3-16.** Ultimately, conversations with the aforementioned REITs did not proceed beyond the exploratory phase. As discussed below, however, it was not until August 5, 2013 that Sun Realty formally engaged HFF to seek financing for a recapitalization of Black Rock Shopping Center.  **Exhibit RR, K. Kleban Dep. at 54:9 — 55:10.**

Had Lois Jeruss attended the Family Meeting she would have received important information regarding Sun Realty first-hand and would have had the opportunity to ask questions and participate in the deliberations.  Because she did not attend, other members of Sun Realty provided Plaintiff and its attorneys with the Family Meeting's salient highlights.  Prior to the Family Meeting, Lois Jeruss instructed Attorney James Blank, a beneficiary of the Natalie A. Blank Family Trust, who planned to attend the Family Meeting, to confer with her attorney, Richard Hoffman, about the substance of the Family Meeting.  **Exhibit A, SLSJ Dep. at 133:15 — 138:7; Exhibit RR, K. Kleban Dep. at 59:9 — 60:4.** In addition, Allan Kleban, Lois Jeruss' first cousin, had also attended the meeting, and afterwards discussed the substance of the meeting

with both Lois Jeruss and Plaintiff's other attorney, Carleen Schreder. **Exhibit A, SLSJ Dep. at 144:14 — 145:3; Exhibit E, Albert Kleban Dep. at 90:18 — 91:24.**

  G. **Allan Kleban Brokers Sale Of Plaintiff's Interest In Sun Realty To Le Rivage**

  On the same day of the Family Meeting, immediately after it concluded, Albert and Ken Kleban met separately with Allan Kleban. **Exhibit E, Allan Kleban Dep. at 104:7 — 110:20.** Allan Kleban is the first cousin of Albert Kleban, and was the beneficiary of the Allan J. Kleban Family Trust, which had an 8.33337% interest in Sun Realty. **Id. at 17:22 - 20:24; Exhibit B, Sun Realty Operating Agreement at Ex. A.** In addition, Allan Kleban had a small personal interest in Sun Realty that he inherited upon his mother's death, which together with his interest in the Allan J. Kleban Family Trust (collectively, "Allan Kleban Membership Interest"), totaled roughly an 11% interest in Sun Realty controlled by Allan Kleban. **Exhibit E, Allan Kleban Dep. at 21:10-13.** The meeting between Albert, Ken and Allan Kleban was arranged by Allan Kleban for the purpose of discussing Allan Kleban's interest in selling his 11% interest in Sun Realty to Le Rivage. **Id. at 105:9 — 106:10.** Initially, Albert and Ken Kleban indicated that they were not interested in purchasing Allan Kleban's 11% interest because Le Rivage was overexposed in Sun Realty, and as a minority shareholder, it had limited control over Black Rock Shopping Center. **Id. at 108:6-16.** Allan Kleban then suggested, based upon prior conversations he had with Lois Jeruss, that Plaintiff may be interested in selling its membership interest in Sun Realty on the same terms as Allan Kleban. **Id. at 109:22-25.** Albert and Ken Kleban indicated that Le Rivage might be agreeable to a purchase of Plaintiff's and Allan Kleban's interest in Sun Realty, provided the terms of the Operating Agreement could be amended to give controlling authority to Sun Realty's majority shareholder. **Id. at 109:22 - 112:10.** The meeting concluded

with Allan Kleban stating that he would speak to Lois Jeruss about Plaintiff selling its membership interest in Sun Realty to Le Rivage. **Id. at 110:2-6.**

Shortly after the meeting, Allan Kleban called Lois Jeruss and relayed to her the substance of his conversation with Albert and Ken Kleban, specifically Le Rivage's willingness to purchase Plaintiff's interest on the same terms as a purchase of Allan Kleban's interest. **Id. at 112:1-7.** Allan Kleban also provided Lois Jeruss with a one page valuation of Sun Realty prepared by Ken Kleban, with a note to Lois Jeruss, stating that Le Rivage was interested in purchasing Allan Kleban's and Plaintiff's interest in Sun Realty at a price based on that valuation, and inviting Carlene Schreder, Plaintiff's counsel, to contact Allan to discuss the proposal. **Id. at 112:9-10; Exhibit SS, E-mail from Allan Kleban to L. Jeruss, dated 4/30/13 with K. Kleban Valuation.** Lois Jeruss indicated to Allan Kleban that she was interested in selling Plaintiff's interest in Sun Realty on the terms that Allan Kleban described. **Exhibit A, SLSJ Dep. at 144:19 — 145:24.**

On May 3, 2013, Albert Kleban sent a letter of intent to Lois Jeruss, offering to pay $2,020,540.41 to Plaintiff to purchase its membership interest in Sun Realty and certain promissory notes held by Plaintiff totalling $914,308. Doc 1, ¶ 39. After lengthy and detailed negotiations between Schreder and counsel for Albert Kleban in which substantive changes were made to the letter of intent at Schreder's insistence, Albert Kleban sent a revised letter of intent to Plaintiff on May 22, 2013, once again offering to purchase Plaintiff's membership interest and notes for $2,020,540.41 ("Letter of Intent"). **Exhibit TT, Letter from Albert Kleban to L. Jeruss, dated 5/22/13.** Shortly thereafter, Plaintiff countersigned the Letter of Intent, thereby accepting the offer. **Id.** Albert Kleban also sent a letter of intent to Allan Kleban, offering to purchase Allan Kleban's membership interest in Sun Realty and promissory notes on the same

terms and at the same valuation offered to Plaintiff. Allan Kleban accepted the offer.  **Exhibit E, Allan Kleban Dep. at 189:13-20.**

On June 27, 2013, Plaintiff and Albert Kleban executed a Membership Purchase Agreement ("SLSJ Purchase Agreement"), dated June 1, 2013, wherein Plaintiff agreed to sell its 33.3333% membership interest and outstanding promissory notes to Albert Kleban, in exchange for $2,020,540.41, with one half payable in the form of a promissory note.  **Exhibit UU, SLSJ Purchase Agreement, dated 6/1/13.** Albert Kleban also executed a Membership Purchase Agreement with Allan Kleban ("Allan Kleban Purchase Agreement"), dated June 1, 2013, to purchase Allan Kleban's 11.11107% membership interest and outstanding promissory notes on the same terms and at the same valuation that Plaintiff's membership interests and promissory notes were being purchased.  **Exhibit VV, Allan Kleban Purchase Agreement, dated 6/1/13.**

On July 29, 2013, Plaintiff executed an "Assignment of Membership Interest" (the "SLSJ Assignment"), assigning its membership interest in Sun Realty to Le Rivage, as Albert Kleban's successor-in-interest under the SLSJ Purchase Agreement.  **Exhibit WW, SLSJ Assignment, dated 6/29/13.** On July 31, 2013, Allan Kleban also executed an "Assignment of Membership Interest" (the "Allan Kleban Assignment"), assigning his membership interests in Sun Realty to Le Rivage.  **Exhibit XX, Allan Kleban Assignment, dated 7/31/13.**

### H.    Regency Transaction

Although Plaintiff was initially satisfied with the sale of its interest in Sun Realty to Le Rivage, it took a negative view of the transaction, when, almost a full year after Allan Kleban brokered the transaction at the Family Meeting, it learned that a portion of Sun Realty had been sold to a third party along with other properties owned by the Kleban Family in March 2014. **Exhibit CCC at 37:24 — 38:1**.

That transaction followed Sun Realty's engagement of HFF, a commercial real estate broker.  On August 15, 2013, Sun Realty executed a financing fee agreement with HFF, pursuant to which HFF was engaged to market Sun Realty and other properties owned by the Kleban family, but not Plaintiff, to prospective buyers. ("Financing Fee Agreement").  **Exhibit RR, K. Kleban Dep. at 54:9 - 55:10; Exhibit ZZ, HFF Financing Fee Agreement, executed 8/15/13**.

In September 2013, Robert Rizzi of HFF, contacted Joanne Rotonde of  Regency Centers Corporation ("Regency") to discuss the possibility of purchasing interests of Sun Realty and other Kleban family properties. **Exhibit CCC, Regency Centers Corporation Deposition Transcript ("Regency Dep.") at 21:10 - 22:4; 118:21 - 121:2; Exhibit RRR, E-mail from R. Rizzi to J. Rotonde, dated 11/23/12**.  Regency was not aware that Sun Realty and other Kleban family properties were for sale until it was contacted by HFF in September 2013.  **Exhibit CCC at 118:21 - 121:2; Exhibit RRR**.

On October 11, 2013, Regency sent a formal letter of intent to HFF ("Regency Letter of Intent") to purchase an 80% interest in three Kleban owned properties: Brick Walking Shopping Center, Fairfield Shopping Center, and Black Rock Shopping Center (collectively, "Kleban Properties").  **Exhibit BBB, Regency Letter of Intent, dated 10/11/13; Exhibit CCC, Regency Dep. at 19:8-20.**  The Kleban Properties were owned by various limited liability companies controlled by members of the Kleban Family (the "Kleban Entities"), including Sun Realty, which as discussed above, owned an ownership interest in a portion of Black Rock Shopping Center.  **Exhibit DDD, Contribution Agreement, dated 10/17/13; Exhibit EEE, First Amendment to Contribution Agreement, dated 11/5/13**.  It became evident at this time that the sale of Sun Realty's interest in Black Rock Shopping Center would be maximized by offering it for sale as part of the sale of the Kleban Properties.

Pursuant to the Regency Letter of Intent, the Kleban Entities would maintain a 20% ownership stake and continue to operate and manage the properties. **Exhibit BBB**. The agreement was consummated pursuant to a Contribution Agreement signed by Regency and the Kleban Entities, dated October 17, 2013, as amended by a First Amendment to Contribution Agreement, dated November 5, 2013, a Second Amendment to Contribution Agreement, dated November 20, 2013, and a Third Amendment to Contribution Agreement, dated December 1, 2013. **Exhibit DDD; Exhibit FFF, Second Amendment to Contribution Agreement, dated 11/20/13; Exhibit AAA, Third Amendment to Contribution Agreement, dated 12/1/13**. As stated in the latter amendment, Regency agreed to purchase the Kleban Properties for $119,589,000. $24,487,793.12 of that figure was sub-allocated as the purchase price for the 80% interest in Sun Realty. **Exhibit AAA**. The transaction closed in March of 2014 following a complicated and extensive due diligence period. **Exhibit CCC at 37:24 — 38:1**.

Thereafter, Plaintiff filed this lawsuit, charging Albert Kleban with breach of fiduciary duty (count one), securities fraud (count three), and common law fraud (count four), and Le Rivage with aiding and abetting breach of fiduciary duty (count two) and imposition of constructive trust (count five).

## II.     LEGAL STANDARD

Summary judgment is appropriate when the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party, resolving all ambiguities and drawing all reasonable inferences against the movant." Hernandez v. Int'l Shoppes. LLC, 100 F.Supp.3d 232, 247 (E.D.N.Y. 2015), appeal dismissed (June 18, 2015). The substantive law governing the

case will identify those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

No genuinely triable factual issue exists "if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, it appears that the evidence supporting the non-movant's case is so scant that a rational jury could not find in its favor." Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 86 (2d Cir. 1996). If the movant meets this burden, the non-moving party must provide "specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250 (internal quotation marks and citation omitted).

## III.   ARGUMENT

### A.   Breach of Fiduciary Duty Against Albert Kleban

Plaintiff's breach of fiduciary duty claim against Albert Kleban is premised on the theory that Albert Kleban owed it a fiduciary duty because he is the "president of . . . SMP," the "managing member of Turnpike," and "the principal individual managing Sun Realty and Black Rock Shopping Center," and that Albert Kleban breached that duty of care by "omitting to state [certain] material facts" and making "incomplete and misleading disclosures of material information," in connection with Albert Kleban's purchase of Plaintiff's shares in Sun Realty. Doc. 1 at ¶¶ 59, 62. There is no merit in these allegations.

The determination of whether a fiduciary duty is owed is a question of law for the court to decide.  See Iacurci v. Sax, 313 Conn. 786, 795 (2014); Biller Assocs. v. Peterken, 269 Conn. 716, 721-22 (2004). It is well-recognized in Connecticut that not all business relationships create a fiduciary relationship. Hi-Ho Tower, Inc. v. Com-Tronics. Inc., 255 Conn. 20, 38 (2000);

accord Biller Associates v. Peterken, 269 Conn. at 723. For example, in the absence of a specific agreement to the contrary, parties to a commercial contract do not ordinarily bear a fiduciary relationship. See Calvin Klein Trademark Trust v. Wachner, 123 F. Supp. 2d 731, 733-34 (S.D.N.Y. 2000); see also Krys v. Butt, 486 Fed.Appx. 153, 155 (2d Cir. 2012) (summary order). Nor is a fiduciary duty created by the "[s]uperior skill and knowledge" of one party relative to that of another; see Hi-Ho Tower. Inc. v. Com-Tronics. Inc., 255 Conn. at 42; or by the fact that the parties' relationship is lengthy, see Iacurci v. Sax, 313 Conn. 786, 805 (2014) (parties "lengthy" relationship of seventeen years was not probative of whether fiduciary relationship existed). "It is axiomatic that a party cannot breach a fiduciary duty to another party unless a fiduciary relationship exists between them." Biller Associates v. Peterken, 269 Conn. at 723.

To prove a breach of fiduciary duty, a plaintiff must demonstrate: (1) the existence of a fiduciary duty, and (2) a breach of that duty, specifically, a breach of the duty of loyalty and honesty. See Seven Bridges Found v. Wilson Agency, Inc., No. FSTCV116009707S, 2012 WL 899206, at *4 (Conn. Super. Ct. Mar. 2, 2012). Plaintiff's claim against Albert Kleban is defective under both prongs of the test. First, Albert Kleban did not owe Plaintiff a fiduciary duty as a matter of law. Nothing in the parties' contractual agreements or in the nature of their relationship states or suggests the duty of a fiduciary. Second, as discussed *infra*, even if, *arguendo,* Albert Kleban did owe Plaintiff a fiduciary duty, there is no basis in the record from which to conclude that Albert Kleban had breached that duty.

### i.      *No Fiduciary Duty Is Discernable In The SLSJ Purchase Agreement Or SLSJ Assignment*

With respect to the existence of a fiduciary duty as a matter of law, courts look to any contracts between the parties to "discover the nexus of the parties' relationship and the particular contractual expression establishing the parties' interdependency." Krvs v. Butt, 486 F. App'x

153, 155 (2d Cir. 2012) (summary order) (internal quotation marks omitted).  "If the parties do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them."  Id. (internal quotation marks omitted).  Here, the contractual agreements between Plaintiff and Albert Kleban are the SLSJ Purchase Agreement and the SLSJ Assignment.  **See** **Exhibits UU and WW**.  It is well-settled that "parties to a commercial contract do not ordinarily bear a fiduciary relationship to one another unless they specifically so agree."  Calvin v. Klein Trademark Trust v. Wachner, 123 F. Supp. 2d 731, 733-34. Neither the SLSJ Purchase Agreement nor the SLSJ Assignment states that the relationship between Plaintiff and Albert Kleban is fiduciary in nature.  **See** **Exhibits UU and WW**. On the contrary, the Purchase Agreement indicates that Albert Kleban and Plaintiff were dealing at arms' length; it expressly states that Plaintiff and Kleban agree to hold each other harmless for any and all liabilities "arising out of the Purchase Agreement.  **See** **Exhibit UU at § 7.1**; cf. Transnational Mgmt. Sys. IL LLC v. Carcione, No. 14-CV-2151 (KBF), 2016 WL 7077040, at *4 (S.D.N.Y. Dec. 5, 2016) (dismissing claim of buyer of airplane for breach of fiduciary duty pursuant to purchase agreement, where nothing in purchase agreement suggested the parties intended to create a fiduciary duty and purchase agreement contained hold-harmless provision). As the Connecticut Supreme Court has repeatedly observed, "arm's length" business relationships are not fiduciary in nature.  Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. at 38 (discussing precedent and concluding that arm's-length transaction was not fiduciary in nature notwithstanding allegations that defendants undertook to provide technical assistance and management services to plaintiff and were plaintiff's "sole technical advisors" on whom plaintiff "relied exclusively") (internal quotation marks omitted).

Apart from the parties' contractual agreements, Plaintiff alleges that Albert Kleban owes it a fiduciary duty because he is the president of SMP and the managing member of Turnpike; however, nothing in the Turnpike Property Management Contract or the Sun Realty Operating Agreement states that Albert Kleban owes Plaintiff a fiduciary duty. The Turnpike Property Management Contract is signed by Albert Kleban on behalf of Sun Realty, and Jackie Campell (nee Morris) on behalf of Turnpike. Plaintiff is not a party to that agreement. **See** **Exhibit G at p. 8**. To the extent a fiduciary duty is defined in that agreement, it is Turnpike's fiduciary duty to Sun Realty, and Plaintiff does not allege a legal theory supporting the conclusion that Turnpike is the alter ego of Albert Kleban such that its fiduciary duty to Sun Realty is imputable to Albert Kleban as a matter of law.

The Sun Realty Operating Agreement is also not a source of Albert Kleban's fiduciary obligation. As an initial matter, Albert Kleban is neither a member of Sun Realty nor a signatory of the Operating Agreement in his individual capacity, and therefore there is no written agreement between Albert Kleban and Plaintiff that imposes on Albert Kleban a fiduciary obligation to Plaintiff. **See** **Exhibit B (signature pages)**. Nor is there any merit in Plaintiff's theory, as alleged in the complaint, that Albert Kleban owes Plaintiff a fiduciary duty because he is the "president of SMP" [Doc. 1 at ¶ 58], the manager of Sun Realty designated in the Operating Agreement. **Exhibit B at § 6.1**. That theory of the case is defective in two respects. First it assumes, contrary to the Connecticut Limited Liability Act, under which Sun Realty is organized, that managers of limited liability companies owe members the duty of a fiduciary. Second it assumes, that the duty owed by SMP to Sun Realty (assuming, *arguendo*, that one exists) is a duty that imputes to Albert Kleban as the president of SMP. Neither assumption is correct under the governing law.

Although it is generally well-settled that partners in general partnerships owe one another a fiduciary duty; see Konover Development Corp. v. Zeller, 228 Conn. 206, 226 (1994), Oakhill Associates v. D'Amato, 228 Conn. 723, 727 (1994); the duty owed among members and managers of limited liability companies is a *duty of good faith*.  See Conn. Gen. Stat. Gen. Stat. § 34-141(a) ("A member or manager [of an LLC] shall discharge his duties under . . . the operating agreement, in good faith, with the care an ordinary prudent person in a like position would exercise under similar circumstances, and in the manner he reasonably believes to be in the best interests of the limited liability company . . ."). As observed by the Connecticut Superior Court, the duty of good faith set forth in "§ 34-141 . . . is not the same as a duty of a fiduciary, which goes beyond good faith, and requires the fiduciary to put the interests of those to whom the fiduciary duty is owed ahead of interests of the fiduciaries."   Calpitano v. Rotundo, No. CV116008972, 2011 WL 3672092, at *6 (Conn. Super. Ct. Aug. 3, 2011). This lower level of care reflects the legislature's recognition that a "limited liability corporation more closely resembles a business corporation than a partnership, and the members' relationship to each other . . . more akin to shareholders than partners." Id. Thus, members and managers of a limited liability companies organized under Connecticut law owe each other the duty of good faith imbued in any arm's length transaction, but they do not owe each other fiduciary obligations. To impose a greater standard of care would run afoul of the law.

Here, the Operating Agreement states that the "Company," or Sun Realty, is formed as a "limited liability company under the [Connecticut Limited Liability Act]."   **Exhibit B at Article I**; Conn. Gen. Stat. § 34-100, et seq. The Connecticut Limited Liability Act "provides a set of default rules governing [LLCs], which organizers and members can elect to modify at their discretion   through   the   company's   operating   agreement."   Caton  v.  Fischel,

No. X10UWYCV146026078, 2016 WL 3027014, at *3 (Conn. Super. Ct. May 5, 2016) (internal quotation marks omitted). Because the members of Sun Realty did not opt out of the Act's default rules, the strictures of the Act apply. As nothing in the Act imposes on members and managers the duty of a fiduciary, there is no basis in the Operating Agreement from which to conclude that SMP, let alone Albert Kleban, owed a fiduciary duty to Plaintiff.

Moreover, even if SMP owed a fiduciary to Plaintiff, Plaintiff's theory that Albert Kleban owes it a fiduciary duty as the president of SMP would fail because the law does impute the duties of a corporate fiduciary to its officers or directors, and Plaintiff does not plead any veil piercing or alter ego theory under which Albert Kleban could be deemed personally liable for any breach of care committed by SMP. Officers and directors of corporate entities owe fiduciary duties only to their corporate entities, not to third parties. Krys v. Butt, 486 F. App'x at 156-57; Grosvenor Properties Ltd. V. Southmark Corp., 896 F.2d 1149 (9th Cir. 1990) ("[A] corporation's employees owe no fiduciary duty to a third party with whom they deal on behalf of their employer."); 7547 Partners v. Fistek, 114 F.3d 1183 (5th Cir. 1997) (stating that "corporate officers such as members of the Board of Directors, only owe fiduciary duties to the shareholders of the corporation they are elected to represent and to the corporation itself and not to third parties such as a partnership and its limited partners"); Receivables Exchange. LLC v. Suncoast Tech. Inc., No. 10-4152, 2012 WL 1019623 (E.D. La. Mar. 26, 2012) ("The general rule is that a corporate officer does not owe a fiduciary duty to parties which contract with that corporation."). In Krys v. Butt, for example, the Second Circuit concluded that breach of fiduciary claims against corporate officer failed as a matter of law because it was "derivative" of the breach of the fiduciary claim against the corporate entity; 486 Fed. Appx. at 156; and in that regard, characterized plaintiff's theory that corporate fiduciary duties automatically extend to officers as

"absurd," **id.** at n.4.  Therefore, any duty of care owed by Albert Kleban, is a duty of care owed to SMP. Accordingly, even if SMP owed Plaintiff a fiduciary duty (it did not), that duty of care did not run to Albert Kleban as SMP president under the governing law.

> ### ii.      There Are No Special Circumstances Creating A Fiduciary Relationship In Fact

Because there is no fiduciary duty apparent in any contract between the parties, or otherwise imposed by the Connecticut Limited Liability Act, Plaintiff theorizes that if not in law, a fiduciary relationship between Plaintiff and Albert Kleban exists in fact by virtue of Albert Kleban's role as the "principal individual managing Sun Realty and Black Rock Shopping Center" whom Plaintiff "trusted" to "act in [its] best interest."   Doc. 1 at ¶¶ 58, 60.

Plaintiff is wrong. The law does not recognize relationships as fiduciary in nature merely because they are defined by reliance, trust and dependence.  As an initial matter, Plaintiff's allegation that Albert Kleban was the "principal individual managing Sun Realty and Black Rock Shopping Center" overstates his role and is not supported by the record. The record shows that by 2013, Ken Kleban, as a director of SMP, was becoming as much involved in the management of Sun Realty as was Albert Kleban, who, then in his eighties, was reducing his direct involvement.  **Exhibit E at 154:23 – 156:2** .  In fact, as discussed *infra*, some of what Plaintiff attributes to Albert Kleban as evidence of fraud and breach of fiduciary duty were actually statements or information disseminated by Ken Kleban. Doc. 1 at ¶¶ 35 and 37 (pertaining to statements or conduct of Ken Kleban).

Moreover, Plaintiff's allegation that Albert Kleban owed it a fiduciary duty of care by virtue of his "superior knowledge, skill and expertise" in the area of real estate and the "trust" Plaintiff placed in him, misstates the law and implies that Albert Kleban exercised dominion and influence over Plaintiff when, in actuality, Plaintiff was advised at every turn by its capable, paid

advisors. As noted above, "[s]uperior skill and knowledge alone do not create a fiduciary duty among parties in a business transaction."  Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 42, 761 A.2d 1268, 1280 (2000) (explaining that if superior skill and knowledge were alone sufficient to impose a fiduciary duty "all parties that possess a superior, technical skill, including electricians, plumbers and mechanics, would owe a fiduciary duty to their clients"). Rather, the Connecticut Supreme Court has held that for a plaintiff to succeed on a breach of fiduciary duty claim, it is necessary to show that the defendant "exercised *dominance or influence* over the plaintiff as a result of his superior knowledge and skill and that the defendant undertook to act *primarily for the benefit* of the plaintiff." Id. at 43 (emphasis added). The imposition of a fiduciary duty also requires one party with a "special vulnerability" who is at an "elevated risk" of being "taken advantage of."  Iacurci v. Sax, 313 Conn. 786, 801-02, 99 A.3d 1145, 1155 (2014); see Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. at 38 (in the absence of a special relationship, recognizing the existence of a fiduciary duty only in instances where "the fiduciary was . . . in a dominant position, thereby creating a relationship of dependency").

Albert Kleban did not exercise dominance or influence over Plaintiff as required by law to create a fiduciary relationship. The record reflects that Carleen Schreder was actively representing Plaintiff's interests in Sun Realty and its other properties since as early as August 2005. In fact, Attorney Schreder was so forceful in her role as Plaintiff's advisor that in response to Ms. Schreder's first communications to Albert Kleban and Turnpike in August 2005, Jackie Campbell felt compelled to advise Ms. Schreder that her method of dealing was personally "very insult[ing]" and compared her questions and insinuations to an "inquisition." **Exhibit GGG, Letter from J. Campbell to C. Schreder, dated 8/8/05.**  In the years that followed, Ms. Schreder had regular contact with Albert Kleban, Turnpike or SMP, asking questions and

seeking clarification about virtually every significant development involving Plaintiff's interest in Sun Realty.  **See**, **e.g,** **Exhibits M, P, Q, R, S, U, V, W, BB, CC, GG, HH, II, JJ, III**. Plaintiff, through Ms. Schreder or Lois Jeruss, advocated Plaintiff's position that, *inter alia*, (i) Sun Realty should not purchase the gas station property that was ultimately purchased by FBW; **Exhibit AA**; (ii) Sun Realty should not purchase the Children's Place property; **Exhibit E** at 147: 9-19 ; (iii) Albert Kleban should arrange for a bank loan to FBW to fund repayment of a loan owing to Sun Realty; **Exhibit II**; (iv) Sun Realty should sell out to a third party; **Exhibits CC, GG, MI**; (v) Sun Realty should adopt a comprehensive plan for dealing with tenant turnover; **Exhibits S and V**; (vi) Sun Realty should withhold dividends to fund capital calls; **Exhibit T** (vii) Sun Realty should calculate tax liabilities in the manner advocated by Plaintiff; **Exhibits M, JJ, KK, HHH**; (viii) Sun Realty should pay Attorney Schreder for legal services rendered; **Exhibit III** (ix) Plaintiff would not contribute to capitals, or would contribute to capitals only up to a certain amount if certain information was provided; **Exhibits V, T, CC**; **Exhibit NNN**, **E-mail from C. Schreder to J. Campbell, dated 1/29/08**; (x) Plaintiff would not guarantee loans made to Sun Realty; **Exhibit HH**; and (xi) certain topics should be included on the agenda at the Family Meeting, including a review of Sun Realty's balance sheet and projected cash flow for 2013; **Exhibit JJJ, E-mail from C. Schreder to J. Campbell, dated 4/18/13**.

Plaintiff would have this Court believe that it was a babe in the woods with respect to the sale of its membership interests to Albert Kleban, and assignment to Le Rivage, but the fact of the matter is that she was lawyered-up and heavily-advised in connection with those transactions and the management of Sun Realty.  In addition to Attorney Schreder, Plaintiff or Attorney Schreder were also counseled by Attorney Richard Hoffman, who had particular knowledge about the Connecticut real estate market; James Blake, Lois Jerus' first cousin once-removed

who controlled a membership interest in Sun Realty and was a lawyer with Kaye Scholer in New York; Allan Kleban, also an accomplished lawyer, who sold his interest in Sun Realty to Albert Kleban on the same terms as Plaintiff (and who satisfied with the transaction, did not subsequently file a lawsuit against his cousin); and Larry Schweitzer, Plaintiff's accountant. **Exhibit A**, SLSJ Dep. at 135:8 - 137:19; 139:23 - 141:23; 151:6 - 154:2; **Exhibit D**, Albert Kleban Dep. 89:13 - 91:25; **Exhibit RR**, K. Kleban Dep. at 59:13 - 60:4; **Exhibit LLL**, E-mail from L. Jeruss to J. Blank, dated 4/23/13; **Exhibit MMM**, E-mail from R. Hoffman to J. Blake, dated 4/24/13.

Attorney Schreder was particularly fastidious and diligent with respect to the SLSJ Purchase Agreement and SLSJ Assignment. She negotiated the transaction documents heavily and extracted an opinion from Stephan Grozinger, Albert Kleban's attorney, regarding the permissibility of the SLSJ Purchase Agreement as well as an estoppel from SMP concerning the SLSJ Assignment. **Exhibit OOO**, Grozinger Opinion, dated 6/29/13; **Exhibit SSS**, Estoppel Certificated, dated 6/29/13.

Finally, no reasonable jury could conclude that there was an understanding between Albert Kleban and Plaintiff that Albert Kleban, in his capacity as president of SMP, managing member of Turnpike or an individual managing Sun Realty and Black Rock, would be acting "primarily for the benefit of" Plaintiff, and not, as it were, for the benefit of *all* the members of Sun Realty. Cf. Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 42. Even assuming that the duties of SMP under the Operating Agreement, or Turnpike under the Turnpike Property Management Contract, are imputable to Albert Kleban in his individual capacity (they are not), nothing in either agreements states that SMP's and Turnpike's duties under those agreements were to any entity other than Sun Realty. Likewise, every communication sent by Albert Kleban

(or Jackie Campbell on his behalf) to members of Sun Realty expresses a concern for Sun Realty and the collective well-being of its members.  **See** **Exhibits F, M, N, O, X, DD, LL, MM, NN, OO, PP, QQ, and HHH**. Plaintiff could not have possibly been under the impression that Albert was acting primarily for its benefit at the expense of the other members of Sun Realty.

**B.**     **Aiding and Abetting Breach of Fiduciary Duty Against LeRivage**

Dismissal of Plaintiff's claim for breach of fiduciary duty against Albert Kleban necessarily requires dismissal of its aiding and breach of fiduciary duty claim against LeRivage. A civil action for aiding and abetting cannot stand alone and depends upon the existence of a valid underlying cause of action.  Efthimiou v. Smith, 268 Conn. 499, 505, 846 A.2d 222, 226 (2004); accord Hartley v. Boyd, No, X02CV034004679SCLD, 2008 WL 442142, at *15 (Conn. Super. Ct. Feb. 4, 2008). In the absence of a viable claim for breach of fiduciary duty against Albert Kleban, Plaintiff's aiding and abetting breach of fiduciary duty claim against LeRivage must also be dismissed.

**C.**     **Violations of Securities Exchange Act of 1934 Against Albert Kleban**

Plaintiff's claim that Albert Kleban defrauded Plaintiff in violation of the Securities Exchange Act of 1934 ("Exchange Act") should also be dismissed.

The analysis of whether an LLC membership interest qualifies as an "investment contract" is performed under the three-prong test set forth in SEC v. W.J. Howey Co., 320 U.S. 293 (1946). That test requires: (1) that a purchaser give up some tangible and definable consideration in return for the interest obtained; (2) the existence of either common interests between the investor and managers of the enterprise or a pooling of interests by members; (3) an expectation of profit by the investor; and (4) that the expectation of profit be derived from the entrepreneurial efforts of others.  Id.

Here, the critical inquiry arises under the fourth prong of the <u>Howey</u> test; specifically, whether Plaintiff invested in Sun Realty with the expectation that it would derive profits from the entrepreneurial efforts of others. It is clear from both the terms of the Sun Realty Operating Agreement, as well as Plaintiff's involvement in the affairs of Sun Realty, from the formation of that entity up to Plaintiff's sale of its interest in that entity under the Purchase and Assignment Agreements, that Plaintiff exercised significant control over Sun Realty. The Sun Realty Operating Agreement requires members to participate in the affairs of Sun Realty, stating that members "shall diligently employ themselves in the business of the Company" and "shall inform all other Members of all his work transactions on behalf of the Company." **<u>Exhibit B</u> at § 6.1(d)**. In addition, the Operating Agreement bestows on Sun Realty members a broad range of rights and powers. Specifically, the Operating Agreement states that: (i) members have the right to vote based on percentage interests, **<u>id.</u> at § 6.3**; (ii) members have the right to call a meeting for any purpose, **<u>id.</u> at § 6.4**; (iii) members have the right to inspect Sun Realty's books and records, **<u>id.</u> at §§ 7.2, 11.1(b)**; (iv) members have the right to receive a copy of Sun Realty's tax returns, **<u>id.</u> at § 7.3**; (v) a vote of 51% of membership interest is required to negotiate a sale or refinance of the shopping center, **<u>id.</u> at § 6.1(h)**; (vi) unanimous consent of the members is required to dissolve the company, **<u>id.</u> at § 9.1(a)(i)**; (vii) a "majority in interest" (defined as a 75% membership interest, **<u>id.</u> at art. I**) is required to approve a substitute member, **<u>id.</u> at § 10.3(d)**, or incur additional debt, **<u>id.</u> at § 2.5**; and (viii) member approval is required for capital improvements over a set dollar amount, **<u>id.</u> at § 6.2(g)**.   These features of the Operating Agreement compel the conclusion that there was an expectation that the success of Sun Realty was to be borne from the active involvement of its members.   <u>Cf</u>. <u>Keith v. Black Diamond Advisors, Inc.</u>, 48 F. Supp. 2d 326, 333 (S.D.N.Y. 1999) (provisions in operating agreement

vesting member with broad range or rights and powers, including the right to vote in proportion to his holding, was "antithetical to the notion of member passivity required under the fourth prong of *Howey*").

In addition to the provisions of the Operating Agreement, the undisputed facts on this record demonstrate that Plaintiff exercised meaningful involvement in the management and direction of Sun Realty, in one or more of the following ways: (i) by declining to agree to the purchase of the gas station adjacent to Black Rock Shopping in the early 2000s, thereby causing Sun Realty to not purchase the gas station, **Exhibit AA**; (ii) by similarly declining to agree Sun Realty's purchase of the Children's Place property, **Exhibit E** at 147: 9-19; (iii) by repeatedly advocating for the sale of Sun Realty, thereby resulting in Sun Realty commissioning an appraisal of Black Rock Shopping Center and the ultimate sale of Sun Realty interests to Regency, **Exhibits CC, GG, HH**; **Exhibit D**, **Albert Kleban Dep. at 133:22 — 134:2**; (iv) by repeatedly directing Sun Realty to adopt an overarching plan for addressing tenant vacancies that involved diverting cash flow to capital improvements to reduce the need for members' loans to Sun Realty when tenants defaulted, **Exhibits S, V and T**; (v) by directing Sun Realty to direct cash flow to Sun Realty's cash reserves in order to reduce the need for capital calls, **Exhibit T**; (vi) by directing Albert Kleban, as president of SMP, to loan money to FBW so that FBW could fund its obligation to Sun Realty, **Exhibit II**; (vii) by directing Sun Realty in November 2011 to sell Black Shopping Center before the end of 2012 to avoid an expected tax liability increase, **Exhibit CC**; (viii) by advising Sun Realty of the tax implications associate with Wings Over Water's repayment of a $170,000 loan in August 2010. **Exhibit M**; (ix) by advising Sun Realty of an error in the way Sun Realty was allocating interest on its 2011 tax return, resulting in a correction of the error identified by Plaintiff, **Exhibit JJ**; (x) by advising Sun Realty that Lois

Jeruss would not personally guarantee any loans in connection with any refinance of Sun Realty's mortgage, thereby contributing to Sun Realty's decision to sell its membership interests, **Exhibit HH**; (xi) by seeking reimbursement from Sun Realty for legal services rendered in connection with Plaintiff's analysis of Sun Realty's 2011 tax return, **Exhibit III**; (xii) by agreeing to several capital calls totalling $913,000, thereby allowing Sun Realty to fund costs associated with tenant turnover and make capital improvement, **Exhibit A, SLSJ Dep. at 95:9 — 96-17**; (xiii) by communicating, through its attorney, with SMP or Turnpike on a regular basis for the better part of a decade about every significant development affecting Black Rock Shopping Center, **Exhibits M, P, Q, R, S, U, V, W, BB, CC, GG, HH, II, JJ, III**.

In light of the foregoing Plaintiff cannot seriously contend that it was merely a passive investor in Sun Realty. It is apparent that Plaintiff assumed an active role in Sun Realty, such that its investment interest in Sun Realty was an investment contract under the governing law.

**D.    The Facts Do Not Support An Actionable Theory of Liability, Including Common Law Fraud As Pleaded Against Albert Kleban**

Even if Plaintiff's interest in Sun Realty was an investment contract, such that it could state a claim for securities fraud, and even if Albert Kleban owed Plaintiff a fiduciary duty, such that it could state a claim a claim for breach of fiduciary duty, Plaintiff's claims for securities fraud and breach of fiduciary duty would fail for the additional reason that there is no evidence demonstrating that Plaintiff was in any way defrauded or that Albert Kleban did not at all times deal with Plaintiff honestly and transparently. Plaintiff's claim for common law fraud against Albert Kleban also fails for this lack of evidentiary support.

Plaintiff's breach of fiduciary duty and fraud based claims against Albert Kleban are predicated, in their entirety, on the following allegations: (1) that Albert Kleban made certain misrepresentations in an e-mail dated April 6, 2013 [Doc. 1 at ¶¶ 25, 29, 31 and 33]; (2) that

Ken Kleban made certain misrepresentations in an e-mail dated April 19, 2013 [id. at ¶ 35]; (3) that Allan Kleban sent Plaintiff a valuation of Sun Realty prepared by Ken Kleban [id. at ¶ 37]; and (4) that Albert Kleban failed to disclose certain material facts to Plaintiff regarding third parties that were interested in purchasing or marketing Black Rock Shopping Center for sale [id. at ¶ 47].[5] None of these alleged statements or omissions evidence fraud or breach of fiduciary duty.

### i.    Albert Kleban's April 6, 2013 E-mail

The complaint characterizes the following statements in Albert Kleban's April 6, 2013 e-mail as misleading statements of fact:

- Albert Kleban's statement that he favored "complete transparency of our family business operations, and solidarity as a family moving forward." Doc. 1 at § 25.

- Albert Kleban's "brief summary of the present situation," including problems with certain tenants and spaces, and Albert Kleban's statements regarding certain "negative aspects of the property," specifically that Sun Realty would not have "sufficient reserves" if its "mortgage became due" ahead of schedule, and that Sun Realty members were "unhappy [that they would] have to start amortizing [Sun Realty's] existing mortgage." Id. at § 29.

- Albert Kleban's statement that Sun Realty members "should contribute [their] pro rata share for . . . extraordinary expenses," which in Plaintiff's case was $99,999.90.

- Albert Kleban's statement that while he did "not want to appear overly pessimistic," his summary of the issues affecting Sun Realty was "the reality" of the situation, and his statement that Sun Realty members should be "assured that every bit of energy [and] creativity" would be "directed to the mutual interests of every single partner and every location as long as Ken, Jackie and [he were] involved." Id. at § 33.

The first problem Plaintiff has predicating its case on the foregoing statements is that none of these so-called "misrepresentations" are actually untruthful. In fact, when asked at its deposition, through Lois Jeruss, to identify statements in the April 6, 2016 e-mail that were false,

---

[5] In that latter regard, the record demonstrates that Regency, the entity that ultimately purchased the Kleban Fairfield Portfolio, did not express an interest in those properties until September 2013, well after the Purchase and Assignment Agreements were executed. **Exhibit CCC at 118:21 - 121:2; Exhibit RRR**.

Plaintiff *recanted* the foregoing allegations and explicitly *stated that it was unable to identify statements in that e-mail that were untruthful*! **Exhibit A, SLSJ Dep. at 116:9 - 117:9 (referencing Exhibit OO)**.[6]  Plaintiff was also unable to identify untruthful statements in e-mails or memoranda Albert Kleban sent to Sun Realty members dated October 22, 2009, November 6, 2009, September 29, 2010 and July 10, 2012.  **Id. at 51:17-22 (referencing Exhibits I and PPP); 60:22 — 61:9 (referencing Exhibit K); 109:20 — 110:14 (referencing Exhibit MM)**. On the contrary, Plaintiff admitted that she was kept sufficiently informed about Black Rock during the times relevant to this lawsuit. **Id. at 68:15 - 69:11 (referencing Exhibit O)**.  Based on Plaintiff's admission, the above listed, so-called "misrepresentations" made by Albert Kleban do not support her legal theories of liability.

### ii.      Statements Made By Ken Kleban In An E-mail, Dated April 19, 2013

Plaintiff's case against Albert Kleban is based in part on an e-mail Ken Kleban sent to Sun Realty members, dated April 19, 2013 — ten days before the Family Meeting. Doc. I at ¶ 35. The subject of the April 19, 2013 was "Sun Realty Information." Id. In the e-mail, Ken

---

[6] Defendants direct the Court's attention to the following colloquy:

> Mr. Bowerman:.. In your answer to Interrogatory 4 at page 17, you indicate that Albert Kleban made untruths in [the April 6, 2013] e-mail communication. Can you identify for me today what in his e-mail communication of April 6, 2013, was an untruth?

> Ms. Jeruss: Could I ask my attorney a question?

> Mr. Bowerman: Well, I'd like you to answer my question first. Then if you want to confer with your attorney, you're certainly welcome to.

> Ms. Jeruss: In light of everything that happened, it seems as if information was withheld from me. So that is in the scope of when we're saying that it maybe not have been completely forthcoming.

> Mr. Bowerman: Okay. So as I understand your response, at least as to [the April 6, 2013 E-mail], you're not maintaining there's anything untruthful in this e-mail. You think that there was something that was being withheld from you?

> Ms. Jeruss: That's correct.

**Exhibit A, SLSJ Dep. at 116:9 — 117:9.**

Kleban stated that Sun Realty was "seeing tremendous pressure on our many smaller tenants" and Sun Realty faced a "challenging scenario." Id. (internal quotation marks omitted). Given the state of the real estate market at this time, the updates from Albert Kleban dating back several years detailing the challenges facing Black Rock and its tenants (see above, section I.B) and Plaintiff's admissions that those updates were truthful; **Exhibit A, SLSJ Dep. at 51:17-22; 60:22 — 61:9; 109:20 — 110:14; and 116:9 — 117:9**; there is quite clearly no triable issue that Sun Realty on April 19, 2013 was not, in fact, "seeing tremendous pressure on . . . smaller tenants" and was faced with a "challenging scenario." Doc. 1 at ¶ 35.

Ken Kleban's April 19 e-mail also provides a "brief analysis showing the shortfall" Sun Realty would have if it were required to refinance the mortgage on that date. Ken Kleban described the analysis as an "instructive" "exercise," that was based on certain "assumptions" regarding Black Rock Shopping Center. Its apparent purpose was to convey that based on the assumptions stated in the e-mail, a mortgage refinance would likely require a "capital call of significance" in addition to "debt to equity conversion." Doc. 1-2. Nothing in the "brief analysis" or "exercise" prepared by Ken Kleban was untruthful or conveys an intent to defraud Plaintiff; on the contrary, it demonstrates Ken Kleban's efforts to keep members of Sun Realty fully informed about the challenges facing Black Rock Shopping Center.

In addition to the fact that there is nothing inherently fraudulent or misleading in the April 19 e-mail, it also quite obviously is not probative of Plaintiff's claims against *Albert Kleban*. The complaint in no way suggests that Ken Kleban was speaking in this instance, on behalf of Albert Kleban, or at his behest. Therefore, statements made by Ken Kleban are very clearly immaterial to Plaintiff's claims against Albert Kleban, the individual defendant in this case.

### iii.      *Allan Kleban Sends Plaintiff Ken Kleban's Valuation*

Plaintiff's allegations that it was defrauded by Albert Kleban vis-à-vis the valuation prepared by Ken Kleban and sent to it by Allan Kleban is also unavailing. See Doc. 1 at ¶ 37. Not only is there nothing intrinsically fraudulent or misleading about the valuation prepared by Ken Kleban or any allegation or suggestion on the record that Ken Kleban was acting upon the direction of Albert Kleban when he prepared the valuation, there is likewise no evidence that Allan Kleban, in sending Plaintiff Ken Kleban's valuation, was acting upon the direction of Albert Kleban, such that his actions are imputable to Albert Kleban. At bottom, Plaintiff would have this Court impute the conduct of third and fourth parties to Albert Kleban. There is no basis for this theory of liability in the law or facts of this case.

### iv.      *Albert Kleban's Alleged Failure to Disclose Certain Material Facts*

Plaintiff also improperly bases its claims for securities fraud and common law fraud on the theory that Albert Kleban failed to disclose certain material facts, which had they been known by Plaintiff, would have dissuaded it from selling its membership interest to Albert Kleban.  See Doc. 1 at §§ 76, 83. Those facts are: (1) that sometime in early 2013, Albert Kleban was approached by one or more third parties inquiring about a possible acquisition of, or investment in, shopping centers located in Fairfield that Albert Kleban owned or controlled, including Black Rock Shopping Center; (2) that sometime in early 2013, before June 27, 2013, Albert Kleban commenced discussions with HFF concerning a possible engagement to solicit potential purchasers or investors in Sun Realty or Black Rock Shopping Center and; (3) HFF believed that Black Rock Shopping Center was among "the best located and mostly [sic] highly sought after [properties] in the suburban New York market." Id. at § 47. This theory of the case is unavailing.

As an initial matter, a party can be held liable for fraud based on omissions only where the plaintiff establishes that the defendant had an affirmative duty to disclose the allegedly concealed information. See Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 179 (2011); Setzer v. Old Republic Life Ins. Co., 257 N.C. 396, 399 (N.C. 1962). Because Albert Kleban owed no fiduciary duty to Plaintiff, he did not have an affirmative obligation to disclose the facts in issue.

Moreover, even if Albert Kleban did owe a duty to Plaintiff to disclose the information in question, it is apparent on this record that Plaintiff could have very easily obtained the information in issue by exercising reasonable diligence — most notably, by attending the Family Meeting where the allegedly material information was disclosed. "Where the representation relates to matters that are not peculiarly within the other party's knowledge and both parties have available the means of ascertaining the truth . . . courts have held that the complaining party should have discovered the facts and that any reliance under such circumstances therefore would be unjustifiable." Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1542 (2d Cir. 1997) (citing Royal Am. Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011, 1016 (2d Cir. 1989) (brackets omitted); see also id. (citing Compania Sud-Americana de Vapores v. IBJ Schroder Bank & Trust Co., 785 F. Supp. 411, 419-20 (S.D.N.Y.1992) ("In this case, there is no basis to dispute that [plaintiff] had access to the critical information underlying its fraud claim and, had it exercised ordinary intelligence or made simple inquiries, [it] would have been able to discover the alleged misrepresentations."); Most v. Monti, 91 A.D.2d 606, 456 N.Y.S.2d 427, 428 (N.Y.App.Div.1982) ("It is clear that [the] information ... was readily available to plaintiffs upon their making reasonable inquiry."); Marine Midland Bank v. Palm Beach Moorings. Inc.,

61 A.D.2d 927, 403 N.Y.S.2d 15, 17 (N.Y.App.Div.1978) (the claimant "had the opportunity to examine the corporate records before assuming the obligations")).

The undisputed facts demonstrate the following with respect to the information that Plaintiff claims was withheld from it: (i) Albert Kleban convened the Family Meeting for the purpose of facilitating an open exchange of ideas and complete transparency of the family business operations, **Exhibit QQ**; (ii) members of Sun Realty traveled from different parts of the country to attend the Family Meeting, **Exhibit E, Allan Kleban Dep. 77:20 — 79:17** (iii) Lois Jeruss determined that the Family Meeting would not be worth her while and chose not to attend, **id. at 79:9-12; Exhibit A, SLSJ Dep. at 124:12 — 129:17**; (iv) the prospect of selling Sun Realty to a third party was discussed at the Family Meeting, **Exhibit E, Allan Kleban Dep. at 91:22 — 92:22**; (v) Albert and Ken Kleban disclosed at the Family Meeting that they had been in exploratory conversations with certain REITs, including Kimco, **id. at 92:13 — 94:3; Exhibit RR, Ken Kleban Dep. at 54:5 - 58:17, 62:25 - 63:2; 156:23 — 164:1; Exhibit D, Albert Kleban Dep. at 117:19 — 121:16**; and (vi) Albert and Ken Kleban disclosed at the Family Meeting that they were in talks with HFF about marketing Black Rock Shopping Center and other Kleban properties for sale, **Exhibit RR, Ken Kleban Dep. at 56:12-24**. Not only does the record indicate that the information in question was disclosed at the Family Meeting, there is no suggestion in the record that Plaintiff made any attempt to speak to Albert or Ken Kleban in order to learn what was discussed at the Family Meeting. In essence, Ms. Jeruss could not be bothered to attend the Family Meeting, and afterwards, could not be bothered to place a telephone call to her cousins about what was discussed. **Exhibit A, SLSJ Dep. at 130:13 — 133:14.**   In fact, there is no record of Lois Jeruss or her attorney, Carleen Schreder, ever speaking directly with Albert Kleban by telephone, or otherwise, at any time in 2013.  Merely by

attending the Family Meeting, or thereafter, by making a "simply inquiry," Plaintiff could have ascertained the information it claims forms the basis of its fraud claims.  Having failing to do so, she is without entitlement to relief on any theory of fraud.

###    E.    Imposition of Constructive Trust

Finally, Plaintiff's claim for "constructive trust" must be dismissed. It is well-settled that a "constructive trust" is a remedy, and not a cause of action. See, e.g., Carney v. Marin, No. 3:12-CV-00181, 2014 WL 1029911 (D. Conn. Mar. 17, 2014) (Underhill, J) (dismissing a cause of action for "constructive trust" and converting to a request for a remedy); Carney v. Lopez, 933 F. Supp. 2d 365 (D. Conn. 2013) (same); Levinson v. PSCC Servs. Inc., No. 3:09-CV-00269 (PCD), 2010 WL 5477250 (D. Conn. Dec. 29, 2010) (Dorsey, J.) (dismissing a "constructive trust" count because "constructive trust" is not a cause of action); Titan Real Estate Ventures, LLC v. MJCC Realty L.P. (In re Flanagan), 415 B.R. 29 (D. Conn. 2009) (noting that "constructive trust" is not an independent, substantive cause of action, but rather is typically a remedy for unjust enrichment). As a claim for imposition of constructive of trust is not cognizable as a matter of law, it must be dismissed.

## IV.    CONCLUSION

It is apparent from the foregoing that Plaintiff has no entitlement to relief on this record. Its claims for imposition of constructive trust, securities fraud, breach of fiduciary duty and aiding abetting breach of fiduciary duty fail as a matter of law. Those claims, and Plaintiff s claim for common law fraud, should be dismissed *a fortiori* for a total lack of evidentiary support in the developed record.

WHEREFORE, Defendants respectfully request that this Court grant their Motion for Summary Judgment and dismiss this case in its entirety.

Respectfully Submitted,

ALBERT J. KLEBAN and
THE LE RIVAGE, L.P.

/s/ Richard W. Bowerman
Richard W. Bowerman (ct 04181)
LeClairRyan, A Professional Corporation
545 Long Wharf Drive, Ninth Floor
New Haven, Connecticut 06511
Tel.: (203) 672-1638
Fax: (203) 672-3228
richard.bowerman@leclairryan.com

— Their Attorney —

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2018, the foregoing document was filed electronically and sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.


/s/ Richard W. Bowerman_____
Richard W. Bowerman (ct 04181)