## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SLSJ, LLC, | : | Case No. 3:14-CV-00390 (CSH) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ALBERT KLEBAN and THE LE RIVAGE, | : | April 5, 2018 |
| LIMITED PARTNERSHIP, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## LOCAL RULE 56(a)(1) STATEMENT

Pursuant to Rule 56(a)(1) of the Local Rules of this Court, Defendants Albert Kleban and

The Le Rivage Limited Partnership ("Le Rivage") (herein collectively "Defendants") set forth

below each material fact for which they contend that there is no genuine issue to be tried.

1.      Lois Jeruss owns 70% percent of Plaintiff SLSJ, LLC ("Plaintiff" or "SLSJ") and

the remainder of Plaintiff is owned by Ms. Jeruss's two daughters.  **Exhibit A**, **SLSJ, LLC**

**Deposition Transcript ("SLSJ Dep.") 16:24 — 17:5.**

2.      Sun Realty is organized pursuant to a certain Amended and Restated Operating

Agreement, executed by Sun Realty members on May 26, 1999, and amended February 20, 2002

("Sun Realty Operating Agreement").  **Exhibit B, Sun Realty Operating Agreement, Exhibit**

**A**.

3.      SMP is the corporate manager of Sun Realty.  **Exhibit B, Sun Realty Operating**

**Agreement at § 6.2**

4.      At the relevant times, SMP was owed by Albert Kleban and his wife Alida

Kleban, and was comprised of five directors: Albert and Alida Kleban, their son, Ken Kleban,

Stephan B. Grozinger, Esq., and Lucy G. Fabrizi. **Exhibit C, Unanimous Consent of the Shareholders of Sun Realty-SMP, Inc. and Related Documents ("SMP Consent Agreement"); Exhibit D, Albert Kleban Deposition Transcript ("Albert Kleban Dep.") 31:19-22**.

5.      The management authority of SMP, and the limits on that authority, were set forth in the Sun Realty Operating Agreement. **Exhibit B, Operating Agreement**.

6.      Pursuant to the Sun Realty Operating Agreement, capital contributions were strictly voluntary. **Id. at § 3.2(b); Exhibit E, Allan Kleban Deposition Transcript ("Allan Kleban Dep.") 84:1-2, 94:19-22; Exhibit F, Memorandum from Albert Kleban to Sun Realty Members, dated 1/9/12**.

7.      There were limits on the amount of money SMP was authorized to spend on capital improvement projects. **Id. at § 6.2(g).**

8.      SMP could not unilaterally alter the terms of the Operating Agreement as amendments to the Operating Agreement required the unanimous consent of all members of Sun Realty. **Id. at § 12.1**.

9.      The day-to-day management, operation and maintenance of Black Rock Shopping Center was assigned to Turnpike Properties, LLC ("Turnpike") pursuant to a certain Property Management Contract entered into between Sun Realty and Turnpike on January 1, 2001 ("Turnpike Property Management Contract"). **Exhibit G, Turnpike Property Management Contract**.

10.      Turnpike was owned, in part by Albert and Ken Kleban, and employed Jackie Campell (nee Morris), as its property manager. **Id.; Exhibit D, Albert Kleban Dep. 48:12-18**.

2

11.     The powers and responsibilities of Turnpike with respect to Black Rock Shopping Center were set forth in the Turnpike Property Management Contract, which required Turnpike to *inter alia*, collect rents; purchase supplies, equipment and trade services; order and supervise repairs and alterations; pay invoices; maintain and repair fixtures, equipment and other machinery; take legal action on behalf of Sun Realty; review plans and specifications related documents for tenant construction work; and ensure compliance with laws and ordinances relative to the property's leasing, use, operation and maintenance.  **Exhibit G at § 2.1.**

12.     SMP and/or Turnpike provided Sun Realty members with information affecting Black Rock Shopping Center and Sun Realty, including financing information, via a website accessible to Sun Realty Members and written correspondences sent by e-mail, fax and mail. **Exhibit E, Allan Kleban Dep. at 21:14 – 24:22; 153:13 – 154:22.**

13.     SMP and/or Turnpike, through Albert Kleban and/or Jackie Campbell sent correspondences to Sun Realty members in 2008 and 2009 advising Sun Realty members of issues involving tenants and spaces at Black Rock Shopping Center, including, *inter alia*: replacement of Marty's Shoes by Nine West; replacement of Rye Ridge Deli with Moe's Southwest Grill; replacement of Olympia Sports with Aspen Dental; a lease signed with Fundamental Plus to assume space occupied Gap; efforts to redemise Old Navy to accommodate Fresh Market; lease negotiations with Gap; an arrearage owing from Madison Jewelers; and a rent concession from Hallmark Cards.  **Exhibit H, Memorandum from Albert Kleban to Sun Realty Members, dated 1/18/08; Exhibit I, Memorandum from Albert Kleban to Sun Realty Members, dated 10/22/09; Exhibit PPP, Memorandum from Albert Kleban to Sun Realty Members, dated 11/6/09.**

3

14.     SMP and/or Turnpike, through Albert Kleban and/or Jackie Campbell sent correspondences to Sun Realty members in 2010 advising Sun Realty members regarding, *inter alia*, recapture of the lower level of Ritz Camera and plans to construct a swimming pool at the shopping center as part of lease negotiations with Wings Over Water School of Swimming ("Wings Over Water").  **Exhibit J, Memorandum from Albert Kleban to Sun Realty Members, dated 8/3/10**; **Exhibit K, Memorandum from Albert Kleban to Sun Realty Members, dated 9/29/10**; **Exhibit L, Memorandum from Albert Kleban to Sun Realty Members, dated 12/7/10**.

15.     SMP and/or Turnpike, through Albert Kleban and/or Jackie Campbell sent correspondences to Sun Realty members in 2011 and 2012 advising Sun Realty members regarding, *inter alia*: replacement of Nine West with Carter's Jewelers; termination of lease agreement by Madison Jewelers; an arrearage owing from Hallmark Cards; a new lease agreement signed with Hallmark Cards; a property façade renovation; and construction at the Rehabilitation Associates and Verizon spaces. **Exhibit M, E-mail from J. Campbell to Sun Realty Members, dated 2/15/12**; **Exhibit N, Memorandum from Albert Kleban to Sun Realty Members, dated 10/13/11**; **Exhibit O,  Memorandum from Albert Kleban to Sun Realty Members, dated 10/18/11**.

16.     SMP and/or Turnpike, through Albert Kleban and/or Jackie Campbell, kept members of Sun Realty informed of developments affecting Black Rocking Shopping Center and Sun Realty. **Exhibit A, SLSJ Dep. at 69:5-11**; **Exhibit E, Allan Kleban Dep. at 36:10-20**.

17.     Plaintiff, through counsel, regularly asked SMP and Turnpike questions, and received answers regarding Sun Realty's affairs, including questions regarding, amortization schedules, capital calls, cash reserves, cash distributions, cash flows from tenants properties,

construction projections, debt servicing, project financing, repayment schedules for loans made to Sun Realty by members, and tax considerations. **Exhibit M**; **Exhibit P, E-mail from J. Campbell to C. Schreder, dated 11/22/08**; **Exhibit Q, E-mail from C. Schreder to J. Campbell, dated 8/11/10**; **Exhibit R, E-mail from J. Campbell to C. Schreder, dated 8/17/2011**; **Exhibit S, E-Mail from C. Schreder to J. Campbell, dated 10/20/11**; **Exhibit T, E-mail from J. Campbell to C. Schreder, dated 10/25/11**; **Exhibit U, E-mail from C. Schreder to J. Campbell, dated 10/28/11**; **Exhibit V, E-mail from C. Schreder to J. Campbell, dated 11/2/11**.

18.     Albert Kleban invited Plaintiff and its attorney to Black Rock Shopping Center in November 2011.  **Exhibit W, Note from Albert Kleban, dated 11/3/11**. Lois Kleban declined the invitation.  **Exhibit D at 141:11 – 142:7**.

19.     SMP asked Sun Realty members to make pro rata contributions to pay for costs associated with tenant turnover, including (a) a capital call associated with new lease agreements planned at the end of 2009 with Moe's Southwest Grill, Gap, Old Navy, Aspen Dental, and Fundamentals Plus, required a capital infusion of $1.5 million; **Exhibit I**; **Exhibit X, Memorandum from Albert Kleban to Sun Realty Members, dated 11/6/09**; (b) a $600,000 capital call associated with the recapture of the first floor of Ritz Camera and for construction of a swimming pool for Wings Over Water; **Exhibits J and L**; and (c) a $200,000 capital call associated with fit-up costs to lease space to Carter's Jewelers; **Exhibits N and O**.

20.     Capital improvement projects at Black Rock Shopping Center could not proceed unless there was agreement among a substantial interest of Sun Realty members. **Exhibit N**.

21.     Plaintiff was advised at the relevant times by attorney Carleen Schreder who had experience in estate tax and income tax planning and counseling family owned businesses on

loans, transfers, sales and exchanges in the context of real estate transactions.  **Exhibit Z,**

**Carleen L. Schreder, Attorney Biography**.

22.     Plaintiff was advised at the relevant times by attorney Richard Hoffman who was

very familiar with the Connecticut real estate market.  **Exhibit A, SLSJ Dep. at 135:8-14**.

23.      In the early 2000s, Albert Kleban, on behalf of SMP, was presented with the

opportunity to purchase a gas station adjacent to Black Rock Shopping Center.  **Exhibit AA**,

**Letter from J. Campbell to C. Schreder, dated 8/5/05**.

24.     Plaintiff did not consent to the purchase of the gas station property.  **Id.**

25.     Sun Realty did not purchase the gas station property; rather, it was purchased by

an entity comprised of other members of Sun Realty, called FBW, LLC ("FBW").  **Id.**

26.     FBW ground leased the gas station property to Sun Realty.  **Id.**

27.     The ground lease of the gas station property to Sun Realty increased gross sales at

Black Rock Shopping Center resulting in a benefit to members of Sun Realty, including Plaintiff.

**Id.**; **Exhibit BB, Letter from C. Schreder to J. Campbell, dated 8/5/05**.

28.     Sun Realty had an opportunity to purchase property contiguous with Black Rock

Shopping, which was home to The Children's Place.  Plaintiff, however, refused to go along with

the purchase of that property, requiring Sun Realty members to from an entity called Kleban

Development Corporation, LLC ("KBC") in order to purchase that property.  **Exhibit E** at 147:

9-19.

29.     In November 2011, Plaintiff advised SMP that given the stress on owners created

by reoccurring capital calls, it would be in Sun Realty's best interest to sell Black Rock

Shopping Center.  **Exhibit CC, E-mail from C. Schreder to J. Campbell, dated 11/8/11**.

30.     SMP commissioned an appraisal for Black Rock Shopping Center in response to Plaintiff's suggestion that Black Rock Shopping Center should be sold to a third party. **Exhibit DD, Memorandum from Albert Kleban to Sun Realty Members, dated 1/9/12**; **Exhibit EE, Wellspeak Appraisal, 12/23/11**; **Exhibit FF, E-mail from J. Campbell to C. Schreder, dated 2/1/12**.

31.     In January and March of 2012, Plaintiff urged SMP to sell Sun Realty's interest in Black Rock Shopping Center. **Exhibit GG, E-mail from C. Schreder to J. Campbell, dated 1/20/12**; **Exhibit HH, Memorandum from C. Schreder to Albert Kleban, dated 3/12/12**.

32.     Plaintiff repeatedly advised Sun Realty to adopt an overall plan for dealing with tenant turnover and to abandon its piecemeal approach to addressing tenant vacancies.  **Exhibits S and V**.

33.     Plaintiff advised Sun Realty that cash flow should be diverted to capital improvements to obviate the necessity of making loans to Sun Reality to fund the costs associated with tenant defaults.  **Exhibit T**.

34.     Plaintiff advised SMP to direct cash flow from a recently acquired lease with Nine West to Sun Realty's cash reserves in order to reduce the need for capital calls.  **Exhibit P**.

35.     In August 2005, Plaintiff advised Albert Kleban to arrange for a bank loan to FBW so that FBW could make payments on a loan Sun Realty had made to FBW.  **Exhibit II, Letter from C. Schreder to Albert Kleban, dated 8/3/05**.

36.     In November 2011, Plaintiff advised SMP that a sale of Black Rock Shopping Center should occur before the end of 2012 to avoid expected increases in tax rates, including capital gains taxes.  **Exhibit CC**.

37.     In August 2010, Plaintiff advised Sun Realty regarding the tax implications of a $170,000 loan from Sun Realty to Wings Over Water; specifically, that to avoid tax liability, Sun Realty should not accept rent payments for Wings Over Water as repayment of the loan.  **Exhibit M**.

38.     In January 2012, Plaintiff identified an error in the way Sun Reality was allocating interest on its 2011 tax return. **Exhibit JJ, Memorandum from C. Schreder to Albert Kleban, dated 6/29/12**; **see also Exhibit HHH, E-mail from Albert Kleban to Sun Realty Members, dated 7/14/12**; **Exhibit III, E-mail from C. Schreder to J. Campbell, dated 9/11/12**; **Exhibit KK, E-mail from J. Campbell to C. Schreder, dated 9/25/12.**

39.     As a result of Plaintiff identifying an error in the way Sun Realty was allocating interest on its 2011 tax return, SMP caused Sun Reality to correct the error and calculate the interest in the manner Plaintiff had suggested.  **Id.**

40.     In an e-mail to Sun Realty members dated, January 9, 2015, SMP notified Sun Realty members that the mortgage for Black Rock Shopping Center was required to be refinanced in 2015.  **Exhibit DD**.

41.     In an e-mail to Sun Realty members dated, January 9, 2015, SMP advised Sun Realty that the expected mortgage refinance would likely require amortization and a higher interest rate, which would reduce cash flow, as well as personal guarantees from Sun Realty members.  **Id.**

42.     In an e-mail to Sun Realty members dated, January 9, 2015, SMP asked each member of Sun Realty to indicate whether they would be interested in selling their shares of Sun Reality to other members or would agree to Sun Realty selling Black Rock Shopping to a third party.  **Id.**

43.     In an e-mail to Sun Realty members dated, January 9, 2015, SMP provided Sun Realty members with the appraisal it commissioned for the property in response to Plaintiff's earlier urging that that the property be sold.  **Id.**; **see** **Exhibit EE**.

44.     In a memorandum dated March 12, 2012, Plaintiff advised SMP that it would be in favor of Sun Realty selling Black Rock Shopping Center in its entirety or in Plaintiff selling its interest in Sun Realty to other members of Sun Realty before the mortgage had to be refinanced in 2015.  **Exhibit HH**.

45.     In a memorandum dated March 12, 2012, Plaintiff advised SMP that that Lois Jeruss would not be willing to personally guarantee any loans in connection with mortgage refinance required in 2015.  **Id.**

46.     In June and July of 2012, SMP reported to Sun Realty members that Madison Jewelers was going out of business and was behind on rent, that Hallmark was struggling to make rent payments and would be filing for bankruptcy, that Ritz Camera was $12,000 behind one rent and would also be filing for bankruptcy, and that Audio Design had vacated Turnpike Shopping Center without giving notice.  **Exhibit LL, Memorandum from Albert Kleban to Sun Realty Members, dated 6/27/12**; **Exhibit MM, Memorandum from Albert Kleban to Sun Realty Members, dated 7/10/12**; **Exhibit HHH.**

47.     In an e-mail to Sun Realty members dated July, 24, 2012, SMP described the problems with tenants at Black Rock Shopping center as "serious."  **Exhibit HHH**.

48.      In an e-mail to Sun Realty members dated June 27, 2012, SMP characterized the real estate market as "exceptionally difficult."  **Exhibit LL**.

49.     In December 2012, SMP, through Albert Kleban, reported that the retail stores at Black Rock Shopping Center were having a "less than stellar performance" as a result of a

variety of factors, including a decline in consumer spending, competition from big chain stores, and internet sales, and that in addition to Madison Jewelers, The Clubhouse was also behind on rent. **Exhibit NN, Memorandum from Albert Kleban to Sun Realty Members, dated 12/12/12**.

50.     In April 2013 that Madison Jewelers was $86,000 behind on rent, that the lease agreement with Total Look was expiring, that Koko Fit Club was terminating its lease, and that lease of the Madison Jewelers space to Meat House would require fit-up costs and brokerage fees. **Exhibit OO, Memorandum from Albert Kleban to Sun Realty Members, dated 4/6/13**.

51.     During the relevant times, Sun Realty members were aware that Sun Realty's biggest tenants, The Gap and Old Navy, might not renew their leases. **Exhibit E, Allan Kleban Dep. 187:3-18**.

52.     In an e-mail dated April 6, 2013, SMP advised Sun Realty members (a) that Sun Realty was required to start amortizing the mortgage for Black Rock Shopping Center pursuant to the original mortgage agreement for Black Rock Shopping Center negotiated in 2006 and (b) that to fund the amortization and expenses relating to tenant turnover, Sun Realty Members should pay their pro rata share of a $300,000 capital call, which, in Plaintiff's case would have been $99,999.00. **Exhibit OO**.

53.     In and e-mail dated April 19, 2013, Ken Kleban provided Sun Realty members with an analysis that projected that the mortgage refinance expected in 2015 would need to be funded by additional significant capital contributions as well as a conversion of loans made by Sun Realty members to Sun Realty to equity.  **Exhibit PP, E-mail from J. Campbell to Sun Realty Members, dated 4/19/13.**

54.     In an email dated April 6, 2013, Albert Kleban, invited Sun Realty members to a family meeting to be held at the Turnpike office on April 29, 2013 at 9:00 am ("Family Meeting").

55.     In an email dated April 6, 2013, Albert Kleban stated that the Family Meeting would facilitate "a friendly and open exchange of ideas, complete transparency of . . . family business operations, and solidarity as a family moving forward." **Id.**

56.     The Family Meeting was well-attended, but Lois Kleban did not attend, having determined ahead of time that nothing new would come of the meeting and that it would not be worth her while to attend.  **Exhibit E, Allan Kleban Dep. at 79:1-17**; **Exhibit A, SLSJ Dep. at 124:13 – 129:17**.

57.     The prospect of selling Sun Realty to a third party was also discussed at the Family Meeting.  **Exhibit E, Allan Kleban Dep. at 91:22 – 92:22**.

58.     At the Family Meeting, Albert and Ken Kleban explained that they had exploratory conversations with certain real estate investment trusts ("REITs"), including Kimco Realty ("Kimco") about selling interests in Sun Realty or other properties owned by the Kleban family.  **Id. at 92:18 – 94-2**; **Exhibit RR, Ken Kleban Deposition Transcript ("K. Kleban Dep." ) at 56:12-24**; **Exhibit D, Albert Kleban Deposition Transcript ("Albert Kleban Dep.") at 89:13 - 90:11**; **121:3-16**.

59.     At the Family Meeting, Albert and Ken Kleban explained that they had preliminary conversations with HFF, a commercial real estate broker, about marketing Black Rock Shopping Center and other Kleban family properties as properties for sale.  **Exhibit RR, K. Kleban Dep. at 54:9 – 56:24**.

60.     At the Family Meeting, Albert Kleban expressed his opinion that Kimco was the only REIT that presented a remotely promising option for Sun Realty.   **Exhibit D, Albert Kleban. Dep. at 121:3-16**.

61.     On August 5, 2013, Sun Realty formally engaged HFF to seek financing for a recapitalization of Black Rock Shopping Center.   **Exhibit RR, K. Kleban Dep. at 54:9 – 55:10.**

62.     After the Family Meeting, James Blank spoke with Plaintiff's attorney, Richard Hoffman, about was discussed at the Family Meeting. **Exhibit A, SLSJ Dep. at 133:15 – 138:7; Exhibit RR, K. Kleban Dep. at 59:9 – 60:4.**

63.     After the Family Meeting, Allan Kleban spoke with Lois Jeruss and Plaintiff's attorney, Carleen Schreder, about what was discussed at the Family Meeting.   **Exhibit A, SLSJ Dep. at 133:15 – 138:7; Exhibit RR, K. Kleban Dep. at 59:9 – 60:4**.

64.     Following the Family Meeting, Allan Kleban met with Albert and Ken Kleban. **Exhibit E, Allan Kleban Dep. at 104:7 – 110:20**.

65.     Allan Kleban arranged to meet with Albert and Ken Kleban following the Family Meeting in order to discuss Allan Kleban selling his 11% interest in Sun Realty to Le Rivage. **Exhibit E, Allan Kleban Dep. at 105:9 – 106:10**.

66.     When Allan, Albert and Ken Kleban met following the Family Meeting, Albert and Ken Kleban first indicated they were not interested in purchasing Allan Kleban's 11% interest because Le Rivage was overexposed in Sun Realty, and as a minority shareholder, it had limited control over Black Rock Shopping Center.  **Id. at 108:6-16**.

67.     When Allan, Albert and Ken Kleban met following the Family Meeting, Allan Kleban suggested that Plaintiff might be interested in selling its membership interest in Sun Realty on the same terms as Allan Kleban.  **Id. at 109:22-25.**

68.     The meeting between Allan, Albert and Ken Kleban following the Family Meeting, concluded with Allan Kleban suggesting that he would speak to Lois Jeruss about Plaintiff selling its membership interest in Sun Realty to Le Rivage.  **Id. at 110:2-6**.

69.     After the Family Meeting, Allan Kleban told Lois Jeruss about his conversations with Albert and Ken Kleban following the Family Meeting and that LeRivage was willing to purchase his interest and Plaintiff's interest in Sun Realty on the same terms. **Id. at 112:1-7**.

70.     Allan Kleban provided Lois Jeruss with a one page valuation of Sun Realty prepared by Ken Kleban, with a note to Lois Jeruss, stating that Le Rivage was interested in purchasing Allan Kleban's and Plaintiff's interest in Sun Realty at a price based on that valuation, and inviting Carlene Schreder, Plaintiff's counsel, to contact Allan to discuss the proposal.  **Id. at 112:9-10; Exhibit SS, E-mail from Allan Kleban to L. Jeruss, dated 4/30/13 with K. Kleban Valuation**.

71.     Lois Jeruss indicated to Allan Kleban that she was interested in selling Plaintiff's interest in Sun Realty on the terms that Allan Kleban described.   **Exhibit A, SLSJ Dep. at 144:19 – 145:24**.

72.      On May 22, 2013, Albert Kleban sent a revised letter of intent to Plaintiff, offering to purchase Plaintiff's membership interest and notes for $2,020,540.41 ("Letter of Intent").  **Exhibit TT**, **Letter from Albert Kleban to L. Jeruss, dated 5/22/13**.

73.     Plaintiff countersigned the Letter of Intent, thereby accepting Albert Kleban's offer. **Id.**

74.     Albert Kleban also sent a letter of intent to Allan Kleban, offering to purchase Allan Kleban's membership interest in Sun Realty and promissory notes on the same terms and at the same valuation offered to Plaintiff.  **Exhibit E, Allan Kleban Dep. at 189:13-20**.

75.     Allan Kleban accepted Albert Kleban's offer to purchase his membership interest in Sun Realty.  **Id.**

76.     On June 27, 2013, Plaintiff and Albert Kleban executed a Membership Purchase Agreement ("SLSJ Purchase Agreement"), dated June 1, 2013, wherein Plaintiff agreed to sell its 33.3333% membership interest and outstanding promissory notes to Albert Kleban, in exchange for $2,020,540.41, with one half payable in the form of a promissory note.  **Exhibit UU, SLSJ Purchase Agreement, dated 6/1/13**.

77.     Albert Kleban executed a Membership Purchase Agreement ("Allan Kleban Purchase Agreement") with Albert Kleban, dated June 1, 2013, to purchase Albert Kleban's 11.11107% membership interest and outstanding promissory notes on the same terms and at the same valuation that Plaintiff's membership interests and promissory notes were purchased. **Exhibit VV, Allan Kleban Purchase Agreement, dated 6/1/13**.

78.     On July 29, 2013, Plaintiff executed an "Assignment of Membership Interest" (the "SLSJ Assignment"), assigning its membership interest in Sun Realty to Le Rivage, as Albert Kleban's successor-in-interest under the SLSJ Purchase Agreement. **Exhibit WW, SLSJ Assignment, dated 6/29/13**.

79.     On July 31, 2013, Allan Kleban executed an "Assignment of Membership Interest" (the "Allan Kleban Assignment"), assigning his membership interests in Sun Realty to Le Rivage.  **Exhibit XX, Allan Kleban Assignment, dated 7/31/13**.

80.     Sun Realty executed a financing fee agreement with HFF on August 15, 2013 pursuant to which HFF was formally engaged to market Sun Realty and other properties owned by the Kleban family to prospective buyers. ("Financing Fee Agreement").  **Exhibit RR, K. Kleban Dep. at 54:9 – 55:10**; **Exhibit ZZ, HFF Financing Fee Agreement, executed 8/15/13**.

81.     In September 2013, Robert Rizzi of HFF, contacted Joanne Rotonde of  Regency Centers Corporation ("Regency") to discuss the possibility of purchasing interests of Sun Realty and other Kleban family properties. **Exhibit CCC, Regency Centers Corporation Deposition Transcript ("Regency Dep.") at 21:10 - 22:4; 118:21 - 121:2; Exhibit RRR, E-mail from R. Rizzi to J. Rotonde, dated 11/23/12.**

82.     Regency was not aware that Sun Realty and other Kleban family properties were for sale until it was contacted by HFF in September 2013.  **Exhibit CCC at 118:21 - 121:2; Exhibit RRR.**

83.     On October 11, 2013, Regency sent a formal letter of intent to HFF ("Regency Letter of Intent") to purchase an 80% interest in three Kleban owned properties: Brick Walking Shopping Center, Fairfield Shopping Center, and Black Rock Shopping Center (collectively, "Kleban Properties").  **Exhibit BBB, Regency Letter of Intent, dated 10/11/13; Exhibit CCC, Regency Dep. at 19:8-20.**

84.     The Kleban Properties were owned by various limited liability companies controlled by members of the Kleban Family (the "Kleban Entities"), including Sun Realty. **Exhibit DDD, Contribution Agreement, dated 10/17/13; Exhibit EEE, First Amendment to Contribution Agreement, dated 11/5/13.**

85.     Pursuant to the Regency Letter of Intent, the Kleban Entities would maintain a 20% ownership stake and continue to operate and manage the properties.  **Exhibit BBB.**

86.     The agreement between Regency and the Kleban Entities to purchase a twenty percent interest in the Kleban Entities was consummated pursuant to a Contribution Agreement signed by Regency and the Kleban Entities, dated October 17, 2013, as amended by a First Amendment to Contribution Agreement, dated November 5, 2013, a Second Amendment to

Contribution Agreement, dated November 20, 2013, and a Third Amendment to Contribution Agreement, dated December 1, 2013. **Exhibit DDD; Exhibit EEE, First Amendment to Contribution Agreement, dated 11/5/13; Exhibit FFF, Second Amendment to Contribution Agreement, dated 11/20/13; Exhibit AAA, Third Amendment to Contribution Agreement, dated 12/1/13**.

87.     The Third Amendment to the Contribution Agreement stated that agreed to purchase the Kleban Properties for $119,589, 000.  $24,487,793.12 of that figure was sub-allocated as the purchase price for the 80% interest in Sun Realty. **Exhibit AAA.**

88.     The transaction between Regency and the Kleban Properties closed in March of 2014. **Exhibit CCC, Deposition Transcript of B. Argalas ("Argalas Dep.") at 37:24 – 38:1**.

89.     By 2013, Ken Kleban, as a director of SMP, was becoming as much involved in the management of Sun Realty as was Albert Kleban, who, then in his eighties, was reducing his direct involvement.  **Exhibit E at 154:23 – 156:2**.

90.     Jackie Campbell advised Carleen Schreder in August 2005 that Schreder's method of dealing was personally "very insult[ing]" and compared her questions and insinuations to an "inquisition." **Exhibit GGG, Letter from J. Campbell to C. Schreder, dated 8/8/05**.

91.     Ms. Schreder had regular contact with Albert Kleban, Turnpike or SMP, and asked questions and sought clarification about significant developments involving Plaintiff's interest in Sun Realty.  **Exhibits M, P, Q, R, S, U, V, W, BB, CC, GG, HH, II, JJ, III**.

92.     Plaintiff, through Ms. Schreder or Lois Jeruss, advocated Plaintiff's position that, *inter alia*, (i) Sun Realty should not purchase the gas station property that was ultimately purchased by FBW; **Exhibit AA**; (ii) Sun Realty should not purchase the Children's Place property; **Exhibit E** at 147: 9-19 ; (iii) Albert Kleban should arrange for a bank loan to FBW to

16

fund repayment of a loan owing to Sun Realty; **Exhibit II**; (iv) Sun Realty should sell out to a third party; **Exhibits CC, GG, MI**; (v) Sun Realty should adopt a comprehensive plan for dealing with tenant turnover; **Exhibits S and V**; (vi) Sun Realty should withhold dividends to fund capital calls; **Exhibit T** (vii) Sun Realty should calculate tax liabilities in the manner advocated by Plaintiff; **Exhibits M, JJ, KK, HHH**; (viii) Sun Realty should pay Attorney Schreder for legal services rendered; **Exhibit III** (ix) Plaintiff would not contribute to capitals, or would contribute to capitals only up to a certain amount if certain information was provided; **Exhibits V, T, CC**; **Exhibit NNN**, **E-mail from C. Schreder to J. Campbell, dated 1/29/08**; (x) Plaintiff would not guarantee loans made to Sun Realty; **Exhibit HH**; and (xi) certain topics should be included on the agenda at the Family Meeting, including a review of Sun Realty's balance sheet and projected cash flow for 2013; **Exhibit JJJ, E-mail from C. Schreder to J. Campbell, dated 4/18/13**.

93.      James Blake, Richard Hoffman, Carleen Schreder, and Allan Kleban gave Plaintiff advice regard the sale of its interest in Sun Realty and/or the Connecticut Real Estate Market. **Exhibit A, SLSJ Dep. at 135:8 - 137:19; 139:23 - 141:23; 151:6 - 154:2; Exhibit D, Albert Kleban Dep. 89:13 - 91:25; Exhibit RR, K. Kleban Dep. at 59:13 - 60:4; Exhibit LLL, E-mail from L. Jeruss to J. Blank, dated 4/23/13; Exhibit MMM, E-mail from R. Hoffman to J. Blake, dated 4/24/13.**

94.      Schreder negotiated the transaction documents heavily and extracted an opinion from Stephan Grozinger, Albert Kleban's attorney, regarding the permissibility of the SLSJ Purchase Agreement as well as an estoppel from SMP concerning the SLSJ Assignment. **Exhibit OOO, Grozinger Opinion, dated 6/29/13; Exhibit SSS, Estoppel Certificated, dated 6/29/13**

95.     Albert Kleban (or Jackie Campbell on his behalf) sent e-mails expressing concern for Sun Realty and its members. **Exhibits F, M, N, O, X, DD, LL, MM, NN, OO, PP, QQ, and HHH**.

96.     The Sun Realty Operating Agreement requires members to participate in the affairs of Sun Realty, stating that members "shall diligently employ themselves in the business of the Company" and "shall inform all other Members of all his work transactions on behalf of the Company." **Exhibit B at § 6.1(d)**.

97.     The Sun Realty Operating Agreement states that: (i) members have the right to vote based on percentage interests, **id. at § 6.3**; (ii) members have the right to call a meeting for any purpose, **id. at § 6.4**; (iii) members have the right to inspect Sun Realty's books and records, **id. at §§ 7.2, 11.1(b)**; (iv) members have the right to receive a copy of Sun Realty's tax returns, **id. at § 7.3**; (v) a vote of 51% of membership interest is required to negotiate a sale or refinance of the shopping center, **id. at § 6.1(h)**; (vi) unanimous consent of the members is required to dissolve the company, **id. at § 9.1(a)(i)**; (vii) a "majority in interest" (defined as a 75% membership interest, **id. at art. I**) is required to approve a substitute member, **id. at § 10.3(d)**, or incur additional debt, **id. at § 2.5**; and (viii) member approval is required for capital improvements over a set dollar amount, **id. at § 6.2(g)**.

98.     Plaintiff (i) declined to agree to the purchase of the gas station adjacent to Black Rock Shopping in the early 2000s, thereby causing Sun Realty to not purchase the gas station, **Exhibit AA**; (ii) declined to agree Sun Realty's purchase of the Children's Place property, **Exhibit E** at 147: 9-19; (iii) repeatedly advocated for the sale of Sun Realty, resulting in Sun Realty commissioning an appraisal of Black Rock Shopping Center and the ultimate sale of Sun Realty interests to Regency, **Exhibits CC, GG, HH**; **Exhibit D, Albert Kleban Dep. at 133:22**

— **134:2**; (iv) repeatedly directed Sun Realty to adopt an overarching plan for addressing tenant vacancies that involved diverting cash flow to capital improvements to reduce the need for members' loans to Sun Realty when tenants defaulted, **Exhibits S, V and T**; (v) directed Sun Realty to direct cash flow to Sun Realty's cash reserves in order to reduce the need for capital calls, **Exhibit T**; (vi) directed Albert Kleban, as president of SMP, to loan money to FBW so that FBW could fund its obligation to Sun Realty, **Exhibit II**; (vii) directed Sun Realty in November 2011 to sell Black Shopping Center before the end of 2012 to avoid an expected tax liability increase, **Exhibit CC**; (viii) advised Sun Realty of the tax implications associate with Wings Over Water's repayment of a $170,000 loan in August 2010. **Exhibit M**; (ix) advised Sun Realty of an error in the way Sun Realty was allocating interest on its 2011 tax return, resulting in a correction of the error identified by Plaintiff, **Exhibit JJ**; (x) advised Sun Realty that Lois Jeruss would not personally guarantee any loans in connection with any refinance of Sun Realty's mortgage, thereby contributing to Sun Realty's decision to sell its membership interests, **Exhibit HH**; (xi) sought reimbursement from Sun Realty for legal services rendered in connection with Plaintiff's analysis of Sun Realty's 2011 tax return, **Exhibit III**; (xii) agreed to several capital calls totalling $913,000, thereby allowing Sun Realty to fund costs associated with tenant turnover and make capital improvement, **Exhibit A, SLSJ Dep. at 95:9 — 96-17**; (xiii) communicated, through its attorney, with SMP or Turnpike on a regular basis for the better part of a decade about significant developments affecting Black Rock Shopping Center, **Exhibits M, P, Q, R, S, U, V, W, BB, CC, GG, HH, II, JJ, III**.

99.     When asked at its deposition, through Lois Jeruss, to identify statements in an e-mail from Albert Kleban, dated April 6, 2016 e- that were false, Plaintiff stated that it was unable

to identify statements in that e-mail that were untruthful.  **Exhibit A, SLSJ Dep. at 116:9 - 117:9 (referencing Exhibit OO)**

100.  Plaintiff was also unable to identify untruthful statements in e-mails or memoranda Albert Kleban sent to Sun Realty members dated October 22, 2009, November 6, 2009, September 29, 2010 and July 10, 2012.  **Id. at 51:17-22 (referencing Exhibits I and PPP); 60:22 — 61:9 (referencing Exhibit K); 109:20 — 110:14 (referencing Exhibit MM)**.

101.  Plaintiff admitted that she was kept sufficiently informed about Black Rock during the times relevant to this lawsuit. **Id. at 68:15 - 69:11 (referencing Exhibit O)**.

102.  The following is true with respect to the Family Meeting: (i) Albert Kleban convened the Family Meeting for the purpose of facilitating an open exchange of ideas and complete transparency of the family business operations, **Exhibit QQ**; (ii) members of Sun Realty traveled from different parts of the country to attend the Family Meeting, **Exhibit E, Allan Kleban Dep. 77:20 — 79:17** (iii) Lois Jeruss determined that the Family Meeting would not be worth her while and chose not to attend, **id. at 79:9-12; Exhibit A, SLSJ Dep. at 124:12 — 129:17**; (iv) the prospect of selling Sun Realty to a third party was discussed at the Family Meeting, **Exhibit E, Allan Kleban Dep. at 91:22 — 92:22**; (v) Albert and Ken Kleban disclosed at the Family Meeting that they had been in exploratory conversations with certain REITs, including Kimco, **id. at 92:13 — 94:3; Exhibit RR, Ken Kleban Dep. at 54:5 - 58:17, 62:25 - 63:2; 156:23 — 164:1; Exhibit D, Albert Kleban Dep. at 117:19 — 121:16**; and (vi) Albert and Ken Kleban disclosed at the Family Meeting that they were in talks with HFF about marketing Black Rock Shopping Center and other Kleban properties for sale, **Exhibit RR, Ken Kleban Dep. at 56:12-24**.

103.   Lois Jeruss did not call Albert or Ken Kleban after the Family Meeting to learn what was discussed at the meeting from Albert or Ken Kleban directly. **Exhibit A, SLSJ Dep. at 130:13 — 133:14.**

Respectfully Submitted,

ALBERT J. KLEBAN and
THE LE RIVAGE, L.P.

/s/ Richard W. Bowerman
Richard W. Bowerman (ct 04181)
LeClairRyan, A Professional Corporation
545 Long Wharf Drive, Ninth Floor
New Haven, Connecticut 06511
Tel.: (203) 672-1638
Fax: (203) 672-3228
richard.bowerman@leclairryan.com

– Their Attorneys –

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2018, the foregoing document was filed electronically and sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Richard W. Bowerman
Richard W. Bowerman (ct 04181)