# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SLSJ, LLC,

                Plaintiff,

v.

ALBERT J. KLEBAN and THE LE
RIVAGE LIMITED PARTNERSHIP,

                Defendants.

Case No. 3:14-CV 00390 (CSH)

May 24, 2018

 

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

David E. Lieberman (phv 06902)
Levin Schreder & Carey Ltd.
120 North LaSalle Street, 38th Floor
Chicago, IL  60602
Tel.:  (312) 332-6300
Fax:  (312) 332-6393
Email:  david@levinschreder.com

Joseph J. Cherico (ct 24869)
McCarter & English, LLP
One Canterbury Green
201 Broad Street
Stamford, CT  06901
Tel.:  (203) 399-5900
Fax:  (203) 399-5800
Email:  jcherico@mccarter.com

*Attorneys for Plaintiff SLSJ, LLC*

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

SUMMARY OF MATERIAL FACTS .................................................................................. 1

1. The Parties ............................................................................................................... 2

2. The Parties' June 2013 Membership Interest Purchase Agreement ....................... 3

3. Sun Realty's Joint Venture Agreement with Regency Centers Corporation .......... 4

4. Albert Kleban's Exclusive Management and Control of Sun Realty .................... 6

5. Albert Kleban's False and Misleading Assurances he Managed Sun Realty
   Loyally in All Members' Interests and Disclosing Material Information ............. 8

6. Albert Kleban's Misleading Negative Reports Concerning Sun Realty's
   Business, Financial Condition and Value ............................................................ 12

7. Albert Kleban's Omissions of Critical, Material Facts ....................................... 16

   a. The Klebans' Undisclosed Negotiations with Federal Realty ............... 17

   b. The Klebans' Additional Undisclosed Negotiations with Kimco .......... 19

   c. Kleban Made No Disclosure to SLSJ or Other Sun Realty Members .... 22

ARGUMENT ...................................................................................................................... 23

I. Albert Kleban Owed Fiduciary Duties and Breached Them ............................... 23

   A. Albert Kleban Stood in a Fiduciary Relationship to SLSJ and
      Other Sun Realty Members ..................................................................... 23

      1. Members Reposed Trust and Confidence in Albert Kleban ......... 24

      2. Albert Kleban Possessed Superior Knowledge, Skill and Expertise .......... 28

      3. Albert Kleban Undertook the Duty to Represent the Interests
         of Sun Realty's Members .............................................................. 29

      4. Albert Kleban Occupied a "Superior Position" Affording
         Opportunity for Abuse .................................................................. 31

i

5. SMP's Powers and Duties are Relevant to Determining Albert Kleban's Fiduciary Relationship to Sun Realty Members ........................ 32

B. Albert Kleban's Breach of Fiduciary Duty is Presumed as a Matter of Law, and Unrebutted in the Record ................................................................... 35

1. Defendants Cannot Show "Free and Frank Disclosure" ........................... 35

2. Defendants Cannot Prove Kleban Paid Adequate Consideration .......... 38

3. Defendants Cannot Make the Required Showing of Parity in Sophistication and Bargaining Power ......................................................... 39

4. SLSJ's Receipt of Competent and Independent Advice Does Not Establish the Transaction was Fair ..................................................... 40

II. The Evidence Supports SLSJ's Fraud Claims ................................................. 41

A. Sun Realty Membership Interests Were "Securities" ............................................ 42

B. There is Substantial Evidence Kleban Made False and Misleading Statements of Material Fact ................................................................................... 43

III. Defendants Misstate SLSJ's Unjust Enrichment Claim .................................................... 45

CONCLUSION ........................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AIU Insurance Co. v. TIG Insurance Co.*, 934 F. Supp. 2d 594, 605
    (S.D.N.Y 2013), *aff'd*, 577 Fed. App'x 24 (2d Cir. 2014) ....................................33

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018)....................................43

*Stratte-McClure v. Morgan Stanley*, 776 F.3d 94 (2d Cir. 2015)....................................44

*Strong v. Repide*, 213 U.S. 419, 431 (1909) ....................................37

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008)....................................42

**State Cases**

*Calpitano v. Rotundo*, No. CV-11-6008972, 2011 WL 3672092
    (Conn. Super. Ct. Aug. 3, 2011) ....................................32

*Clinton v. Aspinwall*, No. HHD-CV-13-6042758-S,
    2015 WL 5438689 (Conn. Super. Ct. Aug. 20, 2015)....................................32

*Davenport v. Quinn*, 730 A.2d 1184 (Conn. App. Ct. 1999)....................................34

*Fraser v. United States*, 674 A.2d 811 (Conn. 1996) ....................................23, 33

*Gagne v. Vaccaro,* 766 A.2d 416 (Conn. 2001) ....................................45

*Iacurci v. Sax*, 313 Conn. 99 A.3d 1145 (Conn. 2014)....................................*passim*

*Konover Development Corp. v. Zelle,* 635 A.2d 798 (Conn. 1994) ....................................*passim*

*Levy v. Guilford Village Walk, LLC*, No. NNH-CV-09-5029013-S,
    2011 WL 3593984 (Conn. Super. Ct. July 22, 2011) ....................................32

*Meinhard v. Salmon*, 164 N.E. 545 (N.Y. 1928) ....................................37

*Seven Bridges Foundation v. Wilson Agency, Inc.*, No. FST-CV-11-6009707-S,
    2012 WL 899206 (Conn. Super. Ct. Mar. 2, 2012) ....................................35

*Wilcox v. Schmidt*, Nos. WWM-CV-04-4001126-S, WWM-CV-05-4001851-S,
    2010 WL 2817490 (Conn. Super. Ct. June 3, 2010) ....................................32

*Yavarone v. Jim Moroni's Oil Service, LLC*, No. CV-03-0102318-S,
    2005 WL 737010 (Conn. Super. Ct. Feb. 18, 2005)....................................32

*Zaist v. Olson*, 227 A.2d 552 (Conn. 1967) ................................................................................34

*Zanker Group, LLC v. Summerville at Litchfield Hills, LLC*,
    No. NNH-CV-04-4015238-S, 2005 WL 3047268 (Conn. Super. Ct. Oct. 24, 2005) .............32

**<u>Rule</u>**

Federal Rule of Evidence 201 ...........................................................................................................3

**<u>Secondary Authorities</u>**

19 FEDERAL PRACTICE AND PROCEDURE Jurisdiction § 4507 (3d ed.) ..........................................33

Robert H. Sitkoff, *The Economic Structure of Fiduciary Law*,
    91 B.U. L. Rev. 1039 (2011) ..........................................................................................28, 31

PRINCIPLES OF CORPORATE GOVERNANCE: ANALYSIS AND RECOMMENDATIONS (1994) ..............28

Appraisal Institute, THE APPRAISAL OF REAL ESTATE (13th ed. 2008) .........................................16

Plaintiff SLSJ, LLC (**"SLSJ"**), respectfully submits this memorandum in opposition to defendants' motion for summary judgment.

The essential facts establishing defendants' liability are undisputed:

1. Defendant Albert Kleban managed and controlled Sun Realty Associates, LLC (**"Sun Realty"**) as president of its Manager, Sun Realty-SMP, Inc. (**"SMP"**);

2. Kleban purchased plaintiff SLSJ's membership interests in Sun Realty on July 29, 2013; and

3. Kleban failed to disclose that he was then negotiating with two investors seeking to purchase Sun Realty's only material asset, real estate comprising the majority of Black Rock Shopping Center (**"Black Rock"**), or that he had determined by then to engage a commercial real estate broker to market the property more broadly for sale.

These undisputed facts, coupled with incontrovertible evidence establishing a fiduciary relationship between Kleban and Sun Realty's members, including SLSJ, require denial of defendants' motion for summary judgment as to all of SLSJ's claims. The undisputed facts also conclusively establish that Kleban breached his fiduciary duty to SLSJ and warrant entry of summary judgment in favor of SLSJ on its first claim for relief. Given the critical, material information Kleban undisputedly withheld from his principal, SLSJ, he cannot, as a matter of law, meet his burden as fiduciary to prove the fairness of their transaction by clear and convincing evidence.

## SUMMARY OF MATERIAL FACTS

This action arises from Albert Kleban's July 29, 2013 purchase of plaintiff SLSJ, LLC's 33.33 percent membership interests in Sun Realty, a family-owned limited liability company whose sole business purpose was "ownership, operation, management and leasing" of a single piece of real estate, the largest portion of Black Rock Shopping Center in Fairfield, Connecticut. (Defs. Ex. B, Operating Agmt., at ¶ 2.1 and Ex. A thereto; Defs. Ex. UU, Membership Interest Purchase Agmt.) Sun Realty's owners, including Albert Kleban and SLSJ managing member

Lois Jeruss, were descendants of the late brothers Irving, Harry and Leon Kleban, and held their respective interests either individually, or through various business organizations or trusts administered for their benefit.  (Defs. Ex. B, and Ex. A thereto; **Pl. Ex. 1**, Declaration of Lois Jeruss, at ¶ 4.)

     **1.**     **The Parties.**

Plaintiff SLSJ is a limited liability company formed by Lois Jeruss and her late husband to hold non-controlling interests in real estate she inherited from her father, Leon Kleban.  (Pl. Ex. 1, Jeruss Decl. ¶ 2.)  Ms. Jeruss is manager and in 2013 owned 70 percent of SLSJ's membership interests.  (Defs.' LR 56(a)(1) Stmt. ¶ 1.)  Her two daughters own the balance.  (*Id.*)  None of SLSJ's members has specialized knowledge or experience in managing a business or commercial real estate.  (**Pl. Ex. 2**, cited excerpts from the Deposition of Lois Jeruss, at 7-12, 159-160; Pl. Ex. 1, Jeruss Decl. ¶ 3.)

Defendant Albert Kleban is Irving Kleban's son and Ms. Jeruss's first cousin, and the family member who managed and controlled Sun Realty and several other real estate ventures held by or for the benefit of Irving, Harry and Leon Kleban's respective descendants.  (**Pl. Ex. 3**, cited excerpts from the Deposition of Albert Kleban, at 42-44; Pl. Ex. 1, Jeruss Decl. ¶ 5.)

Defendant Le Rivage Limited Partnership (**"Le Rivage"**) is a limited partnership.  Albert Kleban and his wife Alida were its general partners at the time of the subject transaction in 2013.  (**Pl. Ex. 4**, Limited Partnership Agmt., at LR 25 and 27; Pl. Ex. 3, A. Kleban Dep. at 62-63.)  Le Rivage held an 11.11 percent membership interest in Sun Realty before acquiring another 44.44 percent in July 2013.  (Defs. Ex. B, Operating Agmt., at Ex. A.)

Albert Kleban is an attorney and experienced real estate developer.  He was a founder and "principal" of Kleban Properties, LLC, described on its website as a "real estate developer" that "owns and operates office, retail, and mixed-use properties in town centers across the East

Coast." (**Pl. Ex. 5**, at "About Kleban Properties . . .," http://www.klebanproperties.com/about.htm (last visited Aug. 6, 2014).) Kleban Properties' website stated:

> Although Mr. Kleban has had a successful law practice and civic career, he is most recognized in Fairfield County for his keen business acumen, real estate expertise and significant real estate portfolio. Presently Mr. Kleban owns and/or controls approximately 1,000,000 square feet of retail and office space in Connecticut and Florida. . . .  Mr. Kleban is respected by many and considered to be one of the premier commercial real estate developers in Fairfield County.

(*Id.*, at "Biography of Principals . . .," http://www.klebanproperties.com/principals.htm (last visited Aug. 6, 2014).) S*ee* Fed. R. Evid. 201.  The site reproduced a 2014 magazine cover article featuring Albert Kleban and his son, Ken, referring to their Kleban Holding Co. as "Fairfield's second- largest property owner." (**Pl. Ex. 6**, "The Kleban Machine . . .," at 46, http://www.klebanproperties.com/news/The-Kleban-Machine-Building-a-Future-for-Fairfield.pdf (last visited Aug. 6, 2014).)

Albert and Ken Kleban also owned and managed Turnpike Properties, LLC, a property management company that managed approximately 14 commercial properties in Connecticut, including Black Rock. (**Pl. Ex. 7**, at "Turnpike Properties Our Centers," http://www.turnpikepropertiesct.com/TP2.html (last visited Aug. 8, 2014).) Its website described Albert Kleban and his co-owners as "successful developers for over 40 years," who "have built and currently manage over 1 million square feet of regional and neighborhood strip shopping centers throughout Connecticut." (*Id.*, at "Turnpike Properties Local Map," http://www.turnpikepropertiesct.com/TP4.html (last visited Aug. 8, 2014).)

> 2.  **The Parties' June 2013 Membership Interest Purchase Agreement.**

Discussions leading to the subject Membership Interest Purchase Agreement between SLSJ and Albert Kleban commenced on or about April 29, 2013.  Allan Kleban, a mutual cousin, telephoned SLSJ managing member Lois Jeruss to advise her that Albert Kleban was offering to

purchase SLSJ's 33.33 percent membership interest in Sun Realty, along with two promissory notes SLSJ held from Sun Realty. (Defs. Ex. E, Allan Kleban Dep. at 111-112.) Allan Kleban then emailed Ms. Jeruss on April 30, 2013, writing: "Here is the one page valuation that I have discussed with Ken and Albert. They are agreeable to buying your interest and mine at this valuation." (Defs. Ex. SS, Apr. 30, 2013 email, at p. 1.) The attached valuation stated the market value of Sun Realty's interest in Black Rock as $23,082,960. (*Id.* at p. 2; *see also* Defs.' LR 56(a)(1) Stmt. ¶¶ 69-70.)[1]

In May, Albert Kleban forwarded written offers to SLSJ on the same terms, offering $2,020,540 for SLSJ's membership interests and two notes it held from Sun Realty. (Defs.' LR 56(a)(1) Stmt. ¶ 72; Defs. Ex. TT, May 22, 2013 Letter of Intent.) The notes had an aggregate original principal amount of $914,308. (Defs. Ex. TT.) On June 27, 2013, SLSJ and Albert Kleban executed their contract, agreeing to a closing on July 31 or earlier by mutual agreement. (Defs.' LR 56(a)(1) Stmt. ¶ 76; Defs. Ex. UU, Membership Interest Purchase Agmt.) Closing occurred July 29, 2013. Albert Kleban paid $2,020,540 to SLSJ, and SLSJ assigned its 33.33 percent membership interests and notes to Kleban's partnership and assignee, Le Rivage. (Defs.' LR 56(a)(1) Stmt. ¶ 78; Defs. Ex. UU; Defs. Ex. WW, Assignment.)

### 3. Sun Realty's Joint Venture Agreement with Regency Centers Corporation.

On October 17, 2013, less than 12 weeks after buying out SLSJ's entire interest in Sun Realty, Albert Kleban executed, on behalf of Sun Realty, a lucrative joint venture agreement with Regency Centers Corporation (**"Regency"**), a national real estate investment trust. (Defs. Ex. DDD, Contribution Agmt., dated Oct. 17, 2013.) Under the joint venture agreement, Sun

---

[1]  Contrary to defendants' brief, Allan Kleban's cited email and testimony referred to Albert and Ken Kleban, not to "Le Rivage," and referred to the valuation as "discussed with Ken and Albert" or with Ken, not as "proposed by Ken Kleban." (*See* Defs.' Br. at 17.)

Realty effectively sold Regency an 80 percent share of its only asset, its interest in Black Rock, for $24,487,793. (Defs.' LR 56(a)(1) Stmt. ¶¶ 83, 86, 87; Defs. Ex. DDD, at ¶ 2; Defs. Ex. AAA, Third Amendment to Contribution Agmt., dated Dec. 1, 2013, at ¶ 2 and Ex. 3.3 thereto.) The Sun Realty-Regency transaction, part of a larger joint venture involving two other Kleban-family shopping centers also controlled by Albert Kleban, closed in March 2014. (Defs.' LR 56(a)(1) Stmt. ¶¶ 83-99.) The commercial real estate broker who secured the Regency transaction on behalf of Sun Realty was HFF, Inc. (*Id.* ¶¶ 81-83.)

In determining the $24,487,793 price Regency paid to purchase an 80 percent interest, Regency and Albert Kleban, on behalf of Sun Realty, agreed that the value of Sun Realty's entire 100 percent interest in Black Rock was $30,609,665, a valuation approximately $7.5 million greater than the $23,082,960 valuation of the same property used to determine the price Kleban paid on July 29, 2013 to purchase SLSJ's 33.33 percent interest in Sun Realty. (Defs. Ex. AAA, at ¶ 2 and Ex. 3.3 thereto.) In a matter of months, Albert Kleban and his partnership, Le Rivage, thereby effectively realized a $2.5 million gain on the 33.33 percent interest he purchased from SLSJ, *i.e.,* one-third of the differential between the respective valuations used as the basis for the pricing in the respective transactions with SLSJ and Regency.

Albert Kleban first notified Sun Realty members of the Regency transaction and of his and Ken Kleban's underlying sale efforts one day after he signed the agreement. In an October 18, 2013 email, he exulted: "Ken and I are extremely pleased to share with you an exciting development at Sun Realty, FBW and KDC. We have entered into a transaction with Regency Centers. . . . This has been a work product of *many months* and it is the fulfillment of all that we could have desired from this property." (**Pl. Ex. 8** (emphasis added).) As detailed in Section 7, below, the Regency transaction was the culmination of continuous efforts by Albert and Ken

Kleban since February 2013 to sell Black Rock outright or in part in a joint venture, none of which was disclosed to SLSJ before selling its interest to Kleban on July 29 or to other Sun Realty members before October 18, 2013.

**4.    Albert Kleban's Exclusive Management and Control of Sun Realty.**

Under Sun Realty's Operating Agreement, its designated "Manager" was SMP, a corporation Albert Kleban owned together with his wife, Alida.  (Defs.' LR 56(a)(1) Stmt. ¶¶ 3-4; Defs. Ex. B, Operating Agmt., at ¶ 6.1; **Pl. Ex. 9**, at SMP 27; Pl. Ex. 3, A. Kleban Dep. at 56.) Sun Realty's Operating Agreement granted Kleban's SMP expansive powers as Manager:

> The Manager(s) shall have *full, exclusive and complete discretion, power and authority,* subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer and operate the business and affairs of the Company for the purposes herein stated and *to make all decisions affecting such business and affairs* . . . .

(Defs. Ex. B, at ¶ 6.2 (emphasis added).)  Defendants minimize the scope of SMP's powers by quoting this provision only selectively, omitting the words italicized above.  (*See* Defs.' Br. at 3-4.)

SMP was never managed or operated as a separate company, independent in any respect from its controlling shareholder, Albert Kleban.  He served as SMP's president, corporate secretary, and director, and acknowledged at deposition that, "as a practical matter," he, "alone," was "the person who ha[d] managed and controlled Sun Realty-SMP."  (Pl. Ex. 3, A. Kleban Dep. at 32; Pl. Ex. 9, at SMP 27 and 29.)  SMP had no employees, no offices of its own, gross annual income less than $20, total assets less than $3,000, and Kleban's correspondence to Sun Realty members never used SMP stationery or email domains or addresses.  (Pl. Ex. 3, A. Kleban Dep. at 56-57; **Pl. Ex. 10**, SMP 2011 Form 1120S.)

SMP's board members and officers other than Albert Kleban served only in name. Albert Kleban acknowledged that nominal officer and director Alida Kleban "had no active role

6

in [the] business." (Pl. Ex. 3, A. Kleban Dep. at 57.) "My wife has had really nothing to do with it," he explained. (*Id.* at 32.) Defendants now maintain Ken Kleban, another nominal officer and director, was managing Sun Realty "as a director of SMP," (Defs.' Br. at 27), but he testified that he had "[n]o direct involvement in" SMP, no knowledge he was even named an officer or director, and no knowledge of the identities of SMP's president or shareholders. (**Pl. Ex. 11**, cited excerpts from the Deposition of Ken Kleban, at 8, 18; Pl. Ex. 9, at SMP 27 and 29.) Albert Kleban likewise had no knowledge Ken was an officer or director of SMP, or that Ken maintained any "formal relationship" with the company, and could not say for certain that SMP ever seated a board of directors. (Pl. Ex. 3, A. Kleban Dep. at 31-32, 51-52.)

The sole business purpose of SMP was "to act as the Managing Member of Sun Realty Associates LLC," but in practice, Albert Kleban acknowledged, it was he who managed and controlled Sun Realty through SMP, while delegating a great deal of managerial responsibilities and functions to Ken Kleban and to property manager Jacqueline Campbell, neither of whom was employed by SMP. (Pl. Ex. 9, at SMP 7 (Cert. of Incorporation) and 17 (By-laws); Pl. Ex. 3, A. Kleban Dep. at 46-48; **Pl. Ex. 12**, cited excerpts from the Deposition of Jacqueline Campbell, at 125; Pl. Ex. 11, K. Kleban Dep. at 18.) Ken Kleban explained that SMP's role as Manager of Sun Realty was merely "a documentary position, not [] an active position." (Pl. Ex. 11, K. Kleban Dep. at 19.)

Ms. Campbell was employed by Turnpike Properties, LLC, a property management company owned by Albert and Ken Kleban and engaged by Albert as SMP president to manage Black Rock. (Defs.' LR 56(a)(1) Stmt. ¶¶ 9-11.) Turnpike Properties' only role under its contract with Sun Realty was to "manage, operate and maintain" the shopping center property. (Defs. Ex. G, Property Mgmt. Contract, at ¶ 2.1.)

Although Sun Realty members granted Kleban's SMP "full, exclusive and complete discretion, power an authority" to manage and control Sun Realty, subject only to certain narrow limits, defendants contend that, in addition to Albert Kleban's company, SMP, other Sun Realty members also "actively" participated in Sun Realty's "direction and management." (Defs.' Br. at 8; *see also id.* at 9 and 32.) Family members holding interests in Sun Realty uniformly denied that, stating that Albert Kleban managed the company, with assistance from his son, and without active involvement from other members. (*See, e.g.,* **Pl. Ex. 13**, cited excerpts from the Deposition of Roberta Howard, trustee of several family trusts holding membership interests, at 16, 20 (Albert Kleban was "responsible for managing" Sun Realty, and no other members "play[ed] a role in managing the business"); Defs. Ex. B (signature page); Pl. Ex. 13, Howard Dep. at 64; Pl. Ex. 2, Jeruss Dep. at 27 ("Albert and Ken did everything and ran it and made the decisions and sent all the e-mails").)[2]

5.    **Albert Kleban's False and Misleading Assurances he Managed Sun Realty Loyally in All Members' Interests and Disclosing Material Information.**

When SLSJ sold its interests to Albert Kleban in July 2013, it relied on his repeated statements that he was managing Sun Realty in its interest and making all appropriate disclosures

---

[2]    *See also* **Pl. Ex. 14**, cited excerpts from the Deposition of Elizabeth Wolfe, at 11, 36-37 (Albert Kleban was "head honcho" who "managed Sun Realty in 2012 and 2013," and Ms. Wolfe, who was trustee of a family trust holding Sun Realty membership interests, "was not privy to the day-to-day operations" and could identify no other member who "participated in managing Sun Realty"); **Pl. Ex. 15**, cited excerpts from the Deposition of Richard Levin, at 14, 30-32 (Albert Kleban "was the senior managing person of" Sun Realty and with Ken Kleban was "running" Sun Realty "for countless years," while Dr. Levin, beneficiary under a trust holding membership interests, was never "involved in the management"); **Pl. Ex. 16**, cited excerpts from the Deposition of Allan Kleban, at 151 ("Al and Ken were managing the business of the [Sun Realty] LLC" and possessed the Manager's "powers that are identified in section 6.2" under the Operating Agreement."); *see also id.* at 154-155; **Pl. Ex. 17**, cited excerpts from the Deposition of James Blank, Kleban's first-cousin-once-removed and trustee of a trust holding interests, at 9, 32-33 (Albert and Ken Kleban "managed" Sun Realty, and to his knowledge, no "other family members . . . actively participate[d] in the management of Sun Realty").

of material information. (Pl. Ex. 1, Jeruss Decl. ¶ 8.) Under the Operating Agreement, Albert

Kleban's company, SMP, undertook an express obligation to keep SLSJ and other Sun Realty

members fully informed of material information:

> The General Manager shall render, to the extent the circumstances render it just
> and reasonable, true and full information of all things affecting the Member to any
> Member.

(Defs. Ex. B, at ¶ 11.1(c).) Albert Kleban acknowledged he was the individual "principally

responsible" to carry out SMP's "responsibilities" as Manager "to disseminate information to

[Sun Realty] members," and that, as president of SMP, he owed Sun Realty members "fiduciary

duties" that included a "duty to make full and fair disclosure of all material information." (Pl.

Ex. 3, A. Kleban Dep. at 34-35, 57-58.)

Albert Kleban generally carried out his reporting responsibilities by emailing status

reports to members with updates on Sun Realty's business and finances. (Defs.' LR 56(a)(1)

Stmt. ¶¶ 12-15.) Mr. Kleban also authorized Ken Kleban and Ms. Campbell to render business

information, and so advised Sun Realty members. (*Id.*; Pl. Ex. 3, A. Kleban Dep. at 57-58; s*ee,

e.g.,* Defs. Ex. OO, Apr. 6, 2013 Status Rpt. (members should consult "Ken and Jackie as you

have been doing to keep you abreast of the situation").)[3] While defendants now contend other

Sun Realty members "actively" participated in Management," the dozens of emails defendants

cite and cited herein confirm that no other member disseminated company information, or had

access to it other than through Albert Kleban and his delegates. (*See also* Defs. Ex. B, at ¶ 6.2;

Pl. Ex. 2, Jeruss Dep. at 27.)

---

[3]  *See also* Defs. Ex. MM, July 10, 2012 Status Rpt. ("Any questions please feel free to call
Jackie, Ken or myself"); Defs. Ex. O, Oct. 18, 2011 Status Rpt. ("Any questions you may direct
them to Jackie, Ken or me."); **Pl. Ex. 18**, July 13, 2011 Status Rpt. ("give Jackie a call directly").

In his reports to SLSJ and other members, Kleban repeatedly and personally assured them that he was in fact making appropriate disclosures of all material information.  (*See, e.g.,* Defs. Ex. MM, July 10, 2012 Status Rpt., at p. 1 ("It is our desire to keep all of you fully informed of the status of our properties"); Defs. Ex. O, Oct. 18, 2011 Status Rpt. ("I want to be sure that you are all kept abreast of the situation").).[4]

Albert Kleban also repeatedly assured SLSJ and other Sun Realty members that he and his appointed management team were loyally managing Sun Realty for the benefit of all members' interests.  (*See* Defs. Ex. OO, Apr. 6, 2013 Status Rpt., at p. 4 ("You can be assured that every bit of energy [and] creativity is directed to the mutual interests of every single partner and every location as long as Ken, Jackie and I are involved"); Defs. Ex. T, Oct. 25, 2011 Campbell email, at p. 2 (Albert Kleban writes: "You can be sure that we are doing everything possible to achieve our mutual goals").)

Kleban reiterated his loyalty assurances in correspondence specifically directed to SLSJ, as did his authorized spokesperson, Jackie Campbell, copying Kleban.  Kleban, for example, thanked SLSJ for contributing to capital call, writing:

> I know how difficult it is but at this point in time your investment in Sun Realty is secure. . . .  *You can count on us to do everything in our power to try to enhance the value of the property and your interest.*

---

[4]     For other illustrations of such assurances to members, *see also* Defs. Ex. PPP, Nov. 6, 2009 Status Rpt., at LSC 1131 (reporting "[i]n an effort to keep you apprised of developments"); Defs. Ex. K, Sept. 29, 2010 Status Rpt., at p. 1 ("I will continue to keep you advised on all developments"); **Pl. Ex. 19**, May 25, 2011 email (making an "effort to keep you [] most advised"); Pl. Ex. 18, July 13, 2011 Status Rpt. ("we will keep you informed as time passes or any developments arise"); **Pl. Ex. 20**, July 24, 2012 Status Rpt., at p. 3 ("we will try to inform you periodically as best we can.").

(**Pl. Ex. 21**, Nov. 15, 2011 A. Kleban email (emphasis added).)[5]

SLSJ and other Sun Realty members relied on Albert Kleban to manage Sun Realty transparently, capably and steadfastly in their interests. (*See, e.g.,* Pl. Ex. 14, Wolfe Dep. at 41-44 ("trusted the expertise of Albert Kleban" to "make the best real estate decisions [and] business decisions[] for each family member who is involved with any of the real estate," with his "intention" "only [for] the best interest of all family members"); Pl. Ex. 1, Jeruss Decl. ¶ 7.)[6]

Albert Kleban made yet further assurances of fidelity under the Operating Agreement. He undertook the obligation on behalf of SMP and Le Rivage, the two Sun Realty members he managed and controlled, to "be faithful" to fellow members "in all transactions related to the Company." (Defs. Ex. B, Operating Agmt., ¶ 6.2(d) at LSC 27.)

---

[5]    *See also* Defs. Ex. KK, Sept. 13, 2012 Campbell email to C. Schreder, at pp. 2-3 ("Rest assured that . . . Ken, Al and I are working hard to ensure that Sun and all properties we manage are done so with the utmost dedication and professionalism[,]" and "the property would continue to be managed with the best interests of all members in mind."); Defs. Ex. I, Oct. 22, 2009 Status Rpt., at LSC 1136 ("undivided attention and effort of Jackie, Ken and myself" to the enterprise); Defs. Ex. GGG, Aug. 8, 2005 Campbell ltr., at p. 2 ("Mr. Kleban [took] on the role of managing member of Sun Realty . . . to insure the financial welfare of his family, his sister's families and uncles' families, which include [SLSJ Manager] Lois Jeruss"); Defs. Ex. AA, Aug. 5, 2005 Campbell ltr., at pp. 1, 3 (Albert Kleban "feels that Lois Jeruss has benefited from all of his actions on behalf of Sun Realty" since he "took over management of Sun Realty," and was "desirous of cooperating with Lois Jeruss to enhance any additional opportunities that may be presented to Sun Realty Associates.").

[6]    *See also* Pl. Ex. 15, Levin Dep. at 75-79 (citing longstanding "inherent trust in all of us in . . . what Albert was doing for us as a family," including absolute trust he would disclose "[a]nything that was important to [Dr. Levin's] decision making concerning [his membership] interest"); Pl. Ex. 17, Blank Dep. at 120-122 (had "confidence in Albert and Ken" and relied on them "to manage [Sun Realty's] property in a way that was productive for [Mr. Blank] as a member," based on their "track record," their "experience and expertise in commercial real estate management," and their status as "sophisticated, educated, real estate executives"); Pl. Ex. 13, Howard Dep. at 66-67 (Albert Kleban had an "unbelievable" level of expertise and knowledge of the commercial real estate business," possessed by no other member.).

6.    **Albert Kleban's Misleading Negative Reports Concerning Sun Realty's Business, Financial Condition and Value.**

In agreeing to sell its interests in July 2013, SLSJ also relied on Albert Kleban's substantive reports concerning Sun Realty's business, financial condition and value, as well as the reports sent by his delegates, Ms. Campbell and Ken Kleban.  (Pl. Ex. 1, Jeruss Decl. ¶ 9.)  In the years immediately preceding the transaction, Albert Kleban consistently reported that Sun Realty was beset by distressed market conditions and tenants, causing financial difficulties for Sun Realty.  (*See, e.g.,* **Pl. Ex. 22**, Feb. 12, 2013 Status Rpt. (continued "economic malaise," with "recent tenant developments" that included one tenant opting not to lease space, another with continuing arrearages, and all others close to current on rent but "all appear to still be suffering"); Defs. Ex. MM, July 10, 2012 Status Rpt. (market still "quite volatile and precarious," leaving another tenant in "serious financial trouble" thereby threatening $197,653 in annual rent receipts).)[7]

On April 6, 2013, timed just 23 days before making his offer to buy out SLSJ's interest, Albert Kleban issued a particularly pointed and bleak report.  Unknown to Sun Realty members, however, in February and March 2013, Albert and Ken Kleban had commenced separate,

_____

[7]    For several more examples of negative reports in 2011 and 2012, *see* Defs. Ex. NN, Dec. 12, 2012 Status Rpt. (several tenant issues and "less than a stellar performance" among local retail stores); Pl. Ex. 20, July 24, 2012 Status Rpt., at pp. 1-2 ("serious problems" in market with multiple tenants "unable to pay" or possibly "vacating the premises," circumstances "rampant throughout the area"); Defs. Ex. LL, June 27, 2012 Status Rpt. (market "exceptionally difficult," and many tenants experiencing "difficulty making rental payments" or "on the border line of surviving"); Defs. Ex. O, Oct. 18, 2011 Status Rpt. (market "in as difficult a position as" Kleban had seen and various distressed tenants causing increased costs and reduced income to Sun Realty, a "major short fall," and "other problems" expected); Defs. Ex. N, Oct. 13, 2011 Status Rpt. (market "extremely difficult," and Sun Realty incurring "approximately $200,000" in "fit up costs" to replace another vacating tenant); Pl. Ex. 18, July 13, 2011 Status Rpt. (market "worst" of a lifetime, with each "fire" management puts out followed by "a new one," and prospects for reduced cash flow as replacement tenants were "paying a lesser rent");  Pl. Ex. 19, May 25, 2011 Status Rpt. (market "exceptionally soft").

promising discussions with Federal Realty Investment Trust and Kimco Realty Corp., two national real estate investment trusts that stated interest in acquiring Black Rock. (*See* Sect. 7(a) and (b), immediately below.) Albert Kleban's April 6 report, which purported to provide members a "summary of the present situation," made no reference to his ongoing sale efforts with third parties. (Defs. Ex. OO, at p. 1.) Rather, he detailed, at uncharacteristic length, significant distress in the market and among tenants, concluding:

> What I report to you now, contains some negative aspects of the property but it is not much different than what other realtors are experiencing across our area with small tenants. The economic situation for these type [sic] of tenants is somewhat bleak. Hopefully, in the course of the next two years, when our mortgage comes due we will be able to present a brighter picture.

(*Id.* at p. 2.)

Kleban also reported financial difficulties that caused SLSJ particular concern inasmuch as he warned of: (1) Sun Realty's inability to repay loans previously received from members, which included a material $914,308 loan from SLSJ; (2) its need for additional capital contributions from members, including material amount, $100,000, from SLSJ; and (3) Sun Realty's troubled prospects for refinancing the company's $15.8 million mortgage loan, particularly concerning given past warnings that members would be required to personally guarantee any new loan. (Pl. Ex. 1, Jeruss Decl. ¶ 10; Pl. Ex. 2, Jeruss Dep. at 25-27 ("this was a huge chunk of money that it seemed as if I had a large chance of losing or having to put in equity" and "I would have to have personal guarantees" and "I felt quite threatened by the situation"); *id.* at 144-147; Defs. Ex. V, Nov. 2, 2011 Schreder email to Campbell ("Lois has loaned more than anyone but Albert, and this is becoming way too much of her portfolio"); *see also* **Pl. Ex. 23**, Feb. 29, 2012 Campbell email (Albert Kleban "worried about" "the mortgage that when refinanced will require personal signatures from everyone.").)

Kleban warned SLSJ and other members in his April 6, 2013 email:

> Nevertheless, we should be cognizant of the fact that if our mortgage came due today we have not accumulated sufficient reserves to cover a refinancing since our loan to value would be insufficient . . . .

> We are all unhappy that we have to start amortizing our existing mortgage, which . . . forecloses the possibility of any repayment of the outstanding [Member] loans until we sell or refinance the property. . . . [E]ach of us must recognize the reality of the situation.

(Defs. Ex. OO, at pp. 2-3; *see also id.* at 3 ("We should contribute our pro rata share for these extraordinary expenses . . . [approximately] $300,000 [] on a pro rata basis.").)  Capital contributions were not mandatory, but Kleban urged SLSJ to participate.  (*See* Defs. Ex. T, Oct. 25, 2011 email.)

Kleban's April 6 email disclosed nothing of his ongoing sale negotiations with Federal Realty and Kimco, but nonetheless renewed his personal assurances of transparency and loyalty, characterizing his report as "the reality of situation," assuring members of "respect for all of [their] concern," and "that every bit of energy [and] creativity is directed to the mutual interests of every single partner . . . as long as Ken, Jackie and I are involved."  (Defs. Ex. OO, at pp. 2-3, 4.)  Kleban similarly stressed the benefits of "complete transparency of our family business operations, and solidarity as a family moving forward" in an e-mail to members earlier that day, proposing an unprecedented "family meeting" on April 29.  (Defs. Ex. QQ, Apr. 6, 2013 email.) (The meeting was scheduled to follow a family memorial service, when many family members would visit Connecticut..  (Pl. Ex. 15, Levin Dep. at 24-25; Pl. Ex. 2, Jeruss Dep. at 158.).)[8]

Thirteen days later, with Albert Kleban's evident authorization, Ken Kleban disseminated a "Refinancing Analysis," which, he advised members, showed "the shortfall [in loan to value

_____

[8]     Contrary to defendants' contention, SLSJ managing member Lois Jeruss identified false statements in the April 6 email during her deposition.  (Pl. Ex. 2, Jeruss Dep. at 171-173.  *See* Defs.' Br. at 35-36.)

ratio] we would have if we were to be able to refinance today." (Defs. Ex. PP, Apr. 19, 2013 K. Kleban email, at p. 1.) He copied Albert Kleban. (*Id.*)

Defendants maintain that Ken Kleban's correspondence is "very clearly immaterial to Plaintiff's claims against Albert Kleban." (Defs.' Br. at 37.) Albert Kleban's own April 6 email specifically referred to and adopted Ken Kleban's purported analysis concerning "the problems that presently exist on a refinancing," and its conclusion that refinancing would be difficult because the Sun Realty's "loan to value" ratio was "insufficient." (Defs. Ex. OO, at pp. 2, 3.) It also reiterated Ken Kleban's and Jackie Campbell's authority to report to members on behalf of Sun Realty management, expressly directing members having questions to "Ken or Jackie," who could keep them "abreast of the situation." (Defs. Ex. OO, at p. 4; *see also* Pl. Ex. 3, A. Kleban Dep. at 57-58 (confirming Ken Kleban's authority to report to members), and 195-196.)

Albert and Ken Kleban's references to an "insufficient" loan-to-value ratio, or to the purported "shortfall" in the value component, in their respective April emails, were predicated on management's stated valuation of Sun Realty's interest in Black Rock as $20,224,300. (Defs. Ex. PP, Apr. 19, 2013 email, at LSC 52.) Ken Kleban sent that valuation to members, copying Albert. (*Id.*, at p. 1.) Shortly thereafter, as detailed in Section 7, immediately below, Ken Kleban sent alternative valuations to prospective purchasers Kimco and Federal Realty, copying Albert Kleban, stating the market value of the same property as approximately $32 million, roughly $12 million higher. In past assurances of transparency, Ms. Campbell had specifically advised SLSJ that it was "important from our view point to keep everyone appraised so that they know all the aspects of the property, including its value." (Defs. Ex. FF, Feb. 1, 2012 email.)

The disparate valuations provided to Sun Realty members and to Federal Realty and Kimco were all computed using the same standard valuation method, dividing annual net

operating income by a capitalization rate.  Appraisal Institute, THE APPRAISAL OF REAL ESTATE, at 499 (13th ed. 2008) (Chapter 22, Direct Capitalization); *see also* Defs. Ex. DD, Jan. 9, 2012 A. Kleban mem. at p. 2 (referring to direct capitalization method).  Ken Kleban advised members that the 8 percent capitalization rate used as the divisor in the $20,224,300 valuation he sent to SLSJ, Albert Kleban and other members April 19, was "reasonable."  (Defs. Ex. PP, Apr. 19, 2013 email, at p. 1 ("Valuation at an 8 cap. Multi-tenant (non-grocery anchored) uses with short term leases makes this a reasonable assumption.").)  For management's valuations provided to Kimco and, on June 4, to Federal Realty, Ken Kleban used a 5.5 percent capitalization rate.  (*See* Fact Summary, Sect. 7, immediately below.)  (Had Ken Kleban used a 5.5 percent rate as the divisor in the "refinancing analysis" he sent members on April 19, the resulting valuation would have been $29,417,163, not $20,224,300.  (Defs. Ex. PP, at LSC 52.).)[9]

Ken Kleban concluded his April 19 email ominously warning Sun Realty members:

Obviously, this is a challenging scenario. Will our NOI [net operating income] look better in 2015??  Possible, but we are seeing tremendous pressure on our many smaller tenants.

Assuming the analysis holds up, there would indeed be a capital call of significance - on top of the debt to equity conversion - in 2016 or before.

(Defs. Ex. PP, at p. 3.)  Ten days later, Albert Kleban offered to buy out SLSJ's interest in Sun Realty.

### 7.    Albert Kleban's Omissions of Critical, Material Facts.

As Albert Kleban wrote Sun Realty members October 18, 2013, the Regency transaction was the culmination of "a work product of many months."  (Pl. Ex. 8.)  None of those efforts, including none of the conduct and communications set forth in sections 7(a) and (b),

---

[9]    Assuming Ken Kleban's $1,617,944 adjusted net operating income figure, the computation would have been $1,617,944/.055 rather, than $1,617,944/.08. (*See* Defs. Ex. PP.)

immediately below, was disclosed or known to SLSJ. Had SLSJ known any of these facts, it would not have executed the Membership Interest Purchase Agreement at the specified contract price or would not have sold or assigned its membership interests thereunder. As would any reasonable person, it "would have waited" to "see what would happen." (Pl. Ex. 2, Jeruss Dep. at 123; *see also id.,* at 117-124, 185-186; Pl. Ex. 1, Jeruss Decl. ¶ 12.)

      a.    **The Klebans' Undisclosed Negotiations with Federal Realty.**

Albert and Ken Kleban's clandestine efforts to sell Black Rock commenced on or before February 11, 2013, five and one-half months before SLSJ sold Albert Kleban its interests in Sun Realty without knowledge of the Klebans' efforts. On February 11, the Klebans met with Federal Realty's Vice President of East Coast Acquisitions, Barry Carty, who advised that Federal Realty had identified Black Rock as an acquisition "target." (**Pl. Ex. 24**, cited excerpts from the Deposition of Barry Carty, at 10-19.) Defendants maintain "conversations" with Federal Realty never "proceed[ed] beyond the exploratory phase" (Defs.' Br. at 15), but the Klebans and Federal Realty engaged in extensive negotiations through July 29, 2013, culminating in a joint venture offer from Federal Realty to purchase interests in Black Rock with discussions concerning terms ensuing for several weeks. (Pl. Ex. 24, Carty Dep. at 23, 26, 33, 53-63, 72-77.)

During the course of negotiations, Mr. Carty twice toured Black Rock with his colleagues, accompanied on his second visit on June 20, 2013 by Federal Realty's chief financial officer, for meetings with Albert and Ken Kleban to discuss potential joint venture terms. (Pl. Ex. 24, Carty Dep. at 29, 39-42; **Pl. Ex. 25**, June 17, 2013 Carty email string.) Federal Realty conducted extensive due diligence and was provided a great deal of Sun Realty's detailed proprietary business and financial information for its standard underwriting analyzing a potential investment. (**Pl. Ex. 26**, June 4, 2013 K. Kleban email and attachment; **Pl. Ex. 27**, June 24, 2013

Carty email string; **Pl. Ex. 28**, June 29, 2013 K. Kleban email; **Pl. Ex. 29**, July 2, 2013 K.

Kleban email; Pl. Ex. 24, Carty Dep. at 28, 30-31, 34-35, 43-45, 53-56.)

On June 24, 2013, unknown to SLSJ and three days before signing its Membership

Interest Purchase Agreement with Albert Kleban, Kleban executed, on behalf of Sun Realty, a

"Confidentiality Agreement" expressly governing ongoing "discussions and negotiations"

between Sun Realty and Federal Realty "concerning the possible acquisition of" Black Rock.

(**Pl. Ex. 30**, at p. 1; Pl. Ex. 24, Carty Dep. at 47-52.)  Eight days later, after sending additional

Sun Realty data to Federal Realty, Ken Kleban asked Federal Realty whether the Klebans could

then "expect [a] term sheet," and Federal Realty provided one, on July 9, a written proposal to

acquire Black Rock and two other Kleban-controlled properties in a joint venture transaction,

followed by continued negotiations of terms through July.  (Pl. Ex. 24, Carty Dep. at 53-62, 66,

72-74; Pl. Ex. 29, July 2, 2013 K. Kleban email; **Pl. Ex. 31**, July 9, 2013 Carty email and

attachment; **Pl. Ex. 32**, July 17, 2013 Carty email and attachment; **Pl. Ex. 33**, July 21, 2013

Carty email; **Pl. Ex. 34**, July 22, 2013 Carty email and attachment.)

On or before July 27, 2013, two days before Albert Kleban purchased SLSJ's interests,

the Klebans determined to work with HFF, the broker who would secure the Regency transaction

11 weeks later, in October 2013.  (**Pl. Ex. 37**, July 27, 2013 K. Kleban email to J. Mayer ("We

are engaging HFF of New York to assist us in this transaction."); **Pl. Ex. 38**, July 25, 2013 R.

Rizzi (HFF) email to K. Kleban ("It was good seeing you and Al. . . .  We're looking forward to

helping you get the best price and structure."); **Pl. Ex. 39**, July 27, 2013 K. Kleban email and

attachments to R. Rizzi and S. Grozinger (forwarding comments to HFF's proposed engagement

agreement); **Pl.s' Ex. 53**, cited excerpts from the Deposition of Robert Rizzi, at 30-39.)

Ultimately, Federal Realty and the Klebans could not agree on a purchase price or underlying valuation.  (Pl. Ex. 24, Carty Dep. at 70-71, 74-77, 91; **Pl. Ex. 35**, July 29, 2013 Carty email string; Pl. Ex. 53, Rizzi Dep. at 43-46; **Pl. Ex. 36**, July 29, 2013 K. Kleban email.)  Their negotiations then largely concluded on July 29, 2013, when Ken Kleban advised Federal Realty the Klebans had begun working with HFF.  (Pl. Ex. 35, July 29, 2013 Carty email string.)

<b>b.      The Klebans' Additional Undisclosed Negotiations with Kimco.</b>

In February or March 2013, shortly after being approached by Federal Realty, Albert Kleban approached David Henry, the chief executive officer of Kimco, another national real estate investment trust, inquiring into Kimco's potential interest in Black Rock.  (**Pl. Ex. 40**, cited excerpts from the Deposition of Joshua Weinkranz, at 13-16; **Pl. Ex. 41**, cited excerpts from the Deposition of David Henry, at 18-22.)  Albert and Ken Kleban then met Mr. Henry and his colleague for lunch in March and advised Kimco that the Klebans intended to market Black Rock and another Fairfield property for sale, touting Black Rock as a "superior property" at a "superior location."  (Pl. Ex. 40, Weinkranz Dep. at 13-16; Pl. Ex. 41, Henry Dep. at 19-23; **Pl. Ex. 42**, Mar. 29, 2013 email.)  Mr. Henry and his colleague toured Black Rock the same day.  (Pl. Ex. 41, Henry Dep. at 19.)  The next month, Albert Kleban sent members his April 6 "bleak" "summary of the present situation," making no reference to his discussions with Kimco and Federal Realty, then offered to buy out SLSJ's interests on April 29.  (Defs. Ex. OO, at p. 1.)

The Klebans' discussions with Kimco continued and, by May 2013, Kimco was underwriting a potential purchase of Black Rock, including an analysis of detailed proprietary information received from Sun Realty, such as rent rolls, tenancy data, lease terms and income and expense data.  (**Pl. Ex. 43**, cited excerpts from the Deposition of Scott Onufrey, at 26-28, 31-32; Pl. Ex. 11, K. Kleban Dep. at 205; Pl. Ex. 40, Weinkranz Dep. at 46; Pl. Ex. 41, Henry Dep. at 27-28; **Pl. Ex. 44**, May 9, 2013 G. Misoulis email to K. Kleban.)

Discussions lulled thereafter, but on July 31, immediately after reaching an impasse with Federal Realty over valuation and purchase price, the Klebans notified Kimco that they were willing to yield on a critical sticking point. (*See* **Pl. Ex. 45**, July 31, 2013 Henry email to K. Kleban ("We have determined a way to strip out the need to continue to manage this property and can now consider a straight sale of the property."); Pl. Ex. 41, Henry Dep. at 33-35; Pl. Ex. 43, Onufrey Dep. at 25-28; *see also* **Pl. Ex. 46**, Aug. 1, 2013 Henry email string with K. Kleban; Pl. Ex. 41, Henry Dep. at 46.)

Four weeks later, on August 26, Kimco offered to purchase Black Rock for $39 million (including the two smaller parcels owned by Kleban-related entities other than Sun Realty). The Klebans rejected the offer, seeking a higher price, and continued their efforts to market Black Rock through HFF, which quickly secured Regency's letter of intent six weeks later, on October 11. (Pl. Ex. 43, Onufrey Dep. at 14-16, 18, 20, 22-23, 30; **Pl. Ex. 47**, Aug. 26, 2013 Onufrey email to K. Kleban; Defs.' LR 56(a)(1) Stmt. ¶ 83.)

Defendants now characterize the Klebans' "conversations" with Kimco as merely "exploratory," (Defs.' Br. at 15), but in fee negotiations with their broker, HFF, the Klebans characterized them as near final, insisting on a carve-out for any sale of "Sun Realty" to Kimco, arguing, on August 5, 2013, arguing at the time that an agreement with Kimco was likely imminent. (**Pl. Ex. 48**, Aug. 5, 2013 email (sale of "Sun Realty" with letter of intent "in the next few days" was "likely" since Kimco already had "all the due diligence materials, they have toured the properties, they have vetted us personally, and we have a structure for a deal . . . ."); Pl. Ex. 53, Rizzi Dep. at 53-54.) Ken Kleban also advised Kimco on July 31 that the Klebans would postpone their broader offering through HFF for two weeks, "so as to give us the time to work thru [a letter of intent] with you," noting discussions with Kimco began "more than 6

months ago and [we] gave you the bulk of the underwriting info at that time."  (Pl. Ex. 46, Aug. 1 Henry email with K. Kleban.)

During negotiations with Federal Realty and Kimco, Ken Kleban provided valuations showing the market value of Sun Realty's interests in Black Rock as $31,867,836 and $32,857,291, respectively, roughly $9 million greater than the $23.08 million value provided to SLSJ in pricing Kleban's purchase of its membership interests at nearly the same time.  (Pl. Ex. 26, June 4, 2013 K. Kleban email and attachment; Pl. Ex. 24, Carty Dep. at 28, 30-31; **Pl. Ex. 49**; Pl. Ex. 40, Weinkranz Dep. at 47-49; *compare with* Defs. Ex. SS, at p. 2.  *See also* Pl. Ex. 3, A. Kleban Dep. at 194-196 (confirming Albert Kleban authorized the transmission).)  The valuations Sun Realty sent Kimco and Federal Realty used a 5.5 percent capitalization rate, materially lower than the 8 percent rate Ken Kleban told Sun Realty members was "reasonable" in his April 19 email.  (Defs. Ex. PP, Apr. 19, 2013 email, at LSC 52.)  Ken Kleban advised Kimco that Black Rock "would need to command a cap rate lower than" the rate the Klebans and Kimco used in 2012 for a different property, which had been in the "low six-percent range."  (**Pl. Ex. 50**, May 19, 2013 email string, at p. 2; Pl. Ex. 41, Henry Dep. at 29-30; Pl. Ex. 40, Weinkranz Dep. at 36.)

Ken Kleban also made it a point to alert Federal Realty and Kimco of his father's April 29 purchase offer to SLSJ and to Allan Kleban, notifying both firms:  "Family mtg today resulted in offer from my father and me to purchase 44% more of LLC giving us greater leeway to act. Should know more within a week or two."  (**Pl. Ex. 51**, Apr. 29, 2013 K. Kleban email to Carty; Pl. Ex. 24, Carty Dep. at 23; **Pl. Ex. 52**, Apr. 29, 2013 K. Kleban email to Henry and Weinkranz; Pl. Ex. 41, Henry Dep. at 25-26.)  Shortly thereafter, he updated Kimco:  "We are getting close to completing a consolidation purchase of shares in [Sun Realty] as well as an operating

agreement change to provide the unlimited authority we need to possibly move forward with you." (Pl. Ex. 50, May 19, 2013 email string, at p. 2; Pl. Ex. 41, Henry Dep. at 29-30.)

      **c.**     **Kleban Made No Disclosure to SLSJ or Other Sun Realty Members.**

It is undisputed that neither Albert nor anyone else disclosed to SLSJ the Klebans' discussions with Kimco, Federal Realty or HFF. Defendants try to fault SLSJ for not learning them, asserting that Albert and Ken Kleban disclosed some aspects of this information to other members of Sun Realty who attended a "family meeting" on April 29, 2013. (*See* Defs.' Br. at 14-15, and 39-40.) Before the meeting, SLSJ's counsel wrote Jackie Campbell requesting "any information that is provided to other partners in connection with the [family] meeting," because Ms. Jeruss was unavailable. (*See* Defs. Ex. JJJ, Apr. 18, 2013 Schreder email.) SLSJ thereafter received no information concerning discussions with Federal Realty, Kimco, HFF or efforts to sell Black Rock Shopping Center. (Pl. Ex. 2, Jeruss Dep. at 116-124; Pl. Ex. 1, Jeruss Decl. ¶ 12.). Moreover, no minutes, notes, agenda, recording or other record document reflects such a disclosure to any Sun Realty member, and, contrary to defendants' assertions, members who attended uniformly deny receiving any such information before October 2013.[10]

---

[10]     *See* Pl. Ex. 17, Blank Dep. at 23-27 (no mention April 29 of "ongoing discussions with any real estate firms concerning Black Rock Shopping Center or Sun Realty," or of discussions with "Kimco concerning Black Rock Shopping Center"), at 27-28 ("no knowledge" before October 2013 Klebans "had been working with a real estate brokerage firm concerning a possible sale of Black Rock Shopping Center"), and at 104 ("no knowledge," before October 2013, of "any discussions . . . about a possible sale"); Pl. Ex. 13, Howard Dep. at 18-20 (no "knowledge of any dealings" between Klebans and Federal Realty or Kimco), and at 19 (never told in 2013 Klebans were "communicating with HFF, Inc"); Pl. Ex. 15, Levin Dep. at 29-30 (unaware of "any dealings" or "communications" with Federal Realty or Kimco," or "with HFF, Inc."); Pl. Ex. 14, Wolfe Dep. at 24-25, 34 (not made "aware, at any time, in 2013 of any discussions . . . with any real estate companies concerning Sun Realty or Black Rock Shopping Center," or of "dealings . . . with HFF Inc."); Pl. Ex. 16, Allan Kleban Dep. at 156-161 (never told of discussions "with representatives of Federal Realty"), at 93 (no "discussion about Kimco" April 29 other than reference by Ken Kleban to "an off-the-cuff comment type of discussion" that

## <u>ARGUMENT</u>

## I. **Albert Kleban Owed Fiduciary Duties and Breached Them.**

There is no dispute Connecticut law governs SLSJ's claims for breach of fiduciary duty and requires the Court to determine whether defendant Kleban: (1) owed of a fiduciary duty, and (2) breached. (*See* Defs.' Br. at 22.) But defendants' arguments for summary judgment fail because evidence that Kleban stood in a fiduciary relationship to Sun Realty's members is abundant and conclusive, as is evidence he breached when he purchased SLSJ's interests without disclosing critical information that he was then negotiating a joint venture or sale of Black Rock. Defendants, moreover, erroneously frame the Court's analysis by reversing the burden of proof. Once SLSJ establishes Mr. Kleban owed fiduciary duties, the burden shifts to defendants to prove the fairness of the subject transaction by clear and convincing evidence, a burden they cannot possibly meet.

### A. **Albert Kleban Stood in a Fiduciary Relationship to SLSJ and other Sun Realty Members.**

The threshold "fiduciary duty determination is a question of law" reserved to the Court. *Iacurci v. Sax*, 99 A.3d 1145, 1152 (Conn. 2014) (citations and quotations omitted). This is undisputed. (*See* Defs.' Br. at 21.) In the absence of a "per se fiduciary" relationship, however, this threshold determination, while a question of law for the Court, is "fact driven" and depends "on the unique facts presented in the record." *Iacurci*, 99 A.3d at 1152. *See also id.* (quoting *Fraser v. United States*, 674 A.2d 811, 815 (Conn. 1996) ("Duty is a legal conclusion about relationships between individuals" and "determined by the circumstances surrounding the conduct of the individual.")). Here, the facts and circumstances surrounding the relationship

---

"wasn't even [a] preliminary discussion"), and at 191-192 (unaware of "any discussions . . . with HFF").

between Albert Kleban and Sun Realty's members, including SLSJ, conclusively establish it was fiduciary in nature.

In *Iacurci*, the Connecticut Supreme Court reiterated the "flexible" approach required to determine fiduciary duties in business relationships:

> Turning to the standard for determining whether a fiduciary relationship exists, this court has recognized that some actors are per se fiduciaries by nature of the functions they perform, [such as] agents, partners [and] lawyers . . . . Beyond these per se categories, however, a flexible approach determines the existence of a fiduciary duty, which allows the law to adapt to evolving situations wherein recognizing a fiduciary duty might be appropriate.

99 A.3d at 1154 (internal quotation marks and citation omitted). *Accord Konover Dev. Corp. v. Zelle,* 635 A.2d 798, 806 (Conn. 1994) ("the fiduciary relationship is not singular," and "[f]iduciaries appear in a variety of forms," so "equity has carefully refrained from defining a fiduciary relationship in precise detail" so "as to exclude new situations.").

While a flexible approach is required, the Connecticut Supreme Court identifies the four defining characteristics of a fiduciary relationship that courts must analyze:

> [A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other [and] [t]he superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him.

*Iacurci*, 99 A.3d at 1154. Each defining fiduciary characteristic was manifest in Albert Kleban's relationship to SLSJ and other Sun Realty members.

### 1. Members Reposed Trust and Confidence in Albert Kleban.

SLSJ and Sun Realty members uniformly attested to their profound "trust and confidence" in Albert Kleban, personally and individually, to manage Sun Realty on their behalves and in their mutual interests. (Pl. Ex. 1, Jeruss Decl. ¶ 7 (placed trust and confidence in Kleban to manage and operate Sun Realty capably and competently, and in SLSJ and other

members' interests).)  Other members testified to the same effect.  Asked at deposition to identify who "managed Sun Realty in 2012 and 2013," member Elizabeth Wolfe identified Albert Kleban, her uncle, as the "head honcho," explaining that she trusted that Albert Kleban would "make the best real estate decisions, business decisions, for each family member who is involved with any of the real estate," and that his "only intention [was] the best interest of all family members."  (Pl. Ex. 14, Wolfe Dep. at 6-7, 11, 36, 41, 43-44.)  Richard Levin, Albert Kleban's nephew, testified that members had "inherent trust in . . . what Albert was doing for us as a family."  (Pl. Ex. 15, Levin Dep. at 75-79.)  James Blank, Kleban's first-cousin-once-removed, testified to his "confidence in Albert and Ken Kleban" and reliance "on them to manage the [Sun Realty] property in a way that was productive for [him] as a member."  (Pl. Ex. 17, Blank Dep. at 120-122.)

For his part, Albert Kleban, an experienced lawyer, acknowledged that "[o]f course" he "owed fiduciary duties to members of Sun Realty Associates in [his] role as the president of the company that was managing Sun Realty Associates."  (Pl. Ex. 3, A. Kleban Dep. at 35.)

> My understanding in the capacity of a fiduciary is to do everything with the greatest integrity . . . and with all your effort that you can possibly put together for the benefit of the company.  [And] Sun Realty had my undivided attention and absolute integrity throughout.

(*Id.* at 34.)

The profound trust and confidence SLSJ and other members reposed in Albert Kleban to manage Sun Realty was also evidenced by the extraordinarily broad control they granted to SMP, a company he, "alone," "managed and controlled."  (Pl. Ex. 3, A. Kleban Dep. at 32; *see* Fact Summary, Sect. 4, above.)  Under the Operating Agreement, Sun Realty members appointed Kleban's SMP to serve as Manager and thereby entrusted it with:

full, exclusive and complete discretion, power and authority . . . to manage, control, administer and operate the business and affairs of the Company . . . and to make all decisions affecting such business and affairs. . . .

(Defs. Ex. B, Operating Agmt., at ¶¶ 6.1, 6.2.)

Defendants argue SMP's sweeping decision-making authority and control were "limited in numerous and important ways," but they ignore this express grant of "full, exclusive and complete discretion, power and authority. . . to make all decisions," which goes unmentioned in their brief. Defendants rely instead on the handful of discrete and narrow limitations under the Operating Agreement restricting only certain extraordinary actions. (*See* Defs.' Br. at 4 (citing only SMP's inability to: (1) unilaterally sell or refinance Black Rock; (2) compel members to contribute additional capital; (3) amend the Operating Agreement; or (4) make capital improvements beyond a specified expense.) In all other respects, SLSJ and other members entrusted Albert Kleban, as sole officer, director or shareholder controlling SMP, with plenary power to manage and control Sun Realty on their behalves.

Still, further evidence that Sun Realty members reposed "unique trust and confidence" in Albert Kleban is found in Operating Agreement paragraph 11.1(c), under which members entrusted Kleban's SMP, as Manager, to provide "true and full information of all things affecting the Member to any Member" whenever just and reasonable. (Defs. Ex. B, at ¶ 11.1(c).) Members attested to their trust and confidence in Kleban, personally, to carry out this mandate to keep them informed. (*See, e.g.,* Pl. Ex. 15, Levin Dep. at 76-79 ("Absolutely" trusted Kleban would disclose "[a]nything that was important" in keeping with family "tradition" of being "honest and forthright and making family as their priority"); Pl. Ex. 1, Jeruss Decl. ¶ 7 ("relied on statements by Albert Kleban and Jackie Campbell that Albert Kleban was managing Sun Realty in the interest of SLSJ and other members . . . and was making all appropriate disclosures of material information").) For his part, Albert Kleban acknowledged that his "fiduciary duties"

to members included "a duty to make full and fair disclosure of all material information," as well as a duty "to do everything I possibly could for their benefit." (Pl. Ex. 3, A. Kleban Dep. at 35; *see also id.* at 124 (acknowledging his "fiduciary duty" as "manager of Sun Realty Associates" "to affirmatively provide material information to members").)

Operating Agreement paragraph 6.2 further illustrates the trust and confidence inherent in Kleban's relationship to SLSJ and other Sun Realty members. It required all members, including the two member companies Albert Kleban managed and controlled, SMP and Le Rivage, to "be faithful" to fellow members in "all transactions related to the company." (Defs. Ex. B, at ¶ 6.2(d).)

As detailed and illustrated at length in the Fact Summary, Section 5, above, moreover, Mr. Kleban encouraged and solicited SLSJ and other members to place their trust and confidence in him, personally, and in his two principal delegates, Ken Kleban and Jackie Campbell. He repeatedly assured members of his and his delegates' loyal and transparent management of Sun Realty in each member's interest. (*See, e.g,* Defs. Ex. OO, Apr. 6, 2013 Status Rpt., at p. 4 ("You can be assured that every bit of energy [and] creativity is directed to the mutual interests of every single partner and every location as long as Ken, Jackie and I are involved."); Fact Summary, Sect. 5, above.)

Kleban's correspondence consistently refers personally to Albert, Ken and Jackie, never to SMP, and never uses SMP or Sun Realty business stationery or internet addresses. Having repeatedly and personally assured SLSJ and other members that he and his delegates were loyally managing Sun Realty in each member's interests and faithfully reporting material information, Mr. Kleban should not be heard now to deny he was precisely what he promised to be, and acknowledged he was, a fiduciary in whom members' reposed unique trust and

confidence.  Defendants acknowledge the duties of "loyalty and honesty" are core fiduciary duties.  (Defs. Br. at 22.)  *See also* Robert H. Sitkoff, *The Economic Structure of Fiduciary Law*, 91 B.U. L. Rev. 1039, 1043 (2011) (attached as **Pl. Ex. 54**) ("core fiduciary duties" include duty of loyalty, which requires, "chief among" its "procedural and substantive safeguards," "full and fair disclosure by the fiduciary") (citing, *inter alia*, PRINCIPLES OF CORPORATE GOVERNANCE: ANALYSIS AND RECOMMENDATIONS §§ 5.01-5.02 (1994)).

### 2. Albert Kleban Possessed Superior Knowledge, Skill and Expertise.

Albert Kleban also embodied the second defining characteristic of a fiduciary relationship, a "superior knowledge, skill or expertise."  *Iacurci*, 99 A.3d at 1154.  As detailed in Fact Summary, Section 1, above, Mr. Kleban's own statements underscore his prodigious knowledge, skill and expertise in managing and developing commercial real estate.  (*See, e.g.,* Pl. Ex. 5, at "Biography of Principals . . ." (Kleban is "recognized in Fairfield County for his keen business acumen, real estate expertise and significant real estate portfolio," and "respected by many and considered to be one of the premier commercial real estate developers in Fairfield County.").)  As also detailed in Fact Summary, Section 5, above, Sun Realty members attested to their reliance on Kleban's knowledge, skill and expertise.  (*See, e.g.,* Pl. Ex. 1 Jeruss Decl. ¶ 7 ("trusted, relied on, and had confidence in Albert Kleban's substantial and superior knowledge, skill, experience and expertise in managing and developing shopping centers and other commercial real estate"); Pl. Ex. 13, Howard Dep. at 66-67 (Albert Kleban possessed "unbelievable" level of expertise and knowledge of the commercial real estate business" unique among members); Pl. Ex. 14, Wolfe Dep. at 43-44 ("trusted the expertise of Albert Kleban"); Pl. Ex. 17, Blank Dep. at 120-122 ("confidence in Albert and Ken," in their "track record," and in their "experience and expertise in commercial real estate management" as "sophisticated, educated, real estate executives").)

Albert Kleban's "superior knowledge" also pertained to his specific, insider knowledge of Sun Realty's business, finances and affairs. Through exclusive control of SMP, Kleban managed Sun Realty and enjoyed direct, insider knowledge, including exclusive knowledge of his and Ken Kleban's 2013 sale efforts. SLSJ and other members had only the information Kleban and his delegates provided, the information asymmetry giving rise to this case.

SLSJ's members had no direct access to Sun Realty insider information and no experience in business or managing or developing commercial real estate. (Pl. Ex. 2, Jeruss Dep. at 7-12; Pl. Ex. 1, Jeruss Decl. ¶¶ 3, 13.) Managing member Lois Jeruss's professional experience was as a teacher and briefly as a travel agent. (Pl. Ex. 2, Jeruss Dep. at 8-9, 10-12.) Defendants stress that Ms. Jeruss obtained the advice from her personal estate planning lawyer, Carleen Schreder, concerning SLSJ's interest in Sun Realty, but Ms. Schreder likewise had no insider information and was a lawyer practicing in estate tax and income tax planning, not a real estate professional. (*See* Defs. Ex. Z, Attorney Biography.)[11]

### 3. Albert Kleban Undertook the Duty to Represent the Interests of Sun Realty's Members.

Albert Kleban's relationship with SLSJ and other Sun Realty members also embodied the third defining characteristic of fiduciary relationships: One party undertakes "a duty to represent the interests of the other." *Iacurci*, 99 A.3d at 1154. Albert Kleban undertook a duty to represent members' interests under the Operating Agreement, agreeing that his company, SMP, would: (1) undertake "full, exclusive and complete discretion, power and authority" to "manage,

---

[11]  Defendants draw selectively from Ms. Schreder's website biography, citing it as evidence of experience "in the real estate area, advising clients on loans, transfers, sales and exchanges." (Defs.' Br. at 9 (citing Defs. Ex. Z).) The referenced biographical text refers to tax advice, stating that Ms. Schreder works with clients "in the real estate area, to structure loans, investments and sales or exchanges *in order to maximize the deductibility of available losses and defer income taxation as appropriate.*" (Defs. Ex. Z (emphasis added).) Defendants ignore these italicized words.

control, administer and operate the business and affairs of" Sun Realty; (2) make "all decisions affecting such business and affairs"; and (3) provide "true and full information of all things affecting" any Member" insofar as just and reasonable. (Defs. Ex. B, Operating Agmt., at ¶¶ 6.2 and 11.1(c); Pl. Ex. 3, A. Kleban Dep. at 32.)

Kleban reaffirmed his personal undertaking of the duty to represent members' interests by repeatedly giving members his personal assurance he was doing so with the utmost transparency, integrity and loyalty to each member's interests. (*See* Fact Summary, Sect. 5, above (detailing 15 examples of Albert Kleban's and Ms. Campbell's personal assurances of his loyalty and transparency).) Kleban testified himself that he owed and carried out a duty "to do everything [he] possibly could for [members'] benefit." (Pl. Ex. 3, A. Kleban Dep. at 35.) As shown above, moreover, SLSJ and other members uniformly understood he was doing so. (*See* Fact Summary, Sect. 5, above; Pl. Ex. 1, Jeruss Decl. ¶¶ 7-8.)

Defendants try to downplay the responsibilities undertaken by Albert Kleban, asserting that, although Kleban remained president of Sun Realty's Manager, SMP, throughout 2013, he no longer was the "principal individual managing Sun Realty." (Defs.' Br. at 27.) Kleban's own testimony contradicts defendants' denial. Asked at deposition whether he was "actively involved in the spring of 2013 in the management of Sun Realty Associates," he answered: "Of course I was, yes." (Pl. Ex. 3, A. Kleban Dep. at 173.) Asked Ken Kleban's role through 2013, Albert testified that he "delegated certain work for him," and other work to Jackie Campbell, "and they reported back to me." (*Id*. at 46-47; *see also id.* at 57-58 (confirming Albert Kleban "principally responsible" to "disseminate information to members").) Albert Kleban did nothing in 2013 to relinquish the duty he undertook to represent members's interests.

### 4. Albert Kleban Occupied a "Superior Position" Affording Opportunity for Abuse.

In *Iacurci*, the Connecticut Supreme Court elaborated on the fourth defining characteristic of a fiduciary, *i.e.,* a "superior position" affording "opportunity for abuse":

> The *unique* element that inheres a fiduciary duty to one party is an elevated risk that the other party could be taken advantage of—and usually unilaterally. That is, the imposition of a fiduciary duty counterbalances opportunities for self-dealing that may arise from one party's easy access to, or heightened influence regarding, another party's moneys, property, or other valuable resources.

99 A.3d at 1154 (emphasis in original). *Accord Konover*, 635 A.2d at 806, 809 (even in a "complex commercial transaction," "wise public policy counsels the retention of the fiduciary principle," because "an active general partner may use its position in the partnership for its advantage at the expense of a passive limited partner.") *See also* Sitkoff, *The Economic Structure of Fiduciary Law*, 91 B.U. L. Rev. at 1049 ("Agency theory, and in particular its emphasis on the problem of opportunism in circumstances of asymmetric information, explains [the] basic contours of fiduciary doctrine.").

This case illustrates just such a risk, opportunistic self-dealing by Albert Kleban to exploit his advantage of asymmetric information. Albert Kleban took advantage of SLSJ through his unique access to insider information inherent in his exclusive power to manage and control Sun Realty when he purchased SLSJ's membership interests in July 2013, issuing pointedly negative reports triggering SLSJ's concern over the security of its investment while concealing promising negotiations with two national real estate investment trusts seeking to acquire Black Rock, discussing exalted valuations, and his determination to retain a broker to offer Black Rock to the market more broadly. (*See* Fact Summary, Sects. 6, 7(a) and (b), above.) Kleban was thus able to purchase SLSJ's membership interests and realized, in effect, a

$2.5 million gain under an agreement he signed twelve weeks later.  (*See* Fact Summary, Sect. 3, above.)

> **5.      SMP's Powers and Duties are Relevant to Determining Albert Kleban's Fiduciary Relationship to Sun Realty Members.**

Defendants argue incorrectly that powers and duties granted to SMP under Sun Realty's Operating Agreement are irrelevant to determining whether Albert Kleban individually owed fiduciary duties to company members.  (Defs.' Br. at 24-27.)  Defendants first assert, contrary to Connecticut law, that "members and managers of [a] limited liability companies . . . do not owe each other fiduciary obligations."  (*Id*. at 24-25.)  No reported appellate decision appears to address this specific issue, but Connecticut Superior Court decisions overwhelmingly hold just the opposite.  *Clinton v. Aspinwall*, No. HHD-CV-13-6042758-S, 2015 WL 5438689, at *3 (Conn. Super. Ct. Aug. 20, 2015) (Robaina, J.) ("Connecticut [] recognize[s] a fiduciary duty between members and managers of a limited liability company.").[12]

More important, binding Connecticut Supreme Court precedent makes clear it would reject defendants' postulated categorical rule as completely counter to the "flexible," fact-specific approach it mandates, *Iacurci*, 99 A.3d at 1154, under which it expressly recognizes that

---

[12]      *See also Wilcox v. Schmidt*, Nos. WWM-CV-04-4001126-S, WWM-CV-05-4001851-S, 2010 WL 2817490, at *3 (Conn. Super. Ct. June 3, 2010) (Swords, J.) ("Members and managers of a limited liability company generally owe a fiduciary duty to other members.") (citation and internal quotation marks omitted); *Zanker Grp., LLC v. Summerville at Litchfield Hills, LLC*, No. NNH-CV-04-4015238-S, 2005 WL 3047268, at *3 (Conn. Super. Ct. Oct. 24, 2005) (Munro, J.) (same); *Levy v. Guilford Vill. Walk, LLC*, No. NNH-CV-09-5029013-S, 2011 WL 3593984, at *2 (Conn. Super. Ct. July 22, 2011) (Wilson, J.) ("like a partner in a partnership, a member of a limited liability company has a fiduciary duty to the other members") (citation and internal quotation marks omitted);*Yavarone v. Jim Moroni's Oil Serv., LLC*, No. CV-03-0102318-S, 2005 WL 737010, at *8 (Conn. Super. Ct. Feb. 18, 2005) (Aurigemma, J.) (same).

Even the lone contrary Superior Court holding cited by defendants, *Calpitano v. Rotundo*, No. CV-11-6008972, 2011 WL 3672092 (Conn. Super. Ct. Aug. 3, 2011), does not hold that a manager owes no fiduciary duties to members.  It concerns only duties owed as between two members.  *See id.* at *1.

fiduciaries "appear in a variety of forms." *Konover*, 635 A.2d at 806. Fiduciary determinations turn on the specific "relationships between individuals," and "the circumstances surrounding the conduct of the individual," not on abstract categories. *Konover*, 635 A.2d at 807-08; *Iacurci*, 99 A.3d at 1152. The Connecticut Supreme Court's binding precedent gives every indication to predict that, where, as here, the recognized, defining fiduciary characteristics are manifest in the specific type of relationship at hand, between a manager and members of a limited liability company, the Court would again hold that "wise public policy counsels the retention of the fiduciary principle." *Konover*, 635 A.2d at 809.[13]

Defendants also argue that, "even if SMP owed Plaintiff a fiduciary duty," it "did not run to Albert Kleban as SMP president under governing law." (Defs.' Br. at 26-27.) Here, again, defendants ignore the Connecticut Supreme Court's mandated "flexible approach" to fiduciary determinations focused on specific facts concerning the relationships and other "circumstances surrounding the conduct of the individual." *Iacurci,* 99 A.3d at 1152 (quoting *Fraser*, 674 A.2d at 815). This Court must review all of the facts and circumstances of Albert Kleban's relationship to SLSJ and other Sun Realty's members, which include the salient facts of the expansive powers and duties Members granted under the Operating Agreement to SMP, a corporation subject to Albert Kleban's sole control.

Defendants' attempt to hide Mr. Kleban behind corporate formalities also contravenes settled law that "[c]ourts will disregard the fiction of separate legal entity when a corporation is," as SMP was here, "a mere instrumentality or agent of [an] individual owning all or most of its

---

[13]     *See also* 19 FEDERAL PRACTICE AND PROCEDURE Jurisdiction § 4507 (3d ed.) (Federal court determines issues of state law as "it believes the highest court of the state would presently determine them," with "relevant holdings of that court" providing the best evidence). *Accord AIU Ins. Co. v. TIG Ins. Co.*, 934 F. Supp. 2d 594, 605 (S.D.N.Y 2013) (state's supreme court "should provide the binding guidance"), *aff'd*, 577 Fed. App'x 24 (2d Cir. 2014).

stock." *Davenport v. Quinn*, 730 A.2d 1184, 1196 (Conn. App. Ct. 1999) (quoting *Zaist v. Olson*, 227 A.2d 552, 557 (Conn. 1967)). *See also id.* (If "there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity . . . .")

As detailed at length in the Fact Summary, Section 4, above, SMP's shareholders, directors and officers never managed SMP as a separate company, independent in any respect from its controlling shareholder, Albert Kleban. SMP's role as Manager was merely "a documentary position, not [] an active position." (Pl. Ex. 11, K. Kleban Dep. at 19.) Albert Kleban was the sole acting officer, director and shareholder, and he acknowledged he, "alone," was "the person who ha[d] managed and controlled Sun Realty-SMP," and, through it, was the individual who "managed Sun Realty Associates." (Pl. Ex. 3, A. Kleban Dep. at 31-32, 46-48, 51-53, 57; Pl. Ex. 11, K. Kleban Dep. at 8, 18. *See* Fact Summary, Sect. 4, above (detailing SMP's lack of independence from Albert Kleban).) There is no basis to adhere to the fiction of separate identity, *Davenport,* 730 A.2d at 1196, and no basis to permit Albert Kleban to hide behind SMP now to deny he personally stood in a fiduciary relationship to Sun Realty members, whose interests he repeatedly and personally pledged to serve with loyalty and integrity.[14]

---

[14] Defendants make additional arguments that neither the parties' June 2013 Membership Interest Purchase Agreement, nor the Turnpike Properties Management Contract, establish a fiduciary relationship between Albert Kleban and SLSJ. (Defs.' Br. at 23-24.) The arguments are red herrings. SLSJ agrees the parties' 2013 agreement gives rise to no fiduciary relationship. SLSJ's claim center on the preexisting, longstanding fiduciary relationship that Kleban breached by exploiting his informational advantage when he entered into the 2013 agreement. As to the Turnpike Properties Management Contract, defendants are correct nothing in it "states that Albert Kleban owes Plaintiff a fiduciary duty." (*Id.* at 24.) The contract constitutes just one additional piece of evidence establishing Albert Kleban's sweeping control and authority over Sun Realty, inasmuch as it shows Mr. Kleban engaged his own captive property management company to serve as Sun Realty's property manager.

**B.     Albert Kleban's Breach of Fiduciary Duty is Presumed as a Matter of Law, and Unrebutted in the Record.**

Once the Court finds that Albert Kleban owed SLSJ and other Sun Realty members a fiduciary duty, the "burden of proving fair dealing properly shifts to the fiduciary," and the "standard of proof is clear and convincing evidence." *Konover*, 635 A.2d at 805, 810 (citations and internal quotation marks omitted).

The Connecticut Supreme Court provides the governing standard to determine whether a fiduciary can meet his burden:

> [T]he fiduciary's responsibility to establish that the transaction was fair [is] to be considered in light of all the circumstances.  Important factors in determining whether a particular transaction is fair include a showing by the fiduciary:  (1) that he made a free and frank disclosure of all the relevant information he had; (2) that the consideration was adequate; [] (3) that the principal had competent and independent advice before completing that transaction[; and] (4) the relative sophistication and bargaining power among the parties.

*Konover*, 635 A.2d at 809 (citations and internal quotation marks omitted).  Defendants cannot make that showing here, and misstate the burden of proof.  (*See* Defs.' Br. at 22 and 34 (arguing "there is no evidence demonstrating . . . Kleban did not at all times deal with Plaintiff honestly and transparently").)  Defendants rely on inapposite precedent that specifies only the elements a plaintiff must *allege*, not who must prove them.  (*See* Defs.' Br. at 22 (citing *Seven Bridges Found. v. Wilson Agency, Inc.*, No. FST-CV-11-6009707-S, 2012 WL 899206, at *4 (Conn. Super. Ct. Mar. 2, 2012).)

**1.     Defendants Cannot Show "Free and Frank Disclosure."**

Defendants cannot meet their burden to prove by clear and convincing evidence that Albert Kleban "made a free and frank disclosure of all the relevant information he had." *Konover*, 635 A.2d at 809.  Defendants concede that when Kleban purchased SLSJ's membership interests on July 29, 2013, he had not disclosed to SLSJ any of the facts set forth in

the Fact Summary, Section 7(a) and (b), above. Instead, defendants try to characterize the

undisclosed insider information as somehow irrelevant and immaterial. First, they diminish the

Klebans' negotiations with Kimco, Federal Realty and HFF as mere "conversations [that] did not

proceed beyond the exploratory phase," or "preliminary conversations." (Defs.' Br. at 15.) But

the incontrovertible documentary record and uncontradicted third-party testimony detailed in

Fact Summary, Section 7, confirms that, among the matters Kleban failed to disclose:

(1)     Albert and Ken Kleban were engaged in separate negotiations, ongoing since
        February 2013, with Kimco and Federal Realty, both seeking to acquire interests
        in Black Rock, and both underwriting a contemplated acquisition with a great deal
        of Sun Realty's proprietary information;

(2)     the Klebans had provided their own valuations to Kimco and Federal Realty
        stating the value of Sun Realty's real estate as, $32,857,291 and $31,867,836,
        respectively, roughly $9 million greater than the $23,082,960 valuation provided
        to SLSJ to set the purchase price Kleban paid for its membership interests;

(3)     Ken Kleban advised Kimco and Federal Realty April 29, 2013, of Albert Kleban's
        offer to purchase SLSJ's interests that, if accepted, would give the Klebans
        "greater leeway to act";

(4)     On June 24, 2013, three days before signing his purchase agreement with SLSJ,
        Albert Kleban executed a "Confidentiality Agreement" governing the ongoing
        "discussions and negotiations" with Federal Realty "concerning the possible
        acquisition of" Black Rock;

(5)     by July 9, 2013, the Klebans received a joint venture proposal from Federal
        Realty; and

(6)     the Klebans determined on or before July 27, 2013 to work with HFF to market
        Black Rock more broadly.

(*See* Fact Summary, Sect. 7(a) and (b), above.) That information was relevant and highly

material to any SLSJ or any member solicited to sell its interest in April 2013 just after receiving

Albert Kleban's ominous April 6 report of significant financial difficulties at Sun Realty and

bleak prospects. (*See* Fact Summary, Sect. 6, above; Pl. Ex. 1, Jeruss Decl. ¶ 12; Pl. Ex. 2,

Jeruss Dep. at 116-124.)  *See also Strong v. Repide*, 213 U.S. 419, 431 (1909) (corporate director breached fiduciary duty to shareholder by failing to disclose value of shares).

Defendants also try to shift the blame to SLSJ for not discovering Albert and Ken's sale efforts because it determined not to "attend[] the [April 29] Family Meeting where the allegedly material information was disclosed." (Defs.' Br. at 39.)  The material information was not disclosed at the "family meeting," but even assuming *arguendo* it were, that disclosure would in no sense discharge Kleban's duty as a fiduciary to make "free and frank disclosure" to members who did not attend, particularly a member whose principal lives 800 miles away in Chicago, who expressly requested information disclosed at the meeting, and whose interest the fiduciary offered to buy out the same day.  (*See* Defs. Ex. JJJ, Apr. 18, 2013 Schreder email (requesting "any information that is provided to other partners in connection with the [family] meeting" because Ms. Jeruss was unavailable); Pl. Ex. 2, Jeruss Dep. at 125-128.)  Defendants' reliance on disclosures allegedly made when SLSJ was not present is a form of gamesmanship wholly antithetical to "the role of undivided loyalty" and unbending "standard of behavior" courts have long required of fiduciaries.  *See, e.g., Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, J.).  Albert Kleban himself acknowledged a fiduciary's duty "is to do everything with the greatest integrity."  (Pl. Ex. 3, A. Kleban Dep. at 34.)

Defendants' "family meeting" defense fails for the additional reason that Albert Kleban's fiduciary duty to inform was ongoing, so Kleban was obliged to disclose his continued dealings with Kimco, Federal Realty and HFF after the April 29 "family meeting."  It is undisputed he did not do so.  Any April 29 disclosure would have been woefully insufficient because negotiations with the third parites advanced considerably thereafter.  (*See* Fact Summary, Sect. 7(a) and (b), above.)

Defendants' effort to blame SLSJ is also contrary to the record. Defendants identify no documentary evidence of disclosure on April 29 concerning the Klebans' negotiations with Kimco, Federal Realty or HFF. Defendants instead cobble together assorted vague, oblique alleged references to Kimco or to a sale, mostly on the basis of the uncorroborated testimony of Albert or Ken Kleban, but even their recounting belies defendants' contention that there was disclosure of "the information that Plaintiff claims was withheld from it." (*See* Defs.' Br. at 40.) Moreover, as detailed at length in the Fact Summary, Section 7(c) above, members who attended the family meeting uniformly receiving any such disclosure.

### 2. Defendants Cannot Prove Kleban Paid Adequate Consideration.

Defendants also cannot make the required showing that the consideration Albert Kleban paid to purchase SLSJ's interests on July 29, 2013 "was adequate." *Konover*, 635 A.2d at 809. Kleban paid $2,020,540, a purchase price based upon a $23,082,960 valuation of Sun Realty's interest in Black Rock. (*See* Fact Summary, Sect. 2, above; Defs. Ex. TT.) Twelve weeks later, Kleban executed Sun Realty's joint venture agreement under which it sold Regency an 80 percent interest in the same real estate based on a $30,609,665 valuation, $7,526,705 greater. (*See* Fact Summary, Sect. 3, above, and record materials cited therein.) Mr. Kleban thus underpaid SLSJ by $2,508,901 for its 33.33 percent membership interest, *i.e.*, 33.33 percent of the difference in valuations used to establish the respective purchase prices in the SLSJ-Kleban transaction and the Regency transaction.

Mr. Kleban knew, moreover, that the $23,082,960 valuation used as the basis for his purchase price to SLSJ was inadequate. As detailed in Fact Summary, Section 7(a), above, on June 4, three weeks before SLSJ signed the Membership Interest Purchase Agreement, Ken Kleban sent Federal Realty, with a copy to Albert Kleban, Sun Realty's internal valuation of the same property as $31,867,836, nearly $9 million greater. (Pl. Ex. 26, June 4, 2013 K. Kleban

email; Pl. Ex. 24, Carty Dep. at 28, 30-31.)  Ken Kleban also sent Kimco an even higher

valuation, $32,857,291.  (Pl. Ex. 49; Ex. 40, Weinkranz Dep. at 47-49.)  Defendants cannot show

that Albert Kleban paid adequate consideration for SLSJ's interest.

### 3. Defendants Cannot Make the Required Showing of Parity in Sophistication and Bargaining Power.

Defendants also cannot show parity in the parties' relative levels of "sophistication and

bargaining power."  *Konover*, 635 A.2d at 809.  There were wide disparities.

As to sophistication, as detailed in Section 1 of the Fact Summary above, Albert Kleban

held himself out as "one of the premier commercial real estate developers in Fairfield County"

and widely respected and recognized "for his keen business acumen, real estate expertise and

significant real estate portfolio."  (Pl. Ex. 5.)  SLSJ's manager, Lois Jeruss, had no business

experience and no experience managing or developing commercial real estate.  (Pl. Ex. 2, Jeruss

Dep. at 7-12.)  Defendants stress that SLSJ was advised in the transaction.  The advisor was Ms.

Jeruss's personal estate planning attorney, Carleen Schreder, who focused her practice on estate

tax and income tax planning, not in advising commercial real estate investors, developers or

managers in operating their business or in real estate or securities transactions.  (Defs. Ex. Z,

Attorney Biography.)

As to bargaining power, Kleban held a vastly dominant position.  He had complete

information.  SLSJ had only the information Kleban and his delegates provided, which, in April

through July 2013, consisted of false and misleading statements that Albert and Ken Kleban

were devoting "every bit of energy" to "the mutual interests of every single partner," and that the

"reality of the situation" was that Sun Realty's tenants' circumstances were "somewhat bleak,"

the company's loan-to-value ratio was "insufficient" to "cover a refinancing," management had

determined Sun Realty's real estate had a market value of only $20,224,300, the company could

not repay member loans, and it required another capital call "of significance." (Defs. Ex. OO, at p. 2; Defs. Ex. PP, Apr. 19, 2013 email, at p. 2 and LSC 52; *see also* Fact Summary, Sect. 6, above.)  In the absence of the countervailing promising information that prospects were good for a possible sale and management possessed information Sun Realty's value was substantially more than members were told, the negative information was acutely worrisome to SLSJ, rendering it a distressed seller.  (Pl. Ex. 2, Jeruss Dep. at 116-124; *see also* Fact Summery, Sect. 7, above.)  The Operating Agreement, moreover, severely restricted Sun Realty members' ability to sell their interests, so SLSJ lacked the ability to sell to a third party, further depriving it of bargaining power.  (Defs. Ex. B, Operating Agmt., at art. X.)

### 4. SLSJ's Receipt of Competent and Independent Advice Does Not Establish the Transaction was Fair.

Defendants stress the remaining factor under *Konover*, "that the principal had competent and independent advice."  635 A.2d at 809.  SLSJ obtained advice concerning its sale of its membership interests from Ms. Jeruss's personal estate planning counsel.  (*See* Defs.' Br. at 8-9, 17, 28-30.)  While the principal's receipt of competent, independent advice is relevant "in determining whether a particular transaction is fair," it is one of several factors the fact-finder must consider "in light of all the circumstances," including whether the fiduciary made "a free and frank disclosure" of all relevant information, paid "adequate" consideration, and had no greater "sophistication and bargaining power" than his principal.  *Konover*, 635 A.2d at 809.  Receipt of competent advice, alone, is not sufficient to establish fairness, and does not immunize a fiduciary who exploits his informational monopoly in a self-dealing transaction by failing to disclose critical, material information.

Here, moreover, as detailed in the Fact Summary, Section 4, above, SLSJ's counsel received Albert Kleban and Jackie Campbell's personal assurance that they were disclosing all

material information, including, specifically, information concerning a possible sale, and

requested "any information that is provided to other partners in connection with the [family]

meeting." (Pl. Ex. 21; Defs. Ex. JJJ, Apr. 18, 2013 Schreder email.) A fiduciary who

intentionally withholds information from the principal's independent advisor should not be heard

to defend the transaction by pointing to the advisor's involvement. Defendants also point to

second-hand discussions or inquiries with other Sun Realty members who happened to be

lawyers, James Blank and Allan Kleban, but misstates the record to assert SLSJ was "counseled"

by them in the transaction. (*See* Defs.' Br. at 29-30.) Reference to the cited testimony refutes

that assertion.

On the record here, defendants cannot show the fairness of the Membership Interest

Purchase Agreement by clear and convincing evidence. Their request for summary judgment on

SLSJ's First and Second Claims for Relief for breach of fiduciary duty and aiding and abetting a

breach, must be denied.

## II.     The Evidence Supports SLSJ's Fraud Claims.

Defendants request summary judgment on SLSJ's securities fraud claim arguing that:

(1) there is no genuine dispute that a membership interest in Sun Realty conferred more than

"passive investor" status, and thus did not constitute an "investment contract" qualifying as a

"security" for purposes of the Securities Exchange Act; and (2) "there is no evidence

demonstrating that Plaintiff was in any way defrauded or that Albert Kleban did not at all times

deal with Plaintiff honestly and transparently." (*See* Defs.' Br. at 31-34.) There is ample

evidence of both, establishing, at the very least, a genuine dispute that precludes summary

judgment.

A.     Sun Realty Membership Interests Were "Securities."

There is substantial evidence Sun Realty membership interests constituted investment contracts. The governing test turns on "the reality of the parties' positions and whether the reasonable expectation was one of significant investor control," rather than a passive investment. *United States v. Leonard*, 529 F.3d 83, 85 (2d Cir. 2008) (citation and internal quotation marks omitted). "It is the passive investor for whose benefit the securities laws were enacted." *Id.* at 88 (citation and internal quotation marks omitted).

The Fact Summary, above, at Sections 4 through 7, identifies abundant evidence showing that Sun Realty membership interests afforded members other than SMP no reasonable expectation of "significant investor control" over the company, conferring only passive investor status. Members granted SMP, as Manager, the "full, exclusive and complete discretion, power and authority" to "manage, control, administer and operate [Sun Realty's] business and affairs" and "to make all [related] decisions." (Defs. Ex. B, Operating Agmt., at ¶¶ 6.1 and 6.2.) The only limitations were a handful of Operating Agreement terms and the requirements of applicable law. (*Id*, at ¶ 6.2.) Albert Kleban acknowledged he managed and controlled Sun Realty through SMP. (Pl. Ex. 3, A. Kleban Dep. at 46-48.)

Family members holding interests in Sun Realty uniformly denied that Sun Realty member other than SMP played an active role in managing the business, and attested that Albert Kleban managed the company. (*See* Fact Summary, Sect. 4, above.) Albert Kleban also repeatedly assured members he was managing Sun Realty with dedication and loyalty to their interests. (*See* Fact Summary, Sect. 5, above (excerpting from Kleban's assurances).) Review of Albert Kleban's status reports and correspondence to members further underscores the respective active and passive roles. (*See* Fact Summary, Sects. 5–6, above (several illustrations).) No member other than SMP, Kleban's alter-ego, disseminated information concerning Sun Realty's

business and affairs.  There is perhaps no better illustration of Kleban's control than his and Ken

Kleban's dealings in 2013 with Federal Realty, Kimco, HFF and Regency, none of which they

disclosed to Sun Realty members until after Kleban signed Sun Realty's Contribution Agreement

with Regency.  (*See* Fact Summary, Sect. 7, above (detailing Albert and Ken Klebans'

undisclosed efforts to secure a sale or joint venture ono behalf of SMP).)

     The record is conclusive that Sun Realty membership interests conferred only "passive

investor" status and thus constituted "securities" under the Exchange Act.  At minimum, there is

a genuine issue that precludes summary judgment for defendants.

> **B.      There is Substantial Evidence Kleban Made False and Misleading
>      Statements of Material Fact.**

     The record refutes defendants' arguments that SLSJ's Exchange Act and common law

fraud claims "lack . . . evidentiary support" of fraud.  (Defs.' Br. at 34.)  To prove fraud under

Section 10(b) of the Exchange Act, SLSJ must show  "a material misrepresentation or omission"

by Kleban with scienter in connection with his purchase of SLSJ's interests.  *Charles Schwab*

*Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 92 (2d Cir. 2018) (citation and internal quotation

marks omitted).

     The record shows that, in connection with his purchase of SLSJ's membership interests,

Albert Kleban knowingly omitted to state critical material facts.  As detailed in SLSJ's

Argument I.B.1, above, which addresses largely the same issue, *i.e.,* whether Kleban made "free

and frank disclosure of all the relevant information he had," defendants concede that when

Kleban purchased SLSJ's membership interests on July 29, 2013, he had disclosed to SLSJ none

of the facts set forth in the Fact Summary, Section 7(a) and (b), above, concerning his and Ken

Kleban's discussions with investors and a broker concerning a sale of Black Rock.  That

information was relevant and highly material to any member solicited to sell its interest in April

2013 just after receiving Albert Kleban's ominous April 6 report of significant financial difficulties at Sun Realty and bleak prospects, including an inability to repay member loans, a significant capital call in the offing, an inability to refinance the property when its mortgage matured because the value of the shopping center was only $20.2 million. (*See* Fact Summary, Sect. 6, above.) Kleban's omissions rendered false and misleading the repeated assurances of transparency and loyalty Kleban and his agents made to SLSJ and other Sun Realty members, 15 of which are chronicled in the Fact Summary, Section 5, above. They also rendered misleading his and his agent's status reports concerning the business, affairs, financial condition and value of Sun Realty, several of which are chronicled in the Fact Summary, Section 6, above, most notably Kleban's pointedly negative report of April 6, 2013, and Ken Kleban's follow up report on April 19, authorized by and copied to Albert Kleban.

As shown in Argument I.B.1, above, defendants' argument that SLSJ "could have very easily obtained the information . . . by attending the 'Family Meeting'" (Defs.' Br. at 39) is unavailing for several reasons. First, Kleban owed a duty of disclosure. (*See* Argument I.A., above); *see also Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100-01 (2d Cir. 2015) (duty to disclose "may arise when there is a corporate insider trad[ing] on confidential information" or a "statement that would otherwise be inaccurate, incomplete, or misleading") (citations and internal quotation marks omitted). In addition, the "family meeting occurred April 29, 2013, and the Klebans' negotiations with Federal Realty, Kimco, and HFF advanced substantially during the three months thereafter, before SLSJ sold its interests on July 29. (*See* Fact Summary, Sect. 7(a) and 7(b), above.) Any April 29 disclosure would have been woefully incomplete. Third, as detailed in the Fact Summary, Section 7(c) above, members who attended the family meeting uniformly deny that any such disclosure was made. Defendants, moreover, can identify no

documentary evidence of disclosure and rely only on assorted vague, oblique alleged references to Kimco or to a sale allegedly made April 29, 2013, mostly on the basis of the uncorroborated testimony of Albert and Ken Kleban. (*See* Defs.' Br. at 40.) At the very least, there is abundant evidence establishing a genuine dispute precluding summary judgment.

## III. Defendants Misstate SLSJ's Unjust Enrichment Claim.

Defendants seek judgment on the pleadings on SLSJ's Fifth Claim for Relief, arguing erroneously that it fails to state a cause of action. (Defs.' Br. at 41.) SLSJ's Fifth Claim asks the Court to impose a constructive trust over the membership interests SLSJ assigned to Le Rivage, or the proceeds received therefrom, "on the ground that Le Rivage would be unjustly enriched if it were permitted to retain the membership interest or proceeds" as "a result of its and Kleban's wrongful conduct." (Compl. ¶¶ 91-92.) As stated by the Connecticut Supreme Court:

> Unjust enrichment is a very broad and flexible equitable doctrine that has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that has come to him at the expense of the plaintiff. The doctrine's three basic requirements are that (1) the defendant was benefited, (2) the defendant unjustly failed to pay the plaintiff for the benefits, and (3) the failure of payment was to the plaintiff's detriment.

*Gagne v. Vaccaro,* 766 A.2d 416, 427-28 (Conn. 2001) (internal citation omitted). SLSJ states such a claim against Le Rivage.

<u>CONCLUSION</u>

Plaintiff SLSJ, LLC, respectfully requests entry of an order denying defendants' Motion for Summary Judgment in its entirety.

Respectfully submitted,

Plaintiff
SLSJ, LLC

By: */s/ David E. Lieberman*
David E. Lieberman (phv 06920)

David E. Lieberman (phv 06902)
Levin Schreder & Carey Ltd.
120 North LaSalle Street, 38th Floor
Chicago, IL  60602
Tel.:  (312) 332-6300
Fax:  (312) 332-6393
Email:  david@levinschreder.com

Joseph J. Cherico (ct 24869)
McCarter & English, LLP
One Canterbury Green
201 Broad Street
Stamford, CT  06901
Tel.:  (203) 399-5900
Fax:  (203) 399-5800
Email:  jcherico@mccarter.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this **24th day of May, 2018**, a copy of the foregoing **Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment** was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ David E. Lieberman*
David E. Lieberman (phv 06920)
Levin Schreder & Carey Ltd.
120 North LaSalle Street, 38th Floor
Chicago, IL  60602
Tel.:  (312) 332-6300
Fax:  (312) 332-6393
Email:  david@levinschreder.com

465608.2