

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SLSJ, LLC,

                Plaintiff,

v.

ALBERT J. KLEBAN and THE LE RIVAGE LIMITED PARTNERSHIP,

                Defendants.

Case No. 3:14-CV 00390 (CSH)

May 24, 2018

## PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT OF FACTS
## IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(a)(2) of the Local Rules of this Court, Plaintiff SLSJ, LLC, responds

to Defendants' Local Rule 56(a)(1) Statement as follows:

1.      Lois Jeruss owns 70% percent of Plaintiff SLSJ, LLC ("Plaintiff" or "SLSJ") and the remainder of Plaintiff is owned by Ms. Jeruss's two daughters. <u>Exhibit A</u>, SLSJ, LLC Deposition Transcript ("SLSJ Dep.") 16:24 — 17:5.

**RESPONSE:** Admitted.

2.      Sun Realty is organized pursuant to a certain Amended and Restated Operating Agreement, executed by Sun Realty members on May 26, 1999, and amended February 20, 2002 ("Sun Realty Operating Agreement"). <u>Exhibit B</u>, Sun Realty Operating Agreement, Exhibit A.

**RESPONSE:** Admitted.

3.      SMP is the corporate manager of Sun Realty. <u>Exhibit B</u>, Sun Realty Operating Agreement at § 6.2.

**RESPONSE:** Plaintiff admits SMP was a corporation and manager of Sun Realty and

denies it was a corporation manager insofar as another meaning is intended. Defs. Ex. B, at ¶ 6.2.

4.      At the relevant times, SMP was owed by Albert Kleban and his wife Alida Kleban, and was comprised of five directors: Albert and Alida Kleban, their son, Ken Kleban, Stephan B. Grozinger, Esq., and Lucy G. Fabrizi. <u>Exhibit C</u>, Unanimous Consent of the

Shareholders of Sun Realty-SMP, Inc. and Related Documents ("SMP Consent Agreement"); Exhibit D, Albert Kleban Deposition Transcript ("Albert Kleban Dep.") 31:19-22.

**RESPONSE:** Plaintiff admits SMP was owned by Albert and Alida Kleban and they appointed the referenced five directors, and denies a corporation is comprised of its directors.

5. The management authority of SMP, and the limits on that authority, were set forth in the Sun Realty Operating Agreement. Exhibit B, Operating Agreement.

**RESPONSE:** Admitted except denied insofar as limits are imposed in law or equity.

6. Pursuant to the Sun Realty Operating Agreement, capital contributions were strictly voluntary. Id. at § 3.2(b); Exhibit E, Allan Kleban Deposition Transcript ("Allan Kleban Dep.") 84:1-2, 94:19-22; Exhibit F, Memorandum from Albert Kleban to Sun Realty Members, dated 1/9/12.

**RESPONSE:** Plaintiff admits capital contributions were not mandatory but denies they were strictly voluntary inasmuch as pressure was brought to bear. *See* Defs. Ex. T.

7. There were limits on the amount of money SMP was authorized to spend on capital improvement projects. Id. at § 6.2(g).

**RESPONSE:** Admitted.

8. SMP could not unilaterally alter the terms of the Operating Agreement as amendments to the Operating Agreement required the unanimous consent of all members of Sun Realty. Id. at § 12.1.

**RESPONSE:** Admitted.

9. The day-to-day management, operation and maintenance of Black Rock Shopping Center was assigned to Turnpike Properties, LLC ("Turnpike") pursuant to a certain Property Management Contract entered into between Sun Realty and Turnpike on January 1, 2001 ("Turnpike Property Management Contract"). Exhibit G, Turnpike Property Management Contract.

**RESPONSE:** Admitted.

10. Turnpike was owned, in part by Albert and Ken Kleban, and employed Jackie Campell (nee Morris), as its property manager. Id.; Exhibit D, Albert Kleban Dep. 48:12-18.

**RESPONSE:** Admitted.

11.     The powers and responsibilities of Turnpike with respect to Black Rock Shopping Center are set forth in the Turnpike Property Management Contract, which required Turnpike to *inter alia*, collect rents; purchase supplies, equipment and trade services; order and supervise repairs and alterations; pay invoices; maintain and repair fixtures, equipment and other machinery; take legal action on behalf of Sun Realty; review plans and specifications related documents for tenant construction work; and ensure compliance with laws and ordinances relative to the property's leasing, use, operation and maintenance.  Exhibit G at § 2.1.

**RESPONSE:** Admitted.

12.     SMP and/or Turnpike provided Sun Realty members with information affecting Black Rock Shopping Center and Sun Realty, including financing information, via a website accessible to Sun Realty Members and written correspondences sent by e-mail, fax and mail. Exhibit E, Allan Kleban Dep. at 21:14 – 24:22; 153:13 – 154:22.

**RESPONSE:** Plaintiff admits Sun Realty management and Turnpike provided the

information and denies SMP, who is unmentioned in the referenced testimony, provided it.  Defs.

Ex. E at 21-24, 153-154.

13.     SMP and/or Turnpike, through Albert Kleban and/or Jackie Campbell sent correspondences to Sun Realty members in 2008 and 2009 advising Sun Realty members of issues involving tenants and spaces at Black Rock Shopping Center, including, *inter alia*: replacement of Marty's Shoes by Nine West; replacement of Rye Ridge Deli with Moe's Southwest Grill; replacement of Olympia Sports with Aspen Dental; a lease signed with Fundamental Plus to assume space occupied Gap; efforts to redemise Old Navy to accommodate Fresh Market; lease negotiations with Gap; an arrearage owing from Madison Jewelers; and a rent concession from Hallmark Cards.  Exhibit H, Memorandum from Albert Kleban to Sun Realty Members, dated 1/18/08; Exhibit I, Memorandum from Albert Kleban to Sun Realty Members, dated 10/22/09; Exhibit PPP, Memorandum from Albert Kleban to Sun Realty Members, dated 11/6/09.

**RESPONSE:** Plaintiff admits Jackie Campbell sent the referenced correspondence to

Sun Realty members in 2008 and 2009 using Turnpike stationery or email signature and

forwarded writings from Albert Kleban, copying him by means of his Aol email account, but

denies SMP, which is unreferenced in the exhibits, sent the correspondence.  Defs. Exs. H, I and

PPP.

14.     SMP and/or Turnpike, through Albert Kleban and/or Jackie Campbell sent correspondences to Sun Realty members in 2010 advising Sun Realty members regarding, *inter alia*, recapture of the lower level of Ritz Camera and plans to construct a swimming pool at the

shopping center as part of lease negotiations with Wings Over Water School of Swimming ("Wings Over Water").  Exhibit J, Memorandum from Albert Kleban to Sun Realty Members, dated 8/3/10; Exhibit K, Memorandum from Albert Kleban to Sun Realty Members, dated 9/29/10; Exhibit L, Memorandum from Albert Kleban to Sun Realty Members, dated 12/7/10.

**RESPONSE:**  Plaintiff admits Jackie Campbell sent the referenced correspondence to Sun Realty members in 2010 using a Turnpike email signature and forwarding writings from Albert Kleban, copying him on his Aol email account, but denies SMP, which is unreferenced in the exhibits, sent the correspondence.  Defs. Exs. J, K and L.

15.    SMP and/or Turnpike, through Albert Kleban and/or Jackie Campbell sent correspondences to Sun Realty members in 2011 and 2012 advising Sun Realty members regarding, *inter alia*: replacement of Nine West with Carter's Jewelers; termination of lease agreement by Madison Jewelers; an arrearage owing from Hallmark Cards; a new lease agreement signed with Hallmark Cards; a property façade renovation; and construction at the Rehabilitation Associates and Verizon spaces. Exhibit M, E-mail from J. Campbell to Sun Realty Members, dated 2/15/12; Exhibit N, Memorandum from Albert Kleban to Sun Realty Members, dated 10/13/11; Exhibit O,  Memorandum from Albert Kleban to Sun Realty Members, dated 10/18/11.

**RESPONSE:**  Plaintiff admits Jackie Campbell sent the referenced correspondence to Sun Realty members in 2011 and 2012 using a Turnpike email signature and forwarding writings from Albert Kleban, copying him on an Aol email account, but denies SMP, which is unreferenced in the exhibits, sent the correspondence.  Defs. Exs. M, N and O.

16.    SMP and/or Turnpike, through Albert Kleban and/or Jackie Campbell, kept members of Sun Realty informed of developments affecting Black Rocking Shopping Center and Sun Realty. Exhibit A, SLSJ Dep. at 69:5-11; Exhibit E, Allan Kleban Dep. at 36:10-20.

**RESPONSE:**  Denied.  Defs. Ex. A, at 69 and 117; Defs. Ex. E at 36:10; Pl. Ex. 17, Blank Dep. at 23-28; Pl. Ex. 13, Howard Dep. at 18-20; Pl. Ex. 15, Levin Dep. at 29-30; Pl. Ex. 14, Wolfe Dep. at 24-25, 34; Pl. Ex. 16, Allan Kleban Dep. at 93, 156-161,191-192; Pl. Ex. 2, Jeruss Dep. at 117-124, 185-186; Pl. Ex. 1, Jeruss Decl. ¶ 12; Pl. Ex. 24, Carty Dep. at 10-19, 23, 26, 28-31, 33-35, 39-42, 47-52, 53-63, 70-77, 76-77, 91; Pl. Ex. 26, June 4, 2013 K. Kleban email and attachment; Pl. Ex. 27, June 24, 2013 Carty email string; Pl. Ex. 28, June 29, 2013 K.

Kleban email; Pl. Ex. 29, July 2, 2013 K. Kleban email; Pl. Ex. 30, at p. 1; Pl. Ex. 31, July 9,

2013 Carty email and attachment; Pl. Ex. 32, July 17, 2013 Carty email and attachment; Pl.

Ex. 33, July 21, 2013 Carty email; Pl. Ex. 34, July 22, 2013 Carty email and attachment; Pl.

Ex. 35, July 29, 2013 Carty email string; Pl. Ex. 36, July 29, 2013 K. Kleban email; Pl. Ex. 37,

July 27, 2013 K. Kleban email to J. Mayer; Pl. Ex. 38, July 25, 2013 R. Rizzi email to K.

Kleban; Pl. Ex. 39, July 27, 2013 K. Kleban email and attachments to R. Rizzi and S. Grozinger;

Pl. Ex. 40, Weinkranz Dep. at 13-16, 36, 46-49; Pl. Ex. 41, Henry Dep. at 18-22, 25-28, 33-35;

Pl. Ex. 42, Mar. 29, 2013 email; Defs. Ex. OO; Pl. Ex. 43, Onufrey Dep. at 14-16, 18, 20, 22-23,

25-32; Pl.'s Ex. 44, May 9, 2013 G. Misoulis email to K. Kleban; Pl. Ex. 45 July 31, 2013 Henry

email to K. Kleban; Pl. Ex. 46  Aug. 1, 2013 Henry email string with K. Kleban; Pl. Ex. 47, Aug.

26, 2013 Onufrey email to K. Kleban; Pl. Ex. 49; Pl. Ex. 50, May 19, 2013 email string; Pl.

Ex. 51, Apr. 29, 2013 K. Kleban email to Carty; Pl. Ex. 52, Apr. 29, 2013 K. Kleban email to

Henry and Weinkranz.

      17.     Plaintiff, through counsel, regularly asked SMP and Turnpike questions, and received answers regarding Sun Realty's affairs, including questions regarding, amortization schedules, capital calls, cash reserves, cash distributions, cash flows from tenants properties, construction projections, debt servicing, project financing, repayment schedules for loans made to Sun Realty by members, and tax considerations. Exhibit M; Exhibit P, E-mail from J. Campbell to C. Schreder, dated 11/22/08; Exhibit Q, E-mail from C. Schreder to J. Campbell, dated 8/11/10; Exhibit R, E-mail from J. Campbell to C. Schreder, dated 8/17/2011; Exhibit S, E-Mail from C. Schreder to J. Campbell, dated 10/20/11; Exhibit T, E-mail from J. Campbell to C. Schreder, dated 10/25/11; Exhibit U, E-mail from C. Schreder to J. Campbell, dated 10/28/11; Exhibit V, E-mail from C. Schreder to J. Campbell, dated 11/2/11.

      **RESPONSE:** Plaintiff admits it asked Jackie Campbell and Albert Kleban questions

through counsel regarding the referenced subjects and received answers on the occasions

referenced, but denies receiving any answers identified as provided by SMP.  Defs. Exs. M, P, Q,

R, S, T, U and V.

18.     Albert Kleban invited Plaintiff and its attorney to Black Rock Shopping Center in November 2011.  Exhibit W, Note from Albert Kleban, dated 11/3/11. Lois Kleban declined the invitation.  Exhibit D at 141:11 – 142:7.

**RESPONSE:**  Admitted.

19.     SMP asked Sun Realty members to make pro rata contributions to pay for costs associated with tenant turnover, including (a) a capital call associated with new lease agreements planned at the end of 2009 with Moe's Southwest Grill, Gap, Old Navy, Aspen Dental, and Fundamentals Plus, required a capital infusion of $1.5 million; Exhibit I; Exhibit X, Memorandum from Albert Kleban to Sun Realty Members, dated 11/6/09; (b) a $600,000 capital call associated with the recapture of the first floor of Ritz Camera and for construction of a swimming pool for Wings Over Water; Exhibits J and L; and (c) a $200,000 capital call associated with fit-up costs to lease space to Carter's Jewelers; Exhibits N and O.

**RESPONSE:**  Admitted except denied insofar as the statement refers to SMP, which is referenced in none of the exhibits, as the party making the request.  *See* Defs. Exs. I, X, J, L, N and O.

20.     Capital improvement projects at Black Rock Shopping Center could not proceed unless there was agreement among a substantial interest of Sun Realty members. Exhibit N.

**RESPONSE:**  Admitted except denied as to capital improvement projects below a certain cost threshold.  Defs. Ex. B, at ¶ 6.2(g).

21.     Plaintiff was advised at the relevant times by attorney Carleen Schreder who had experience in estate tax and income tax planning and counseling family owned businesses on loans, transfers, sales and exchanges in the context of real estate transactions.  Exhibit Z, Carleen L. Schreder, Attorney Biography.

**RESPONSE:**  Admitted except denied as to Ms. Schreder's experience counseling family-owned businesses, which is described in the reference exhibits as experience "in the real estate area, to structure loans, investments and sales or exchanges in order to maximize the deductibility of available losses and defer income taxation as appropriate."  Defs. Ex. Z.

22.     Plaintiff was advised at the relevant times by attorney Richard Hoffman who was very familiar with the Connecticut real estate market.  Exhibit A, SLSJ Dep. at 135:8-14.

**RESPONSE:** Admitted except denied that Mr. Hoffman was very familiar with the

Connecticut real estate market.  Defs. Ex. A at 135:8-14.

23.    In the early 2000s, Albert Kleban, on behalf of SMP, was presented with the opportunity to purchase a gas station adjacent to Black Rock Shopping Center.  Exhibit AA, Letter from J. Campbell to C. Schreder, dated 8/5/05.

**RESPONSE:** Admitted.

24.    Plaintiff did not consent to the purchase of the gas station property.  Id.

**RESPONSE:** Admitted.

25.    Sun Realty did not purchase the gas station property; rather, it was purchased by an entity comprised of other members of Sun Realty, called FBW, LLC ("FBW").  Id.

**RESPONSE:** Admitted.

26.    FBW ground leased the gas station property to Sun Realty.  Id.

**RESPONSE:** Admitted.

27.    The ground lease of the gas station property to Sun Realty increased gross sales at Black Rock Shopping Center resulting in a benefit to members of Sun Realty, including Plaintiff. Id.; Exhibit BB, Letter from C. Schreder to J. Campbell, dated 8/5/05.

**RESPONSE:** Admitted.

28.    Sun Realty had an opportunity to purchase property contiguous with Black Rock Shopping, which was home to The Children's Place.  Plaintiff, however, refused to go along with the purchase of that property, requiring Sun Realty members to from an entity called Kleban Development Corporation, LLC ("KBC") in order to purchase that property.  Exhibit E at 147: 9-19.

**RESPONSE:** Denied.  *See* Defs. Ex. E at 147:9-19.

29.    In November 2011, Plaintiff advised SMP that given the stress on owners created by reoccurring capital calls, it would be in Sun Realty's best interest to sell Black Rock Shopping Center.  Exhibit CC, E-mail from C. Schreder to J. Campbell, dated 11/8/11.

**RESPONSE:** Denied.  Defendants' Exhibit CC states:  SLSJ "would like Albert to look

at the possibility of selling the center. Of course, there is no immediacy to this request, so this

should not be viewed as a fire sale, but given the stresses on the owners, who do not have

unlimited funds, such action should be considered. Selling in the next year could have benefits

because tax rates are likely to increase after 2012, especially on capital gains."

30.     SMP commissioned an appraisal for Black Rock Shopping Center in response to
Plaintiff's suggestion that Black Rock Shopping Center should be sold to a third party. Exhibit
DD, Memorandum from Albert Kleban to Sun Realty Members, dated 1/9/12; Exhibit EE,
Wellspeak Appraisal, 12/23/11; Exhibit FF, E-mail from J. Campbell to C. Schreder, dated
2/1/12.

**RESPONSE:** Denied.  In the cited exhibit Albert Kleban states that he individually

commissioned the appraisal, making no reference to SMP, and states he did so because "a few of

you mentioned that in light of the needed capital calls and uncertainty of the marketplace, we

should consider selling the property."  *See* Defs. Ex. DD.

31.     In January and March of 2012, Plaintiff urged SMP to sell Sun Realty's interest in
Black Rock Shopping Center. Exhibit GG, E-mail from C. Schreder to J. Campbell, dated
1/20/12; Exhibit HH, Memorandum from C. Schreder to Albert Kleban, dated 3/12/12.

**RESPONSE:** Denied.  The exhibits are misstated.  *See* Defs. Exs. GG and HH.

32.     Plaintiff repeatedly advised Sun Realty to adopt an overall plan for dealing with
tenant turnover and to abandon its piecemeal approach to addressing tenant vacancies.  Exhibits
S and V.

**RESPONSE:** Denied.  The exhibits state concerns and questions and are misstated as

rendering advice.  *See* Defs. Exs. S and V.

33.     Plaintiff advised Sun Realty that cash flow should be diverted to capital
improvements to obviate the necessity of making loans to Sun Reality to fund the costs
associated with tenant defaults.  Exhibit T.

**RESPONSE:** Denied.  The exhibit stated concerns and questions and is misstated as

rendering advice.  *See* Defs. Ex. T.

34.     Plaintiff advised SMP to direct cash flow from a recently acquired lease with
Nine West to Sun Realty's cash reserves in order to reduce the need for capital calls.  Exhibit P.

**RESPONSE:** Admitted.

35.     In August 2005, Plaintiff advised Albert Kleban to arrange for a bank loan to FBW so that FBW could make payments on a loan Sun Realty had made to FBW.  Exhibit II, Letter from C. Schreder to Albert Kleban, dated 8/3/05.

**RESPONSE:** Denied.  The exhibit states a suggestion and is misstated as rendering

advice.  *See* Defs. Ex. II.

36.     In November 2011, Plaintiff advised SMP that a sale of Black Rock Shopping Center should occur before the end of 2012 to avoid expected increases in tax rates, including capital gains taxes.  Exhibit CC.

**RESPONSE:** Denied.  *See* Defs. Ex. CC.

37.     In August 2010, Plaintiff advised Sun Realty regarding the tax implications of a $170,000 loan from Sun Realty to Wings Over Water; specifically, that to avoid tax liability, Sun Realty should not accept rent payments for Wings Over Water as repayment of the loan.  Exhibit M.

**RESPONSE:** Denied.  The exhibit asks questions and raises concerns over tax

implications but does not render the advice described.  *See* Defs. Ex. M.

38.     In January 2012, Plaintiff identified an error in the way Sun Reality was allocating interest on its 2011 tax return.  Exhibit JJ, Memorandum from C. Schreder to Albert Kleban, dated 6/29/12; see also Exhibit HHH, E-mail from Albert Kleban to Sun Realty Members, dated 7/14/12; Exhibit III, E-mail from C. Schreder to J. Campbell, dated 9/11/12; Exhibit KK, E-mail from J. Campbell to C. Schreder, dated 9/25/12.

**RESPONSE:** Admitted.

39.     As a result of Plaintiff identifying an error in the way Sun Realty was allocating interest on its 2011 tax return, SMP caused Sun Reality to correct the error and calculate the interest in the manner Plaintiff had suggested.  Id.

**RESPONSE:** Admitted except denied insofar as causation is attributed to SMP, to which

no reference is made in the cited exhibits.

40.     In an e-mail to Sun Realty members dated, January 9, 2015, SMP notified Sun Realty members that the mortgage for Black Rock Shopping Center was required to be refinanced in 2015.  Exhibit DD.

**RESPONSE:** Admitted except denied insofar as the email is dated January 9, 2012, and

contains a memorandum from Albert Kleban, with no reference to SMP as the party giving

notice. *See* Defs. Ex. DD.

41.  In an e-mail to Sun Realty members dated, January 9, 2015, SMP advised Sun
Realty that the expected mortgage refinance would likely require amortization and a higher
interest rate, which would reduce cash flow, as well as personal guarantees from Sun Realty
members. Id.

**RESPONSE:** Admitted except denied insofar as the email is dated January 9, 2012, and

contains a memorandum from Albert Kleban, with no reference to SMP as the party giving

notice. *See* Defs. Ex. DD.

42.  In an e-mail to Sun Realty members dated, January 9, 2015, SMP asked each
member of Sun Realty to indicate whether they would be interested in selling their shares of Sun
Reality to other members or would agree to Sun Realty selling Black Rock Shopping to a third
party. Id.

**RESPONSE:** Admitted except denied insofar as the email is dated January 9, 2012, and

contains a memorandum from Albert Kleban, with no reference to SMP and asks member to

consider selling, not to indicate their interest. *See* Defs. Ex. DD.

43.  In an e-mail to Sun Realty members dated, January 9, 2015, SMP provided Sun
Realty members with the appraisal it commissioned for the property in response to Plaintiff's
earlier urging that that the property be sold. Id.; see Exhibit EE.

**RESPONSE:** Denied. *See* Defs. Exs. DD and EE.

44.  In a memorandum dated March 12, 2012, Plaintiff advised SMP that it would be
in favor of Sun Realty selling Black Rock Shopping Center in its entirety or in Plaintiff selling
its interest in Sun Realty to other members of Sun Realty before the mortgage had to be
refinanced in 2015. Exhibit HH.

**RESPONSE:** Denied. The email states SLSJ's interest "in seeing a long-term solution

for the property in which consideration is given to selling the property in its entirety or selling

[its] interest in its entirety at some point in time before the loan has to be refinanced." *See* Defs.

Ex. HH.

45.     In a memorandum dated March 12, 2012, Plaintiff advised SMP that that Lois Jeruss would not be willing to personally guarantee any loans in connection with mortgage refinance required in 2015. Id.

**RESPONSE:** Admitted.

46.     In June and July of 2012, SMP reported to Sun Realty members that Madison Jewelers was going out of business and was behind on rent, that Hallmark was struggling to make rent payments and would be filing for bankruptcy, that Ritz Camera was $12,000 behind one rent and would also be filing for bankruptcy, and that Audio Design had vacated Turnpike Shopping Center without giving notice. Exhibit LL, Memorandum from Albert Kleban to Sun Realty Members, dated 6/27/12; Exhibit MM, Memorandum from Albert Kleban to Sun Realty Members, dated 7/10/12; Exhibit HHH.

**RESPONSE:** Admitted except denied insofar as the emails contain memoranda from

"Al Kleban," with no reference to SMP as the party reporting. *See* Defs. Exs. LL, MM and

HHH.

47.     In an e-mail to Sun Realty members dated July, 24, 2012, SMP described the problems with tenants at Black Rock Shopping center as "serious." Exhibit HHH.

**RESPONSE:** Admitted except denied insofar as the emails contain a memorandum from

"Al Kleban," with no reference to SMP as the party reporting. *See* Defs. Ex. HHH.

48.     In an e-mail to Sun Realty members dated June 27, 2012, SMP characterized the real estate market as "exceptionally difficult." Exhibit LL.

**RESPONSE:** Admitted except denied insofar as the emails contain a memorandum from

"Al Kleban," with no reference to SMP as the party reporting. *See* Defs. Ex. LL.

49.     In December 2012, SMP, through Albert Kleban, reported that the retail stores at Black Rock Shopping Center were having a "less than stellar performance" as a result of a variety of factors, including a decline in consumer spending, competition from big chain stores, and internet sales, and that in addition to Madison Jewelers, The Clubhouse was also behind on rent. Exhibit NN, Memorandum from Albert Kleban to Sun Realty Members, dated 12/12/12.

**RESPONSE:** Admitted except denied insofar as the emails contain a memorandum from "Al Kleban," with no reference to SMP as the party reporting. *See* Defs. Ex. NN.

50.     In April 2013 that Madison Jewelers was $86,000 behind on rent, that the lease agreement with Total Look was expiring, that Koko Fit Club was terminating its lease, and that lease of the Madison Jewelers space to Meat House would require fit-up costs and brokerage fees. Exhibit OO, Memorandum from Albert Kleban to Sun Realty Members, dated 4/6/13.

**RESPONSE:** Admitted.

51.     During the relevant times, Sun Realty members were aware that Sun Realty's biggest tenants, The Gap and Old Navy, might not renew their leases. Exhibit E, Allan Kleban Dep. 187:3-18.

**RESPONSE:** Denied. The cited testimony refers to comments made, not Sun Realty members' awareness.

52.     In an e-mail dated April 6, 2013, SMP advised Sun Realty members (a) that Sun Realty was required to start amortizing the mortgage for Black Rock Shopping Center pursuant to the original mortgage agreement for Black Rock Shopping Center negotiated in 2006 and (b) that to fund the amortization and expenses relating to tenant turnover, Sun Realty Members should pay their pro rata share of a $300,000 capital call, which, in Plaintiff's case would have been $99,999.00. Exhibit OO.

**RESPONSE:** Admitted except denied insofar as the email contains a memorandum from "Al Kleban," with no reference to SMP as the party reporting. *See* Defs. Ex. OO.

53.     In and e-mail dated April 19, 2013, Ken Kleban provided Sun Realty members with an analysis that projected that the mortgage refinance expected in 2015 would need to be funded by additional significant capital contributions as well as a conversion of loans made by Sun Realty members to Sun Realty to equity. Exhibit PP, E-mail from J. Campbell to Sun Realty Members, dated 4/19/13.

**RESPONSE:** Denied. Misstates the referenced exhibit. *See* Defs. Ex. PP.

54.     In an email dated April 6, 2013, Albert Kleban, invited Sun Realty members to a family meeting to be held at the Turnpike office on April 29, 2013 at 9:00 am ("Family Meeting").

**RESPONSE:** Admitted.

55.     In an email dated April 6, 2013, Albert Kleban stated that the Family Meeting would facilitate "a friendly and open exchange of ideas, complete transparency of . . . family business operations, and solidarity as a family moving forward." Id.

**RESPONSE:** Admitted except denied insofar as the email states nothing about

facilitating and states "we can only benefit from" such an exchange, transparency and solidarity.

*See* Defs. Ex. QQ.

56.     The Family Meeting was well-attended, but Lois Kleban did not attend, having determined ahead of time that nothing new would come of the meeting and that it would not be worth her while to attend. Exhibit E, Allan Kleban Dep. at 79:1-17; Exhibit A, SLSJ Dep. at 124:13 – 129:17.

**RESPONSE:** Denied. Misstates Defendants' Exhibit A, at 124:13–129:17.

57.     The prospect of selling Sun Realty to a third party was also discussed at the Family Meeting. Exhibit E, Allan Kleban Dep. at 91:22 – 92:22.

**RESPONSE:** Denied. Pl. Ex. 17, Blank Dep. at 23-28; Pl. Ex. 13, Howard Dep. at 18-

20; Pl. Ex. 15, Levin Dep. at 29-30; Pl. Ex. 14, Wolfe Dep. at 24-25, 34.

58.     At the Family Meeting, Albert and Ken Kleban explained that they had exploratory conversations with certain real estate investment trusts ("REITs"), including Kimco Realty ("Kimco") about selling interests in Sun Realty or other properties owned by the Kleban family. Id. at 92:18 – 94:2; Exhibit RR, Ken Kleban Deposition Transcript ("K. Kleban Dep." ) at 56:12-24; Exhibit D, Albert Kleban Deposition Transcript ("Albert Kleban Dep.") at 89:13 - 90:11; 121:3-16.

**RESPONSE:** Denied. Pl. Ex. 17, Blank Dep. at 23-28, 104; Pl. Ex. 13, Howard Dep. at

18-20; Pl. Ex. 15, Levin Dep. at 29-30; Pl. Ex. 14, Wolfe Dep. at 24-25, 34.

59.     At the Family Meeting, Albert and Ken Kleban explained that they had preliminary conversations with HFF, a commercial real estate broker, about marketing Black Rock Shopping Center and other Kleban family properties as properties for sale. Exhibit RR, K. Kleban Dep. at 54:9 – 56:24.

**RESPONSE:** Denied. Pl. Ex. 17, Blank Dep. at 23-28, 104; Pl. Ex. 13, Howard Dep. at

18-20; Pl. Ex. 15, Levin Dep. at 29-30; Pl. Ex. 14, Wolfe Dep. at 24-25, 34.

60.     At the Family Meeting, Albert Kleban expressed his opinion that Kimco was the only REIT that presented a remotely promising option for Sun Realty.  Exhibit D, Albert Kleban. Dep. at 121:3-16.

**RESPONSE:**  Denied.  Pl. Ex. 17, Blank Dep. at 23-28; Pl. Ex. 13, Howard Dep. at 18-20; Pl. Ex. 15, Levin Dep. at 29-30; Pl. Ex. 14, Wolfe Dep. at 24-25, 34.

61.     On August 5, 2013, Sun Realty formally engaged HFF to seek financing for a recapitalization of Black Rock Shopping Center.  Exhibit RR, K. Kleban Dep. at 54:9 – 55:10.

**RESPONSE:**  Admitted except denied insofar as the date, which is misstated.  *See* Defs. Ex. RR, at 54-55.

62.     After the Family Meeting, James Blank spoke with Plaintiff's attorney, Richard Hoffman, about was discussed at the Family Meeting. Exhibit A, SLSJ Dep. at 133:15 – 138:7; Exhibit RR, K. Kleban Dep. at 59:9 – 60:4.

**RESPONSE:**  Admitted.

63.     After the Family Meeting, Allan Kleban spoke with Lois Jeruss and Plaintiff's attorney, Carleen Schreder, about what was discussed at the Family Meeting.  Exhibit A, SLSJ Dep. at 133:15 – 138:7; Exhibit RR, K. Kleban Dep. at 59:9 – 60:4.

**RESPONSE:**  Denied insofar it states Carleen Schreder participated in the discussion and insofar as it relies on the referenced exhibits.  *See* Pl. Ex. 16, Allan Kleban Dep. at 183.

64.     Following the Family Meeting, Allan Kleban met with Albert and Ken Kleban. Exhibit E, Allan Kleban Dep. at 104:7 – 110:20.

**RESPONSE:**  Admitted.

65.     Allan Kleban arranged to meet with Albert and Ken Kleban following the Family Meeting in order to discuss Allan Kleban selling his 11% interest in Sun Realty to Le Rivage. Exhibit E, Allan Kleban Dep. at 105:9 – 106:10.

**RESPONSE:**  Admitted except denied insofar as the statement refers to Le Rivage, which is contrary to the cited testimony, which refers to Albert Kleban, not Le Rivage.. *See* Defs. Ex. E, at 106.

66.     When Allan, Albert and Ken Kleban met following the Family Meeting, Albert and Ken Kleban first indicated they were not interested in purchasing Allan Kleban's 11% interest because Le Rivage was overexposed in Sun Realty, and as a minority shareholder, it had limited control over Black Rock Shopping Center.  Id. at 108:6-16.

        **RESPONSE:**  Admitted.

67.     When Allan, Albert and Ken Kleban met following the Family Meeting, Allan Kleban suggested that Plaintiff might be interested in selling its membership interest in Sun Realty on the same terms as Allan Kleban.  Id. at 109:22-25.

        **RESPONSE:**  Admitted.

68.     The meeting between Allan, Albert and Ken Kleban following the Family Meeting, concluded with Allan Kleban suggesting that he would speak to Lois Jeruss about Plaintiff selling its membership interest in Sun Realty to Le Rivage.  Id. at 110:2-6.

        **RESPONSE:**  Admitted.

69.     After the Family Meeting, Allan Kleban told Lois Jeruss about his conversations with Albert and Ken Kleban following the Family Meeting and that LeRivage was willing to purchase his interest and Plaintiff's interest in Sun Realty on the same terms.  Id. at 112:1-7.

        **RESPONSE:**  Admitted except denied insofar as the statement refers to LeRivage, which is contrary to the cited testimony, which refers to "Al and Ken."  *See* Defs. Ex. E, at 112:1-7.

70.     Allan Kleban provided Lois Jeruss with a one page valuation of Sun Realty prepared by Ken Kleban, with a note to Lois Jeruss, stating that Le Rivage was interested in purchasing Allan Kleban's and Plaintiff's interest in Sun Realty at a price based on that valuation, and inviting Carlene Schreder, Plaintiff's counsel, to contact Allan to discuss the proposal.  Id. at 112:9-10; Exhibit SS, E-mail from Allan Kleban to L. Jeruss, dated 4/30/13 with K. Kleban Valuation.

        **RESPONSE:**  Admitted except denied insofar as:  (a) the statement refers to LeRivage, which is contrary to the cited testimony and exhibit, which refer to "Al and Ken"; (2) the statement asserts the valuation was "prepared by Ken Kleban," which is unsupported by the cited materials, which state that Allan Kleban discussed the valuation "with Ken and Albert."  *See* Defs. Exs. S and E, at 112:1-7.

71.     Lois Jeruss indicated to Allan Kleban that she was interested in selling Plaintiff's interest in Sun Realty on the terms that Allan Kleban described. <u>Exhibit A</u>, SLSJ Dep. at 144:19 – 145:24.

**RESPONSE:** Denied. The statement misstates the cited testimony. *See* Defs. Ex. A at 144-145.

72.     On May 22, 2013, Albert Kleban sent a revised letter of intent to Plaintiff, offering to purchase Plaintiff's membership interest and notes for $2,020,540.41 ("Letter of Intent"). <u>Exhibit TT</u>, Letter from Albert Kleban to L. Jeruss, dated 5/22/13.

**RESPONSE:** Admitted.

73.     Plaintiff countersigned the Letter of Intent, thereby accepting Albert Kleban's offer. <u>Id.</u>

**RESPONSE:** Denied. The Letter of Intent expressly stated "THIS PROPOSAL IS PRESENTED TO YOU FOR DISCUSSION PURPOSES ONLY. NEITHER PARTY SHALL BE BOUND UNLESS AND UNTIL EACH HAS EXECUTED AND DELIVERED A FORMAL AGREEMENT IN A FORM AND SUBSTANCE MUTUALLY AGREEABLE TO THE PARTIES. BUYER RESERVES THE RIGHT TO WITHDRAW THIS PROPOSAL AT ANY TIME WITHOUT NOTICE." *See* Defs. Ex. TT (emphasis in original).

74.     Albert Kleban also sent a letter of intent to Allan Kleban, offering to purchase Allan Kleban's membership interest in Sun Realty and promissory notes on the same terms and at the same valuation offered to Plaintiff. <u>Exhibit E</u>, Allan Kleban Dep. at 189:13-20.

**RESPONSE:** Denied. The referenced testimony identifies no terms of the letter of intent. *See* Defs. Ex. E, at 189:13-20.

**75.**     Allan Kleban accepted Albert Kleban's offer to purchase his membership interest in Sun Realty. <u>Id.</u>

**RESPONSE:** Admitted.

76.     On June 27, 2013, Plaintiff and Albert Kleban executed a Membership Purchase Agreement ("SLSJ Purchase Agreement"), dated June 1, 2013, wherein Plaintiff agreed to sell its 33.3333% membership interest and outstanding promissory notes to Albert Kleban, in exchange

for $2,020,540.41, with one half payable in the form of a promissory note.  Exhibit UU, SLSJ
Purchase Agreement, dated 6/1/13.

**RESPONSE:**  Admitted, although the agreement was contingent and closing was not to

occur until July 31 or such earlier date as the parties mutually agreed.  *See* Defs. Ex. UU, at 2.

77.    Albert Kleban executed a Membership Purchase Agreement ("Allan Kleban
Purchase Agreement") with Albert Kleban, dated June 1, 2013, to purchase Albert Kleban's
11.11107% membership interest and outstanding promissory notes on the same terms and at the
same valuation that Plaintiff's membership interests and promissory notes were purchased.
Exhibit VV, Allan Kleban Purchase Agreement, dated 6/1/13.

**RESPONSE:**  Admitted.

78.    On July 29, 2013, Plaintiff executed an "Assignment of Membership Interest"
(the "SLSJ Assignment"), assigning its membership interest in Sun Realty to Le Rivage, as
Albert Kleban's successor-in-interest under the SLSJ Purchase Agreement. Exhibit WW, SLSJ
Assignment, dated 6/29/13.

**RESPONSE:**  Admitted.

79.    On July 31, 2013, Allan Kleban executed an "Assignment of Membership
Interest" (the "Allan Kleban Assignment"), assigning his membership interests in Sun Realty to
Le Rivage.  Exhibit XX, Allan Kleban Assignment, dated 7/31/13.

**RESPONSE:**  Admitted.

80.    Sun Realty executed a financing fee agreement with HFF on August 15, 2013
pursuant to which HFF was formally engaged to market Sun Realty and other properties owned
by the Kleban family to prospective buyers. ("Financing Fee Agreement").  Exhibit RR, K.
Kleban Dep. at 54:9 – 55:10; Exhibit ZZ, HFF Financing Fee Agreement, executed 8/15/13.

**RESPONSE:**  Admitted.

81.    In September 2013, Robert Rizzi of HFF, contacted Joanne Rotonde of  Regency
Centers Corporation ("Regency") to discuss the possibility of purchasing interests of Sun Realty
and other Kleban family properties. Exhibit CCC, Regency Centers Corporation Deposition
Transcript ("Regency Dep.") at 21:10 - 22:4; 118:21 - 121:2; Exhibit RRR, E-mail from R. Rizzi
to J. Rotonde, dated 11/23/12.

**RESPONSE:**  Admitted.

82. Regency was not aware that Sun Realty and other Kleban family properties were for sale until it was contacted by HFF in September 2013. Exhibit CCC at 118:21 - 121:2; Exhibit RRR.

**RESPONSE:** Admitted.

83. On October 11, 2013, Regency sent a formal letter of intent to HFF ("Regency Letter of Intent") to purchase an 80% interest in three Kleban owned properties: Brick Walking Shopping Center, Fairfield Shopping Center, and Black Rock Shopping Center (collectively, "Kleban Properties"). Exhibit BBB, Regency Letter of Intent, dated 10/11/13; Exhibit CCC, Regency Dep. at 19:8-20.

**RESPONSE:** Admitted.

84. The Kleban Properties were owned by various limited liability companies controlled by members of the Kleban Family (the "Kleban Entities"), including Sun Realty. Exhibit DDD, Contribution Agreement, dated 10/17/13; Exhibit EEE, First Amendment to Contribution Agreement, dated 11/5/13.

**RESPONSE:** Admitted.

85. Pursuant to the Regency Letter of Intent, the Kleban Entities would maintain a 20% ownership stake and continue to operate and manage the properties. Exhibit BBB.

**RESPONSE:** Denied. Defs. Ex. BBB, at 2.

86. The agreement between Regency and the Kleban Entities to purchase a twenty percent interest in the Kleban Entities was consummated pursuant to a Contribution Agreement signed by Regency and the Kleban Entities, dated October 17, 2013, as amended by a First Amendment to Contribution Agreement, dated November 5, 2013, a Second Amendment to Contribution Agreement, dated November 20, 2013, and a Third Amendment to Contribution Agreement, dated December 1, 2013. Exhibit DDD; Exhibit EEE, First Amendment to Contribution Agreement, dated 11/5/13; Exhibit FFF, Second Amendment to Contribution Agreement, dated 11/20/13; Exhibit AAA, Third Amendment to Contribution Agreement, dated 12/1/13.

**RESPONSE:** Admitted except that the statement misstates the percentage Regency acquired, which was 80 percent. Defs. Ex. DDD, at 5.

87. The Third Amendment to the Contribution Agreement stated that agreed to purchase the Kleban Properties for $119,589, 000. $24,487,793.12 of that figure was sub-allocated as the purchase price for the 80% interest in Sun Realty. Exhibit AAA.

**RESPONSE:** Admitted.

88. The transaction between Regency and the Kleban Properties closed in March of 2014. Exhibit CCC, Deposition Transcript of B. Argalas ("Argalas Dep.") at 37:24 – 38:1.

**RESPONSE:** Admitted.

89. By 2013, Ken Kleban, as a director of SMP, was becoming as much involved in the management of Sun Realty as was Albert Kleban, who, then in his eighties, was reducing his direct involvement. Exhibit E at 154:23 – 156:2.

**RESPONSE:** Denied. *See* Pl. Ex. 3, A. Kleban Dep. at 46-47, 57-58 and 173.

90. Jackie Campbell advised Carleen Schreder in August 2005 that Schreder's method of dealing was personally "very insult[ing]" and compared her questions and insinuations to an "inquisition." Exhibit GGG, Letter from J. Campbell to C. Schreder, dated 8/8/05.

**RESPONSE:** Denied insofar as the statement refers to Schreder's method of dealing, or

Schreder's questions and insinuations, which is inconsistent with the referenced exhibit. *See*

Defs. Ex. GGG.

91. Ms. Schreder had regular contact with Albert Kleban, Turnpike or SMP, and asked questions and sought clarification about significant developments involving Plaintiff's interest in Sun Realty. Exhibits M, P, Q, R, S, U, V, W, BB, CC, GG, HH, II, JJ, III.

**RESPONSE:** Admitted except denied insofar as the statement refers to the contact as

"regular." The cited exhibits show it was episodic and intermittent. *See* Defs. Exs. M, P, Q, R,

S, U, V, W, BB, CC, GG, HH, II, JJ and III.

92. Plaintiff, through Ms. Schreder or Lois Jeruss, advocated Plaintiff's position that, *inter alia*, (i) Sun Realty should not purchase the gas station property that was ultimately purchased by FBW; Exhibit AA; (ii) Sun Realty should not purchase the Children's Place property; Exhibit E at 147: 9-19 ; (iii) Albert Kleban should arrange for a bank loan to FBW to fund repayment of a loan owing to Sun Realty; Exhibit II; (iv) Sun Realty should sell out to a third party; Exhibits CC, GG, MI; (v) Sun Realty should adopt a comprehensive plan for dealing with tenant turnover; Exhibits S and V; (vi) Sun Realty should withhold dividends to fund capital calls; Exhibit T (vii) Sun Realty should calculate tax liabilities in the manner advocated by Plaintiff; Exhibits M, JJ, KK, HHH; (viii) Sun Realty should pay Attorney Schreder for legal services rendered; Exhibit III (ix) Plaintiff would not contribute to capitals, or would contribute to capitals only up to a certain amount if certain information was provided; Exhibits V, T, CC; Exhibit NNN, E-mail from C. Schreder to J. Campbell, dated 1/29/08; (x) Plaintiff would not guarantee loans made to Sun Realty; Exhibit HH; and (xi) certain topics should be included on

the agenda at the Family Meeting, including a review of Sun Realty's balance sheet and projected cash flow for 2013; Exhibit JJJ, E-mail from C. Schreder to J. Campbell, dated 4/18/13.

**RESPONSE:** Denied. *See* Defs.' Exs. AA, E, II, CC, GG, MI, S, V, T, M, JJ, KK, HHH, III, V, T, CC, NNN, HH and JJJ.

93. James Blake, Richard Hoffman, Carleen Schreder, and Allan Kleban gave Plaintiff advice regard the sale of its interest in Sun Realty and/or the Connecticut Real Estate Market. Exhibit A, SLSJ Dep. at 135:8 - 137:19; 139:23 - 141:23; 151:6 - 154:2; Exhibit D, Albert Kleban Dep. 89:13 - 91:25; Exhibit RR, K. Kleban Dep. at 59:13 - 60:4; Exhibit LLL, E-mail from L. Jeruss to J. Blank, dated 4/23/13; Exhibit MMM, E-mail from R. Hoffman to J. Blake, dated 4/24/13.

**RESPONSE:** Admitted as to Ms. Schreder and Mr. Hoffman and denied as to the other individuals listed. The referenced exhibits do not show that Mr. Blank or Allan Kleban gave SLSJ advice regarding the sale.

94. Schreder negotiated the transaction documents heavily and extracted an opinion from Stephan Grozinger, Albert Kleban's attorney, regarding the permissibility of the SLSJ Purchase Agreement as well as an estoppel from SMP concerning the SLSJ Assignment. Exhibit OOO, Grozinger Opinion, dated 6/29/13; Exhibit SSS, Estoppel Certificated, dated 6/29/13.

**RESPONSE:** Admitted except denied insofar as defendants assert Ms. Schreder negotiated "heavily" or "extracted" the referenced documents from Mr. Grozinger, which is unsupported in the referenced exhibits. *See* Defs. Exs. OOO and SSS.

95. Albert Kleban (or Jackie Campbell on his behalf) sent e-mails expressing concern for Sun Realty and its members. Exhibits F, M, N, O, X, DD, LL, MM, NN, OO, PP, QQ, and HHH.

**RESPONSE:** Admitted.

96. The Sun Realty Operating Agreement requires members to participate in the affairs of Sun Realty, stating that members "shall diligently employ themselves in the business of the Company" and "shall inform all other Members of all his work transactions on behalf of the Company." Exhibit B at § 6.1(d).

**RESPONSE:** Denied. *See* Defs. Ex. B, at ¶ 6.1(d) ("The Members shall diligently employ themselves in the business of the Company and be faithful to each other in all

transactions relating to the Company, and give, whenever required, a true account of all business transactions arising out of or connected with the conduct of the Company."); Pl. Ex. 13, Howard Dep. at 16, 20; Pl. Ex. 14, Wolfe Dep. 11, 36-37; Pl. Ex. 15, Levin Dep. at 14, 30-32; Pl. Ex. 16, Allan Kleban Dep. at 151, 154-155; Pl. Ex. 17, Blank Dep. at 9, 32-33.

97.     The Sun Realty Operating Agreement states that: (i) members have the right to vote based on percentage interests, id. at § 6.3; (ii) members have the right to call a meeting for any purpose, id. at § 6.4; (iii) members have the right to inspect Sun Realty's books and records, id. at §§ 7.2, 11.1(b); (iv) members have the right to receive a copy of Sun Realty's tax returns, id. at § 7.3; (v) a vote of 51% of membership interest is required to negotiate a sale or refinance of the shopping center, id. at § 6.1(h); (vi) unanimous consent of the members is required to dissolve the company, id. at § 9.1(a)(i); (vii) a "majority in interest" (defined as a 75% membership interest, id. at art. I) is required to approve a substitute member, id. at § 10.3(d), or incur additional debt, id. at § 2.5; and (viii) member approval is required for capital improvements over a set dollar amount, id. at § 6.2(g).

**RESPONSE:** Admitted.

98.     Plaintiff (i) declined to agree to the purchase of the gas station adjacent to Black Rock Shopping in the early 2000s, thereby causing Sun Realty to not purchase the gas station, Exhibit AA; (ii) declined to agree Sun Realty's purchase of the Children's Place property, Exhibit E at 147: 9-19; (iii) repeatedly advocated for the sale of Sun Realty, resulting in Sun Realty commissioning an appraisal of Black Rock Shopping Center and the ultimate sale of Sun Realty interests to Regency, Exhibits CC, GG, HH; Exhibit D, Albert Kleban Dep. at 133:22 — 134:2; (iv) repeatedly directed Sun Realty to adopt an overarching plan for addressing tenant vacancies that involved diverting cash flow to capital improvements to reduce the need for members' loans to Sun Realty when tenants defaulted, Exhibits S, V and T; (v) directed Sun Realty to direct cash flow to Sun Realty's cash reserves in order to reduce the need for capital calls, Exhibit T; (vi) directed Albert Kleban, as president of SMP, to loan money to FBW so that FBW could fund its obligation to Sun Realty, Exhibit II; (vii) directed Sun Realty in November 2011 to sell Black Shopping Center before the end of 2012 to avoid an expected tax liability increase, Exhibit CC; (viii) advised Sun Realty of the tax implications associate with Wings Over Water's repayment of a $170,000 loan in August 2010. Exhibit M; (ix) advised Sun Realty of an error in the way Sun Realty was allocating interest on its 2011 tax return, resulting in a correction of the error identified by Plaintiff, Exhibit JJ; (x) advised Sun Realty that Lois Jeruss would not personally guarantee any loans in connection with any refinance of Sun Realty's mortgage, thereby contributing to Sun Realty's decision to sell its membership interests, Exhibit HH; (xi) sought reimbursement from Sun Realty for legal services rendered in connection with Plaintiff's analysis of Sun Realty's 2011 tax return, Exhibit III; (xii) agreed to several capital calls totalling $913,000, thereby allowing Sun Realty to fund costs associated with tenant turnover and make capital improvement, Exhibit A, SLSJ Dep. at 95:9 — 96-17; (xiii) communicated, through its attorney, with SMP or Turnpike on a regular basis for the better part of a decade

about significant developments affecting Black Rock Shopping Center, <u>Exhibits M, P, Q, R, S, U, V, W, BB, CC, GG, HH, II, JJ, III</u>.

**RESPONSE:** Denied. The referenced exhibits are misstated. *See* Defs. Exs. CC, GG,

HH, S, V, T, II, M, P, Q, R, S, U, V, W, BB, CC, GG, HH, II, JJ and III.

99. When asked at its deposition, through Lois Jeruss, to identify statements in an e-mail from Albert Kleban, dated April 6, 2016 e- that were false, Plaintiff stated that it was unable to identify statements in that e-mail that were untruthful. <u>Exhibit A</u>, SLSJ Dep. at 116:9 - 117:9 (referencing Exhibit OO).

**RESPONSE:** Denied. *See* Pl. Ex. 2, Jeruss Dep. at 171-173. In addition, Ms. Jeruss

stated in the referenced testimony that it seemed "as if information was withheld from me. So

that is in the scope of when we're saying that it may[] not have been completely forthcoming."

*See* Defs. Ex. A, at 116-117.

100. Plaintiff was also unable to identify untruthful statements in e-mails or memoranda Albert Kleban sent to Sun Realty members dated October 22, 2009, November 6, 2009, September 29, 2010 and July 10, 2012. <u>Id</u>. at 51:17-22 (referencing <u>Exhibits I and PPP</u>); 60:22 — 61:9 (referencing <u>Exhibit K</u>); 109:20 — 110:14 (referencing <u>Exhibit MM</u>).

**RESPONSE:** Denied. *See* Pl. Ex. 2, Jeruss Dep. at 163-170.

101. Plaintiff admitted that she was kept sufficiently informed about Black Rock during the times relevant to this lawsuit. <u>Id</u>. at 68:15 - 69:11 (referencing Exhibit O).

**RESPONSE:** Denied. The cited testimony refers only to October 2011 and states "At

that time I was being informed, [] to the best of my knowledge." *See* Defs. Ex. A, at 69. *See*

*also id.* at 117 ("If I had known before the sale" that "Ken and Al were going to different parties

in efforts to sell the shopping center such as this Kimco and Federal at a price of $30 million and

none of this was being disclosed to me," "I wouldn't have sold it at that price.").

102. The following is true with respect to the Family Meeting: (i) Albert Kleban convened the Family Meeting for the purpose of facilitating an open exchange of ideas and complete transparency of the family business operations, <u>Exhibit QQ</u>; (ii) members of Sun Realty traveled from different parts of the country to attend the Family Meeting, <u>Exhibit E</u>, Allan Kleban Dep. 77:20 — 79:17 (iii) Lois Jeruss determined that the Family Meeting would not be

worth her while and chose not to attend, id. at 79:9-12; Exhibit A, SLSJ Dep. at 124:12 — 129:17; (iv) the prospect of selling Sun Realty to a third party was discussed at the Family Meeting, Exhibit E, Allan Kleban Dep. at 91:22 — 92:22; (v) Albert and Ken Kleban disclosed at the Family Meeting that they had been in exploratory conversations with certain REITs, including Kimco, id. at 92:13 — 94:3; Exhibit RR, Ken Kleban Dep. at 54:5 - 58:17, 62:25 - 63:2; 156:23 — 164:1; Exhibit D, Albert Kleban Dep. at 117:19 — 121:16; and (vi) Albert and Ken Kleban disclosed at the Family Meeting that they were in talks with HFF about marketing Black Rock Shopping Center and other Kleban properties for sale, Exhibit RR, Ken Kleban Dep. at 56:12-24.

**RESPONSE:** Denied. *See* Pl. Ex. 15, Levin Dep. at 24-25; Pl. Ex. 2, Jeruss Dep., at 158; Pl. Ex. 17, Blank Dep. at 23-28 and 104; Pl. Ex. 13, Howard Dep. at 18-20; Pl. Ex. 15, Levin Dep. at 29-30; Pl. Ex. 14, Wolfe Dep. at 24-25, 34; Pl. Ex. 16, Allan Kleban Dep. at 156-161, 191-192; Pl. Ex. 24, Carty Dep. at 10-19, 23, 26, 29, 33, 39-42, 53-63, 72-77; Pl. Ex. 40, Weinkranz Dep. at 13-16; Pl. Ex. 41, Henry Dep. at 18-23; Pl. Ex. 42, Mar. 29, 2013 email.

103.    Lois Jeruss did not call Albert or Ken Kleban after the Family Meeting to learn what was discussed at the meeting from Albert or Ken Kleban directly. Exhibit A, SLSJ Dep. at 130:13 — 133:14.

**RESPONSE:** Admitted.

### ADDITIONAL MATERIAL FACTS

1.    Plaintiff SLSJ is a limited liability company formed by Lois Jeruss and her late husband to hold non-controlling interests in real estate she inherited from her father, Leon Kleban. (**Pl. Ex. 1**, Declaration of Lois Jeruss, at ¶ 2.) None of SLSJ's members has specialized knowledge or experience in managing a business or commercial real estate. (**Pl. Ex. 2**, cited excerpts from the Deposition of Lois Jeruss, at 7-12, 159-60; Pl. Ex. 1, Jeruss Decl. ¶ 3.)

2.    Defendant Albert Kleban is Irving Kleban's son and Ms. Jeruss's first cousin, and the family member who managed and controlled Sun Realty and several other real estate ventures held by or for the benefit of Irving, Harry and Leon Kleban's respective descendants.

(**Pl. Ex. 3**, cited excerpts from the Deposition of Albert Kleban, at 42-44; Pl. Ex. 1, Jeruss Decl. ¶ 5.)

3.    Defendant Le Rivage Limited Partnership (**"Le Rivage"**) is a limited partnership. Albert Kleban and his wife Alida were its general partners in 2013. (**Pl. Ex. 4**, Limited Partnership Agmt., at LR 25 and 27; Pl. Ex. 3, A. Kleban Dep. at 62-63.) Le Rivage held an 11.11 percent membership interest in Sun Realty before acquiring another 44.44 percent in July 2013. (Defs. Ex. B, Operating Agmt, at Ex. A.)

4.    Albert Kleban is an attorney and experienced real estate developer. He was a founder and "principal" of Kleban Properties, LLC, described on its website as a "real estate developer" that "owns and operates office, retail, and mixed-use properties in town centers across the East Coast." (**Pl. Ex. 5**, at "About Kleban Properties . . .," http://www.klebanproperties.com/ about.htm (last visited Aug. 6, 2014).) Kleban Properties' website stated: "Although Mr. Kleban has had a successful law practice and civic career, he is most recognized in Fairfield County for his keen business acumen, real estate expertise and significant real estate portfolio. Presently Mr. Kleban owns and/or controls approximately 1,000,000 square feet of retail and office space in Connecticut and Florida. . . ." (*Id.*, at "Biography of Principals . . .," http://www.klebanproperties.com/principals.htm (last visited Aug. 6, 2014).)

5.    Albert and Ken Kleban also owned and managed Turnpike Properties, LLC, a property management company that managed approximately 14 commercial properties in Connecticut, including Black Rock. (**Pl. Ex. 7**, at "Turnpike Properties Our Centers," http://www.turnpikepropertiesct.com/TP2.html (last visited Aug. 8, 2014).)

6.      Discussions leading to the subject Membership Interest Purchase Agreement between SLSJ and Albert Kleban commenced on or about April 29, 2013.  Allan Kleban, a mutual cousin, telephoned SLSJ managing member Lois Jeruss to advise her that Albert Kleban was offering to purchase SLSJ's 33.33 percent membership interest in Sun Realty, along with two promissory notes SLSJ held from Sun Realty.  (Defs. Ex. E, Allan Kleban Dep. at 111-112; Defs. Ex. SS, Apr. 30, 2013 email, at p. 1.)  The attached valuation stated the market value of Sun Realty's interest in Black Rock as $23,082,960.  (Defs. Ex. SS, Apr. 30, 2013 email, at p. 2; *see also* Defs.' LR 56(a)(1) Stmt. ¶¶ 69-70.)

7.      In May, Albert Kleban forwarded written offers to SLSJ on the same terms, offering $2,020,540 for SLSJ's membership interests and two notes it held from Sun Realty.  (Defs.' LR 56(a)(1) Stmt. ¶ 72; Defs. Ex. TT, May 22, 2013 Letter of Intent.)  The notes had an aggregate original principal amount of $914,308.  (Defs. Ex. TT.)

8.      On June 27, 2013, SLSJ and Albert Kleban executed their contract, agreeing to a closing on July 31 or earlier by mutual agreement.  (Defs.' LR 56(a)(1) Stmt. ¶ 76; Defs. Ex. UU, Membership Interest Purchase Agmt.)  Closing occurred July 29, 2013.  Albert Kleban paid $2,020,540 to SLSJ, and SLSJ assigned its 33.33 percent membership interests and notes to Kleban's partnership and assignee, Le Rivage.  (Defs.' LR 56(a)(1) Stmt. ¶ 78; Defs. Ex. UU; Defs. Ex. WW, Assignment.)

9.      On October 17, 2013, Albert Kleban executed, on behalf of Sun Realty, a joint venture agreement with Regency Centers Corporation (**"Regency"**).  (Defs. Ex. DDD, Contribution Agmt., dated Oct. 17, 2013.)  Under the joint venture agreement, Sun Realty effectively sold Regency an 80 percent share of its only asset, its interest in Black Rock, for $24,487,793.  (Defs.' LR 56(a)(1) Stmt. ¶¶ 83, 86, 87; Defs. Ex. DDD, at ¶ 2; Defs. Ex. AAA,

Third Amendment to Contribution Agmt., dated Dec. 1, 2013, at ¶ 2 and Ex. 3.3 thereto.)  The

commercial real estate broker who secured the Regency transaction on behalf of Sun Realty was

HFF, Inc.  (Defs.' LR 56(a)(1) Stmt. ¶¶ 81-83.)

10.     In determining the $24,487,793 price Regency paid to purchase an 80 percent

interest, Regency and Albert Kleban, on behalf of Sun Realty, agreed that the value of Sun

Realty's entire 100 percent interest in Black Rock was $30,609,665.  (Defs. Ex. AAA, at ¶ 2 and

Ex. 3.3 thereto.)

11.     Under Sun Realty's Operating Agreement, its designated "Manager" was SMP, a

corporation Albert Kleban owned together with his wife, Alida.  (Defs.' LR 56(a)(1) Stmt. ¶¶ 3-

4; Defs. Ex. B, Operating Agmt., at ¶ 6.1; **Pl. Ex. 9**, at SMP 27; Pl. Ex. 3, A. Kleban Dep. at 56.)

Sun Realty's Operating Agreement granted provided:

> The Manager(s) shall have full, exclusive and complete discretion, power and
> authority, subject in all cases to the other provisions of this Agreement and the
> requirements of applicable law, to manage, control, administer and operate the
> business and affairs of the Company for the purposes herein stated and to make all
> decisions affecting such business and affairs . . . .

(Defs. Ex. B, at ¶ 6.2.)

12.     Sun Realty is a family-owned limited liability company whose sole business

purpose was "ownership, operation, management and leasing" of a single piece of real estate, the

largest portion of Black Rock Shopping Center in Fairfield, Connecticut.  (Defs. Ex. B,

Operating Agmt., at ¶ 2.1 and Ex. A thereto.)  Sun Realty's owners were descendants of the late

brothers Irving, Harry and Leon Kleban, and held their respective interests either individually, or

through various business organizations or trusts administered for their benefit.  (Defs. Ex. B, and

Ex. A thereto; Pl. Ex. 1, Jeruss Decl. ¶ 4.)

13.     SMP's role as Manager of Sun Realty was merely "a documentary position, not []

an active position."  (**Pl. Ex. 11**, cited excerpts from the Deposition of Ken Kleban Dep., at 19.)

Albert Kleban acknowledged, it was he who managed and controlled Sun Realty through SMP, while delegating a great deal of managerial responsibilities and functions to Ken Kleban and to property manager Jacqueline Campbell, neither of whom was employed by SMP.  (Pl. Ex. 9, at SMP 7 (Cert. of Incorporation) and 17 (By-laws); Pl. Ex. 3, A. Kleban Dep. at 46-48; **Pl. Ex. 12**, Campbell Dep. at 125; Pl. Ex. 11, K. Kleban Dep. at 18.)

14.    Ms. Campbell was employed by Turnpike Properties, LLC, a property management company owned by Albert and Ken Kleban and engaged by Albert as SMP president to manage Black Rock.  (Defs.' LR 56(a)(1) Stmt. ¶¶ 9-11.)  Turnpike Properties' only role under its contract with Sun Realty was to "manage, operate and maintain" the shopping center property.  (Defs. Ex. G, Property Mgmt. Contract, at ¶ 2.1.)

15.    SMP was never managed or operated as a separate company, independent in any respect from its controlling shareholder, Albert Kleban.  He served as SMP's president, corporate secretary, and director, and acknowledged at deposition that, "as a practical matter," he, "alone," was "the person who ha[d] managed and controlled Sun Realty-SMP."  (Pl. Ex. 3, A. Kleban Dep. at 32; Pl. Ex. 9, at SMP 27 and 29.)  SMP had no employees, no offices of its own, gross annual income less than $20, total assets less than $3,000, and Kleban's correspondence to Sun Realty members never used SMP stationery or email domains or addresses.  (Pl. Ex. 3, A. Kleban Dep. at 56-57; **Pl. Ex. 10**, SMP 2011 Form 1120S.)

16.    SMP's board members and officers other than Albert Kleban served only in name. (Pl. Ex. 3, A. Kleban Dep. at 31-32, 51-52, 57; Pl. Ex. 11, K. Kleban Dep. at 8, 18.)

17.    Albert Kleban managed Sun Realty, with assistance from Ken Kleban, and without active involvement from other members.  (*See, e.g.,* **Pl. Ex. 13**, cited excerpts from the Deposition of Roberta Howard, at 16, 20, 64; Pl. Ex. 2, Jeruss Dep. at 27; **Pl. Ex. 14**, cited

excerpts from the Deposition of Elizabeth Wolfe, at 11, 36-37; **Pl. Ex. 15**, cited excerpts from the Deposition of Richard Levin, at 14, 30-32; **Pl. Ex. 16**, cited excerpts from the Deposition of Allan Kleban, at 151, 154-155; **Pl. Ex. 17**, cited excerpts from the Deposition of James Blank, at 9, 32-33.)

18.     When SLSJ sold its interests to Albert Kleban in July 2013, it relied on his repeated statements that he was managing Sun Realty in its interest and making all appropriate disclosures of material information.  (Pl. Ex. 1, Jeruss Decl. ¶ 8.)

19.     Under the Operating Agreement: "The General Manager [was required to] render, to the extent the circumstances render it just and reasonable, true and full information of all things affecting the Member to any Member."  (Defs. Ex. B, at ¶ 11.1(c).)  Albert Kleban acknowledged he was the individual "principally responsible" to carry out SMP's "responsibilities" as Manager "to disseminate information to [Sun Realty] members," and that, as president of SMP, he owed Sun Realty members "fiduciary duties" that included a "duty to make full and fair disclosure of all material information."  (Pl. Ex. 3, A. Kleban Dep. at 34-35, 57-58.)

20.     Albert Kleban generally carried out his reporting responsibilities by emailing status reports to members with updates on Sun Realty's business and finances.  (Defs.' LR 56(a)(1) Stmt. ¶¶ 12-15.)  Mr. Kleban also authorized Ken Kleban and Ms. Campbell to render business information, and so advised Sun Realty members.  (*Id.*; Pl. Ex. 3, A. Kleban Dep. at 57-58; s*ee, e.g.,* Defs. Ex. OO, Apr. 6, 2013 Status Rpt.; Defs. Ex. MM, July 10, 2012 Status Rpt.; Defs. Ex. O, Oct. 18, 2011 Status Rpt; **Pl. Ex. 18**, July 13, 2011 Status Rpt.)

21.     No other member disseminated company information, or had access to it other than through Albert Kleban and his delegates.  (Defs. Ex. B, at ¶ 6.2; Pl. Ex. 2, Jeruss Dep. at 27.)

22.     In his reports to SLSJ and other members, Kleban repeatedly and personally assured that he was in fact making appropriate disclosures of all material information.  (Defs. Ex. MM, July 10, 2012 Status Rpt., at p. 1; Defs. Ex. O, Oct. 18, 2011 Status Rpt.; Defs. Ex. PPP, Nov. 6, 2009 Status Rpt., at LSC 1131; Defs. Ex. K, Sept. 29, 2010 Status Rpt., at p. 1; **Pl. Ex. 19**, May 25, 2011 email; Pl. Ex. 18, July 13, 2011 Status Rpt.; **Pl. Ex. 20**, July 24, 2012 Status Rpt., at p. 3.)

23.     Albert Kleban and Jackie Campbell also repeatedly assured SLSJ and other Sun Realty members that he and his appointed management team were loyally managing Sun Realty for the benefit of all members' interests.  (*See* Defs. Ex. OO, Apr. 6, 2013 Status Rpt., at p. 4; Defs. Ex. T, Oct. 25, 2011 Campbell email, at p. 2; **Pl. Ex. 21**, Nov. 15, 2011 A. Kleban email; Defs. Ex. KK, Sept. 13, 2012 Campbell email to C. Schreder, at pp. 2-3; Defs. Ex. I, Oct. 22, 2009 Status Rpt., at LSC 1136; Defs. Ex. GGG, Aug. 8, 2005 Campbell ltr., at p. 2.)

24.     SLSJ and other Sun Realty members relied on Albert Kleban to manage Sun Realty transparently, capably and steadfastly in their interests.  (Pl. Ex. 14, Wolfe Dep. at 41-44; Pl. Ex. 1, Jeruss Decl. ¶ 7; Pl. Ex. 15, Levin Dep. at 75-79; Pl. Ex. 17, Blank Dep. at 120-122; Pl. Ex. 13, Howard Dep. at 66-67.)

25.     Albert Kleban made additional assurances of fidelity under the Operating Agreement.  (Defs. Ex. B, Operating Agmt., ¶ 6.2(d) at LSC 27.)

26.     In agreeing to sell its interests in July 2013, SLSJ also relied on Albert Kleban's substantive reports concerning Sun Realty's business, financial condition and value, as well as

the reports sent by his delegates, Ms. Campbell and Ken Kleban. (Pl. Ex. 1, Jeruss Decl. ¶ 9.) In the years immediately preceding the Membership Interest Purchase Agreement, Albert Kleban consistently reported that Sun Realty was beset by distressed market conditions and tenants, causing financial difficulties for Sun Realty. (**Pl. Ex. 22**, Feb. 12, 2013 Status Rpt.; Defs. Ex. MM, July 10, 2012 Status Rpt.; Defs. Ex. NN, Dec. 12, 2012 Status Rpt.; Pl. Ex. 20, July 24, 2012 Status Rpt., at pp. 1-2; Defs. Ex. LL, June 27, 2012 Status Rpt.; Defs. Ex. O, Oct. 18, 2011 Status Rpt.)

27.     On April 6, 2013, Albert Kleban issued a report that purported to provide members a "summary of the present situation," and detailed distress in the market and among tenants. (Defs. Ex. OO, at pp. 1-2.) Kleban also reported financial difficulties that caused SLSJ particular concern. (Pl. Ex. 1, Jeruss Decl. ¶ 10; Pl. Ex. 2, Jeruss Dep. at 25-27, 144-147; Defs. Ex. OO, at pp. 2-3.) Kleban's April 6 email disclosed nothing of his ongoing sale negotiations with Federal Realty and Kimco, but renewed his personal assurances of transparency and loyalty. (Defs. Ex. OO, at pp. 2-3, 4.)

28.     On April 19, Ken Kleban disseminated a "Refinancing Analysis" to Sun Realty members, showing "the shortfall [in loan to value ratio] we would have if we were to be able to refinance today." (Defs. Ex. PP, Apr. 19, 2013 K. Kleban email, at p. 1.) He copied Albert Kleban. (*Id.*) He attached a valuation. (*Id.*, at LSC 52.) In past assurances of transparency, Ms. Campbell had specifically advised SLSJ that it was "important from our view point to keep everyone appraised so that they know all the aspects of the property, including its value." (Defs. Ex. FF, Feb. 1, 2012 email.) Ken Kleban concluded his April 19 email warning Sun Realty members that if the enclosed refinancing "analysis holds up, there would indeed be a capital call

of significance - on top of the debt to equity conversion - in 2016 or before."  (Defs. Ex. PP, at p. 2.)

29.     The Contribution Agreement with Regency above was the culmination of "a work product of many months" on the part of Ken and Albert Kleban  (**Pl. Ex. 8**.)

30.     Albert and Ken Kleban undertook efforts to sell Black Rock on or before February 11, 2013, when they met with Federal Realty's Vice President of East Coast Acquisitions, Barry Carty, who advised that Federal Realty had identified Black Rock as an acquisition "target."  (**Pl. Ex. 24**, cited excerpts from the Deposition of Barry Carty, at 10-19.) Albert and Ken Kleban and Federal Realty engaged in extensive negotiations through July 29, 2013, culminating in a joint venture offer from Federal Realty to purchase interests in Black Rock with discussions concerning terms ensuing for several weeks.  (*Id*., at 23, 26, 29, 33, 39-42, 53-63, 72-77; **Pl. Ex. 25**, June 17, 2013 Carty email string.)  Federal Realty conducted extensive due diligence and was provided a great deal of Sun Realty's detailed proprietary business and financial information for its standard underwriting analyzing a potential investment.  (**Pl. Ex. 26**, June 4, 2013 K. Kleban email and attachment; **Pl. Ex. 27**, June 24, 2013 Carty email string; **Pl. Ex. 28**, June 29, 2013 K. Kleban email; **Pl. Ex. 29**, July 2, 2013 K. Kleban email; Pl. Ex. 24, Carty Dep. at 28, 30-31, 34-35, 43-45, 53-56.)

31.     On June 24, 2013, Albert Kleban executed, on behalf of Sun Realty, a "Confidentiality Agreement" expressly governing ongoing "discussions and negotiations" between Sun Realty and Federal Realty "concerning the possible acquisition of" Black Rock. (**Pl. Ex. 30**, at p. 1; Pl. Ex. 24, Carty Dep. at 47-52.)  On July 9, Federal Realty tendered a written proposal to acquire Black Rock and two other Kleban-controlled properties in a joint venture transaction, followed by continued negotiations of terms through July.  (Pl. Ex. 24,

Carty Dep. at 53-62, 66, 72-74; Pl. Ex. 29, July 2, 2013 K. Kleban email; **Pl. Ex. 31**, July 9, 2013 Carty email and attachment; **Pl. Ex. 32**, July 17, 2013 Carty email and attachment; **Pl. Ex. 33**, July 21, 2013 Carty email; **Pl. Ex. 34**, July 22, 2013 Carty email and attachment.)

32.     On or before July 27, 2013, Albert and Ken Kleban determined to work with HFF, the broker who would secure the Regency transaction.  (**Pl. Ex. 37**, July 27, 2013 K. Kleban email to J. Mayer; **Pl. Ex. 38**, July 25, 2013 R. Rizzi (HFF) email to K. Kleban; **Pl. Ex. 39**, July 27, 2013 K. Kleban email and attachments to R. Rizzi and S. Grozinger; **Pl.s' Ex. 53**, cited excerpts from the Deposition of Robert Rizzi, at 30-39.)

33.     Ultimately, Federal Realty and the Klebans could not agree on a purchase price or underlying valuation.  (Pl. Ex. 24, Carty Dep. at 70-71, 74-77, 91; **Pl. Ex. 35**, July 29, 2013 Carty email string; Pl. Ex. 53, Rizzi Dep. at 43-46; **Pl. Ex. 36**, July 29, 2013 K. Kleban email.) Their negotiations then largely concluded on July 29, 2013, when Ken Kleban advised Federal Realty the Klebans had begun working with HFF.  (Pl. Ex. 35, July 29, 2013 Carty email string.)

34.     In February or March 2013, Albert Kleban approached David Henry, the chief executive officer of Kimco, another national real estate investment trust, inquiring into Kimco's potential interest in Black Rock.  (**Pl. Ex. 40**, cited excerpts from the Deposition of Joshua Weinkranz, at 13-16; **Pl. Ex. 41**, cited excerpts from the Deposition of David Henry, at 18-22.) Albert and Ken Kleban then met Mr. Henry and his colleague for lunch in March and advised Kimco that the Klebans intended to market Black Rock and another Fairfield property for sale, touting Black Rock as a "superior property" at a "superior location."  (Pl. Ex. 40, Weinkranz Dep. at 13-16; Pl. Ex. 41, Henry Dep. at 19-23; **Pl. Ex. 42**, Mar. 29, 2013 email.)  Mr. Henry and his colleague toured Black Rock the same day.  (Pl. Ex. 41, Henry Dep. at 19.)

35.     The Klebans' discussions with Kimco continued and, by May 2013, Kimco was underwriting a potential purchase of Black Rock.  (**Pl. Ex. 43**, cited excerpts from the Deposition of Scott Onufrey, at 26-28, 31-32; Pl. Ex. 11, K. Kleban Dep. at 205; Pl. Ex. 40, Weinkranz Dep. at 46; Pl. Ex. 41, Henry Dep. at 27-28; **Pl. Ex. 44**, May 9, 2013 G. Misoulis email to K. Kleban.)

36.     Discussions lulled thereafter, but on July 31, Ken Kleban notified Kimco that "We have determined a way to strip out the need to continue to manage this property and can now consider a straight sale of the property."  (*See* **Pl. Ex. 45**, July 31, 2013 Henry email to K. Kleban; Pl. Ex. 41, Henry Dep. at 33-35; Pl. Ex. 43, Onufrey Dep. at 25-28; *see also* **Pl. Ex. 46**, Aug. 1, 2013 Henry email string with K. Kleban; Pl. Ex. 41, Henry Dep. at 46.)

37.     On or about August 26, Kimco offered to purchase Black Rock for $39 million (including the two smaller parcels owned by Kleban-related entities other than Sun Realty).  The Klebans rejected the offer, seeking a higher price, and continued their efforts to market Black Rock through HFF, which quickly secured Regency's letter of intent six weeks later, on October 11.  (Pl. Ex. 43, Onufrey Dep. at 14-16, 18, 20, 22-23, 30; **Pl. Ex. 47**, Aug. 26, 2013 Onufrey email to K. Kleban; Defs.' LR 56(a)(1) Stmt. ¶ 83.)

38.     During negotiations with Federal Realty and Kimco, Ken Kleban provided valuations showing the market value of Sun Realty's interests in Black Rock as $31,867,836 and $32,857,291, respectively.  (Pl. Ex. 26, June 4, 2013 K. Kleban email and attachment; Pl. Ex. 24, Carty Dep. at 28, 30-31; **Pl. Ex. 49**; Pl. Ex. 40, Weinkranz Dep. at 47-49; Pl. Ex. 3, A. Kleban Dep. at 194-196 (confirming Albert Kleban authorized the transmission).)

39.     The disparate valuations provided to Sun Realty members and to Federal Realty and Kimco were all computed using the same standard valuation method, dividing annual net

operating income by a capitalization rate. (Pl. Ex. 26, Pl. Ex. 49; Defs. Ex. PP, Apr. 19, 2013 email.) Ken Kleban advised members that the 8 percent capitalization rate used as the divisor in the $20,224,300 valuation he sent to SLSJ, Albert Kleban and other members April 19 was "reasonable." (Defs. Ex. PP, Apr. 19, 2013 email, at p. 1.) The valuations Sun Realty sent Kimco and Federal Realty on June 4 used a 5.5 percent capitalization rate, materially lower than the 8 percent rate Ken Kleban told Sun Realty members was "reasonable" in his April 19 email. (Pl. Ex. 26, Pl. Ex. 49; Defs. Ex. PP, Apr. 19, 2013 email, at LSC 52.)

40.      Ken Kleban also advised Federal Realty and Kimco of his father's April 29 purchase offers to SLSJ and to Allan Kleban, notifying both firms: "Family mtg today resulted in offer from my father and me to purchase 44% more of LLC giving us greater leeway to act. Should know more within a week or two." (**Pl. Ex. 51**, Apr. 29, 2013 K. Kleban email to Carty; Pl. Ex. 24, Carty Dep. at 23; **Pl. Ex. 52**, Apr. 29, 2013 K. Kleban email to Henry and Weinkranz; Pl. Ex. 41, Henry Dep. at 25-26.)

41.      None of Albert and Ken Kleban's dealings or communications with Federal Realty, Kimco or HFF was disclosed or known to SLSJ, and had SLSJ known any of these facts, it would not have executed the Membership Interest Purchase Agreement at the contract price or sold or assigned its membership interests thereunder. (Pl. Ex. 2, Jeruss Dep. at 123; *see also id.,* at 117-124, 185-186; Pl. Ex. 1, Jeruss Decl. ¶ 12.)

42.      Neither Albert Kleban nor anyone else disclosed his and Ken Kleban's efforts since February 2013 to sell Black Rock outright or in part in a joint venture to SLSJ before July 29, 2013, the date it sold its interest to Albert Kleban, or to any Sun Realty members other than those controlled by Albert Kleban, SMP and Le Rivage, before October 18, 2013. (*See* Pl.

Ex. 17, Blank Dep. at 23-28, 104; Pl. Ex. 13, Howard Dep. at 18-20; Pl. Ex. 15, Levin Dep. at

29-30; Pl. Ex. 14, Wolfe Dep. at 24-25, 34; Pl. Ex. 16, Allan Kleban Dep. at 156-161,191-192.)


<div style="margin-left: 40%;">

Respectfully submitted,

Plaintiff
SLSJ, LLC

By: _/s/ David E. Lieberman_
    David E. Lieberman (phv 06920)

    David E. Lieberman (phv 06902)
    Levin Schreder & Carey Ltd.
    120 North LaSalle Street, 38th Floor
    Chicago, IL  60602
    Tel.:  (312) 332-6300
    Fax:  (312) 332-6393
    Email:  david@levinschreder.com

    Joseph J. Cherico (ct 24869)
    McCarter & English, LLP
    One Canterbury Green
    201 Broad Street
    Stamford, CT  06901
    Tel.:  (203) 399-5900
    Fax:  (203) 399-5800
    Email:  jcherico@mccarter.com

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on this **24th day of May, 2018**, a copy of the foregoing **Plaintiff's**

**Local Rule 56(a)(2) Statement of Facts in Opposition to Defendants' Motion for Summary**

**Judgment** was filed electronically and served by mail on anyone unable to accept electronic

filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's

electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the

Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ David E. Lieberman*
David E. Lieberman (phv 06920)
Levin Schreder & Carey Ltd.
120 North LaSalle Street, 38th Floor
Chicago, IL  60602
Tel.:  (312) 332-6300
Fax:  (312) 332-6393
Email:  david@levinschreder.com

465745.2