# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SLSJ, LLC,

              Plaintiff,

  v.

ALBERT J. KLEBAN and THE LE RIVAGE
LIMITED PARTNERSHIP,

           Defendants.

Civil Action No.
3:14-cv-390 (CSH)


**OCTOBER 6, 2020**

---

## RULING ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT [Doc. 87 & 113]

**HAIGHT, Senior District Judge:**

The subject matter of this diversity action is the sale by Plaintiff SLSJ, LLC ("SLSJ"), a limited liability company, of its one-third interest in Sun Realty Associates, LLC ("Sun Realty"), whose sole asset was Black Rock Shopping Center ("Black Rock") in Fairfield, Connecticut, to Defendant Albert Kleban and Kleban's assignee, Defendant Le Rivage Limited Partnership ("Le Rivage").

Plaintiff's theory of the case is that in selling its interest in Sun Realty to Defendants, Plaintiff relied upon Kleban's fraudulent statements and misrepresentations regarding the value of Black Rock. Following extensive discovery, the parties filed cross-motions for partial summary judgment under Fed. R. Civ. P. 56(a). This Ruling decides those motions.

## I

This is, at several levels, a family dispute. The managing member of Plaintiff SLSJ, Lois Jeruss, an Illinois citizen, is a cousin of Defendant Albert J. Kleban, a Connecticut citizen. The entity known as Sun Realty was established by Kleban Properties, LLC, originally owned by three

1

Kleban brothers: Leon, Harry and Irving.  Lois Jeruss is the daughter of Leon, and the principal partner owner of Plaintiff SLSJ.  Albert Kleban is the son of Irving.  Sun Realty owned Black Rock. A time came when SLSJ sold its interest in Sun Realty to Albert Kleban and his assignee, Defendant Le Rivage Limited Partnership.  Jeruss alleges in this action that her cousin Albert tricked her in that sale by misrepresenting the value of Sun Realty's only asset, Black Rock, which Kleban sold shortly thereafter to a third party for what Jeruss regards as a suspiciously larger sum.

SLSJ's complaint alleges five claims: breach of fiduciary duty, securities violation, and fraud against Albert Kleban; and aiding and abetting breach of fiduciary duty and fraud against Le Rivage. Defendants moved [Doc. 87] for summary judgment to dismiss all these claims.  Plaintiff opposed that motion, and cross-moved [Doc. 113] for summary judgment finding Defendant Albert Kleban liable on Plaintiff's first claim, breach of a fiduciary duty Albert owed to SLSJ.

The cross-motions were thoroughly briefed and scheduled for oral argument.  The hearing was preceded by the Court's memorandum and order, Doc. 119, which identified, as "of core importance to the rights and liabilities of the parties," the question whether "at the pertinent times and in connection with the subject transaction, a fiduciary relationship existed between Defendant Albert Kleban on the one hand, and Plaintiff SLSJ and/or Lori Jeruss on the other."  *Id*. at 2.  The Court directed counsel to be prepared to discuss whether a fiduciary relationship existed; if so, what fiduciary duties resulted from the relationship; and what burdens of proof are imposed by the relationship.  *Id*. at 5.

The attorneys for the parties focused on those questions during a hearing that consumed the morning and afternoon sessions.  The Court granted the parties leave to file supplemental post-hearing briefs.  Both parties did so.  *See* Defendant's Supplemental Brief [Doc. 130] and Plaintiff's

Supplemental Brief [Doc. 131].  Not surprisingly, given the Court's pre-hearing memorandum and the resulting focus of the oral arguments, these briefs concentrate on the questions relating to the existence *vel non* of a fiduciary relationship between the parties, and the effect of a fiduciary relationship if it existed.

## II

When one considers the manner in which the presentation of these motions has developed, it is sensible to treat them as cross-motions for *partial* summary judgment: specifically, limited to the fiduciary relationship and related fiduciary duty issues.  Rule 56 sanctions that approach.  Rule 56(a) provides: "A party may move for summary judgment, identifying each claim or defense – *or the part* of each claim or defense  – on which summary judgment is sought." Fed. R. Civ. P. 56(a) (emphasis added).  The Advisory Committee Notes to the 2010 Amendment to Rule 56 state: "The first sentence is added  to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or *part of a claim or defense*." (emphasis added).  The fiduciary issues in the case at bar lend themselves to separate analysis and decision.

For these reasons, the Court construes Defendants' present motion as one for a partial summary judgment which, if granted, would hold that no fiduciary relationship existed between Albert Kleban and SLSJ and/or Lori Jeruss, or alternatively, if such relationship existed, Kleban did not breach it.  The Court construes Plaintiff's cross-motion as one for partial summary judgment which, if granted, would hold that a fiduciary relationship existed between Albert Kleban on the one hand and SLSJ and/or Lori Jeruss on the other, and Kleban breached that relationship.

## III

The Court has issued three prior opinions in this case.  They are reported at 2015 WL

1973307 (denying Defendants' motion to dismiss the complaint for lack of personal jurisdiction or alternatively, to compel arbitration); 2016 WL 11527095 (compelling Defendants to produce certain documents in discovery); and 277 F. Supp. 3d 258 (excluding aspects of proposed testimony of Defendants' expert). The rather complex factual background of the case is recited in those opinions, familiarity with which is assumed. That background is recounted and expanded upon herein only to the extent necessary to reflect recent discovery, and to explicate the Court's resolution of these motions.

The facts recounted in this Part III are derived from facts the Court may judicially notice; exhibits attached to the pleadings; depositions conducted and exhibits produced during discovery; and the parties' Local Rule 56(a) statements of purportedly undisputed facts. Those last-named statements, prepared by counsel and to some degree exercises in advocacy, list the evidentiary material upon which the facts in question are said to be based.

The background facts recited in this Part are undisputed or are undisputable, with the exception of one aspect of the case, discussed in Part III.B, *infra*.

## A.    Communications between Albert Kleban and Third Parties

The Kleban family is prominent in the world of commercial real estate development in the state of Connecticut. I will quote the current website of Kleban Properties, LLC:

> Kleban Properties, LLC is a real estate development firm headquartered in Fairfield, CT. The firm manages the properties of the Kleban family and their partners in Connecticut as well as real estate nationwide.
>
> The Kleban family has been involved in real estate development in Connecticut for five generations, principally in Fairfield County.
>
> . . . The company currently manages over 1.5 million square feet of

4

commercial and residential property.

*See* https://www.klebanproperties.com/about/ ("About Us") (visited October 6, 2020).  The present Kleban generations, whose ranks descend from the brothers Leon, Harry and Irving, include Defendant Albert Kleban (son of Irving) and Lois Jeruss (daughter of Leon).

Lois Jeruss, now a widow, lives in Chicago.  She inherited non-controlling real property interests from her father Leon Kleban, and together with her late husband formed SLSJ, a limited liability company, to hold them.  In 2013, the year of the transactions in suit, Lois Jeruss owned 70 percent of SLSJ's membership interests and her two daughters owned the balance.  Neither Lois Jeruss nor her daughters had knowledge or experience in managing a business or dealing with commercial real estate.

Defendant Albert J. Kleban is a lawyer who practiced in Connecticut, and also, during the past several decades, has been a prominent commercial real estate developer in the state.  He is the self-identified "Founder and Principal" of Kleban Properties, LLC.  Albert Kleban is currently the Chairman of Kleban Properties.  His son, Kenneth Kleban, is the President.

As of 2013, when the transactions in suit took place, Kleban Properties had formed Sun Realty, whose sole business was to own, operate, manage and lease real estate comprising the Black Rock Shopping Center.  Sun Realty was an LLC whose principal equity members were Kleban family descendants.  Plaintiff SLSJ, headed by Lois Jeruss, held a 33.33 percent interest in Sun Realty.  Albert Kleban and certain Kleban cousins also owned interests in Sun Realty.

Pursuant to Sun Realty's Operating Agreement, Sun Realty – SMP, Inc. ("SMP") was appointed as Sun Realty's manager, with power "to make all decisions affecting such business and affairs" of Sun Realty.  SMP was a corporation owned by Albert Kleban and his wife, Alida.  Albert

Kleban alone managed and controlled SMP, which had no offices and employees of its own. Albert Kleban also managed and controlled Sun Realty through the vehicle of the Operating Agreement between Sun Realty and SMP.[1]

The parties do not dispute Albert Kleban's dominant role in conducting the business of Sun Realty. A letter dated August 5, 2005, from Jackie Campbell, an employee authorized by Albert Kleban to speak for him, to Carolyn Schreder, the Chicago attorney for SLSJ and Jeruss, states that Albert Kleban "feels that Lois Jeruss has benefit[t]ed from all his actions on behalf of Sun Realty" since he "took over management of Sun Realty," and was "desirous of cooperating with Lois Jeruss to enhance any additional opportunities that may be presented to Sun Realty Associates." Campbell added, in a letter dated August 8, 2005, to Schreder: "Mr. [Albert] Kleban [took] on the role of managing member of Sun Realty . . . to insure the financial welfare of his family, his sister's families and uncles' families, which include Lois Jeruss." On November 14, 2011, Albert Kleban himself stated in an email to SLSJ and Schreder: "I know how difficult it is but at this point in time your investment in Sun Realty is secure. . . . You can count on us to do everything in our power to try to enhance the value of the property and your interest." In an admission germane to a core issue in the case, Albert Kleban acknowledged in his deposition that he "owed fiduciary duties to members of Sun Realty Associates in [his] role as the president of the company that was managing Sun Realty Associates." Albert Kleban was referring to SMP.

On April 6, 2013, Albert Kleban said in an emailed status report to SLSJ members: "You can be assured that every bit of energy [and] creativity is directed to the mutual interests of every single

---

[1] This paragraph in text is derived from the Court's prior opinions and from depositions and documentary evidence cited in Plaintiff's Main Brief [Doc. 103] at 8-13.

partner and every location as long as Ken, Jackie and I are involved."  That status report also painted

a gloomy picture, which Albert Kleban coupled with an expression of hope:

> What I report to you now, contains some negative aspects of the
> property but it is not much different than what other realtors are
> experiencing across our area with small tenants.  The economic
> situation for these type [sic] of tenants is somewhat bleak.  Hopefully,
> in the course of the next two years, when our mortgage comes due we
> will be able to present a brighter picture.

Doc. 89-14 (¶ 10). That last sentence is a reference to a $15.8 million mortgage, which fell due two

years after Kleban's April 6, 2013 status report.

As this chain of correspondence reflects, the stock market reversals and attendant recession

of the year 2008 created major difficulties for large shopping malls such as Black Rock.  The

lingering effects of the economic downturn caused some of Black Rock's retail commercial tenants

to default on their obligations to Black Rock as landlord.  Smaller companies went out of business.

Branches of larger chains  – the Gap, Old Navy  – threatened to leave or sought to reduce their rent

payments.  Reductions in rent payments by tenants of Black Rock put pressure on Sun Realty, Black

Rock's owner, which as noted was carrying a $15.8 million mortgage loan of its own.

To reiterate: Albert Kleban said to Sun Realty LLC members in his April 6, 2013 status

report that the "economic situation" for Black Rock's "small tenants" was "somewhat bleak," but

added: "Hopefully, in the course of the next two years, when our mortgage becomes due we will be

able to present a brighter picture."  However, pre-trial discovery reveals that during this period of

time, Kleban did not content himself with passively hoping the fortunes of Black Rock's small

tenants would recover.  Albert Kleban and Kenneth Kleban were also actively engaged, with the

assistance of a real estate broker, in searching for, and negotiating with, prospective purchasers of

Black  Rock and Sun Realty.

On February 11, 2013, Albert Kleban and Kenneth Kleban met with an executive of Federal Realty, a nationwide real estate investment trust, who advised that Federal had identified Black Rock as an acquisition "target."  The Klebans responded affirmatively to Federal's expression of interest, and began negotiations with Federal, whose executives toured Black Rock twice, the second time on June 20, 2013.  Federal conducted due diligence and received proprietary business and financial information from Kenneth Kleban.  On July 9, 2013, Federal submitted to the Klebans a written proposal to acquire Black Rock and two other Kleban-controlled properties in a joint venture transaction, subject to further negotiations on terms.  Ultimately, Federal Realty and the Klebans could not agree on a purchase price or underlying valuation, and their negotiations came to an end on July 29, 2013, a date on which the Klebans advised Federal that they had begun working with a real estate broker called HFF.

At the same time that Albert Kleban and Kenneth Kleban were negotiating a possible sale of Black Rock and Sun Realty to Federal Realty, which had approached the Klebans in February 2013, the Klebans were pursuing that subject with Kimco Realty, another national real estate investment trust, whose chief executive officer was asked by Albert Kleban if Kimco might have an interest in Black Rock.  Albert and Kenneth Kleban met with Kimco executives in March 2013.  The Klebans told the Kimco executives that they intended to market Black Rock and another Fairfield property for sale, touting Black Rock as a "superior property" at a "superior location."  Discussions between the Klebans and Kimco continued, without agreement.  On July 31, 2013, immediately after the Klebans reached an impasse with Federal Realty about a sale of Black Rock, the Klebans notified Kimco that they would abandon their effort to continue managing Black Rock, and would now

consider a straight sale of the property.  That concession produced, on August 26, 2013, an offer by Kimco to purchase Black Rock for $39 million (including two additional smaller parcels owned by Kleban-related entities other than Sun Realty).

The Klebans rejected Kimco's offer as insufficient.  They continued their efforts to market Black Rock through the broker, HFF.  On August 15, 2013 the Klebans engaged HFF to market Sun Realty and other properties owned by the Kleban family to prospective buyers.  In September 2013 an HFF broker contacted an executive at Regency Centers Corporation, yet another national real estate investment trust, to discuss the possibility of Regency purchasing interests in Sun Realty and other Kleban family properties.  Regency had not been previously aware that Sun Realty and other Kleban family properties were for sale.

The ensuing negotiations succeeded.  By December 2013, Regency and certain Kleban entities (herein "Kleban Entities") entered into an agreement by which Regency purchased an 80 percent interest in Sun Realty and two other Kleban family-owned shopping centers.  The Kleban Entities maintained a 20 percent stake in and continued to operate and manage the properties.

The agreement between Regency and the Kleban Entities recited that Regency purchased the three Kleban properties for $119,589,000.  Regency and Albert Kleban, on behalf of Sun Realty, agreed that the value of Sun Realty's entire 100 percent interest in Black Rock was $30,609,665. Of the $119,589,000 purchase price paid by Regency for the three properties, $24,487,793 was sub-allocated as the purchase price for Regency's newly acquired 80 percent interest in Sun Realty, that amount being 80 percent of the agreed value of Sun Realty's 100 percent interest in Black Rock.

Regency and the Kleban Entities signed their agreement on October 17, 2013.  One day later, on October 18, 2013, Albert Kleban sent an email to the Sun Realty LLC members which stated:

"Ken and I are extremely pleased to share with you an exciting development at Sun Realty, FBW and KDC. We have entered into a transaction with Regency Centers. . . . This has been a work product of *many months* and it is the fulfillment of all that could have [been] desired from this property." Plaintiff's Ex. 8 [Doc. 105], at 113 (emphasis added). Albert Kleban's reference to "many months" presumably reflects the fact that Albert and Kenneth Kleban began their efforts to sell Sun Realty to third parties in February 2013.

## B.   Communications between Albert Kleban and Plaintiff SLSJ

It is now necessary to consider Albert Kleban's communications with SLSJ and Lois Jeruss, within the particular context of Kleban's simultaneous efforts to sell Sun Realty to a third party.

When Albert Kleban sent his April 6, 2013 status report to the Sun Realty members, who at that time included SLSJ, he invited the Sun Realty members to attend a "Family Meeting" at a Kleban-controlled office in Connecticut on April 29. Albert Kleban expressed the view that a Family Meeting would facilitate an exchange of ideas, and achieve transparency of "family business operations" and "solidarity as a family moving forward." A number of Kleban cousins attended the April 29, 2013 Family Meeting, but Jeruss decided not to attend, and stayed in Chicago.

According to Albert Kleban's Local Rule 56(a)(1) statement of undisputed facts [Doc. 87-3] at ¶¶ 57-60, at the Family Meeting "the prospect of selling Sun Realty to a third party was also discussed." Albert and Kenneth Kleban advised the attendees that "they had exploratory conversations with certain real estate investment trusts ('REITs'), including Kimco Realty ('Kimco') about selling interests in Sun Realty or other properties owned by the Kleban family." Doc. 87-3, ¶ 58. The Klebans also told the Family Meeting attendees that they had held "preliminary conversations with HFF, a commercial real estate broker, about marketing Black Rock Shopping

10

Center and other Kleban family properties for sale." *Id.* ¶ 59.  At the Family Meeting, Albert Kleban expressed the view that Kimco was the only real estate investment trust that "presented a remotely promising option for Sun Realty." *Id.* ¶ 60.

Plaintiff SLSJ's Rule 56(a)(2) statement [Doc. 104] denies the truth of those particular assertions.  While Plaintiff purports to base its denials upon the deposition testimony of several witnesses, the testimony of its first-named witness partially corroborates Kleban's account.  That witness is James Blank, an attorney and Kleban family cousin by marriage, who attended the April 29 Family Meeting.  Blank was asked at his deposition whether he was ever told that "Ken Kleban and/or Al Kleban were discussing Black Rock Shopping Center and Sun Realty Associates with Kimco Realty Corporation in 2013."   Blank testified that "Kimco was mentioned at the meeting in April of 2013."  Doc. 106 (Ex. 17: Blank Deposition) at 72.  "And who mentioned it?" counsel inquired.  *Id.* at 73.  "I believe Albert did," Blank responded.  *Id.* "What did he say?" counsel asked. *Id.*  Blank then testified as follows:

> I believe in connection with possibilities for the property  – well, a number of things were discussed in terms of what could happen, options for the property.  And in that connection, partnering with a REIT or having a REIT as an investor, such as Kimco, which is how it came out, was mentioned.
>
> Q.   And what did he say about Kimco, other than what you just testified?
>
> A.   I believe that's it, and Kimco was specifically mentioned.

*Id.*  Counsel put some follow-up questions about "the meeting in April 2013, where you said Kimco was mentioned."  *Id.* at 75.  Blank denied that Albert said "he and Ken were talking to Kimco concerning Black Rock Shopping Center," or that Albert said "anything about any ongoing

11

communications, in 2013, with Kimco," or that "Albert Kleban or anyone [said] anything about any ongoing discussions with any real estate firms concerning Black Rock Shipping Center or Sun Realty." *Id*.

This testimony by James Blank, a principal witness proffered by Plaintiff, constitutes an acknowledgment that at the April 29, 2013 Family Meeting, Albert Kleban introduced the subject of a possible transaction involving Kleban properties like Sun Realty and a real estate investor trust "as an investor," and "specifically mentioned" Kimco Realty in that regard.

Blank did not acknowledge  – on the contrary, he denied  – that Albert told the Family Meeting attendees he and Kenneth Kleban had engaged in specific "exploratory conversations" with REITs, including Kimco, about selling to an REIT interests in Sun Realty or other Kleban family-owned properties.  I do not regard that relatively minor point of disagreement as a dispute about a *material* fact, for the purpose of summary judgment analysis.  The material fact, acknowledged by SLSJ's witness, is Albert Kleban's notification to attendees at the April 29 Family Meeting of the possible option of relieving economic pressure by seeking investments from REITs like Kimco.

## C.    Events Following the April 29, 2013 Family Meeting

After the April 29 Family Meeting concluded, Albert Kleban and Kenneth Kleban met with Allan Kleban, a Kleban cousin who owned an 11 percent interest in Sun Realty.  Allan Kleban requested that meeting in order to discuss selling his interest in Sun Realty to Le Rivage, a limited partnership whose general partners were Albert Kleban and his wife.  Le Rivage held an 11.11 percent membership interest in Sun Realty.  Initially, Albert and Kenneth Kleban disclaimed an interest in buying Allan Kleban's 11 percent interest in Sun Realty. However, the subject was revived when Allan Kleban suggested to Albert and Kenneth Kleban that Lois Jeruss might be

interested in selling SLSJ's 33.33 interest in Sun Realty to Albert Kleban, on the same valuation terms as those proposed by Allan Kleban for his interest.

This gave rise to some communications between Allan Kleban and Lois Jeruss.  On April 29, 2013, Allan Kleban telephoned Jeruss and told her that Albert Kleban was considering purchasing his interest and that of SLSJ in Sun Realty.  The next day, April 30, 2013, Allan Kleban emailed Jeruss as follows: "Here is the one page valuation that I have discussed with Ken and Albert.  They are agreeable to buying your interest and mine at this valuation."  The valuation Allan Kleban attached to his April 30, 2013 email to Jeruss stated the market value of Sun Realty's interest in Black Rock as $23,082,960.

Thereafter, Albert Kleban communicated directly with Jeruss on this subject.  He sent Jeruss a letter of intent dated May 22, 2013, in which Albert Kleban offered SLSJ $2,020,540 for  SLSJ's membership interest in Sun Realty and two promissory notes made by Sun Realty and payable to SLSJ in an aggregate original principal sum of $914,308, representing capital contribution loans SLSJ had previously made to Sun Realty.

SLSJ and Albert Kleban executed a Membership Interest Purchase Agreement, dated as of June 1, 2013, between SLSJ as the Seller and Albert J. Kleban as the Purchaser. Doc. 89-20.  Lois Jeruss signed the Purchase Agreement as "Manager" of SLSJ, the Seller.  Albert J. Kleban signed in his individual capacity as the Purchaser.  The Purchase Agreement recited that SLSJ owned 33.3333% of the membership interests in Sun Realty Associates, LLC, and that SLSJ had made "preferred return capital contributions in an aggregate principal sum of $914,308.18" (for which the two promissory notes had been given).  SLSJ sold these interests to Albert Kleban, for a purchase price of $2,020,540.41.  The Purchase Agreement recites that the closing date of the transaction was

July 31, 2013.  The record does not contain any indication that the closing did not successfully occur.

This is the transaction that Plaintiff SLSJ contends was unfair to it, procured by the breach of fiduciary duties Albert Kleban owed to SLSJ and Lois Jeruss.

At the time of the Kleban Family Meeting on April 29, 2013, Albert Kleban and Kenneth Kleban were engaged in negotiations with Federal Realty and Kimco Realty about a possible sale to those REITs of interests in Sun Realty.  Discussions with Federal began in February 2013, and with Kimco not later than March 2013.  Those negotiations were still in progress on June 27, 2013, when SLSJ and Albert Kleban executed the Purchase Agreement for SLSJ's interest in Sun Realty.  The negotiations between the Klebans and Federal came to an end on July 29, 2013.  Kimco disappeared as a potential purchaser when the Klebans rejected as insufficient Kimco's August 26, 2013 offer to purchase.

As stated *supra*, the Klebans subsequently conducted successful negotiations with Regency Centers Corporation, resulting in the Regency agreement dated October 17, 2013, which on the next day Albert Kleban described to Sun Realty members, in an email expressed with unbridled satisfaction.

It would appear from the record that Albert Kleban's October 18, 2013, email to Sun Realty members, advising them of the agreement the day before with Regency, was the only communication from Albert Kleban to Sun Realty members about selling Sun Realty during the period between the Family Meeting on April 29, 2013, and the Kleban Entities' execution of their agreement with Regency on October 17, 2013.

**IV**

Plaintiff SLSJ's theory of the case is that Albert Kleban breached a fiduciary duty he owed

14

to Plaintiff (and derivatively, Lois Jeruss), to their detriment.

According to Plaintiff, the harm Kleban's fiduciary breach inflicted upon SLSJ and Jeruss is revealed by contrasting valuations of Sun Realty made or advanced by Albert Kleban in two separate contexts: the sale of SLSJ's interest in Sun Realty to Albert Kleban in July 2013, and the sale of interests in Sun Realty and other properties to Regency in October 2013.

Plaintiff asserts that core claim in its briefs and the argument of counsel at the hearing on these cross-motions.  Plaintiff's Main Brief says that on April 30, 2013, Allan Kleban emailed Jeruss: "'Here is the one page valuation that I have discussed with Ken and Albert.  They are agreeable to buying your interest and mine at this valuation.' . . . The attached valuation stated the market value of Sun Realty's interest in Black Rock as $23,082,690." Doc. 103, at 9.  Pursuant to the June 2013 agreement, Albert Kleban bought SLSJ's one-third interest in Sun Realty.  Thereafter, on October 17, 2013, "Albert Kleban executed, on behalf of Sun Realty, a lucrative joint venture agreement with Regency Centers Corporation." *Id*.  "Under the joint venture agreement, Sun Realty effectively sold Regency an 80 percent share of its only asset, its interest in Black Rock, for $24,487,793." *Id*. at 9-10.  Plaintiff then argues in its Main Brief:

> In determining the $24,487,793 price Regency paid to purchase an 80 percent interest, Regency and Albert Kleban, on behalf of Sun Realty, agreed that the value of Sun Realty's entire 100 percent interest in Black Rock was $30,609,665, a valuation approximately $7.5 million greater than the $23,082,960 valuation of the same property used to determine the price Kleban paid on July 29, 2013 to purchase SLSJ's 33.33 percent interest in Sun Realty.  (Defs. Ex. AAA, at ¶ 2 and Ex. 3.3 thereto.) In a matter of months, Albert Kleban and his partnership, Le Rivage, thereby effectively realized a $2.5 million dollar gain on the 33.33 interest he purchased from SLSJ, *i.e.*, one-third of the differential between the respective valuations used as the basis for the pricing in the respective transactions with SLSJ and Regency.

*Id.* at 10.

Plaintiff restates this theory in its post-hearing Supplemental Brief, which argues that "Kleban purchased SLSJ's membership for a price established by a $23 million valuation of Sun Realty's interest in Black Rock Shopping Center, which Kleban furnished with his offer," whereas "[i]n the Regency transaction, a $30.6 million valuation was used, established by the Klebans," a "7.5 million greater valuation [which] generated for Kleban, in effect, a $2.5 million gain on the 33.33 percent interest he purchased from SLSJ . . . . As Kleban then well knew, the consideration he paid SLSJ was inadequate by approximately $2.5 million." Doc. 131, at 21-22.

At the hearing, Mr. Lieberman, counsel for Plaintiff, said that the valuation of Sun Realty that "came from Albert and Ken via Allan . . . is what was used to price the membership agreement that's at the heart of this dispute," and continued:

> That valuation was 22, 23 million, something like that. . . . And our claim is that the differential between that valuation, let's just say 23 million, and this valuation of 30 million is 7 million. So a third of that differential is the damage. That's what we say Lois Jeruss and SLSJ got cheated out of by the membership purchase agreement.

Doc. 127 (Hearing Transcript Pt.2), at 32-33.

## V

The threshold question is whether, given the circumstances of the case, Albert Kleban had a fiduciary relationship with SLSJ and Lois Jeruss. Plaintiff charges Albert Kleban with breach of fiduciary duty. The existence of a fiduciary *duty* depends upon the existence of a fiduciary *relationship.*

The fiduciary relationship is a creation of equity. "[E]quity has carefully refrained from defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations."

*Konover Dev. Corp. v. Zeller*, 228 Conn. 206, 222-23 (1994) (citation and internal quotation marks

omitted). The Supreme Court of Connecticut expanded upon that concept in *Falls Church Group,*

*Ltd. v. Tyler, Cooper and Alcorn, LLP*, 281 Conn. 84 (2007):

> This court broadly has stated that a fiduciary or confidential
> relationship is characterized by a unique degree of trust and
> confidence between the parties, one of whom has superior
> knowledge, skill or expertise and is under a duty to represent the
> interests of the other. The superior position of the fiduciary or
> dominant party affords him great opportunity for abuse of the
> confidence reposed in him. We have not, however, defined that
> relationship in precise detail and in such a manner as to exclude new
> situations, choosing instead to leave the bars down for situations in
> which there is a justifiable trust confided on one side and a resulting
> superiority and influence on the other.

281 Conn. at 108 (citations, internal quotation marks and ellipses omitted). Consistent with that

deliberately imprecise and inclusive standard, "Fiduciaries appear in a variety of forms, including

agents, partners, lawyers, directors, trustees, executors, receivers, bailees and guardians." *Konover*,

228 Conn. at 222. Those  categories, the Connecticut Supreme Court said more recently in *Iacurci*

*v. Sax*, 313 Conn. 786  (2014), consist of actors who "are per se fiduciaries by nature of the functions

they perform," but the Court was careful to add: "Beyond these per se categories, however, a flexible

approach determines the existence of a fiduciary duty, which allows the law to adapt to evolving

situations wherein recognizing a fiduciary duty might be appropriate," which occurs when the

relationship "is characterized by a unique degree of trust and confidence between the parties, one of

whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the

other." 313 Conn. at 800 (citing and quoting *Falls Church Group*).  "With these principles in mind,

'we have recognized that not all business relationships implicate the duty of a fiduciary.'" *Id.*

(quoting *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn 20, 38 (2000)).  *Iacurci* held that a

17

fiduciary relationship did not exist between an accountant tax preparer and his client.

In the case at bar, I conclude that Albert Kleban had a fiduciary relationship with SLSJ, a fellow interest-owning member of Sun Realty, a relationship which extended by derivation to Lois Jeruss, the principal owner of SLSJ. The fiduciary nature of Albert Kleban's relationship with SLSJ and Jeruss is derived from Albert Kleban's manifestly superior knowledge, skill and expertise, openly displayed and unabashedly acknowledged by Albert Kleban during his management of Sun Realty and Black Rock Shopping Center, Sun Realty's only asset, and of SMP, Sun Realty's titular manager. In correspondence with Sun Realty members, Jackie Campbell, Albert Kleban's representative, repeatedly referred to Albert Kleban as the "managing member" of Sun Realty.

Albert Kleban was also president of SMP, a corporation in name only, which contracted with Sun Realty to manage Sun's operations. At his deposition in this case, Kleban testified that the duty of a fiduciary –

> is to do everything with the greatest integrity – and I must emphasize that – with the greatest integrity, and with all your effort that you can possibly put together for the benefit of the company. And in this particular situation, Sun Realty had my undivided attention and absolute integrity throughout.

Doc. 105 (Kleban Deposition transcript), at 48. Albert Kleban then testified:

> Q.  Did you have an understanding that at least from the years 2006 through 2013 you owed fiduciary duties to members of Sun Realty Associates in your role as president of the company that was managing Sun Realty Associates?
>
> A.  Of course.
>
> Q.  And that would include SLSJ and Lois Jeruss?
>
> A.  Of course.

18

> Q.  And those fiduciary duties would include a duty to make full and fair disclosure of all material information to the owners of those interests?
>
> A.   All material information, and to answer any and all questions they had, and to do everything I possibly could for their benefit.

*Id.* at 49. Albert Kleban's able counsel, attending Kleban's deposition in relative silence, probably did not welcome that testimony by his client, but Kleban, himself a practicing attorney and well versed in the management of commercial real estate, meant exactly what he said.  Albert Kleban deserves commendation for a forthright admission.

Depositions are concluded.  The case now moves to the summary judgment stage.  Counsel for Albert Kleban, in an energetic exercise of advocacy, attempts to peel the "fiduciary" label off his forthright client's back.  Counsel contends, first, that as for Sun Realty as an LLC, a Connecticut statute then in effect precludes the characterization of Albert Kleban as a fiduciary; and second, that as for SMP, Sun's management contract was with SMP as a corporation, not with Kleban personally, so Kleban cannot owe Sun a fiduciary duty.  Neither argument is persuasive.

The Connecticut statute Defendant has in mind is former General Statutes § 34-141(a), which was repealed and replaced on July 1, 2017, by General Statutes § 34-255h.  That earlier statute, which was in effect at the times relevant to this action, provided:

> A member or manager [of an LLC] shall discharge his duties under section 34-140 and the operating agreement, in good faith, with the care an ordinary prudent person in a like position would exercise under similar circumstances, and in the manner he reasonably believes to be in the best interests of the limited liability company, and shall not be liable for any action taken as a member or manager, or any failure to take such action, if he performs such duties in compliance with the provisions of this section.

Kleban's Supplemental Brief (his most recent submission) calls this statute "the Connecticut LLC

Act," which in Kleban's perception precludes application of the flexible approach mandated by the Connecticut Supreme Court in *Iacurci v. Sax*.  Doc. 130, at 2.  Kleban's brief contends:

> While the court-made flexible approach may be conclusive of whether or not a fiduciary duty exists between members of partnerships or in a context outside a business organization, it has no relevance to the duties owed among members and managers of Connecticut LLCs that have been defined by statute.
>  . . .
> . . . [U]nder § 34-141 the duty owed by a manager of an LLC to members is the duty of reasonable care, not the duty of a fiduciary. Plaintiff's breach of fiduciary duty claim is therefore precluded by the governing statute and should be dismissed on that basis alone.

*Id.* at 2, 3.

This asserted preclusive effect of § 34-141 upon the existence of fiduciary duties among managers and members of LLCs appears to have escaped the attention of Connecticut lower courts. In *Bongiorno v. J & G Realty, LLC*, No. FSTCV126014465S, 2019 WL 1875510 (Conn. Super. Ct. Mar. 12, 2019), pre-2017 litigation involved three generations of the Bongiorno family and LLCs the family created to own or operate commercial real property.[2]  The Superior Court said: "The court finds that a manager of a manager-managed LLC owes a fiduciary duty to the LLC and its members." 2019 WL 1875510, at *5 (citation and internal quotation marks omitted).  In the case at bar, Albert Kleban was the self-acknowledged manager of Sun Realty, an LLC.

In *Inteliclear, LLC v. Victor*, No. 3:16-cv-1403, 2016 WL 5746349 (D. Conn. October 3, 2016), Judge Arterton said: "A member of a limited liability company has a fiduciary duty to the other members of the LLC." 2016 WL 5746349, at *7 n. 19 (citing *Clinton v. Aspinwall*, Docket No. CV-13-6042758-S, 2014 WL 1190079 (Conn. Super. Ct. Feb. 24, 2014) and *Yavarone v. Jim*

---

[2] *Amended sub nom. Bongiorno v. J. & G. Realty*, No. FSTCV126014465S, 2020 WL 4744843 (Conn. Super. Ct. July 10, 2020).

20

*Moroni's Oil Service, LLC*, Docket No. CV-03-0102318-S, 2005 WL 737010 (Conn. Super. Ct. Feb. 18, 2005)).

In *Papallo v. Lefebvre*, 172 Conn. App. 746 (2017), an LLC whose business was operating a bar, a member of the LLC sued the other member, who managed the business, for *inter alia* breach of fiduciary duty in managing the business's assets.  The trial court held that "the plaintiff and the defendant owed fiduciary duties to one another by virtue of their membership interests in the LLC," 172 Conn. App. at 755, a proposition that the appellate court assumed "without deciding," *id.*, while noting in footnote 1: "The defendant has not participated in this appeal, and, therefore, does not challenge the court's finding, not reproduced in this opinion, that a fiduciary relationship existed between the plaintiff and the defendant by virtue of their membership in the LLC.  For purposes of this appeal, we therefore assume, without deciding, that such relationship existed." *Id.* n.1.

Similarly, in *Clinton v. Aspinwall*, No. HHDCV136042758S, 2015 WL 5438689, at *3 (Conn. Super. Ct. Aug. 20, 2015), the Superior Court held that under Connecticut law "managers and  members of limited liability companies owe each other fiduciary duties."

While the Connecticut cases involving LLCs cited in the preceding paragraphs were decided while § 34-141(a) was in effect, the courts involved neither held nor suggested that the statute precluded the existence of a fiduciary duty among members or managers of an LLC.  They may be contrasted in that regard with *Calpitano v. Rotundo*, No. CV116008972, 2011 WL 3672092 (Conn. Sup. Ct. Aug. 3, 2011), where the court said dismissively that "plaintiff does not provide any authority for the proposition that members of an LLC owe a fiduciary duty to each other."  2011 WL 3672092, at *5.  The court then cited and quoted § 34-141, which, in the court's paraphrase, "sets forth a duty of good faith which is not the same as the duty of a fiduciary, which goes beyond good

faith, and requires the fiduciary to put the interests of those to whom the fiduciary duty is owed ahead of the interests of the fiduciaries." *Id*. at *6. The court reasoned in *Calpitano*: "Reading § 34-141, it is clear that the intention was that an [sic] limited liability corporation more closely resembles a business corporation than a partnership, and the members' relationship to each other is more akin to shareholders than partners," an important distinction since it is also "clear that shareholders owe no particular duty to each other because of their status as fellow shareholders." *Id.*

Plaintiff at bar seeks to distinguish *Calpitano* as an "outlier," which is to say, contrary to the other LLC decisions previously discussed. Moreover, *Calpitano* considered whether fiduciary duties existed between *members* of an LLC *inter se*; the case at bar turns on whether an LLC *manager* (like Albert Kleban) is a fiduciary. Plaintiff also points out, correctly, that Kleban does not cite any Connecticut appellate case involving an LLC which in those particular circumstances holds that § 34-141(a) precludes the existence of a fiduciary duty that, but for the statute, would be imposed by equitable principles. That seems a doubtful proposition, given the broad and inclusive language with which the Connecticut Supreme Court, in *Konover* and its other cited opinions, defines "fiduciary duty" as a creation of equity.

The question posed regarding the effect of § 34-141(a) upon this case is an interesting one, but I need not decide it. Assuming, contrary to a considerable weight of Connecticut case law, that Albert Kleban as a member and member-manager of Sun Realty did not have a fiduciary relationship with SLSJ, another Sun member, Kleban had that relationship with SLSJ in his capacity as president of Sun Realty – SMP, Inc. SMP is that separate corporation Albert Kleban created to contract with Sun Realty LLC for the management of Sun Realty's business. I observed *supra* that Albert Kleban, who owned SMP with his wife, alone managed and controlled SMP, which had no offices or

22

employees of its own.  Given the expertise and experience of Albert Kleban, and the lesser skills of

Kleban cousins like Lois Jeruss who owned Sun Realty interests, it is manifest that in the conduct

of Sun Realty LLC's business affairs, SMP and Albert Kleban had a fiduciary relationship with, and

owed a fiduciary duty to, a Sun Realty interest-owner like SLSJ, and a derivative individual like Lois

Jeruss.  That is precisely the fiduciary relationship, and attendant fiduciary duty, whose existence

Albert Kleban, speaking as president of SMP, forthrightly acknowledged during his deposition,

quoted *supra*.

The fiduciary relationship between Albert Kleban and SLSJ is not precluded by the fact that

Sun Realty's management contract was with SMP, a corporation, rather than with Albert Kleban,

an individual.  Kleban's contention is that he is not individually liable for any breach of a fiduciary

duty SMP owed to SLSJ.  The Connecticut Supreme Court recognizes the equitable remedy of

piercing the corporate veil, whereby "justice may require the courts to disregard the corporate fiction

and impose liability on the real actor."  *Zaist v. Olson*, 154 Conn. 563, 574-75 (1967) (collecting

cases).  *See also Mirlis v. Edgewood Elm Housing, Inc.*, No. 3:19-cv-700, 2020 WL 4369268, at *5

(D. Conn. July 30, 2020) (collecting cases).  The equitable remedy of veil piercing is applied when

an individual exercises "complete domination, not only of finances but of policy and business

practice in respect to the transaction attacked so that the corporate entity as to this transaction had

at the time no separate mind, will or existence of its own," *Zaist,* 154 Conn. at 575.  That description

mirrors Albert Kleban's control over SMP.  There is no substance to Kleban's objection that Plaintiff

did not previously and specifically plead the remedy of veil piercing.  Albert Kleban's domination

of SMP appears clearly enough from  his own submissions on these motions.  I apply this remedy,

sitting as a chancellor in equity.[3]

For the reasons stated in this Part, I conclude that at the relevant times, a fiduciary relationship existed between Albert Kleban as fiduciary, and SLSJ and Lois Jeruss as beneficiaries.

## VI

The conclusion that a fiduciary relationship exists, between Albert Kleban as fiduciary and SLSJ and Lois Jeruss as beneficiaries, triggers additional questions with respect to Plaintiff's claim for breach of a fiduciary duty.

Judge Arterton's opinion in *Inteliclear* states the elements of the claim:

> The essential elements to pleading a cause of action for breach of fiduciary duty under Connecticut case law are: (1) [t]hat a fiduciary relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, (b) an obligation on the part of the defendant to act in the best interests of the plaintiff, and (c) an obligation on the part of the defendant to act in good faith in any matter relating to the plaintiff; (2) [t]hat the defendant advances his own interests to the detriment of the plaintiff; (3) [t]hat the plaintiff sustained damages; [and] (4) [t]hat the damages were proximately caused by the fiduciary's breach of his or her fiduciary duty.

2016 WL 5746349, at *7 n. 19 (quoting *AW Power Holdings, LLC v. FirstLight Waterbury Holdings, LLC*, No. CV146047836S, 2015 WL 897785, at *4 (Conn. Super. Ct. Feb. 17, 2015)).

The existence of a fiduciary relationship has a significant effect upon the resolution of these issues.  In *Konover*, the Connecticut Supreme Court held:

---

[3]  Albert Kleban cites *Krys v. Butt*, 486 F. App'x 153 (2d Cir. 2012), for the proposition that a corporation's fiduciary duties are not extended to or shared by its officers.  The Second Circuit's summary order in *Krys* does not shield Kleban individually from the fiduciary duty also borne by SMP.  *Krys* did not involve corporate veil piercing, which was neither pleaded nor proved; and the Second Circuit was careful to note in *Krys* that "nothing in the complaint suggests that any relationship existed between plaintiffs and the [corporate fiduciary's] individual officers."  486 F. App'x at 156 n. 4.  The case at bar is replete with evidence of Albert Kleban's self-acknowledged individual managerial relationship with Sun Realty.

> Proof of a fiduciary relationship imposes a twofold burden on the fiduciary. First, the burden of proof shifts to the fiduciary; and second, the standard of proof is clear and convincing evidence. Once a fiduciary relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary. Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of proof of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and equivocal evidence.

228 Conn. at 229-30 (citations, internal quotation marks and ellipses omitted). *Konover* further instructs that "the fiduciary's responsibility to establish that the transaction was fair was to be considered in light of all the circumstances," and stated:

> Important factors in determining whether a particular transaction is fair include a showing by the fiduciary: (1) that he made a free and frank disclosure of all the relevant information he had; (2) that the consideration was adequate; and (3) that the principal had competent and independent advice before completing that transaction.

*Id.* at 228 (citation omitted). To these factors, the *Konover* court added "the relative sophistication and bargaining power among the parties." *Id.*

Applying these principles to the case at bar, it is useful to recall that Plaintiff claims Albert Kleban breached a fiduciary duty he owed to SLSJ and Lois Jeruss. Therefore the case turns upon Kleban's conduct *concerning SLSJ and Jeruss*. We must ask: Did Kleban breach a fiduciary duty *owing to SLSJ and Jeruss*? And did such a breach proximately cause damage *to SLSJ and Jeruss*?

These conceptual limitations necessitate consideration of the case's chronology. The gravamen of SLSJ's complaint is that Albert Kleban did not tell other Sun Realty members, including SLSJ, the details of his attempts to sell Sun Realty and Black Rock to third parties. Plaintiff's Main Brief quotes Albert Kleban's written advice to Sun Realty members on October 18, 2013, that "the Regency transaction was the culmination of 'a work product of many months'" Doc.

103, at 21 (quoting Pl. Ex. 8), and then says, with the righteous indignation of advocacy:

> None of those efforts, including none of the conduct and communications set forth in sections 7(a) and (b), immediately below, was disclosed or known to SLSJ. Had SLSJ known any of these facts, it would not have executed the Membership Interest Purchase Agreement at the specified contract price or would not have sold or assigned its membership interests thereunder. As would any reasonable person, it "would have waited" to "see what would happen."

*Id.* at 21-22 (citations omitted). Lois Jeruss's deposition testimony is quoted in support of the latter assertion. Section 7(a) of the Brief, referenced in this passage, is captioned "The Klebans' Undisclosed Negotiations with Federal Realty." Section 7(b) is captioned "The Klebans' Additional Undisclosed Negotiations with Kimco." *Id.* at 22, 24.

The evidence in the record shows that Albert Kleban and his son, Kenneth Kleban, began their efforts to sell Black Rock to a third party by meeting with Federal Realty executives in February 2013. As those negotiations, ultimately unsuccessful, were taking place, in March 2013 Albert Kleban also contacted Kimco's executives about a possible sale of Black Rock to Kimco. These efforts by the Klebans to sell Black Rock came to nothing. Negotiations with Federal Realty ceased on July 31, 2013, without Federal Realty ever having made an offer. Kimco made an offer on August 26, 2013, which Albert Kleban promptly rejected as insufficient. Thereafter, Regency emerged as the purchaser of majority interests in Sun Realty, which included Black Rock. The Klebans' first contact with Regency occurred through its broker in September 2013. The sale agreement to Regency was executed on October 17, 2013.

This undisputed chronology sets the stage for the Membership Interest Purchase Agreement between Defendant Albert Kleban and Plaintiff SLSJ, which SLSJ now challenges as the poisoned

fruit of Kleban's tainted fiduciary duty breach.  The Purchase Agreement is dated as of June 1, 2013.

On that date, Kleban had been trying to sell Black Rock to Federal Realty since February 2013, with

no success, and had just begun, in March 2013, to try to sell the property to Kimco.  On Plaintiff's

theory of the case, the Court is asked to conclude that if on June 1, 2013, Kleban had made these

particular circumstances known to Lois Jeruss, she would have rejected Kleban's offer to pay in

excess of $2 million for SLSJ's one-third interest in Sun Realty and instead "would have waited"

to "see what would happen."  When the Purchase Agreement closed, not later than July 31, 2013,

the situation was essentially the same: Federal Realty was about to drop out of the picture, and

Kimco had not yet submitted an offer (which, when made, Kleban rejected as insufficient).  Plaintiff

presses for the same conclusion: if on July 31, 2013, Jeruss had known these scant additional

circumstances, she would not have sold SLSJ's interest in Sun Realty to Albert Kleban, opting

instead to wait to see what would happen.

What *actually* happened in the real world was that neither Federal Realty nor Kimco bought

Black Rock or any interest in Sun Realty.  As of August 26, 2013, when Albert Kleban rejected the

Kimco offer, Black Rock remained Sun Realty's problematic only asset, with no prospective

purchasers in sight.  Whether in those circumstances the hypothetical Jeruss would have continued

a policy of wait and see is interesting but irrelevant.  The briefs for Plaintiff make much of the

amount Regency ultimately paid for 80 percent of Black Rock and additional Kleban-owned

properties, but these economic differentials do not play a legitimate role in this analysis.

The case at bar is concerned only with what Kleban had failed to tell Jeruss about a sale to

third parties at the time Jeruss engaged in the sale of SLSJ's interest in Sun Realty to Kleban.  That

failure of communication cannot include Regency, which was not even a gleam in the Klebans' eye

when SLSJ sold its Sun Realty interest to Albert Kleban in June 2013.  At that time Regency was awaiting discovery by Kleban's enterprising broker, which did not occur until September 2013.

VII

I have concluded that within the context of a sale of Sun Realty property like Black Rock to third parties, Albert Kleban owed a fiduciary duty to Sun Realty interest-owning members.  SLSJ's claim against Albert Kleban for breach of that fiduciary duty fails because SLSJ cannot show that the conduct by Kleban constituting the alleged breach was the proximate cause of the damage SLSJ claims to have suffered.

The damage SLSJ claims to have suffered is derived solely from a comparison of the value ascribed to Sun Realty when Albert Kleban bought SLSJ's one-third interest in Sun Realty in June 2013 with the allocated value of Sun Realty when the Kleban Entities (including Albert) sold an 80 percent interest in Black Rock and other Kleban-owned properties to Regency in October 2013. SLSJ's theory is that Albert Kleban's breach of his fiduciary duty to SLSJ as a Sun Realty member wrongfully deprived SLSJ of participation in the economically beneficial Regency transaction.  SLSJ would have enjoyed that participation, it theorizes, because if in June 2013 Kleban had fully disclosed to SLSJ his efforts to sell Sun Realty to third parties, SLSJ (and Lois Jeruss) would not have sold SLSJ's interest in Sun Realty to Albert Kleban.  Jeruss would instead have watched and waited, with SLSJ's Sun Realty interest intact, and consequently been able to share in the October millions dispensed by Regency.

Thus, on Plaintiff's theory of the case, Albert Kleban's non-disclosure of third party negotiations in June and July 2013 (when the sale by SLSJ to Albert Kleban closed) is the proximate cause of an economic deprivation suffered by SLSJ in October 2013.  While the Connecticut

Supreme Court has held that Kleban as a fiduciary bears the burden of proving his transaction with SLSJ was fair, SLSJ as the plaintiff in this action bears the burden of proving that Kleban's breach of the fiduciary duty proximately caused the damage of which SLSJ complains.

SLSJ's theory of causation would be plausible if the evidence showed that the Klebans' favorable agreement with Regency had been reached before SLSJ agreed to sell its Sun Realty interest to Albert Kleban; Kleban, in breach of his fiduciary duty, told SLSJ (and other Sun Realty members) *nothing* about efforts to sell Sun Realty to a third party or the impending transaction with Regency; Albert Kleban bought SLSJ's interest in Sun Realty on, say, June 1, for a price calculated on the basis of a valuation amount of Sun Realty as of that date; and Albert then sold his enhanced ownership in Sun Realty to Regency on June 2, for a price calculated on that date on the basis of a valuation amount of Sun Realty twice that of June 1.  But the evidence is quite different.  Albert Kleban told the attendees at the Family Meeting on April 29 that partnering with a real estate investment trust like Kimco might be an option for the hard-pressed Kleban-owned mall properties; that much is acknowledged by the deposition of James Blank, a witness produced by Plaintiff. SLSJ's sale of its Sun Realty interest to Albert Kleban was accomplished a month before the Klebans even learned of Regency's possible interest in the property, and two months before the Regency transaction was agreed to.

I will assume without deciding that Albert Kleban's role as a fiduciary obligated him to disclose to Sun Realty interest-owning members on a day-to-day basis Kleban's efforts to sell the property to third parties.  The problem with SLSJ's present action is that at the time of Kleban's negotiations and transaction with Regency, SLSJ was no longer a member of Sun Realty.  SLSJ closed on its agreement with Albert Kleban not later than July 31, 2013.  On that day, Kleban's

disclosures would have been limited to advising that Federal Realty was not going to purchase an interest in Sun Realty and Kimco had not made an offer. SLSJ is not in a position to characterize Albert Kleban's failure to disclose the Regency transaction as a proximate cause of SLSJ's financially disadvantageous transaction with Kleban, since Regency's financially rewarding appearance on the scene lay well in the future. When the Klebans' broker first introduced them to Regency, SLSJ was no longer a member of Sun Realty, and had not been for over two months (June 1 to mid-September).

In these circumstances, I am unable to conclude that any breach by Defendant Albert Kleban of his fiduciary duty was the proximate cause of compensable damage to Plaintiff SLSJ. I use "proximate cause" in the classic common-law sense, defined by Justice Ginsburg in *CSX Transportation, Inc. v. McBride*, 564 U.S. 685 (2011):

> The *term* "proximate cause" is shorthand for a concept: Injuries have countless causes, and not all should give rise to legal liability. What we mean by the word "proximate," one noted jurist has explained, is simply this: Because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point.

564 U.S. at 692 (emphasis in original) (citations, some internal quotation marks, and ellipsis omitted).

Applying these principles to the case at bar, I decline to trace Albert Kleban's fiduciary duty liability beyond the termination of SLSJ's membership interest in Sun Realty, that being the interest upon which SLSJ's fiduciary relationship with Albert Kleban depended. It follows that Plaintiff's claim against Kleban for damages based on breach of fiduciary duty fails for lack of proximate causation.

## VIII

The briefs and arguments of the parties dispute whether Albert Kleban paid SLSJ a fair price in July 2013, when Kleban purchased SLSJ's one-third interest in Sun Realty.

In Part V of this Ruling, the Court held that at that time, a fiduciary relationship existed between Albert Kleban and Sun Realty members like SLSJ. "Once a fiduciary relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary," a burden which requires proof "by clear and convincing evidence," *Konover*, 228 Conn. at 229-30 (citations omitted).

The fairness *vel non* of what Albert Kleban paid SLSJ for its interest in Sun Realty in July 2013 may have been mooted by the Court's conclusion in Part VII that Albert Kleban's conduct did not proximately cause any damage or loss triggered by Kleban's transaction with Regency in October 2013. However, for the sake of completeness, I consider whether Albert Kleban, who owed SLSJ a fiduciary duty in July 2013, has proved that his purchase of the Sun Realty interest from SLSJ at that time was the product of fair dealing.

The supplemental brief for Albert Kleban vigorously defends the fairness of that SLSJ/Kleban transaction. His argument is essentially in the alternative. Kleban denies he was ever in a fiduciary relationship with SLSJ or Lois Jeruss, a denial I am unable to accept. Kleban's alternative contention is that there was nothing unfair about his purchase of SLSJ's minority interest in Sun Realty.

Albert Kleban's contention that his transaction with SLSJ was *fair* focuses upon the sole basis for Plaintiff's claim that it was *unfair,* principally because the consideration paid by Kleban was *inadequate.* Specifically, SLSJ contrasts the amount of $30,609,665, the agreed value of 100 percent of Sun Realty for purposes of the Regency transaction, with $23,082,960, the "valuation of

31

the same property used to determine the price Kleban paid on July 29, 2013, to purchase SLSJ's 33.33 percent interest in Sun Realty," and concludes that this "effectively realized" for Albert Kleban "a $2.5 million dollar gain on the 33.33 percent interest he purchased from SLSJ," that gain to Kleban being "one-third of *the differential between the respective valuations* used as the basis for the pricing in the respective transactions with SLSJ and Regency."  Doc. 103, at 10 (emphasis added).  I will refer to these amounts as "the SLSJ Valuation" and "the Regency Valuation."

Albert Kleban's contention on this aspect of the case is that the difference in these two valuations of Sun Realty is not probative of the fairness of the price Kleban paid for SLSJ's interest in Sun Realty or the adequacy of the payment.  In that regard, Kleban stresses that this is not a case where a fiduciary buys a property from his beneficiary for a low price, and one week later sells the same property to a third party at twice the price the fiduciary paid the beneficiary for it.  That hypothetical fiduciary might have some difficulty in persuading a court that he dealt fairly with his beneficiary.  However, the case at bar does not involve two uncomplicated sales of the same property, where money changes hands, title passes, and the striking differential between the two paid purchase prices supports a reasonable inference that the earlier transaction was unfair to the beneficiary seller.  In this case, Plaintiff does not ask the Court to condemn Kleban's purchase of SLSL's interest in Sun Realty as unfair on the basis of a suspicious differential between purchase prices.  Rather, SLSJ relies upon a difference between valuations of that property, upon which the purchase prices in question were calculated.

The case for Albert Kleban is that factors exist which explain why the Regency Valuation of Sun Realty was higher than the SLSJ Valuation, while not impugning the fairness of the price Kleban paid SLSJ.  The SLSJ Valuation was generated in the relatively narrow context of Albert

Kleban's purchase of SLSJ's minority interest in Sun Realty.  The Regency Valuation, Kleban notes

in his Supplemental Brief, "reflects Regency's willingness to pay a premium to purchase Sun Realty

as part of a larger portfolio of properties that included other guarantees promised by the Klebans,"

so that "the Regency Valuation was meant to value Regency's purchase of a *majority* interest in a

portfolio of properties." Doc. 130, at 8.  "The inclusion of other properties," Kleban's argument

continues, "resulted in a greater valuation because Regency was willing to pay a premium for

properties that housed national credit tenants not likely to be effected [sic] by the economic

downturn of the brick-and-mortar market."  *Id.* at 9.  In addition, "the Klebans gave Regency

personal guarantees and other commitments that added further value to the Regency Valuation."  *Id*.

These several factors, which increased the Regency Valuation, were not present in the transaction

between Albert Kleban and SLSJ, nor were such factors reflected in the SLSJ Valuation.

These factual distinctions, which are not disputed, undermine the probative effect of the

valuation differential on the issues of the fairness of the price or adequacy of the payment Albert

Kleban made to SLSJ for the Sun Realty minority interest.  Moreover, the record contains two

evidentiary indications that price was fair and the payment adequate.  First, at the same time Albert

Kleban purchased SLSJ's 33.33 percent interest in Sun Realty, he purchased an 11 percent interest

in Sun Realty from Allan Kleban, another Kleban family cousin,  an attorney and construction

company executive.  While the valuation and pricing terms of Allan Kleban's sale of his Sun Realty

interest to Albert were the same as the terms of SLSJ's sale to Albert, Allan Kleban has never

claimed that he did not receive fair value for his interest.  Kleban family members do not seem

inhibited from proclaiming they were wronged.  Second, when in 2012 Lois Jeruss made a gift of

a 7.4% membership in SLSJ to her daughters, she obtained for gift tax purposes a professional

appraisal that the value of Jeruss's one-third interest in Sun Realty was $2,149,983, an amount not materially different from the sum SLSJ and Jeruss received from Albert Kleban when that purchase was consummated in July 2013.  This contemporaneous payment and contemporaneous appraisal furnish significant evidence of the fairness of the transaction in suit and the adequacy of Albert Kleban's payment to SLSJ for the minority interest in Sun Realty SLSJ sold to Kleban in July 2013.

An additional factor is found in *Konover*, which holds that determination of "whether a particular transaction is fair" requires "a showing by the fiduciary" that "the principal had competent and independent advice before completing that transaction." 228 Conn. at 228.  In the case at bar, Lois Jeruss chose not to attend the Kleban Family Meeting on April 29, 2013, and accordingly did not hear Albert Kleban's account of possible discussions with potential third-party purchasers, but the record shows that she was represented throughout by a Chicago attorney, Carleen Schreder, and with respect to a possible sale of SLSJ's interest in Sun Realty, by a Connecticut attorney, Richard Hoffman.  Schreder was active during the relevant years in the protection of Jeruss's interests.  There is no evidence that Albert Kleban failed to answer any question or furnish any information requested by Attorney Schreder or Attorney Hoffman.  Plaintiff correctly argues that a fiduciary beneficiary's representation by counsel does not relieve the *fiduciary* from the obligation of full and frank disclosure of relevant information about a transaction.  However, the Connecticut Supreme Court saw fit in *Konover* to include the *beneficiary's* receipt of competent and independent advice as a factor in determining whether the transaction is fair, and in this case that factor weights in favor of the Defendant.

On the record in this case, I conclude that Defendant Albert Kleban, who had a fiduciary relationship with Plaintiff SLSJ at the times when SLSJ owned a membership interest in Sun Realty,

has proved by clear and convincing evidence that he engaged in fair dealing with SLSJ during the course of the purchase and sale transaction in July 2013.   Kleban makes that proof by (1) undermining the probative effect of the valuation differential as support for Plaintiff's claims that the transaction was unfair and the consideration paid by Defendant inadequate; (2) showing that the nature of that valuation differential, and contemporaneous amounts derived from other sources, militate in Defendant's favor on those issues; and (3) showing that Plaintiff was represented at the relevant times by independent attorneys, who made no discernible objection or claim with respect to the procedure or substance of the transaction in suit.

This conclusion necessitates summary judgment in Defendant's behalf on the cross-motions dealing with breach of fiduciary duty claims.   It is an alternative basis to that contained in Part VII, dealing with proximate causation.

## IX

For the foregoing reasons, the Court makes this Order:

1.  Defendants' Motion for Partial Summary Judgment [Doc. 87] is GRANTED.

2.  Plaintiff's Cross-Motion for Partial Summary Judgment [Doc. 113] is DENIED.

It is SO ORDERED.

Dated:   New Haven, Connecticut
         October 6, 2020


                                    /s/Charles S. Haight, Jr._____
                                    CHARLES S. HAIGHT, JR.
                                    Senior United States District Judge

35